**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ST. LUCIE COUNTY FIRE DISTRICT FIREFIGHTERS' PENSION TRUST FUND and BOYNTON BEACH FIREFIGHTERS' PENSION FUND on behalf of themselves and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>STERICYCLE, INC., CHARLES A. ALUTTO, DAN GINNETTI, BRENT ARNOLD, FRANK TEN BRINK, RICHARD KOGLER, MARK C. MILLER, JACK W. SCHULER, LYNN DORSEY BLEIL, THOMAS D. BROWN, THOMAS F. CHEN, RODNEY F. DAMMEYER, WILLIAM K. HALL, JOHN PATIENCE, MIKE S. ZAFIROVSKI, MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, GOLDMAN, SACHS & CO., J.P. MORGAN SECURITIES LLC, HSBC SECURITIES (USA) INC., MITSUBISHI UFJ SECURITIES (USA), INC., SANTANDER INVESTMENT SECURITIES INC., SMBC NIKKO SECURITIES AMERICA, INC., and U.S. BANCORP INVESTMENTS, INC.,<br><br>Defendants. | No. 1:16-cv-07145<br><br>CLASS ACTION<br><br>**AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED<br><br>**ECF CASE** |

Plaintiffs St. Lucie County Fire District Firefighters' Pension Trust Fund and Boynton Beach Firefighters' Pension Fund (collectively "Plaintiffs"), by and through their undersigned counsel, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, *inter alia*, counsel's investigation, which includes review and analysis of: (i) regulatory filings made by Stericycle, Inc. ("Stericycle" or the "Company") with the United States

Securities and Exchange Commission ("SEC"); (ii) press releases and media reports issued by and disseminated by Stericycle; (iii) other publicly available information concerning Stericycle; and (d) interviews with former Stericycle employees and other individuals with relevant knowledge.

## INTRODUCTION

1.     This securities class action brought on behalf of (i) all purchasers of Stericycle publicly traded securities[1] between February 7, 2013 and July 28, 2016, inclusive (the "Class Period); and (ii) all those who purchased securities in Stericycle's public offering of 7,700,000 depositary shares on or around September 15, 2015, which included 700,000 shares sold pursuant to an overallotment option granted to the offering's underwriters (the "Offering").  The claims asserted herein are alleged against (i) Stericycle; (ii) certain of the Company's current and former senior executives; (iii) the members of Stericycle's board of directors, each of which signed the Registration Statement (defined below) for the Offering; and (iv) the underwriters of the Offering (collectively, the "Defendants").  The claims arise under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act"), and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.     Located in Lake County, Illinois, Stericycle's primary business is as an international waste management and disposal company that specializes in collecting and disposing regulated waste, including medical, pharmaceutical, and hazardous waste.  As of the first quarter of 2016, Stericycle derives 63% of its revenues from small quantity ("SQ") customers. Historically, the Company has focused its growth strategy on cultivating SQ customers as their accounts earn much higher gross margins than the accounts of large quantity ("LQ") customers.

---

[1] This includes Stericycle's common stock and its depositary shares, each of which represents a 1/10th interest in a share of the Company's 5.25% Series A Mandatory Convertible Preferred Stock.

3.      Throughout the Class Period, the Defendants repeatedly touted, and misrepresented, the Company's financial health and growth prospects. In so doing, they concealed from investors the fact that a material portion of Stericycle's revenues was derived from fraudulent overcharging of its SQ customers. Specifically, the Defendants knew or should have known that the Company systematically and routinely increased the rates it charged SQ customers in violation of their contracts and without notice.

4.      The Company's SQ customers have a standard service agreement with Stericycle that provides for the payment of a fixed subscription fee in exchange for the collection and disposal of their regulated waste for periods ranging from one to five years. Each of these contracts had a standard provision that entitled Stericycle to raise a customer's rates in only two circumstances: (i) to account for operational changes the Company implemented to comply with changes in the law; and (ii) to cover increase costs borne by the Company. These contracts would automatically renew upon their expiration unless the customer provided sixty days written notice of termination before the renewal date.

5.      Despite the fact that the SQ customer contracts permitted the Company to raise its rates under limited and specified circumstances, the Company, with the Defendants knowledge, engaged in a systematic and deliberate scheme to regularly raise the rates charged to its SQ customers without justification or notice to its customers. The Company would simply increase the amount of a customer's next invoice and hope the customer would not notice the increase or would pay it without complaint. Although the exact rate increases varied between customers, the Company would raise customer rates by as much as 18% every six months. These increases were not tied to either operational changes or costs increases as required by the SQ customer contracts.

3

6.     While many customers simply paid their improperly inflated invoices, other customers complained. These customers were referred to a "Retention Department" where Stericycle employees attempted to retain the customers' business through coercive tactics, including threatening angry customers with large liquidated damage charges if they canceled their contracts and offering purported price reductions that would still require customers to pay more than they had initially agreed to pay in their contracts.

7.     Defendants continued to tout the Company's financial results and consistent growth without informing investors that much of Stericycle's revenue and growth were built on this foundation of fraud. Customer attrition resulting from these fraudulent billing practices began to materially affect the Company's performance no later the third quarter of 2015.

8.     On October 22, 2015, Stericycle released disappointing financial results for the third quarter of 2015, lowered its 2015 adjusted and cash EPS guidance by 5.7% and 4.3% respectively, and issued 2016 guidance that was below analyst expectations. On this news, the Company's common stock price declined 19% for a total market capitalization loss of over $2.4 billion. Its depository shares fell 13% for an aggregate loss of over $106 million. Then, on April 28, 2016, Stericycle disclosed disappointing financial results for the first quarter of 2016 and lowered its 2016 adjusted EPS guidance to $4.90 - $5.05 from $5.26 - $5.33. On this news, the Company's stock price declined a further 21.5% for an additional market capitalization loss of over $2.2 billion. Stericycle's depositary shares fell 15.4% for an additional aggregate loss of over $108 million. Finally, on July 28, 2016, Stericycle disclosed disappointing financial results for the second quarter of 2016 and lowered its 2016 EPS guidance to $4.68 - $4.75 from $4.90 - $5.05. On this news, the Company's common stock price declined a further 14.8% for an additional

market capitalization loss of over $1.3 billion. Stericycle's depositary shares fell 12% for an additional aggregate loss of over $78 million.

9. Defendants attempted to blame these poor results on a variety of things, including energy prices, increased costs, difficulties in integrating a large acquisition, and a softer hazardous waste market. However, in truth, Stericycle's poor performance in recent months is largely attributable to customer attrition spurred by the Company's fraudulent billing practices.

## JURISDICTION AND VENUE

10. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5 as well as Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l, and 77o. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, Section 22 of the Securities Act, 15 U.S.C. § 77v, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

11. Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b). Stericycle maintains its executive offices in this District and many of the acts and conduct that constitute the violations of law complained of herein, including dissemination to the public of materially false and misleading information, occurred in and/or were issued from this District. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

### A. Plaintiffs

12. Plaintiff St. Lucie County Fire District Firefighters' Pension Trust Fund ("St. Lucie") is a pension fund headquartered in St. Lucie, Florida for the benefit of current and former

firefighters of the St. Lucie County Fire District and their families. As set forth in the attached Certification, St. Lucie purchased Stericycle depositary shares on the NASDAQ Global Select Market during the Class Period, including pursuant to the Offering, and suffered damages as a result of the violations of the federal securities laws alleged herein.

13. Plaintiff Boynton Beach Firefighters' Pension Fund ("Boynton Beach") manages public pension fund assets for current and retired firefighters in Boynton Beach, Florida. Boynton Beach purchased shares of Stericycle common stock on the NASDAQ Global Select Market during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

### B. Corporation Defendant

14. Defendant Stericycle is a Delaware corporation that primarily derives its revenue from collecting and disposing regulated waste. Stericycle maintains its principal executive offices at 28161 North Keith Drive, Lake Forest, Illinois 60045. Stericycle's common stock and depositary shares trade on the NASDAQ Global Select Market, which is an efficient market, under the ticker symbols "SRCL" and "SRCLP" respectively. Stericycle currently has over 84 million shares of common stock outstanding; as of March 31, 2016, Stericycle had 7,700,000 depositary shares outstanding, each representing a $1/10^{th}$ interest in a share of Stericycle's 5.25% Series A Mandatory Convertible Preferred Stock.

### C. Officer Defendants

15. Defendant Charles A. Alutto ("Alutto") is, and was at all relevant times during the Class Period, a director, the President, and the CEO of Stericycle. Alutto has been employed by the Company since May 1997 and became an executive officer in February 2011, serving as President, Stericycle USA. Alutto signed the Registration Statement for the Offering and is

therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials (defined below).

16.     Defendant Dan Ginnetti ("Ginnetti") has served as Stericycle's CFO since August 1, 2014.  Prior to becoming the Company's CFO, Ginnetti served as the Company's Vice President of Corporate Finance and has been employed by the Company since 2003.  Defendant Ginnetti signed the Registration Statement for the Offering and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials.

17.     Defendant Brent Arnold ("Arnold") has served as Stericycle's Executive Vice President and COO since January 1, 2015.  He has been employed by Stericycle since April 2005 and became an executive officer in April 2014, serving as President, Stericycle USA/Canada.

18.     Defendant Frank ten Brink ("ten Brink") served as Stericycle's CFO from 1997 to August 1, 2014.  After transitioning from his CFO role, he became Stericycle's Senior Vice President, Mergers and Acquisitions.

19.     Defendant Richard Kogler ("Kogler") served as Stericycle's COO from 1999 until January 1, 2015.  After transitioning from his COO role, Kogler became Stericycle's Senior Vice President, International.

20.     Defendants Alutto, Ginnetti, Arnold, ten Brink, and Kogler are collectively referred to herein as the "Officer Defendants."  The Officer Defendants, because of their positions with Stericycle, possessed the power and authority to control the contents of Stericycle's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors.  Each of the Officer Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

7

Because of their positions and access to material non-public information available to them, each of the Officer Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

### D. Director Defendants

21. Defendant Mark C. Miller ("Miller") is, and was at all relevant times, a director of Stericycle as well as its Executive Chairman. Miller signed the Registration Statement for the Offering and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials.

22. Defendant Jack W. Schuler ("Schuler") is, and was at all relevant times, a director of Stericycle. Schuler signed the Registration Statement for the Offering and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials.

23. Defendant Lynn Dorsey Bleil ("Bleil") is, and was at all relevant times, a director of Stericycle. Bleil signed the Registration Statement for the Offering and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials.

24. Defendant Thomas D. Brown ("Brown") is, and was at all relevant times, a director of Stericycle. Brown signed the Registration Statement for the Offering and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials.

25. Defendant Thomas F. Chen ("Chen") is, and was at all relevant times, a director of Stericycle. Chen signed the Registration Statement for the Offering and is therefore liable under

the Securities Act for the untrue and misleading statements and omissions in the Offering Materials.

26.     Defendant Rodney F. Dammeyer ("Dammeyer") is, and was at all relevant times, a director of Stericycle.  Dammeyer signed the Registration Statement for the Offering and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials.

27.     Defendant William K. Hall ("Hall") is, and was at all relevant times, a director of Stericycle.  Hall signed the Registration Statement for the Offering and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials.

28.     Defendant John Patience ("Patience") is, and was at all relevant times, a director of Stericycle.  Patience signed the Registration Statement for the Offering and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials.

29.     Defendant Mike S. Zafirovski ("Zafirovski") is, and was at all relevant times, a director of Stericycle.  Zafirovski signed the Registration Statement for the Offering and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials.

30.     Defendants Alutto, Miller, Schuler, Bleil, Brown, Chen, Dammeyer, Hall, Patience, and Zafirovski are collectively referred to herein as the "Director Defendants."

**E.     Underwriter Defendants**

31.     Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") was an underwriter of the Offering described herein.  As an underwriter of the Offering, Merrill Lynch was responsible for ensuring the truthfulness and accuracy of the various statements contained in

or incorporated by reference into the Offering Materials. Merrill Lynch sold 2,100,000 depositary shares in the Offering, not including the exercise of its overallotment option.

32.     Goldman, Sachs & Co. ("Goldman") was an underwriter of the Offering described herein. As an underwriter of the Offering, Goldman was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials. Goldman sold 2,100,000 depositary shares in the Offering, not including the exercise of its overallotment option.

33.     J.P. Morgan Securities LLC ("JP Morgan") was an underwriter of the Offering described herein. As an underwriter of the Offering, JP Morgan was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials. JP Morgan sold 1,050,000 depositary shares in the Offering, not including the exercise of its overallotment option.

34.     HSBC Securities (USA) Inc. ("HSBC") was an underwriter of the Offering described herein. As an underwriter of the Offering, HSBC was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials. HSBC sold 700,000 depositary shares in the Offering, not including the exercise of its overallotment option.

35.     Mitsubishi UFJ Securities (USA), Inc. ("Mitsubishi") was an underwriter of the Offering described herein. As an underwriter of the Offering, Mitsubishi was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials. Mitsubishi sold 262,500 depositary shares in the Offering, not including the exercise of its overallotment option.

36.     Santander Investment Securities Inc. ("Santander") was an underwriter of the Offering described herein.  As an underwriter of the Offering, Santander was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.  Santander sold 262,500 depositary shares in the Offering, not including the exercise of its overallotment option.

37.     SMBC Nikko Securities America, Inc. ("SMBC") was an underwriter of the Offering described herein.  As an underwriter of the Offering, SMBC was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.  SMBC sold 262,500 depositary shares in the Offering, not including the exercise of its overallotment option.

38.     U.S. Bancorp Investments, Inc. ("US Bancorp") was an underwriter of the Offering described herein.  As an underwriter of the Offering, US Bancorp was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.  US Bancorp sold 262,500 depositary shares in the Offering, not including the exercise of its overallotment option.

39.     Merrill Lynch, Goldman, JP Morgan, HSBC, Mitsubishi, Santander, SMBC, and US Bancorp are collectively referred to herein as the "Underwriter Defendants."  The Underwriter Defendants sold and distributed securities in the Offering.

## **BACKGROUND**

40.     Stericycle's primary business is as an international waste management and disposal company that specializes in the collection and disposal of regulated and specialized waste, including medical, pharmaceutical, and industrial hazardous waste, as well as sensitive and confidential documents.  Stericycle operates in 21 countries and its worldwide network includes 253 processing facilities, 358 transfer sites, and 137 other service facilities.

41.     Although most of Stericycle's customers are in the healthcare business, the Company also serves retailers, manufacturers, financial service providers, professional services providers, and governmental entities.  The majority of the Company's customers are considered SQ customers.  These customers are generally small businesses, including those in the medical and industrial fields, that generate low volumes of regulated wastes for disposal.  The Company's domestic SQ business enjoys a higher gross margin and is vastly more profitable than the LQ business. Thus, Stericycle has a stated business model of focusing on small customers, which successfully resulted in the Company deriving 63% of its revenues from SQ customers in the first quarter of 2016.

42.     Each of Stericycle's customers had a contract with the Company that set forth the rate it would be charged for Stericycle's services.  However, throughout the Class Period, Stericycle inflated its revenues from SQ customers by routinely, systematically, and fraudulently increasing the fees it charged these customers.  Despite having no valid contractual basis to do so, Stericycle would increase SQ customers' rates on a regular basis and without notice to the customers in order to meet revenue and growth projections.  If customers discovered these unauthorized rate increases and complained to the Company, they would be threatened with large liquidated damages if they cancelled their contracts.  Many customers were strong-armed into agreeing to new contracts that provided for a lower rate than they were currently being overcharged, but this rate would still be higher than what was set forth in their original contract.

43.     Through this scheme, Stericycle defrauded thousands of customers and perpetuated a misleading image of a successful and growing company.  However, once customers became aware of Stericycle's abusive practices, many of them left the Company and deprived Stericycle of their continued revenue stream, thus materially impacting the Company's financial results.

12

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

44.     The Class Period begins on February 7, 2013, the first trading day after Stericycle released its financial results for the fourth quarter and full year of 2012 in a press release and held a conference call to discuss those results.  In the press release, the Company reported its full year 2012 results as follows:

> Revenues for the full year 2012 were $1.91 billion, up 14.1% from $1.68 billion in 2011. Acquisitions contributed approximately $140.3 million to the current year's growth in revenues.  Revenues increased 15.4% compared to the prior year when adjusted for unfavorable foreign exchange impacts of $21.8 million.  Gross profit was $857.3 million, up 12.7% from $760.7 million in 2011.  Gross profit as a percent of revenue was 44.8% compared with 45.4% in 2011.  Earnings per diluted share increased 14.6% to $3.08 in 2012 from $2.69 in 2011.  Non-GAAP earnings per diluted share, when adjusted for various items, increased 15.4% to $3.30 from $2.86.

45.     On the conference call, Defendant ten Brink reported Stericycle's fourth quarter 2012 results as follows:

> Revenues were $503.6 million, up 12.8% from $446.6 million in Q4 of '12. And internal growth, excluding returns and recall revenues, was up 8.4%. Domestic revenues were $355.6 million, of which $332.7 million was domestic regulated waste and compliance services, and $22.8 million was recalls and returns. Domestic internal growth, excluding recalls and returns revenue, was up 10%, consisting of SQ up 11% and LQ up 9%. International revenues were $148.1 million, and internal growth, adjusted for unfavorable exchange impact of $2.3 million, was up 5%. Acquisitions contributed $31.1 million to the growth in the quarter.
>
> The gross profit was $227 million, or 45.1% of revenues. SG&A expense, including amortization, was $95.6 million, or 19% of revenues. Net interest expense was $13 million. Net income attributable to Stericycle was $70.1 million, or $0.80 per share on an as reported basis, and $0.88 adjusted for acquisitions and other non-recurring expenses.

46.     Defendant Alutto added that "the main growth drivers continue.  SQ being SteriSafe. Clinical services on the international front. And the sharps management service on the LQ side of the business."

13

47.     Moreover, Defendant Kogler commented on an investigation by the New York Attorney General, who alleged that the Company did not follow its customer contract terms and stated that "[w]e disagreed with him."

48.     On February 28, 2013, the Company filed its Form 10-K for the year ended December 31, 2012 in which it described in more detail the Company's financial results for 2012. In this 10-K, Stericycle explained that it targets SQ customers as a growth area because the Company believes their fear of failing to comply with applicable regulations is "the basis for the higher gross margins that we have achieved with our [SQ] customers relative to our [LQ] customers." Stericycle also claimed that one of its competitive strengths was its "Diverse Customer Base and Revenue and Cost Stability" as the Company is "generally protected from the cost of regulatory changes or increases in fuel, insurance or other operating costs because our regulated waste contracts typically allow us to adjust our prices to reflect these cost changes." Moreover, Stericycle claimed that it has "been able to maintain high customer retention through excellent customer service" and "determined that our customer relationships have useful lives from 14 to 40 years based upon the type of customer, with a weighted average remaining useful life of 26.5 years."

49.     The statements set forth in ¶¶ 44-48 above were materially false and/or misleading because Stericycle was engaged in a systematic scheme to unilaterally and fraudulent increase the billing rates it charged its SQ customers without notice and in violation of those customer contracts. As a result of this scheme, the Company's financial results and growth were artificially inflated. Moreover, the Defendants knew they were violating their customer contracts, as alleged by the New York Attorney General. Defendants also knew that Stericycle was not providing excellent customer service and that this scheme was undermining the useful life of its customer

14

relationships. Finally, Defendants knew that the Company's billing practices were, in large part, the basis for the gross margins generated from Stericycle's SQ customers.

50.     On April 24, 2013, after the close of the financial markets, the Company released its financial results for the first quarter of 2013 in a press release and held a conference call to discuss those results.   On the conference call, Defendant ten Brink reported the Company's earnings as follows:

> Revenues were $513.8 million, up 11.7% from $460.1 million in Q1 of '12. And internal growth, excluding returns and recall revenues, was up 8.1%. Domestic revenues were at $363.6 million, of which $341.1 million was domestic regulated waste and compliance services, and $22.5 million was recalls and returns. Domestic internal growth, excluding recalls and returns revenues, was up over 9%, consisting SQ up 10% and LQ up 8%. International revenues were $150.2 million, an internal growth adjusted for unfavorable exchange impact of $4.2 million was up 5.4%. Acquisitions contributed $37.1 million to the growth in the quarter. Gross profit was $232.1 million, or 45.2% of revenues. SG&A expense, including amortization, was $97.7 million, or 19% of revenues. Net interest expense was $13.4 million, and net income attributable to Stericycle was $74.6 million, or $0.85 per share on an as-reported basis, and $0.88 adjusted for acquisition and other nonrecurring expenses.

51.     Moreover, ten Brink commented on customer churn and portrayed it as a non-issue:

> Really, we don't see a major difference in churn. We have a very good revenue retention, about 95%. And the rest of 5% leaves us some customers don't pay their bills. Obviously we stop service. There's doctors, dentists, that close their shops and retire, some consolidate. That's a 2%, and then your normal revenue, maybe 1% or 2%, is obviously it's a competitive market, and we lose some to competition.

52.     Defendant Kogler also commented on various lawsuits that alleged the Company was engaged in the systematic fraudulent billing practices alleged herein and assured investors that "we think the lawsuits are without merit."

53.     On May 9, 2013, the Company filed its Form 10-Q for the quarter ended March 31, 2013 in which it described in more detail the Company's financial results for the first quarter of 2013.   Moreover, in this 10-Q, the Company stated that it had "determined that our customer relationships have useful lives from 14 to 40 years based upon the type of customer, with a

15

weighted average remaining useful life of 26.2 years." The Company also claimed that it "operated in accordance with the terms of our customer contracts" and class action complaints alleging otherwise "are without merit."

54.     The statements set forth in ¶¶ 50-53 above were materially false and/or misleading because the Company's financial results were artificially inflated as a result of the Company's systematic practice of unilaterally raising the rates it charged its SQ customers without notice and in violation of those customers' contracts. Moreover, the Defendants knew that many of the customers that "don't pay their bills" were leaving the Company after they discovered Stericycle's fraudulent billing practices and that the lawsuits concerning the billing scheme did, in fact, have merit. Defendants also knew that this scheme was undermining the useful life of its customer relationships.

55.     On July 24, 2013, after the close of the financial markets, the Company released its financial results for the second quarter of 2013 in a press release and held a conference call to discuss those results. On the conference call, Defendant ten Brink reported the Company's earnings as follows:

> Revenues were $526.5 million, up 12.3% from $468.9 million in the second quarter of 2012. And internal growth, excluding returns and recall revenues, was up 7.5%. Domestic revenues were $370.2 million, of which $346.5 million was domestic regulated waste and compliance services, and $23.7 million was recalls and returns.

> Domestic internal growth excluding recalls and returns revenue was up 7%, consisting of SQ up 8% and LQ up 6%.

> International revenues were $156.3 million and internal growth adjusted for unfavorable exchange impact of $4.1 million was up approximately 9%.

> Acquisitions contributed $34.1 million to the growth in the quarter.

> The gross profit was $237.9 million or 45.2% of revenues and SG&A expense including amortization was $100.6 million or 19.1% of revenues.

Net interest expense was $12.9 million and net income attributable to Stericycle was $78 million or $0.89 per share on an as-reported basis and $0.93 adjusted for acquisition and other nonrecurring expenses.

56.     On August 8, 2013, the Company filed its Form 10-Q for the quarter ended June 30, 2013 in which it described in more detail the Company's financial results for the second quarter of 2013.  Moreover, in this 10-Q, the Company stated that it had "determined that our customer relationships have useful lives from 14 to 40 years based upon the type of customer, with a weighted average remaining useful life of 26.1 years."  The Company also claimed that it "operated in accordance with the terms of our customer contracts" and class action complaints alleging otherwise "are without merit."

57.     The statements set forth in ¶¶ 55-56 above were materially false and/or misleading because the Company's financial results were, in part, attributable to Stericycle's fraudulent scheme to unilaterally increase the billing rates for its SQ customers without notice and in violation of those customers' contracts.  Defendants also knew that this scheme was undermining the useful life of its customer relationships.  Furthermore, Defendants knew the Company was not operating in accordance with the terms of its customer contracts and that class action complaints regarding Stericycle's fraudulent billing practices did have merit.

58.     On October 23, 2013, after the close of the financial markets, the Company released its financial results for the third quarter of 2013 in a press release and held a conference call to discuss those results.  On the conference call, Defendant ten Brink reported the Company's earnings as follows:

> Revenues were $534.6 million, up 11.3% from $480.5 million in Q3 of 2012, and internal growth, excluding returns and recalled revenues, was up 6.5%. Domestic revenues were $378.1 million, of which $353 million was domestic regulated waste and compliance services and $25.1 million was recalls and returns. Domestic internal growth, excluding recalls and returns revenues, was up 6.4%, consisting of SQ up 8% and LQ up 5%. International revenues were $156.5 million, and internal growth adjusted for unfavorable exchange impact of $5.3 million was up

17

approximately 7%. Acquisitions contributed $34.1 million to the growth in the quarter.

Gross profit was $241.4 million or 45.2% of revenues. SG&A expense, including amortization, was $102.3 million or 19.1% of revenues. Net interest expense was $13.3 million, and net income attributable to Stericycle was $80.5 million or $0.92 per share on an as-reported basis and $0.96 adjusted for acquisition and other nonrecurring expenses.

59.     In response to a question, Defendant Alutto confirmed that SQ domestic organic growth for the quarter was 8% and stated that the percentage attributable to price increases was "a little bit over the CPI."

60.     On November 7, 2013, the Company filed its Form 10-Q for the quarter ended September 30, 2013 in which it described in more detail the Company's financial results for the third quarter of 2013.  Moreover, in this 10-Q, the Company stated that it had "determined that our customer relationships have useful lives from 14 to 40 years based upon the type of customer, with a weighted average remaining useful life of 25.9 years."   The Company also claimed that it "operated in accordance with the terms of our customer contracts" and class action complaints alleging otherwise "are without merit."

61.     The statements set forth in ¶¶ 58-60 above were materially false and/or misleading because the Company's financial results were artificially inflated by the Company's systematic practice of increasing the rates it charged its SQ customers in violation of those customers' contracts.  Moreover, the statement that the growth attributable to price increases was slightly higher than the CPI was false and/or misleading because the Company was systematically increasing the rates it charged SQ customers by as much as 18% every six months, whereas the CPI grew by only 1.5% in 2013.  Defendants also knew that this scheme was undermining the useful life of its customer relationships.  Furthermore, Defendants knew the Company was not

operating in accordance with the terms of its customer contracts and that class action complaints regarding Stericycle's fraudulent billing practices did have merit.

62.     On February 5, 2014, after the close of the financial markets, Stericycle released its financial results for the fourth quarter and full year of 2013 in a press release and held a conference call to discuss those results.  In the press release, the Company reported its full year 2013 results as follows:

> Revenues for the full year 2013 were $2.14 billion, up 12.0% from $1.91 billion in 2012. Acquisitions contributed approximately $137.6 million to the current year's growth in revenues.  Revenues increased 13.0% compared to the prior year when adjusted for unfavorable foreign exchange impacts of $19.0 million.  Gross profit was $964.6 million, up 12.5% from $857.3 million in 2012.  Gross profit as a percent of revenues was 45.0% compared with 44.8% in 2012.  GAAP earnings per diluted share increased 15.7% to $3.56 from $3.08 in 2012.  Non-GAAP earnings per diluted share, when adjusted for various items identified in the second of the following tables, increased 12.4% to $3.75 from $3.34.

63.     On the conference call, Defendant ten Brink reported Stericycle's fourth quarter 2013 results as follows:

> Revenues were $567.9 million, up 12.8% from $503.6 million in the fourth quarter of 2012, and internal growth, excluding returns and recall revenues, was up 7.1%. Domestic revenues were $394.6 million, of which $368.2 million was domestic regulated waste and compliance services, and $26.4 million was recalls and returns. Domestic internal growth, excluding recalls and return revenues, was up 7.8%, consisting of SQ up 9% and LQ up 7%.

> International revenues were $173.3 million, and internal growth adjusted for unfavorable exchange impact of $5.4 million, was up approximately 6%.

> Acquisitions contributed $32.4 million to the growth in the quarter.

> Gross profit was $253.3 million, or 44.6% of revenues. Adjusted for litigation settlements, gross profit was 45% of revenues.

> SG&A expense, including amortization, was $109.9 million, or 19.3% of revenues. Net interest expense was $15.3 million. Net income attributable to Stericycle was $78.2 million, or $0.90 per share, on an as-reported basis and $0.99 adjusted for acquisition and other nonrecurring expenses.

19

64.     Defendant Alutto added that "the general business improved by about 13 basis points and touted the Company's domestic growth:

> When you think about our latest quarter domestically, I would just characterize it that all of our growth engines performed really well in the quarter, especially StrongPak. And I think that's why you saw us come back on the higher end of the range for both the SQ and the LQ growth this quarter. We are always going to fluctuate. We've said that on the last several calls now. But certainly everything performed really, really well.

65.     ten Brink further commented on Stericycle's SQ growth and added:

> Yes, so if you look at the small quantity generated 8% to 10% kind of guidance we give, roughly 40% to 50% of that growth comes from kind of price and volume in the market, and the remainder is really the additional services.

66.     On February 28, 2014, the Company filed its Form 10-K for the year ended December 31, 2013 in which it described in more detail the Company's financial results for 2013. In this 10-K, Stericycle explained that it targets SQ customers as a growth area because the Company believes their fear of failing to comply with applicable regulations is "the basis for the higher gross margins that we have achieved with our [SQ] customers relative to our [LQ] customers." Stericycle also claimed that one of its competitive strengths was its "Diverse Customer Base and Revenue and Cost Stability" as the Company is "generally protected from the cost of regulatory changes or increases in fuel, insurance or other operating costs because our regulated waste contracts typically allow us to adjust our prices to reflect these cost changes." Moreover, Stericycle claimed that it had "been able to maintain high customer retention through excellent customer service" and "determined that our customer relationships have useful lives from 14 to 40 years based upon the type of customer, with a weighted average remaining useful life of 24.6 years." Finally, Stericycle claimed that it "operated in accordance with the terms of our customer contracts" and that complaints alleging otherwise "are without merit."

20

67. The statements set forth in ¶¶ 62-66 above were materially false and/or misleading because the Company's financial results, including its gross margins, were, in part, attributable to Stericycle's improper and fraudulent practices of regularly increasing the rates it charged SQ customers in violation of their contracts. Moreover, Defendants failed to disclose that these rate increases materially contributed to the Company's growth and gross margins in the SQ business, as exhibited by the fact that ten Brink attributed 40% to 50% of the growth in the SQ business to price and volume increases. Defendants also knew that Stericycle was not providing excellent customer service and that this scheme was undermining the useful life of its customer relationships. Furthermore, Defendants knew the Company was not operating in accordance with the terms of its customer contracts and that class action complaints regarding Stericycle's fraudulent billing practices did have merit.

68. On April 24, 2014, after the close of the financial markets, the Company released its financial results for the first quarter of 2014 in a press release and held a conference call to discuss those results. On the conference call, Defendant ten Brink reported the Company's earnings as follows:

> Revenues were $570 million, up 10.9% from $513.8 million in Q1 2013. And internal growth excluding returns and recall revenues was up 6.3%. Domestic revenues were $392.1 million, of which $369 million was domestic regulated waste and compliance services and $23.1 million was recalls and returns. Domestic internal growth excluding recalls and returns revenue was up 6.4%, consisting of SQ up 8% and LQ up 5%. International revenues were $177.9 million, and internal growth adjusted for unfavorable exchange impact of $8.1 million was up 6%. Acquisitions contributed $32.9 million to the growth in the quarter.

> Gross profit was $255.5 million or 44.8% of revenue. SG&A expense including amortization was $110.8 million or 19.4% of revenues. Net interest expense was $14.9 million and net income attributable to Stericycle was $79.1 million or $0.91 per share on an as reported basis and 104 adjusted for acquisitions and other nonrecurring expenses.

69.     Moreover, Defendant Alutto broke down Stericycle's SQ internal growth and stated "SQ is about 8% to 10% internal organic growth.  About 40% to 50% of that is price and volumes. The additional comes from additional services[.]"

70.     On May 8, 2014, the Company filed its Form 10-Q for the quarter ended March 31, 2014 in which it described in more detail the Company's financial results for the first quarter of 2014.  Moreover, in this 10-Q, the Company stated that it had "determined that our customer relationships have useful lives from 10 to 40 years based upon the type of customer, with a weighted average remaining useful life of 25.3 years."  The Company also claimed that it "operated in accordance with the terms of our customer contracts" and class action complaints alleging otherwise "are without merit."

71.     The statements set forth in ¶¶ 68-70 above were materially false and/or misleading because Stericycle's financial results were systematically and artificially inflated through the Company's fraudulent billing practices involving its SQ customers.  Moreover, the Company failed to disclose that the internal organic growth in its SQ business, including the growth in prices charged, were partly attributable to a fraudulent scheme to regularly increase the billing rates Stericycle charged its customers in violation of those customer contracts.  Defendants also knew that this scheme was undermining the useful life of its customer relationships.  Furthermore, Defendants knew the Company was not operating in accordance with the terms of its customer contracts and that class action complaints regarding Stericycle's fraudulent billing practices did have merit.

72.     On July 24, 2014, after the close of the financial markets, the Company released its financial results for the second quarter of 2014 in a press release and held a conference call to

discuss those results.  On the conference call, Defendant Ginnetti reported the Company's earnings as follows:

> Revenues were $640.8 million, up 21.7% from $526.5 million in Q2 2013. And internal growth, excluding returns and recall revenues, was up 7.2%. Domestic revenues were $454.5 million, of which $429.8 million was domestic regulated waste and compliance services, and $24.7 million was recalls and returns. Domestic internal growth, excluding recalls and returns revenues, was up 8.3%, consisting of SQ up 9% and LQ up 7%. International revenues were $186.3 million, and internal growth adjusted for unfavorable exchange impact of $4.4 million was up 5%. Acquisitions contributed $81.7 million to the growth in the quarter.
>
> Gross profit was $275.3 million, or 43% of revenues. SG&A expense, including amortization, was $121.7 million, or 19% of revenues. Net interest expense was $16.4 million. Net income attributable to Stericycle was $81.9 million, or $0.95 per share on an as-reported basis, and $1.03 adjusted for acquisitions and other nonrecurring expenses.
>
> *    *    *
>
> Yes. Free cash flow, we came in as reported, 66.6 and 194.7 year to date.

73.     Moreover, Defendant Alutto stated that "I think you saw some good grace growth rates in the domestic business."

74.     On August 7, 2014, the Company filed its Form 10-Q for the quarter ended June 30, 2014 in which it described in more detail the Company's financial results for the second quarter of 2014.  Moreover, in this 10-Q, the Company stated that it had "determined that our customer relationships have useful lives from 10 to 40 years based upon the type of customer, with a weighted average remaining useful life of 24.2 years."  The Company also claimed that it "operated in accordance with the terms of our customer contracts" and class action complaints alleging otherwise "are without merit."

75.     The statements set forth in ¶¶ 72-74 above were materially false and/or misleading because the Company's earnings and growth were artificially inflated by the Company's systematic and fraudulent practice of raising the rates it charged its SQ customers without notice

23

and in violation of the customers' contracts. Defendants also knew that this scheme was undermining the useful life of its customer relationships. Furthermore, Defendants knew the Company was not operating in accordance with the terms of its customer contracts and that class action complaints regarding Stericycle's fraudulent billing practices did have merit.

76. On October 23, 2014, after the close of the financial markets, the Company released its financial results for the third quarter of 2014 in a press release and held a conference call to discuss those results. On the conference call, Defendant Ginnetti reported the Company's earnings as follows:

> Revenues were $667.9 million, up 24.9% from $534.6 million in Q3 2013, and internal growth, excluding returns and recall revenues, was up 10.3%.

> Domestic revenues were $470.7 million, of which $454 million was domestic regulated waste and compliance services, and $16.6 million was recalls and returns. Domestic internal growth, excluding recalls and returns revenues, was up 8.6%, consisting of SQ up 9% and LQ up 8%. International revenues were $197.2 million and internal growth adjusted for unfavorable exchange impact of $4.1 million was up 14.3%. Acquisitions contributed $93.8 million to the growth in the quarter. Gross profit was $279.5 million, or 41.9% of revenues. SG&A expense, including amortization, was $125.3 million, or 18.8% of revenues. Net interest expense was $16.6 million. Net income attributable to Stericycle was $82.8 million, or $0.96 per share on an as reported basis, and $1.08 adjusted for acquisitions related expenses and other adjusted items.

77. Moreover, Ginnetii maintained that "[o]ur core business is on track and did improve by greater than 10 basis points."

78. On November 7, 2014, the Company filed its Form 10-Q for the quarter ended September 30, 2014 in which it described in more detail the Company's financial results for the third quarter of 2014. Moreover, in this 10-Q, the Company stated that it had "determined that our customer relationships have useful lives from 10 to 40 years based upon the type of customer, with a weighted average remaining useful life of 23.7 years." The Company also claimed that it

"operated in accordance with the terms of our customer contracts" and class action complaints alleging otherwise "are without merit."

79. The statements set forth in ¶¶ 76-78 above were materially false and/or misleading because the Company's financial results and improvements in the core business were partly attributable to, and artificially inflated by, Stericycle's systematic fraudulent billing practices in violation of the contracts it had with its SQ customers. Defendants also knew that this scheme was undermining the useful life of its customer relationships. Furthermore, Defendants knew the Company was not operating in accordance with the terms of its customer contracts and that class action complaints regarding Stericycle's fraudulent billing practices did have merit.

80. On February 5, 2015, after the close of the financial markets, Stericycle released its financial results for the fourth quarter and full year of 2014 in a press release and held a conference call to discuss those results. In the press release, the Company reported its full year 2014 results as follows:

> Revenues for the full year 2014 were $2.56 billion, up 19.3% from $2.14 billion in 2013. Acquisitions contributed approximately $301.6 million to the current year's growth in revenues. Revenues increased 20.8% compared with the prior period when adjusted for unfavorable foreign exchange impact of $33.6 million. GAAP gross profit was $1.09 billion, up 13.5% from $964.6 million in 2013. GAAP gross profit as a percent of revenues was 42.8% compared to 45.0% in 2013. Non-GAAP gross profit, when adjusted for various items identified in the second of the following tables, was $1.10 billion, up 13.5% from $967.2 million in 2013. Non-GAAP gross profit as a percent of revenues was 42.9% compared to 45.1% in 2013. GAAP earnings per diluted share increased 6.3% to $3.79 from $3.56 in 2013. Non-GAAP earnings per diluted share, when adjusted for various items identified in the third of the following tables, increased 13.8% to $4.27 from $3.75.

81. On the conference call, Defendant Ginnetti reported Stericycle's 2014 fourth quarter results as follows:

> Revenues were $676.9 million, up 19.2% from $567.9 million in Q4 2013. And internal growth, excluding returns and recall revenues, was up 8%.

25

Domestic revenues were $479.7 million of which $462.7 million was domestic regulated waste and compliance services and $17 million was recalls and returns. Domestic internal growth, excluding recalls and returns revenues was up 7.3% consisting of SQ up 8% and LQ up 7%.

International revenues were $197.2 million. And internal growth, adjusted for unfavorable foreign-exchange impact of $17 million, was up 10%.

Acquisitions contributed $93.1 million to the growth in the quarter. Gross profit was $285.4 million or 42.2% of revenues. SG&A expense, including amortization, was $124.2 million or 18.3% of revenues. Net interest expense was $18.1 million, net income attributable to Stericycle was $82.5 million or $0.96 per share on an as reported basis and $1.12 adjusted for acquisition related expenses and other adjusted items.

*    *    *

So, versus the prior quarter, gross margins were up 30 basis points.

82.     Moreover, Defendant Arnold touted improvements Stericycle made to foster continued growth: "[w]e increased our regulated waste, operational infrastructure, enabling the continued growth of our retail and SQ regulated waste business."

83.     On March 2, 2015, the Company filed its Form 10-K for the year ended December 31, 2014 in which it described in more detail the Company's financial results for 2014.  In this 10-K, Stericycle claimed that one of its competitive strengths was its "Strong Service Relationships with Customers" and touted its "Revenue and Cost Stability" as the Company is "generally protected from the cost of regulatory changes or increases in fuel, insurance or other operating costs because our regulated waste contracts typically allow us to adjust our prices to reflect these cost changes."  Moreover, according to the 10-K, Stericycle targets SQ customers because their fear of failing to comply with applicable regulations is "the basis for the higher gross margins that we have achieved with our [SQ] customers relative to our [LQ] customers."  Stericycle also stated that it had "determined that our customer relationships have useful lives from 10 to 40 years based upon the type of customer, with a weighted average remaining useful life of 23.8 years" and that

it had "been able to maintain high customer retention through the quality of our customer service." Finally, Stericycle claimed that it "operated in accordance with the terms of our customer contracts" and that class action complaints alleging otherwise "are without merit."

84.    The statements set forth in ¶¶ 80-83 above were materially false and/or misleading because the Company's earnings and growth were driven, in large part, by the Company's practices of fraudulently increasing the rates it charged its SQ customers in violation of their contracts and without providing notice. The Company's financial results and growth, including the gross margins in the SQ business, were buttressed by these practices, which were not disclosed to investors. Defendants knew this scheme was not representative of quality customer service and was undermining customer loyalty and the useful life of Stericycle's customer relationships. Defendants also knew that it was violating the terms of customer contracts and that related class action complaints did have merit.

85.    On April 23, 2015, after the close of the financial markets, the Company released its financial results for the first quarter of 2015 in a press release and held a conference call to discuss those results. On the conference call, Defendant Ginnetti reported the Company's earnings as follows:

> Revenues were $663.3 million, up 16.4% from $570 million in Q1 2014. Internal growth, excluding returns and recall revenues, was up 6.8%. Domestic revenues were $472.2 million, of which $452.3 million was domestic regulated waste and compliance services and $20 million was recalls and returns. Domestic internal growth, excluding recalls and returns revenues, was up 6.4%, consisting of SQ up 8% and LQ up 5%. International revenues were $191.1 million. And internal growth, adjusted for unfavorable foreign exchange impact of $23.1 million, was up 8%.

> Acquisitions contributed $86.3 million to the growth in the quarter. Gross profit was $281.3 million, or 42.4% of revenues. SG&A expense, including amortization, was $128.3 million, or 19.3% of revenues. Net interest expense was $18.6 million. Net income attributable to Stericycle was $75.5 million, or $0.87 per share on an

as reported basis, and $1.08 adjusted for acquisition-related expenses and other adjusted items.

86.     In the quarter, the Company missed its revenue guidance by $13.8 million and Ginnetti dismissed the importance of the revenue miss by blaming it primarily on "the extreme weather impact that we had and its impact on seasonality, as well as the lower energy surcharges that we got in Q1."

87.     Despite the revenue miss, Defendant Alutto stated that the Company was still experiencing positive internal growth:

> I think when you look at the growth drivers for our SQ customer base in the US, there are several growth drivers that drive our organic internal growth. SteriSafe is one of them, Communication Solutions, our hazardous waste, our Environmental Solutions business Brent talked about, the recently completed integration of the PSC, really they all contribute. We continue to improve the SteriSafe offering, which gives us an ability to increase value for our customers and an opportunity to also accelerate revenue growth and profitability.

>                      *      *      *

> No, I think if you look at the growth engines on the SQ side of the business, SteriSafe still provides a majority of the growth on the SQ business, and then Com Sol, Communication Solutions and Environmental Solutions adds some additional growth there.

88.     On May 7, 2015, the Company filed its Form 10-Q for the quarter ended March 31, 2015 in which it described in more detail the Company's financial results for the first quarter of 2015.  Moreover, in this 10-Q, the Company stated that it had "determined that our customer relationships have useful lives from 10 to 40 years based upon the type of customer, with a weighted average remaining useful life of 23.6 years."  The Company also claimed that it "operated in accordance with the terms of our customer contracts" and class action complaints alleging otherwise "are without merit."

89.     The statements set forth in ¶¶ 85-88 above were materially false and/or misleading, because Stericycle was systematically and fraudulently overbilling its clients and thus artificially

28

and improperly inflating its earnings and growth. Defendants also knew that this scheme was undermining the useful life of its customer relationships. Furthermore, Defendants knew the Company was not operating in accordance with the terms of its customer contracts and that class action complaints regarding Stericycle's fraudulent billing practices did have merit.

90. On June 1, 2015, Stericycle representatives spoke at a Stifel Investor Summit (the "Investor Summit"). At the Investor Summit, Defendant ten Brink stated that Stericycle enjoyed 8% to 10% internal growth from SQ customers, with the price component of such growth being a little bit higher than CPI. ten Brink also stated that Stericycle had good relationships with its customers and "really serve[s] the healthcare community extremely well and they support us in all the things."

91. The statements set forth in ¶ 90 above were material false and misleading because Stericycle was systematically increasing the rates charged to SQ customers well in excess of the growth in CPI. Moreover, ten Brink knew that the Company's fraudulent billing practices were undermining its relationships with its customers and were not indicative of a company that serves the health care community extremely well.

92. On July 16, 2015, the Company held a conference call to discuss its acquisition of Shred-it International, Inc. ("Shred-it") in which various Defendants also discussed Stericycle's operations. Defendant Alutto compared the Company's business to Shred-it's and said both "have a similar and exciting growth pattern" and "[r]ecurring revenue and multi-year contracts provide both businesses with a very predictable revenue and profit profile. SQ customers provide a stable and profitable customer base." Moreover, Defendant Arnold described Stericycle's customers as "our large loyal base of customers."

93.     The statements set forth in ¶ 92 above were materially false and misleading because the Company's growth pattern was partly premised on overcharging its customers through Stericycle's scheme of fraudulent billing practices.  Moreover, customers that discovered they were being charged increased rates in violation of their contracts generally were not loyal, and were frequently seeking to terminate Stericycle or negotiate lower rates, and were often irate at their mistreatment by the Company.

94.     On July 23, 2015, after the close of the financial markets, the Company released its financial results for the second quarter of 2015 in a press release and held a conference call to discuss those results.  On the conference call, Defendant Ginnetti reported the Company's earnings and touted its gross margins:

> Revenues were $715.7 million, up 11.7% from $640.8 million in Q2 2014. Internal growth, excluding returns and recall revenues, was up 7.7%. Domestic revenues were $518.2 million, of which $489.9 million was domestic regulated waste and client services, and $28.3 million was recalls and returns. Domestic internal growth, excluding recalls and returns revenues, was up 6.6%, consisting of SQ up 8% and LQ up 5%.

> International revenues were $197.5 million and internal growth adjusted for unfavorable foreign exchange impact of $27.3 million was up 10%. Acquisitions contributed $58.9 million to growth in the quarter. Gross profit was $305.3 million, or 42.7% of revenues. SG&A expense, including amortization, was $135.7 million, or 19% of revenues. Net interest expense was $16.4 million. Net income attributable to Stericycle was $60.5 million or $0.70 per share on an as-reported basis and $1.14 adjusted for acquisition-related expenses and other adjusted items.

>                         *       *       *

> So we are very pleased with our third straight quarter-over-quarter increase in gross margin. Our increase over Q1 was 25 basis points. So, if you start with a Q1 gross margin of 42.4%, the returns on the recall business rebounded from the weather and seasonality, and that increased our margin by about 55 basis points.

95.     Defendant Alutto claimed "[a]ll of our lines of business continued to perform well" and discussed the Company's purported growth as follows:

SQ growth, as we have stated in our guidance, is 8% to 10% growth. There really hasn't been a significant change to the contribution to those growth rates. Again, about 40% to 50% of that organic growth is related to price and volume, and then 50% to 60% of that, so the remainder of that growth, is in the additional services, whether that's Steri-Safe hazardous-waste disposal, Communications Solutions, they all contribute to the SQ growth.

96.     On August 9, 2015, the Company filed its Form 10-Q for the quarter ended June 30, 2015 in which it described in more detail the Company's financial results for the second quarter of 2015.  Moreover, in this 10-Q, the Company stated that it had "determined that our customer relationships have useful lives from 10 to 40 years based upon the type of customer, with a weighted average remaining useful life of 23.3 years."  The Company also claimed that it "operated in accordance with the terms of our customer contracts" and complaints alleging otherwise "are without merit."

97.     The statements set forth in ¶¶ 94-96 above were materially false and/or misleading because Stericycle's revenues and growth were in large part driven by the Company's fraudulent billing practices.  Defendants also knew that this scheme was undermining the useful life of its customer relationships.   Furthermore, Defendants knew the Company was not operating in accordance with the terms of its customer contracts and that class action complaints regarding Stericycle's fraudulent billing practices did have merit.

98.     On September 8, 2015, Stericycle filed a registration statement on Form S-3 (the "Registration Statement") with the SEC in order to raise capital to fund the Company's acquisition of Shred-it.  The Registration statement was supplemented by a preliminary prospectus supplement filed with the SEC on September 9, 2015 (the "Preliminary Prospectus"), a pricing term sheet filed with the SEC on September 10, 2015 (the "Pricing Term Sheet"), and a prospectus supplement filed with the SEC on September 11, 2015 (the "Prospectus" and together with the Registration Statement, the Preliminary Prospectus, and the Pricing Term Sheet, the "Offering Materials").

31

Ultimately, Stericycle sold 7,700,000 depositary shares in the Offering for net proceeds of approximately $746.9 million.

99.     In the Prospectus, Stericycle claimed that one of its competitive strengths was its "Strong Service Relationships with Customers" and touted its "Revenue and Cost Stability" as the Company is "generally protected from the cost of regulatory changes or increases in fuel, insurance or other operating costs because our regulated waste contracts typically allow us to adjust our prices to reflect these cost changes." The Prospectus also contained a summary of the Company's financial results for the six months ended June 30, 2015, including revenues of nearly $1.4 billion and undiluted EPS of $1.60, and the full year ended December 31, 2014. Finally, the Prospectus incorporated by reference the Company's Form 10-K for the year ended December 31, 2014 and the quarters ended March 31, 2015 and June 30, 2015, including the false and/or misleading statements contained in those filings as specified above. That Registration Statement was signed by the Director Defendants and Defendant Ginnetti, and the Offering was underwritten by the Underwriter Defendants.

100.     The statements set forth in ¶¶ 98-99 above were materially false and/or misleading because the Company's earnings and growth were driven, in large part, by the Company's practices of fraudulently increasing the rates it charged its SQ customers in violation of their contracts and without providing notice. Defendants also knew this was undermining customer relationships. Moreover, the statements in the filings incorporated by reference are false and/or misleading for the reasons stated above.

101.     On October 22, 2015, after the close of the financial markets, the Company released its financial results for the third quarter of 2015 in a press release and held a conference call to discuss those results. During the call, Stericycle announced that its growth rates and revenues

were unfavorably impacted in part by lower hazardous waste volumes from its industrial customers. Moreover, management stated that it expected lower hazardous waste volumes to continue in the short term and lowered the mid-point of their mid-term domestic internal growth rates by 1%. The Company also lowered its 2015 adjusted and cash EPS guidance by 5.7% and 4.3% respectively and issued 2016 guidance that was below analyst expectations.

102.    In their comments during the October 22, 2015 conference call, Defendants misled investors as to the Company's performance and failed to disclose the true extent of the Company's problems and the underlying reasons behind the disappointing results. Defendant Ginnetti reported the Company's results as follows:

> Revenues were $718.6 million, up 7.6% from $667.9 million in Q3 2014; and internal growth, excluding returns and recall revenues, was up 6.3%.
>
> Domestic revenues were $523.5 million, of which $493.2 million was domestic regulated waste in compliance services and $30.3 million was recalls and returns. Domestic internal growth, excluding recalls and returns revenues, was up 6%, consisting of SQ up 7% and LQ up 4%. Growth rates were unfavorably impacted by lower fuel surcharges and lower hazardous-waste volumes from our industrial customers.
>
> International revenues were $195.1 million. And internal growth, adjusted for unfavorable foreign exchange impact of $33 million, was up 8%. This growth rate was also unfavorably impacted by lower hazardous-waste volume.
>
> Acquisitions contributed $33.3 million to growth in the quarter. Gross profit was $299.7 million or 41.7% of revenues. SG&A expense including amortization was $138 million or 19.2% of revenues.
>
> Net interest expense was $17.4 million. Net income attributable to Stericycle was $41.8 million or $0.47 per share on an as-reported basis and $1.08 when adjusted for acquisition-related expenses and other adjustments, including the recent legal settlement.

103.    On the conference call, Defendant Arnold attempted to reassure investors that, while the Company had not performed as expected, it was still experiencing positive growth:

> In the quarter we experienced a solid growth in selling additional services to our existing customer base. This growth came from retail hazardous waste, sharps

management, pharmaceutical waste, and communication solutions. For example, we are seeing increased adoption of our pharmaceutical waste service by physician practices. By utilizing our existing customer relationships along with our environmental solutions infrastructure, we are able to deliver a simple and cost-effective service that keeps our customers compliant and helps protect the environment.

104.    Moreover, Defendant Alutto attempted to attribute the decline in industrial waste volumes in Q3 2015 "to the drop in energy and commodity prices."

105.    The October 22, 2015 disclosures concerning weakening performance caused the price of Stericycle's common stock to drop precipitously the next day from $149.04 per share to $120.31, a decline of over 19%.  This represented a total market capitalization loss of over $2.4 billion.  Moreover, the trading price of Stericycle's depositary shares fell from $106.34 per share to $92.56, a decline of 13% and an aggregate loss of over $106 million.  Nonetheless, Defendants failed to disclose the true extent of the Company's poor performance and the underlying reasons thereof.  Instead, they continued to mislead the market into believing all of Company's revenues were based on legitimate practices and would improve.  Those material misrepresentations and omissions continued to affect, and artificially buttress, the price of Stericycle's securities.

106.    On November 9, 2015, the Company filed its Form 10-Q for the quarter ended September 30, 2015 in which it described in more detail the Company's financial results for the third quarter of 2015.  Moreover, in this 10-Q, the Company stated that it had "determined that our customer relationships have useful lives from 10 to 40 years based upon the type of customer, with a weighted average remaining useful life of 23.2 years."  The Company also claimed that it "operated in accordance with the terms of our customer contracts" and class action complaints alleging otherwise "are without merit."

107.    The statements set forth in ¶¶ 101-106 above were materially false and/or misleading because the revenue, growth, and margin results reported resulted, in part, from

revenues Stericycle improperly generated by violating their SQ customer contracts and deceptively increasing the rates charged to their customers. Defendants also knew the Company's earnings and growth were not meeting expectations due to negative customer reaction to Stericycle's fraudulent billing practices and the resulting customer attrition and that this scheme was undermining the useful life of Stericycle's customer relationships. Moreover, Defendants knew the Company was not operating in accordance with the terms of its customer contracts and that class action complaints regarding Stericycle's fraudulent billing practices did have merit.

108. On February 4, 2016, after the close of the financial markets, Stericycle released its financial results for the fourth quarter and full year of 2015 in a press release and held a conference call to discuss those results. In the press release, the Company reported its full year 2015 results as follows:

> Revenues for the full year 2015 were $2.99 billion, up $430.3 million or 16.8%, from $2.56 billion in the same period last year. Acquisitions contributed approximately $378.5 million in revenues to the current year's growth. Revenues increased 21.2% compared with the prior period when adjusted for unfavorable foreign exchange impact of $110.2 million.

> GAAP gross profit was $1.27 billion, up 15.7% from $1.09 billion in the same period last year. GAAP gross profit as a percent of revenues was 42.4% compared to 42.8% in the same period last year. Non-GAAP gross profit, when adjusted for various items identified in the second of the following tables, was $1.27 billion, up 15.5% from $1.10 billion in the same period as last year. Non-GAAP gross profit as a percent of revenues was 42.5% compared to 42.9% in the same period last year.

> GAAP earnings per diluted share decreased 21.7% to $2.96 from $3.79 in 2014. Non-GAAP earnings per diluted share, when adjusted for various items identified in the third of the following tables, increased 3.0% to $4.40 from $4.27.

109. On the conference call, Defendant Ginnetti reported Stericycle's fourth quarter 2013 results as follows:

> Revenues were $888.3 million, up 31.2% from $676.9 million in Q4 2014, and internal growth, excluding returns and recall revenues, was up 5.2%. Domestic revenues were $651.1 million, of which $626.8 million was domestic regulated waste and compliance services and $24.3 million was recalls and returns.

Fourth-quarter domestic internal growth, excluding returns and recalls revenues, was up 4%, consisting of SQ up 6% and LQ up 2%. As anticipated, growth rates were impacted by lower fuel surcharges and lower hazardous waste volumes from our industrial customers.

International revenues were $237.2 million, and internal growth adjusted for unfavorable foreign exchange impact of $26.9 million was up 8.1%. This growth rate was also impacted by lower hazardous waste volume. Acquisitions contributed $200 million to growth in the quarter. Gross profit was $380.4 million, or 42.8% of revenues. SG&A expense, including amortization, was $203.6 million, or 22.9% of revenues. Net interest expense was $24.9 million. Net income attributable to Stericycle was $78.9 million, or $0.80 per share on an as reported basis, and $1.11 when adjusted for acquisition related expenses and other adjustments.

110.     Moreover, Defendant Alutto emphasized that "[o]verall, our business performed very well in the quarter and remains on track despite foreign-exchange headwinds and lower hazardous waste volume from our industrial customers."

111.     On March 15, 2016, the Company filed its Form 10-K for the year ended December 31, 2015 in which it described in more detail the Company's financial results for 2015.  In this 10-K, the Company stated that, in response to an unmet need of small businesses, Stericycle developed a comprehensive service "at low, flat monthly fees" and that it had "developed a strong and loyal customer base."  Stericycle also claimed that one of its competitive strengths was its "Strong Service Relationships with Customers" and that it had "determined that our customer relationships have useful lives from 10 to 40 years based upon the type of customer, with a weighted average remaining useful life of 19.2 years."  Finally, Stericycle claimed that it "operated in accordance with the terms of our customer contracts" and that class action complaints alleging otherwise "are without merit."

112.     The statements set forth in ¶¶ 108-111 above were materially false and/or misleading because the Company's financial results were artificially inflated as a result of Stericycle's systematic efforts to increase the billing rates of its SQ customers without notice and

in violation of those customers' contracts. Moreover, Defendants knew that this scheme did not result in "low, flat monthly fees" for customers and was in fact eroding customer loyalty and the useful life of Stericycle's customer relationships. Defendants also knew that class action complaints regarding Stericycle's billing practices did have merit.

113. On April 28, 2016, after the close of the financial markets, the Company released its financial results for the first quarter of 2016 in a press release and held a conference call to discuss those results. During the call, Stericycle announced that its first quarter 2016 results fell below the Company's guidance and analyst expectations. For example, Stericycle reported $1.11 in adjusted EPS, below the Company's guidance of $1.17 and the analyst consensus estimate of $1.14. Moreover, Stericycle lowered its 2016 adjusted EPS guidance to $4.90 - $5.05 from $5.26 - $5.33.

114. On the accompanying conference call, Defendant Ginnetii reported the Company's first quarter 2016 results as follows:

> Revenues were $874.2 million, up 31.8% from $663.3 million in Q1 2015, and internal growth excluding returns and recalls revenues, was up 5.6%. Domestic revenues were $649.7 million, of which $624.9 million was domestic regulated waste in compliance services, and $24.8 million was recalls and returns.

> First-quarter domestic internal growth excluding recalls and returns revenues was up 5% consisting of SQ up 6% and LQ up 4%. As anticipated, growth rates were impacted by lower fuel surcharges and lower hazardous waste volumes from our industrial customers.

> International revenues were $224.5 million and internal growth adjusted for unfavorable foreign exchange impact of $23.8 million was up 7%. This growth rate was also impacted by lower hazardous waste volume.

> Acquisitions contributed $194.5 million to growth in the quarter. Gross profit was $369.2 million or 42.2% of revenue. SG&A expense, including amortization, was $207.3 million or 23.7% of revenues. Net interest expense was $24 million. Net income attributable to Stericycle was $66.7 million or $0.78 per share on an as reported basis and $1.11 when adjusted for acquisition-related expenses and other adjustments.

115.   On May 9, 2016, the Company filed its Form 10-Q for the quarter ended March 31, 2016 in which it described in more detail the Company's financial results for the first quarter of 2016.  Moreover, in this 10-Q, the Company stated that it had "determined that our customer relationships have useful lives from 10 to 40 years based upon the type of customer, with a weighted average remaining useful life of 19.1 years."   The Company also claimed that it "operated in accordance with the terms of our customer contracts" and class action complaints alleging otherwise "are without merit."

116.   Defendants misled investors by not disclosing the true extent of the Company's underlying issues and by attributing these disappointing results to failing to realize synergies in connection with the acquisition of Shred-it, lower industrial hazardous waste revenues, and cost pressures in the international market.   In this quarter, Defendant Alutto attributed the lower industrial hazardous waste revenues to a general "slowdown in the hazardous waste" business, rather than to fuel and energy prices like in the third quarter of 2015.

117.   Moreover, Defendants attempted to assure investors that overall the Company was performing well.  Defendant Alutto stated that "we experienced strong revenue growth, strong cash flow, and solid sequential growth for the Shred-it acquisition."  Defendant Arnold added "[i]n our retail and healthcare hazardous waste compliance programs, we continue to experience strong growth."

118.   The statements set forth in ¶¶ 113-117 above were materially false and/or misleading because the Company's financial results, while disappointing, were still being artificially inflated by Stericycle's systematic scheme to increase the billing rates of its SQ customers without providing notice and in violation of those customers' contracts.  Moreover, Defendants knew that their earnings did not meet expectations due, in part, to negative customer

reaction to these fraudulent billing practices and the resulting customer attrition. Defendants also knew the Company was not operating in accordance with the terms of its customer contracts and that class action complaints regarding Stericycle's fraudulent billing practices did have merit.

119.    The April 28, 2016 disclosures caused the Company's stock price to fall from $121.74 per share to $95.56, a decline of 21.5%. This represented a total market capitalization loss of over $2.2 billion. Moreover, the trading price of Stericycle's depositary shares fell from $91.76 per share to $77.66, a decline of 15.4% and an aggregate loss of over $108 million. Nonetheless, Defendants still failed to disclose the true extent of the Company's poor performance and the underlying reasons thereof. Instead they continued to mislead the market into believing that the entirety of the Company's revenues were based on legitimate billing practices. Those material misrepresentations and omissions continued to affect, and artificially buttress, the price of Stericycle's common stock and depositary shares.

120.    On July 28, 2016, after the close of the financial markets, the Company released its financial results for the second quarter of 2016 in a press release and held a conference call to discuss those results. During the call, Stericycle announced that growth in both its core and non-core business decelerated. Moreover, Stericycle lowered its 2016 EPS guidance to $4.68 - $4.75 per share from $4.90 - $5.05 per share.

121.    On the accompanying conference call, Defendant Ginnetti reported the Company's second quarter 2016 results as follows:

> Global revenues were $891.6 million, up 24.6% from $715.7 million in Q2, 2015. And internal growth, excluding the impact of foreign-exchange acquisitions and manufacturing and industrial services, was up 3.3%. Domestic revenues were $651.1 million. Excluding the impact of acquisitions and manufacturing and industrial's revenues, internal growth was a 2.3%.
>
> For consistency of your models we will continue to report the following for the remainder of the year. Domestic regulated waste and compliance service revenues

was $486.1 million, up 1%. SQ revenue was up 2%, LQ was up 1%. Growth rates were impacted by lower fuel surcharges and lower manufacturing and industrial waste revenues. Recalls and returns revenues was $20.9 million. International revenues were $234.5 million, excluding the impact of foreign-exchange, acquisitions, and manufacturing and industrial services internal growth was 5.8%.

Acquisitions contributed $185.9 million to growth in the quarter. Gross profit was $381.6 million, or 42.8% of revenues. SG&A expense, excluding amortization, was $189.5 million, or 21.3% of revenues. Net interest expense was $24.4 million. Net income attributable to Stericycle was $37.3 million, or $0.43 per share on an as-reported basis, and $1.18 when adjusted for acquisition-related expenses and other adjustments.

122.    Defendant Alutto blamed these results and the cut in guidance partially on "increased pricing pressure on our SQ customer base" and also stated that the same issues that affected the Company in the second quarter of 2016 will likely result in 2017 growth rates below Stericycle's historical average.  Thus, the Company has conceded that limitations on the rates it can charge its SQ customers materially affected its results and will continue to do so for some time.

123.    The July 28, 2016 disclosures caused the Company's stock price to fall from $105.93 per share to $90.27 a decline of 14.8%.  This represented a total market capitalization loss of over $1.3 billion.  Moreover, the trading price of Stericycle's depositary shares fell from $84.72 per share to $74.59, a decline of 12% and an aggregate loss of over $78 million.

124.    In sum, throughout the Class Period, Defendants knew that Stericycle was systematically and fraudulently violating the terms of its SQ customer contracts by regularly increasing the rates it charged without the necessary justification.  Once customers discovered they were being defrauded, the Company attempted to coerce them to remain customers of Stericycle by threatening customers with enormous liquidated termination fees and offering rate reductions that still resulted in customers paying higher rates than those contained in their original contracts. Despite this coercion, many customers still left the Company, thus removing critical sources of

revenue. Overall, through this scheme, Stericycle's financial results and growth were artificially inflated and the Defendants misled the market into believing the Company was performing much better than it actually was. As a result, the Company's stock price was artificially inflated and investors that bought Stericycle stock at such artificially inflated prices have been harmed.

## CLASS ALLEGATIONS

125.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons or entities who purchased or otherwise acquired: (i) Stericycle's publically traded common stock or depositary shares during the Class Period; and (ii) depositary shares in or traceable to the Offering (the "Class"). Excluded from the Class are Defendants and their families, directors, and officers of Stericycle, and their families.

126.    The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of April 29, 2016, Stericycle had 84,912,603 shares of common stock outstanding, owned by hundreds, if not thousands, of investors worldwide. As of March 31, 2016, Stericycle had 7,700,000 depositary shares outstanding, each representing a $1/10^{th}$ interest in a share of Stericycle's 5.25% Series A Mandatory Convertible Preferred Stock, owned by hundreds, if not thousands, of investors worldwide.

127.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class, which predominate over questions which may affect individual Class members, include:

    a.    Whether Defendants violated the Securities Act and/or the Exchange Act;

    b.    Whether Defendants omitted and/or misrepresented material facts;

    c.    Whether Defendants made false and/or misleading statements;

d.  Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

e.  Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and/or misleading;

f.  Whether the Officer Defendants or Director Defendants are personally liable for the alleged misrepresentations and omissions described herein;

g.  Whether the prices of Stericycle stock and depositary shares were artificially inflated;

h.  Whether Defendants' misconduct caused the members of the Class to sustain damages; and

i.  The extent of damage sustained by Class members and the appropriate measure of damages.

128.  Plaintiffs claims are typical of those of the Class because Plaintiffs and the Class sustained damages from Defendants' wrongful conduct.

129.  Plaintiffs will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiffs have no interests that conflict with those of the Class.

130.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## <u>INAPPLICABILITY OF STATUTORY SAFE HARBOR</u>

131.  Stericycle's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability

42

132.     Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time, each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of Stericycle who know the statement was false.  None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## PRESUMPTION OF RELIANCE

133.     At all relevant times, the markets for Stericycle's common stock and depositary shares were efficient markets for the following reasons, among others:

a.   Stericycle's common stock and depositary shares met the requirements for listing, and were listed and actively traded on the NASDAQ Global Select Market, a highly efficient and automated market;

b.   As a regulated issuer, Stericycle filed periodic public reports with the SEC and the NASDAQ Global Select Market;

c.   Stericycle regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d.   Stericycle was followed by multiple securities analysts employed by major brokerage firm(s) who wrote reports, which were distributed to the sales force and

43

certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

134.    As a result of the foregoing, the market for Stericycle's stock promptly digested current information regarding Stericycle from all publicly available sources and reflected such information in the price of Stericycle's stock. Under these circumstances, all purchasers of Stericycle's stock during the Class Period suffered similar injury through their purchase of Stericycle's stock at artificially inflated prices and the presumption of reliance applies.

135.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material false and misleading statements and omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's practice of systematically and routinely raising their customers' rates without notice and in contravention of their contracts—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of Stericycle's SQ clients to the Company's revenues, gross margins, and growth, that requirement is satisfied here.

## COUNT I

### For Violation of Section 11 of the Securities Act Against the Director Defendants, the Underwriter Defendants, and Ginnetti

136.    Plaintiff St. Lucie repeats and realleges each and every allegation contained above as if fully set forth herein.

137.    This Count is brought by Plaintiff St. Lucie pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all members of the Class who purchased or otherwise acquired securities sold pursuant or traceable to the Offering, and who were damaged thereby.

138.    This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act.  For purposes of asserting this Count, Plaintiff St. Lucie does not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a Section 11 claim.

139.    Liability under this Count is predicated on the Director Defendants and Ginnetti signing of the Registration Statement for the Offering and the Director Defendants', the Underwriter Defendants', and Ginnetti's respective participation in the Offering, which was conducted pursuant to the Offering Materials.  The Offering Materials were false and misleading, contained untrue statements of material facts, omitted to state facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

140.    Less than one year has elapsed since the time that Plaintiff St. Lucie discovered, or could reasonably have discovered, the facts upon which this Complaint is based.  Less than three years has elapsed since the time that the securities at issue in this Complaint were bona fide offered to the public.

141.    By reason of the foregoing, the Defendants named in this Count are each jointly and severally liable for violations of Section 11 of the Securities Act to Plaintiff St. Lucie and the other members of the Class pursuant to Section 11(e).

## COUNT II

**For Violation of Section 12(a)(2) of the Securities Act Against the Underwriter Defendants**

142.     Plaintiff St. Lucie repeats and realleges each and every allegation contained above as if fully set forth herein.

143.     This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77k, on behalf of all members of the Class who purchased or otherwise acquired Stericycle securities in and/or traceable to the Offering and who were damaged thereby.

144.     This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act.  For purposes of asserting this Count, Plaintiff St. Lucie does not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a Section 12(a)(2) claim.

145.     The Underwriter Defendants were statutory sellers of Stericycle securities that were registered in the Offering pursuant to the Registration Statement and sold by means of the Offering Materials.  By means of the Offering Materials, the Underwriter Defendants sold approximately 7,700,000 depository shares in the Offering to members of the Class.  The Underwriter Defendants were at all relevant times motivated by their own financial interests.  In sum, the Underwriter Defendants were sellers, offerors, and/or solicitors of sales of the securities that were sold in the Offering by means of the materially false and misleading Offering Materials.

146.     The Offering Materials contained untrue statements of material fact and omitted other facts necessary to make the statements not misleading, and failed to disclose material facts, as set forth herein.

147.     Less than one year has elapsed since the time that Plaintiff St. Lucie discovered, or could reasonably have discovered, the facts upon which this Complaint is based.  Less than three

46

years has elapsed since the time that the securities at issue in this Complaint were bona fide offered to the public.

148.    By reason of the foregoing, the Underwriter Defendants are liable for violations of Section 12(a)(2) of the Securities Act to Plaintiff St. Lucie and the other members of the Class who purchased securities in or traceable to the Offerings, and who were damaged thereby.

## COUNT III

**For Violation of Section 15 of the Securities Act Against the Director Defendants, Ginnetti, and Arnold**

149.    Plaintiff St. Lucie repeats and realleges each and every allegation contained above as if fully set forth herein.

150.    This Count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, against the Director Defendants, Ginnetti, and Arnold.

151.    At all relevant times, the Director Defendants, Ginnetti, and Arnold were controlling persons of Stericycle within the meaning of Section 15 of the Securities Act.  As set forth herein, because of their positions at Stericycle and/or because of their positions on Stericycle Board, the Director Defendants, Ginnetti, and Arnold had the requisite power to directly or indirectly control or influence the decision-making of the Company and the conduct of Stericycle's business, including the wrongful conduct complained of herein.

152.    In their capacities as senior corporate officers of the Company, and as more fully described above, Defendants Alutto, Ginnetti, and Arnold had direct involvement in the day-to-day operations of the Company, and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities law violations as alleged herein. They were also directly involved in providing false information and certifying and/or approving the false and/or misleading statements disseminated by Stericycle during the Class Period.  As a

result of the foregoing, Defendants Alutto, Ginnetti, and Arnold, as a group and individually, were controlling persons of Stericycle within the meaning Section 15 of the Exchange Act.

153.    Similarly, the Director Defendants served as Directors on Stericycle's board of directors at the time the Offering was conducted and at the time that the Registration Statement was signed.  As Directors of a publicly owned company, these Defendants had a duty to disseminate accurate and truthful information with respect to Stericycle's financial condition and results of operations.  These Director Defendants each signed the Registration Statement in connection with the Offering, the Offering Materials were disseminated to the investing public, and the Registration Statement became effective.  Thus, these Defendants controlled the contents and dissemination of the Offering Materials.

154.    This claim does not sound in fraud.  For purposes of asserting this claim under the Securities Act, Plaintiff St. Lucie does not allege that any Defendant acted with scienter or fraudulent intent, which are not elements of a Section 15 claim.

155.    By reason of the aforementioned conduct, each of the Defendants named in this Count is liable under Section 15 of the Securities Act to Plaintiff St. Lucie and the other members of the Class who have asserted claims pursuant to Sections 11 or 12(a)(2) of the Securities Act, as set forth above.  As a direct and proximate result of the conduct of these Defendants, Plaintiff St. Lucie and members of the Class suffered damages in connection with their purchase or acquisition of securities pursuant and/or traceable to the Offering.

## COUNT IV

**For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against Stericycle and the Officer Defendants**

156.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

48

157. During the Class Period, Stericycle and the Officer Defendants carried out a plan, scheme, and course of conduct, which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Stericycle's common stock and/or depositary shares at artificially inflated prices.

158. Stericycle and the Officer Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock and depositary shares in an effort to maintain artificially high market prices for Stericycle's stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

159. Stericycle and the Officer Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, prospects, compliance with customer contracts, and improper billing practices.

160. During the Class Period, Stericycle and the Officer Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

161. Stericycle and the Officer Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the

true facts that were available to them. Stericycle and the Officer Defendants engaged in this misconduct to conceal Stericycle's true condition from the investing public and to support the artificially inflated prices of the Company's common stock and depositary shares.

162. Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Stericycle's common stock and/or depositary shares. Plaintiffs and the Class would not have purchased these securities at the prices they paid, or at all, had they been aware that the market prices had been artificially inflated by Stericycle's and the Officer Defendants' fraudulent course of conduct.

163. As a direct and proximate result of Stericycle's and the Officer Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered economic loss and damages in connection with their respective purchases of the Company's common stock and/or depositary shares during the Class Period, as the prior artificial inflation in the price of these securities was removed over time.

164. By virtue of the foregoing, Stericycle and the Officer Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## **COUNT V**

**For Violation of Section 20(a) of the Exchange Act Against the Officer Defendants**

165. Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

166. The Officer Defendants acted as controlling persons of Stericycle within the meaning of Section 20(a) of the Exchange Act. By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about Stericycle, the Officer Defendants had the

50

power and ability to control the actions of Stericycle and its employees. By reason of such conduct, the Officer Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

a.  Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

b.  Awarding compensatory damages in favor of Plaintiffs and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c.  Awarding Plaintiffs and the Class their reasonable attorneys' fees and expert fees;

d.  As to the claims set forth under the Securities Act, awarding rescission or a recessionary measure of damages; and

e.  Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED: August 4, 2016

/s/ Avi Josefson
Avi Josefson
**BERNSTEIN LITOWITZ BERGER**
 **& GROSSMANN LLP**
875 North Michigan Avenue
Suite 3100
Chicago, IL 60611
Telephone: (312) 373-3880
Facsimile: (312) 794-7801
avi@blbglaw.com

51

Gerald H. Silk
John Vielandi
**BERNSTEIN LITOWITZ BERGER
 & GROSSMANN LLP**
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
jerry@blbglaw.com
john.vielandi@blbglaw.com

*Counsel for Plaintiffs St. Lucie County Fire
District Firefighters' Pension Trust Fund and
Boynton Beach Firefighters' Pension Fund*

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Nate Spera, on behalf of St. Lucie County Fire District Firefighters' Pension Trust Fund ("St. Lucie FF"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am the Chairman of St. Lucie FF. I have reviewed the complaint and authorize its filing.

2. St. Lucie FF did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. St. Lucie FF is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4. St. Lucie FF's transactions in the Stericycle, Inc. securities that are the subject of this action are set forth in the chart attached hereto.

5. St. Lucie FF has sought to serve as a representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification:

*In re Cobalt International Energy, Inc. Securities Litigation*, No. 14-cv-3428 (S.D. Tex.)
*St. Lucie County Fire District Firefighters' Pension Trust Fund v. Stericycle, Inc.*,
No. 16-cv-7145 (N.D. Ill.)

6. St. Lucie FF will not accept any payment for serving as a representative party on behalf of the Class beyond St. Lucie FF's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this ⊃ day of August, 2016.

Nate Spera
Chairman
*St. Lucie County Fire District Firefighters'*
*Pension Trust Fund*

**St. Lucie County Fire District Firefighters' Pension Trust Fund
Transactions in Stericycle**

**Depositary Shares, each representing a 1/10th interest in a share
of 5.25% Series A Mandatory Convertible Preferred Stock**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 9/10/2015 | 422 | 100.0000 |
| Purchase | 9/10/2015 | 95 | 100.1000 |
| Purchase | 9/10/2015 | 340 | 100.0000 |
| Purchase | 9/30/2015 | 275 | 101.4287 |
| Purchase | 5/17/2016 | 48 | 80.5503 |
| | | | |
| Sale | 9/28/2015 | (49) | 101.5000 |
| Sale | 12/2/2015 | (300) | 90.3393 |

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Matthew Petty, on behalf of Boynton Beach Firefighters' Pension Fund ("Boynton Beach Fire"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am the Chairman of Boynton Beach Fire. I have reviewed the complaint and authorize its filing.

2. Boynton Beach Fire did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. Boynton Beach Fire is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4. Boynton Beach Fire's transactions in the Stericycle, Inc. securities that are the subject of this action are set forth in the chart attached hereto.

5. Boynton Beach Fire has sought to serve as a representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification:

*Boynton Beach Firefighters' Pension Fund v. HCP, Inc.*, No. 16-cv-1106 (N.D. Ohio)
*St. Lucie County Fire District Firefighters' Pension Trust Fund v. Stericycle, Inc.*,
No. 16-cv-7145 (N.D. Ill.)

6. Boynton Beach Fire will not accept any payment for serving as a representative party on behalf of the Class beyond Boynton Beach Fire's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this ⟂ day of August, 2016.

*Matthew Petty*
_____
Matthew Petty
Chairman
*Boynton Beach Firefighters' Pension Fund*

**Boynton Beach Firefighters' Pension Fund**
**Transactions in Stericycle, Inc.**

**Common Stock**

| Transaction | Date | Shares | Price |
| --- | --- | --- | --- |
| Purchase | 7/24/2015 | 425 | 132.8174 |
| Purchase | 7/27/2015 | 425 | 132.3517 |
| Purchase | 7/28/2015 | 400 | 134.5837 |
| Purchase | 7/29/2015 | 250 | 138.6339 |
| Purchase | 9/29/2015 | 225 | 137.6678 |
| Purchase | 12/4/2015 | 220 | 116.0179 |
| Sale | 4/29/2016 | (1,305) | 96.0134 |
| Sale | 5/3/2016 | (640) | 94.6776 |