# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| *In re Stericycle, Inc. Securities Litigation* | Civ. A. No. 1:16-cv-07145 |
| | Hon. Andrea R. Wood |
| | |
| | <u>CLASS ACTION</u> |
| | |
| | <u>JURY TRIAL DEMANDED</u> |
| | |
| | **ECF CASE** |

## CLASS ACTION COMPLAINT FOR VIOLATIONS OF
## <u>THE FEDERAL SECURITIES LAWS</u>

**BERNSTEIN LITOWITZ BERGER**
**& GROSSMANN LLP**
Avi Josefson
875 North Michigan Avenue, Suite 3100
Chicago, IL 60611
Telephone: (312) 373-3880
Facsimile: (312) 794-7801
Email: Avi@blbglaw.com

**BERNSTEIN LITOWITZ BERGER**
**& GROSSMANN LLP**
John C. Browne (admitted *pro hac vice*)
Adam H. Wierzbowski (admitted *pro hac vice*)
Julia K. Tebor (*pro hac vice* motion pending)
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
Email: JohnB@blbglaw.com
Email: Adam@blbglaw.com
Email: Julia.Tebor@blbglaw.com

*Lead Counsel for Lead Plaintiffs the Public Employees' Retirement System*
*of Mississippi and the Arkansas Teacher Retirement System*

## **TABLE OF CONTENTS**

I.      PRELIMINARY STATEMENT ................................................................. 1

II.     JURISDICTION AND VENUE ................................................................ 7

III.    PARTIES ................................................................................................. 7

        A.      Lead Plaintiffs ........................................................................... 7

        B.      Corporate Defendant ................................................................ 8

        C.      Officer Defendants .................................................................... 8

        D.      Securities Act Defendants ...................................................... 11

                1.      Director Defendants .................................................... 11

                2.      Underwriter Defendants .............................................. 12

IV.     SUMMARY OF THE ACTION .............................................................. 14

        A.      Overview of Stericycle ........................................................... 14

                1.      SQ and LQ Customers ................................................ 14

                2.      Stericycle's Contracts with Its SQ Customers ........... 16

                3.      Stericycle's Class Period Growth ............................... 16

        B.      Stericycle Defrauded Its Own Customers ............................. 18

                1.      Stericycle Imposed Fraudulent Automatic Price Increases on SQ Customers ........................................................................ 18

                2.      The Officer Defendants Were Personally Responsible for the Automatic Price Increases ........................................................... 24

                3.      Stericycle Imposed Baseless Additional Fees ............ 25

                4.      Stericycle Used Unethical Sales Tactics to Lure Customers into Signing Its Contracts ........................................................... 26

                5.      Government Settlements Confirm Stericycle's Course of Conduct ........ 28

                6.      Stericycle Experienced Undisclosed Pricing Pressure as SQ Customers Cancelled or Re-Negotiated their Contracts ......................... 32

7. The Automatic Price Increases and Baseless Additional Fees Were Material to Stericycle Revenues and Growth ............................................. 37

8. Stericycle's Fraudulent Prices Increases Were Unsustainable ................. 39

C. The Truth Emerges .............................................................................. 43

1. The October 22, 2015 Partial Disclosure ..................................................... 44

2. The February 4, 2016 Partial Disclosure ..................................................... 46

3. The April 28, 2016 Partial Disclosure ......................................................... 47

4. The July 28, 2016 Partial Disclosure ........................................................... 49

5. The September 2, 2016 Partial Disclosure ................................................... 52

6. The September 18 and 19, 2016 Partial Disclosures ................................... 53

V. VIOLATIONS OF THE EXCHANGE ACT ................................................................. 58

A. Stericycle and the Officer Defendants' Material Misstatements and Omissions in Violation of the Exchange Act ......................................................... 58

1. Stericycle and the Officer Defendants' Material Misrepresentations About the Source of Stericycle's Pricing, Revenues and Growth ........... 60

a) Fourth Quarter 2012 and Year-End 2012 ..................................... 60

b) First Quarter 2013 .......................................................................... 66

c) Second Quarter 2013 ...................................................................... 68

d) Third Quarter 2013 ......................................................................... 70

e) Fourth Quarter 2013 and Year-End 2013 ..................................... 73

f) First Quarter 2014 .......................................................................... 76

g) Second Quarter 2014 ...................................................................... 77

h) Third Quarter 2014 ......................................................................... 79

i) Fourth Quarter 2014 and Year-End 2014 ..................................... 80

j) First Quarter 2015 .......................................................................... 83

k) Second Quarter 2015 ...................................................................... 85

l) Third Quarter 2015 ....................................................................... 87

m) Fourth Quarter 2015 and Year-End 2015 .................................... 88

n) First Quarter 2016 ....................................................................... 90

2. Stericycle and the Officer Defendants' Material Misrepresentations that Claims of Improper Rate Increases Were "Without Merit".............. 92

a) Fourth Quarter 2012 and Year-End 2012 .................................... 92

b) First Quarter 2013 ....................................................................... 93

c) Second Quarter 2013 through Second Quarter 2016 .................... 94

3. Defendants' Omissions of Material Facts................................................ 95

B. Additional Allegations of Stericycle and the Officer Defendants' Scienter......... 97

C. Officer Defendants Took Advantage of Stericycle's Soaring Stock Price to Reap Millions in Insider Stock Sales and Launch a Secondary Offering........... 103

D. Additional Loss Causation Allegations ............................................. 110

E. Presumption of Reliance ................................................................... 113

VI. VIOLATIONS OF THE SECURITIES ACT...................................................... 114

VII. INAPPLICABILITY OF STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ......................................................................... 121

VIII. CLASS ALLEGATIONS ................................................................................. 121

IX. CLAIMS FOR RELIEF .................................................................................... 123

X. PRAYER FOR RELIEF .................................................................................... 136

XI. JURY DEMAND ............................................................................................... 137

Lead Plaintiffs the Public Employees' Retirement System of Mississippi and the Arkansas Teacher Retirement System (collectively "Lead Plaintiffs"), by and through their undersigned counsel, bring this action pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), SEC Rule 10b-5 thereunder and Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act"). Lead Plaintiffs bring this class action on behalf of themselves and all other persons or entities who purchased or otherwise acquired securities of Stericycle, Inc. ("Stericycle" or the "Company") in the open market, or pursuant or traceable to Stericycle's public offering of 7.7 million depositary shares on or around September 15, 2015 (which included 700,000 shares sold pursuant to an overallotment option granted to the offering's underwriters) (the "Offering"), during the period from February 7, 2013 through September 18, 2016, inclusive (the "Class Period") and were damaged thereby (the "Class").

## I.  **PRELIMINARY STATEMENT**

1.      This case is about a company that artificially inflated its publicly-reported financial results by perpetrating a massive pricing fraud against its own customers. Stericycle is a waste management and disposal company that specializes in collecting and disposing of medical, pharmaceutical, and hazardous waste. As discussed in more detail below, throughout the Class Period, Stericycle was imposing unauthorized and unilateral price increases upon its customers in blatant violation of its contractual agreements. Stericycle's wrongful conduct has resulted in multiple litigations against the Company, some of which have collectively settled for tens of millions of dollars to date, with others still pending.

2.      As Defendants knew but concealed from investors, this scheme was unsustainable. When Stericycle was forced to discontinue its fraudulent practices, and could no longer juice its revenues by defrauding its own customers, the Company's financial performance foreseeably declined. This, in turn, caused the price of the Company's publicly-traded securities to drop

sharply, resulting in billions of dollars of losses to members of the Class.  Meanwhile, Defendants themselves took advantage of Stericycle's artificially inflated stock price to enrich themselves by more than $55 million in insider sales of their own stock.

3.     During the Class Period, Stericycle's customer base consisted of two primary groups:  Large quantity ("LQ") customers such as hospitals, blood banks, and pharmaceutical manufacturers, and small quantity ("SQ") customers that included businesses such as outpatient medical clinics, medical and dental offices, veterinary offices, and retail pharmacies.  Under Stericycle's standard service agreement with its SQ customers, customers would pay a fixed fee in exchange for Stericycle collecting and disposing of their regulated waste.

4.     The Company's contracts with its SQ customers were the primary driver of Stericycle's financial performance, with SQ customers accounting for revenues at a much higher gross margin than LQ customers.  Defendants told investors that the "the basis for the higher gross margins" for SQ customers was that "when small-quantity regulated waste customers understand the potential risks of failing to comply with applicable regulations, they appreciate the value of the services that we provide."  The Company also publicly described its SQ contracts as offering a "Flat Monthly Fee" and as expressly limiting the circumstances under which Stericycle could increase the fees it charged customers.  Specifically, fee increases were supposed to be limited *solely* to instances where (i) the Company had to implement operational changes to comply with changes in the law; and (ii) to cover increased costs borne by the Company.

5.     Stericycle's services provided to SQ customers were extremely popular during the Class Period, and the Company's revenues grew from $1.9 billion in 2012 to nearly $3 billion by the end of fiscal year 2015, with more than 63% of that revenue being generated by SQ customers. The Company reaped the rewards of this performance as analysts repeatedly praised its "strong

track record of growth" and noted that the Company had met or exceeded Wall Street expectations for earnings per share for thirty-four consecutive quarters. As a result of this seeming success, Stericycle's stock price rose from $98 per share on the first day of the Class Period to achieve an all-time high of nearly $150 per share on October 22, 2015.

6. Unfortunately for investors, Stericycle's success was not being driven by legitimate business practices. It was instead fueled by an egregious fraud that the Company was perpetrating against its own SQ customers. During the Class Period, Stericycle's most senior executives caused the Company's internal billing and accounting software to *automatically* charge an 18% increase every six months on the purportedly flat rates the Company had contractually agreed to charge these SQ customers, while surreptitiously charging numerous impermissible fees and surcharges that had no relation to actual costs or fees that Stericycle incurred in servicing a particular contract.

7. This practice has been confirmed in multiple court proceedings that have been brought against Stericycle on behalf of both its governmental customers and its private customers. For example, on February 1, 2016, the United States District Court for the Northern District of Illinois approved a $28.5 million settlement between a *qui tam* relator and Stericycle. The settlement covered unlawful price overcharges to governmental entities, and was expressly supported by the Attorney General of the United States, the Attorney General of the State of Illinois, and Attorneys General for fourteen other states and the District of Columbia. *See United States of America, et al. v. Stericycle, Inc.*, 08-cv-02390 (N.D. Ill. Feb. 1, 2016) (the "Government Case"). A private case on behalf of Stericycle's non-governmental customers is pending in this District before the Honorable Milton I. Shadur, and is captioned *In re Stericycle, Inc. Steri-safe Contract Litigation*, No. 13 C 5795 (N.D. Ill.) (the "Customer Case").

8. The contours of the fraud have been confirmed in the settlement agreements in the

Government Case, through information provided to Lead Plaintiffs from former employees of the Company, and in sworn deposition testimony provided in the Customer Case – including testimony from Stericycle's most senior executives. As employees in Stericycle's billing department have testified at depositions taken in the Customer Case, during the Class Period the Company targeted its SQ customers with a "behind-the scenes program" that "automatically" imposed an 18% price increase on them. This was in direct violation of the customers' contracts. Moreover, a former Stericycle Compliance Solution Specialist stated to Lead Counsel that the 18% price increases were imposed "like clockwork" every six months even though they had no relation to any actual costs being incurred by Stericycle. The wrongful price increases were implemented through the Company's computerized billing program called "Tower" and, later, "Steri-Works."

9.      Moreover, the price increases were made with the specific purpose of inflating the Company's publicly-reported revenue numbers in order to impress Wall Street. Stericycle's Vice President of Business Operations testified under oath in the Customer Case that these price increases were ***not*** tied to any higher costs that the Company was experiencing, but instead were done solely to hit "revenue goals." This Vice President also testified that this scheme was implemented at the highest levels of the Company, with Defendant Brent Arnold (Stericycle's COO) personally directing the Vice President to prepare a five year plan for SQ customers that would implement regular 18% price increases.

10.     Another former Stericycle employee who worked in the billing department testified that she personally prepared a PowerPoint presentation stating that the "Automated Price Increases" were done at the direction of Defendant Richard Kogler (Stericycle's former COO and current Senior VP). As this employee stated, the purpose of this slide was to let "everybody know that this [*i.e.*, automated price increases] is coming from – it's executive management-driven on

down, that it's not our particular billing team that is making up these rules, they're driven from upper-level management."

11.     As described further below, Defendants also routinely violated their customer contracts by charging unwarranted fees – styled as "Environmental/Regulatory Fees," "Fuel Surcharges" and "Energy Fees" – that had no relation to any costs that Stericycle was incurring. According to deposition testimony in the Customer Case, Defendant Arnold was directly involved in this fraud as well, instructing employees to build a five-year plan for SQ customers that included the ability to "*feather in additional environmental and reg fees*" in arbitrary amounts.  A former Stericycle Customer Care Specialist stated that these so-called environmental fees were entirely fictitious and had no relation to actual costs incurred by the Company.

12.     Unbeknownst to investors, Stericycle's scheme to defraud its SQ customers was causing these customers to complain to the Company in droves and in many instances attempt to cancel their contracts.  In response, Stericycle greatly expanded its "Retention Department," which used aggressive and coercive tactics in an effort to retain these customers at all costs.  The flood of cancellation requests became so large that during the Class Period Stericycle was forced to more than triple the size of its Retention Department.  Despite numerous threats of liquidated damages and other unsavory retention tactics, Stericycle eventually began to lose significant amounts of customers as a result of its fraud.  As a former Stericycle Vice President testified in the Customer Case, he personally met with Stericycle's Executive Committee and "clearly demonstrated the correlation between automated price increases and lost business."  However, this Vice President was told by Defendants that "we are not going to talk about that."

13.     Indeed, Defendants were well aware that their pricing fraud against their own customers could not go on forever.  As the Company's stock price rose during the Class Period,

Defendants took advantage of the artificial inflation to sell more than ***$55.5 million*** worth of their own stock holdings – without making a single purchase of shares on the open market. As described below, these sales were suspicious in timing and dwarfed the salaries and other compensation these insiders received.

14.     The truth finally emerged in a series of partial disclosures beginning on October 22, 2015 when Stericycle revealed sharply reduced revenues and EPS. In response, the Company's stock price declined by approximately 19%, dropping from $149.04 per share to $120.31 and analysts stated that they were "flummoxed" by the bad news. On April 28, 2016, the Company again announced disappointing results that Defendants attributed to "pricing pressure," causing another huge decline in the Company's stock price from $121.74 per share to $95.56, a drop of more than 21%. Further bad news followed the next quarter, with the Company admitting on July 28, 2016 that revenues and EPS were declining because of its "inability to get the price that [Stericycle] assumed it was going to get" from its SQ customers. Finally, on September 18, 2016, the Company revealed that an astonishing 60-70% of its SQ clients were exerting pricing pressure on Stericycle and forcing "discounts" on their Stericycle contracts and that the Company was "enduring significant pricing pressure across its small medical waste customer base."

15.     In total, from the first partial disclosure of the fraud until the end of the Class Period, Stericycle's stock price declined from $149.04 per share to $81.24 per share, a drop of -45%. This drop caused a loss of approximately $5.76 billion in market capitalization. Investors are now entitled to recover against the individuals and entities responsible for their losses.

16.     In this Complaint, Lead Plaintiffs assert two different sets of claims on behalf of purchasers of Stericycle's securities during the Class Period. Counts I and II assert securities fraud claims under Section 10(b) and Section 20(a) of the Securities Exchange Act of 1934 ("Exchange

Act"), and SEC Rule 10b-5, against the Company and certain senior executives (defined below at ¶¶22-27). Counts III through V assert strict-liability and negligence causes of action under the Securities Act of 1933 ("Securities Act") against those Defendants who are statutorily responsible under Sections 11, 12(a)(2) and 15 of the Securities Act for materially untrue statements and misleading omissions made in connection with Stericycle's September 15, 2015 Offering.

## II.  JURISDICTION AND VENUE

17.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, as well as Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l, and 77o. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, Section 22 of the Securities Act, 15 U.S.C. § 77v, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

18.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b). Stericycle maintains its executive offices in this District and many of the acts and conduct that constitute the violations of law complained of herein, including dissemination to the public of materially false and misleading information, occurred in this District. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.  PARTIES

### A.     Lead Plaintiffs

19.     Court-appointed Co-Lead Plaintiff the Public Employees' Retirement System of Mississippi ("Mississippi PERS") is a pension fund established for the benefit of the current and retired public employees of the State of Mississippi. Mississippi PERS is responsible for the

retirement income of employees of the State, including current and retired employees of the State's public school districts, municipalities, counties, community colleges, state universities, libraries and water districts. Mississippi PERS provides benefits to over 75,000 retirees, manages over $25 billion in assets for its beneficiaries, and is responsible for providing retirement benefits to more than 250,000 current public employees. Mississippi PERS purchased Stericycle securities during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

20.    Court-appointed Co-Lead Plaintiff the Arkansas Teacher Retirement System ("ATRS") is a public pension system that has been providing retirement benefits to Arkansas's public school and education employees since 1937. As of June 30, 2015, ATRS managed over $15 billion in assets for the benefit of its members. ATRS purchased Stericycle securities during the Class Period, including depository shares traceable to the Offering, and suffered damages as a result of the violations of the federal securities laws alleged herein.

### B.    Corporate Defendant

21.    Defendant Stericycle was incorporated in Delaware in 1989 and maintains its principal executive offices at 28161 North Keith Drive, Lake Forest, Illinois 60045. Stericycle's common stock and depositary shares trade on the NASDAQ Global Select Market, which is an efficient market, under the ticker symbols "SRCL" and "SRCLP," respectively. Stericycle currently has over 85 million shares of common stock outstanding and, as of March 31, 2016, Stericycle had 7.7 million depositary shares outstanding, each representing a $1/10^{th}$ interest in a share of Stericycle's 5.25% Series A Mandatory Convertible Preferred Stock.

### C.    Officer Defendants

22.    Defendant Charles A. Alutto ("Alutto") is, and was at all relevant times during the Class Period, a Director, the President, and the CEO of Stericycle. Alutto has worked at the

Company since May 1997 and became an executive officer in February 2011, serving as President of Stericycle USA. Defendant Alutto signed the Company's materially misstated public filings, including the Registration Statement for the Offering filed with the SEC on September 12, 2015, and made other materially false and misleading statements to investors, as set forth below. Defendant Alutto is named as a defendant in Count I (for violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder), Count II (for violations of Section 20(a) of the Exchange Act), Count III (for violations of Section 11 of the Securities Act), and Count V (for violations of Section 15 of the Securities Act).

23.     Defendant Dan Ginnetti ("Ginnetti") has served as Stericycle's CFO since August 1, 2014. Prior to becoming the Company's CFO, Ginnetti served as the Company's Vice President of Corporate Finance and has been employed by the Company since 2003. Defendant Ginnetti signed the Company's materially misstated public filings, including the Registration Statement for the Offering filed with the SEC on September 12, 2015, and made other materially false and misleading statements to investors, as set forth below. Defendant Ginnetti is named as a defendant in Count I (for violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder), Count II (for violations of Section 20(a) of the Exchange Act), Count III (for violations of Section 11 of the Securities Act), and Count V (for violation of Section 15 of the Securities Act).

24.     Defendant Brent Arnold ("Arnold") has served as Stericycle's Executive Vice President and COO since January 1, 2015. He has been employed by Stericycle since April 2005 and became an executive officer in April 2014, serving as President of Stericycle USA/Canada. Defendant Arnold made materially false and misleading statements to investors, as set forth below. Defendant Arnold is named as a defendant in Count I (for violations of Section 10(b) of the

Exchange Act and Rule 10b-5 thereunder), Count II (for violations of Section 20(a) of the Exchange Act) and Count V (for violations of Section 15 of the Securities Act).

25. Defendant Frank ten Brink ("ten Brink") served as Stericycle's CFO from 1997 to August 1, 2014. After transitioning from his CFO role, ten Brink became Stericycle's Senior Vice President, Mergers and Acquisitions. Defendant ten Brink made materially false and misleading statements to investors, as set forth below, and is named as a defendant in Count I (for violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder) and Count II (for violations of Section 20(a) of the Exchange Act).

26. Defendant Richard Kogler ("Kogler") served as Stericycle's COO from 1999 until January 1, 2015. After transitioning from his COO role, Kogler became Stericycle's Senior Vice President, International. Defendant Kogler made materially false and misleading statements to investors, as set forth below, and is named as a defendant in Count I (for violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder) and Count II (for violations of Section 20(a) of the Exchange Act).

27. Defendants Alutto, Ginnetti, Arnold, ten Brink, and Kogler are collectively referred to herein as the "Officer Defendants." The Officer Defendants, because of their senior executive positions with Stericycle, possessed the power and authority to control the contents of Stericycle's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each of the Officer Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of the Officer Defendants knew or recklessly disregarded that the adverse facts

10

specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially misstated, false and/or misleading.

### D. Securities Act Defendants

28. Plaintiffs in this action bring claims under both the Securities Act and the Exchange Act. The Securities Act imposes strict liability for untrue statements or omissions of material fact in a registration statement used to offer securities. Strict liability is imposed on, among others, the issuer, signatories of the registration statement, the directors of the company issuing the securities, and the underwriters of the offering. Claims brought under the Securities Act do not require a showing of fraud, scienter, reliance, or causation. Plaintiffs name the following Defendants as defendants in this action for Plaintiffs' claims under the Securities Act.

#### 1. Director Defendants

29. The following Defendants were directors of Stericycle's Board of Directors and signed the Registration Statement for the Offering and the Offering materials that contained, and incorporated by reference, materially untrue and misleading statements and omitted material facts: Defendant Mark C. Miller ("Miller"); Defendant Jack W. Schuler ("Schuler"); Defendant Lynn Dorsey Bleil ("Bleil"); Defendant Thomas D. Brown ("Brown"); Defendant Thomas F. Chen ("Chen"); Defendant Rodney F. Dammeyer ("Dammeyer"); Defendant William K. Hall ("Hall"); Defendant John Patience ("Patience"); and Defendant Mike S. Zafirovski ("Zafirovski").

30. Defendants Miller, Schuler, Bleil, Brown, Chen, Dammeyer, Hall, Patience, and Zafirovski are collectively referred to herein as the "Director Defendants."

### 2. Underwriter Defendants

31. The following investment banks were underwriters of Stericycle's September 2015 Offering issued by way of the Registration Statement for the Offering and the Offering materials that contained materially untrue and misleading statements and omitted material facts:

32. Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") was an underwriter of the Offering. As an underwriter, Merrill Lynch was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials. Merrill Lynch sold 2,100,000 depositary shares in the Offering, not including the exercise of its overallotment option.

33. Goldman, Sachs & Co. ("Goldman Sachs") was an underwriter of the Offering. As an underwriter, Goldman Sachs was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials. Goldman Sachs sold 2,100,000 depositary shares in the Offering, not including the exercise of its overallotment option.

34. J.P. Morgan Securities LLC ("JP Morgan") was an underwriter of the Offering. As an underwriter, JP Morgan was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials. JP Morgan sold 1,050,000 depositary shares in the Offering, not including the exercise of its overallotment option.

35. HSBC Securities (USA) Inc. ("HSBC") was an underwriter of the Offering. As an underwriter, HSBC was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials. HSBC sold 700,000 depositary shares in the Offering, not including the exercise of its overallotment option.

36.     Mitsubishi UFJ Securities (USA), Inc. ("Mitsubishi") was an underwriter of the Offering.   As an underwriter, Mitsubishi was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.  Mitsubishi sold 262,500 depositary shares in the Offering, not including the exercise of its overallotment option.

37.     Santander Investment Securities Inc. ("Santander") was an underwriter of the Offering.  As an underwriter, Santander was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials. Santander sold 262,500 depositary shares in the Offering, not including the exercise of its overallotment option.

38.     SMBC Nikko Securities America, Inc. ("SMBC") was an underwriter of the Offering.  As an underwriter, SMBC was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials. SMBC sold 262,500 depositary shares in the Offering, not including the exercise of its overallotment option.

39.     U.S. Bancorp Investments, Inc. ("US Bancorp") was an underwriter of the Offering. As an underwriter, US Bancorp was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.   US Bancorp sold 262,500 depositary shares in the Offering, not including the exercise of its overallotment option.

40.     Merrill Lynch, Goldman Sachs, JP Morgan, HSBC, Mitsubishi, Santander, SMBC, and US Bancorp are collectively referred to herein as the "Underwriter Defendants."   The Underwriter Defendants underwrote, sold and distributed securities in the Offering.

IV.    **SUMMARY OF THE ACTION**

    A.    **Overview of Stericycle**

41.    Stericycle specializes in the collection and disposal of medical, pharmaceutical, and industrial hazardous waste that must be disposed of in a particular way pursuant to regulation.

    1.    **SQ and LQ Customers**

42.    Stericycle's customers fall into two broad categories:  small-quantity ("SQ") customers and large-quantity ("LQ") customers.  SQ customers are typically small businesses, including outpatient medical clinics, medical and dental offices, long-term and sub-acute care facilities, veterinary offices, and retail pharmacies, which generate relatively lower volumes of regulated waste for disposal.  By contrast, Stericycle's LQ customers generate comparatively more regulated waste, and include hospitals, blood banks, and pharmaceutical manufacturers.

43.    Stericycle generates the highest single percentage of its revenues from SQ customers.  In 2016, SQ customers made up 95% of Stericycle's customer base, and the chart below reflects the very large percentages and dollar amounts of revenue that SQ customers generated for Stericycle in 2013 through 2015:

| Year | Total Domestic Revenue | Total Domestic Revenue from SQ Customers ($) | Total Domestic Revenue from SQ Customers (%) |
|------|------------------------|----------------------------------------------|----------------------------------------------|
| 2013 | $1.51 billion | $951 million | 63% |
| 2014 | $1.8 billion | $1.134 billion | 62% |
| 2015 | $2.17 billion | $1.345 billion | 63% |

The following pie charts from the Company's April 2016 investor presentation show visually the vast difference in gross margin between Stericycle's SQ and LQ customers and the revenue attributable to each:



44.    As Stericycle has stated in its publicly-filed disclosures to investors, the Company's domestic SQ business has a much higher gross margin, and is vastly more profitable to Stericycle, than Stericycle's LQ business.  In the Company's Form 10-Ks filed on February 28, 2014 and March 2, 2015, Stericycle claimed that it targets SQ customers as a growth area because "[w]e believe that when small-quantity regulated waste customers understand the potential risks of failing to comply with applicable regulations, they appreciate the value of the services that we provide."  Stericycle then claimed that this factor was "***the basis*** for the higher gross margins that we have achieved with our small-quantity customers relative to our large-quantity customers."

45.    Defendants thus claimed to investors that "the basis" for the disparity in margins between SQ and LQ customers was SQ customers' purported unique appreciation of the value of Stericycle's services in light of the regulatory requirements governing waste disposal.  In reality, Stericycle used its undisclosed fraud on its own SQ customers to fuel the Company's revenues and growth and meet Wall Street earnings projections.

### 2. Stericycle's Contracts with Its SQ Customers

46. Stericycle SQ customers have standard service agreements with the Company that provide that the customers will pay a fixed fee in exchange for Stericycle collecting and disposing of their regulated waste, for periods ranging from one to five years.

47. The contracts between Stericycle and its SQ customers expressly limited the circumstances under which Stericycle could increase the subscription rates it charged its customers. In this regard, Steri-Safe Service Agreements provided that:

> Stericycle reserves the right to adjust the contract price to account for operational changes it implements to comply with documented changes in law, to cover increases in the cost of fuel, insurance, or residue disposal or to otherwise address cost escalation.

48. In sum, Stericycle's standard form contract provided that the Company could increase the fee it charged its customers *only* to account for (i) "documented changes in law" or (ii) "to cover increases in the cost of fuel, insurance, residue disposal, or to otherwise address cost escalation." The Company also repeatedly described, in its public filings with the SEC, that its contracts with customers were based on a "predetermined subscription fee" and that Stericycle recognized its revenues on its contracts "evenly over the contractual service period."

49. Stericycle's contracts also would automatically renew upon their expiration for the same term length as the original contract unless the customer provided Stericycle with 60 days written notice of termination before the renewal date.

### 3. Stericycle's Class Period Growth

50. During the Class Period, and prior to Stericycle's announcement of its decelerated growth in October 2015, the Company outwardly portrayed an image of financial success and rapid, consistent growth.

51.     Indeed, according to an October 2015 MarketLine Company Report, for the 36 quarters prior to Stericycle's third quarter 2015 negative earnings and growth announcement, sales at Stericycle had increased compared to the same quarter in the previous year.  For example, in the second quarter of 2015, sales at Stericycle totaled $715.69 million, which was an increase of 11.7% from the $640.82 million in sales at the Company during the second quarter of 2014.

52.     In fact, as shown by the chart below from Stericycle's April 2016 investor presentation, the Company's revenue growth throughout the years was astronomical, more than tripling since 2006 to $2.986 billion in 2015:



53.     The market's views on Stericycle reflected positively on the Company's claimed prosperity and growth.  As stated in an RBC analyst report on July 24, 2015, "Stericycle has a strong track record of growth, with 10-year revenue and EPS [earnings per share] CAGRs [compound annual growth rates] of 17% and 18%, respectively.  Two important drivers of this success are:  1) a history of consistently growing the addressable market through geographic and service line expansion; and 2) a disciplined capital allocation strategy that prioritizes internal investment and strategic M&A but also includes share repurchases."

54.     Indeed, for much of the Class Period, Stericycle's share price rose sharply, with its common stock increasing from a closing price of $98.19 at the start of the Class Period on February 7, 2013 to a Class Period high of $150.84 almost two years later on October 19, 2015.  Then, as

discussed below, following a series of corrective disclosures by Stericycle, the price of the Company's common stock fell to $78.00 on September 19, 2016 at the end of the Class Period.

### B. Stericycle Defrauded Its Own Customers

55. Contrary to the contractual restrictions on Stericycle's ability to raise its customers' rates, and its repeated claims to investors, Stericycle perpetrated an enormous and centrally-directed fraud against its customers by unilaterally raising its customers' rates on a regular basis without advance notice and in violation of the contracts. Stericycle carried out this fraud by (i) imposing a standard, automatic percentage price increase (typically 18%) on its customers every six months; and (ii) imposing numerous fees and surcharges that had no relation to actual costs or fees that Stericycle incurred in servicing a particular contract.

56. Defendants engaged in this fraud in order to inflate Stericycle's revenue and growth, meet the Company's and Wall Street's revenue and growth expectations, and artificially inflate the prices of Stericycle's securities. Indeed, as a result of their fraud, the Company consistently managed to meet Wall Street analyst expectations for earnings per share before their fraud was revealed to the market through a series of partial corrective disclosures discussed below, and the Officer Defendants profited handsomely from it, selling in the aggregate more than $55 million in personally-held Stericycle securities.

### 1. Stericycle Imposed Fraudulent Automatic Price Increases on SQ Customers

57. Stericycle generated its extraordinary revenue and achieved its steady growth by programming its internal billing and accounting software to automatically charge an 18% price increase every six months on the purportedly flat rates that it agreed to charge its SQ customers. As a result, the supposedly "predetermined" rates that Stericycle's SQ customers had originally bargained to pay frequently doubled or more during the typical three to five year contract term.

58.     The contours of this fraud have now been well-established after years of litigation in multiple related lawsuits.  As discussed further below, Stericycle's automatic price increases resulted in the federal government and 14 state Attorneys General supporting the settlement of a whistleblower suit filed against the Company related to this misconduct (defined above as the "Government Case"), which collectively settled for $30.9 million  In addition, in 2013, a number of Stericycle customers filed a lawsuit in this District against Stericycle alleging that it violated state consumer protection laws by imposing these fraudulent price increases on them.  The action (defined above as the "Customer Case") is captioned *In re Stericycle, Inc. Steri-Safe Contract Litigation*, No. 13 C 5795 (N.D. Ill.), and is currently pending before the Honorable Milton I. Shadur.  Throughout the Class Period in the instant case, Defendants repeatedly denied the allegations in the Customer Case and claimed that they were "without merit."  However, as referenced herein, the results of discovery in the Customer Case, which only became public in 2016, confirm Plaintiffs' allegations herein.

59.     According to the October 13, 2015 deposition testimony of former Stericycle billing employee Tara Bender in the Customer Case, Stericycle's automatic (or "automated") price increases were a default, "systematic increase" for SQ and Steri-Safe customers by a "behind-the-scenes program" that would "automatically push the pricing to the customers' accounts."  As Bender further testified, Stericycle "called it automated because it was an automatic process." Bender further testified that Stericycle had been implementing automatic price increases since at least July 2003, and that at that time, SQ and Steri-Safe customers were receiving automatic price increases of 18%, which was the "standard."

60.     Stericycle Vice President of Business Operations James Edward Buckman also confirmed under oath during his December 10, 2015 deposition in the Customer Case that the

"standard" percentage automatic price increase for SQ customers was 18%. Buckman testified that if a customer's contract did not specifically state when the customer's prices could be changed or increased, Stericycle's billing system implemented the 18% automated price increase every six months.

61.     This information was corroborated by a former Compliance Solution Specialist, who worked for Stericycle from November 2014 to February 2016, who stated that the 18% price increases occurred "like clockwork" every six months.

62.     Stericycle did not disclose these "automated price increases," or "APIs," in advance to the customers who paid them. Instead, Stericycle simply issued an invoice for the new, inflated price, without notice, explanation or justification.

63.     Moreover, Stericycle's automatic price increases were not permissible based on the language in customers' contracts that Stericycle could increase customers' rates in order to "cover increases in the cost of fuel, insurance, or residue disposal or to otherwise address cost escalation."

64.     As Defendant Kogler himself testified under oath during his July 31, 2014 deposition in the Customer Case, Stericycle imposed its automatic price increases unrelated to specific costs. Specifically, Kogler testified that since Stericycle runs its business as a "unitized service infrastructure," the Company has "never been able to identify costs down to the customer level."

65.     In fact, Stericycle modified the frequency of its automatic price increases not to reflect increased costs incurred by Stericycle but to simply hit the revenue targets that Stericycle and Wall Street set. As James Buckman testified under oath during his December 2015 deposition in the Customer Case, prior to the Class Period, Stericycle increased the frequency of the 18% rate increases from every nine months to every six months based purely on the need to increase

Stericycle revenue and hit "revenue goals." This statement was corroborated by a former Small Quantity Division Territory Account Manager who worked with Stericycle from April 2013 to August 2015, who stated to Lead Counsel that price increases grew in frequency over the years to every six months in order to meet Stericycle's revenue goals. The former Small Quantity Division Territory Account Manager described Stericycle's business as selling illegal contracts to customers because the automatic price increases made the contracts null and void.

66.     According to Buckman, Stericycle's revenue goals reflected Wall Street's expectations of Stericycle's revenues and Stericycle's decision to increase the frequency of price increases was ***not*** based on the Company's specific costs to provide its services to customers:

> Q:     But when you are making decisions about specific initiatives, such as changing the frequency of automated price increases, you don't go back and look and say, hey, how much is – you know, how much is it costing us to dispose of medical waste, how much are we paying for labor or any other specific cost factors when you are making those revenue decisions do you?
>
> A:     Not specifically.
>
> ***
>
> Q:     So, when you are deciding whether to change the frequency of automated price increases, you don't need to go back and look at those cost figures; all you need to do is make sure you hit your revenue numbers in order to make sure you keep your margins, right?
>
> A:     In my role, yes.

67.     As Buckman further testified in the Customer Case, Defendants Arnold and Kogler were also involved in the decision to switch from a nine-month to a six-month API cycle, thereby increasing the rate at which Stericycle increased customers' prices.

68.     Stericycle imposed the APIs through its internal electronic billing and accounting software system called Tower (and later called "Steri-Works").

69.     In January 26, 2016, former Stericycle Vice President Michael Kravets testified under oath in the Customer Case that, although Stericycle's computer system "finds the data in the system," "there is human intervention that initiates the process."

70.     In this regard, Mr. Buckman, Stericycle's Vice President of Business Operations, testified in the Customer Case in December 2015 that Defendant Arnold himself originally tasked Buckman with preparing a five-year plan for SQ customers that would implement a regular 18% price increase.

71.     As shown in the image below, Stericycle's internal billing system shows a last price increase amount for Stericycle customers, here a governmental customer (the Federal Aviation Administration).  As was the case with most SQ customers, Stericycle charged the FAA an 18% fee increase.



72.    As indicated above, in addition to the last price increase amount, the fields

populated with data in Stericycle's system included, for example, "Last Price Inc[rease] Date," "PI

[Price Increase] Exempt," "PI [Price Increase] Max Amt (%)," "PI [Price Increase] Expire Date," and "PI [Price Increase] Reason Code."

### 2. The Officer Defendants Were Personally Responsible for the Automatic Price Increases

73.     As the foregoing facts demonstrate, senior Stericycle executives were directly involved in the development and implementation of Stericycle's strategy to defraud its own customers.  As set forth below, the Officer Defendants developed and implemented the automatic price increases and other baseless surcharges and fees.

74.     For example, former Stericycle revenue and billing employee Tara Bender testified in the Customer Case that Defendant Kogler and other members of Stericycle upper management were responsible for the APIs.  Ms. Bender testified that a Stericycle PowerPoint presentation that she personally worked with stated that, with respect to "Automated Price Increases," the "Rules [were] driven by Rich Kogler."   Bender testified that she intended this slide to let "everybody know that this [*i.e.*, automated price increases] is coming from – it's executive management-driven on down, that it's not our particular billing team that is making up these rules, they're driven from upper-level management."  As Bender added in her testimony, her goal was to inform Stericycle employees that automated price increases were a serious issue that was "coming from upper-level management."

75.     Former Stericycle Vice President Michael Kravets also testified by deposition on January 26, 2016 in the Customer Case that Stericycle's "executive team" made the determination to run the automated price increase process, and that the executive team was comprised of Officer Defendants Alutto, ten Brink, Kogler, Ginnetti and Arnold.

76.     Kravets further testified during the same deposition that the executives proposed the increases in order to "meet our overall business goals," including meeting "Wall Street expectations" and improving "company performance."

### 3.     Stericycle Imposed Baseless Additional Fees

77.     In addition to charging its customers fraudulent automatic price increases, Stericycle imposed numerous fees and surcharges on them that had no relation to actual costs that Stericycle incurred, such as "Environmental / Regulatory Fees," "Fuel Surcharges," "Energy Fees" or "California SB 1807 Fees."

78.     Defendant Arnold directly participated in instituting the baseless environmental fee.  In an email communication used as an exhibit during Mr. Buckman's December 10, 2015 deposition in the Customer Case, Arnold asked that Buckman's five-year plan for SQ customers include "the ability to *feather in additional environmental and reg fees* in the future."  In the email, Arnold provided an example of an arbitrary increase, suggesting that such fees increase in the amount of "*2.5 percent* in Jan, Feb and March of 2012."

79.     According to former Stericycle employees, including a former employee who worked in Stericycle's SQ division in sales and, most recently, in the Retention Department from December 2008 to November 2014, and a former Stericycle Customer Care Specialist who worked for the Company from October 2013 to December 2015, Stericycle's environmental fee was simply made up and had no relation to an actual cost or fee incurred by Stericycle.

80.     According to a former Small Quantity Division Territory Account Manager who worked with Stericycle from April 2013 to August 2015, the environmental fee was a bogus charge that was related to absolutely nothing and implemented simply to boost earnings, and the fuel and energy charges were similarly bogus.

81.     In terms of the size of the fees, a former Territory Sales Specialist with Stericycle from December 2014 to November 2015 stated that Stericycle's environmental fee increased from approximately 5-7% to *13%* during her time at Stericycle.

82.     Stericycle hid these fees from its customers by embedding them in the supposedly flat fee it charged for the Steri-Safe service.

83.     As a former Stericycle Regional Sales Manager who worked for the Company from June 2008 to July 2015 stated, Stericycle created the purported environmental fee as a means to justify Stericycle's price increases. According to the former Regional Sales Manager, customer bills would not be itemized and a customer would only find out that it was paying an "environmental fee" if it requested an itemized bill from Stericycle or if it called Stericycle to complain about their bill.

### 4.     Stericycle Used Unethical Sales Tactics to Lure Customers into Signing Its Contracts

84.     Stericycle also engaged in a fraudulent course of conduct to pressure customers to sign the contracts without giving them enough time to read and understand any fine print that Stericycle might argue permitted it to price-gouge its own SQ customers.

85.     According to a former Stericycle Regional Sales Manager, who worked at the Company from June 2008 to July 2015, Stericycle encouraged "one call closes" when sales personnel talked customers into signing a contract with Stericycle electronically before the customer had the opportunity to read it or understand its terms. To encourage this, Stericycle would have sales contests and reward the salesperson with the most "one call closes."

86.     According to a former Stericycle Inside Sales Regional Account Manager from May 2014 to October 2015, sales personnel would not have the customer read the agreement before

signing it and they would not disclose any information contained within the agreement other than the term length and the original price.

87.     It was also Stericycle's practice to convince anyone who answered the telephone at the customer's site to sign the contract regardless of whether that person had the proper authority within the target company.  According to a former employee who worked in Stericycle's SQ division in sales and, most recently, in the Retention Department from December 2008 to November 2014, the person on the line signing the contract could be the janitor or a secretary.

88.     In addition, according to a former Compliance Solution Specialist who worked at the Company from November 2014 to February 2016, the sales team used scare tactics to convince customers that they were required to obtain a certain type of waste removal service even where they were not generating the relevant volume of waste or were not producing waste considered hazardous by the EPA.

89.     According to the former Compliance Solution Specialist, Stericycle also created a hazardous waste checklist for compliance with EPA regulations, but a third of the items on the checklist were not necessarily hazardous. The checklist was also misleading because certain products were only hazardous in specific percentages.  If customers questioned whether Stericycle's services were necessary, Stericycle employees were told to be vague.

90.     Indeed, a former Inside Sales Regional Account Manager, who worked at Stericycle from May 2014 to October 2015 stated that, on calls with customers, Stericycle would incorrectly cite the requirements of the Resource Conservation and Recovery Act (which gave the EPA the authority to control the generation, transportation, treatment, storage, and disposal of hazardous waste), and would convince customers that they needed Stericycle's services to comply with the law.

### 5. Government Settlements Confirm Stericycle's Course of Conduct

91. The Government Case filed by one of Stericycle's former employees mentioned above, which Stericycle has settled for a total of $30.9 million (including a payment of $1.75 million to the relator), further confirms the existence of Stericycle's fraud with respect to the Company's governmental customers subject to that settlement.

92. On April 28, 2008, *qui tam* relator Jennifer Perez, a former Stericycle employee, filed a complaint against the Company in this District in an action captioned *U.S. v. Stericycle, Inc.*, No. 08-cv-2390. *See* Second Amended *Qui Tam* Complaint (the "*Perez* Complaint") (Dkt. No. 42).

93. Stericycle had hired Perez as a temporary employee in 2004. In 2006, the Company promoted her to the position of government specialist and put her in charge of preventing and resolving disputes with Stericycle's governmental accounts.

94. In Perez's Complaint, she alleged that unauthorized price increases defrauded the federal government and 14 states, including the District of Columbia, by imposing price increases on those customers in violation of customer contracts.

95. The *Perez* Complaint alleged that Stericycle defrauded the government by "knowingly or recklessly: (a) submitting false claims; (b) making false statements in order to get false or fraudulent claims paid or approved; (c) knowingly concealing or improperly avoiding an obligation to pay or transmit money or property to the Government; and/or (d) fraudulently inducing the Government to enter into a contract knowing at the time the contract was entered into that it had no intent of honoring the terms of the contract but instead intended on arbitrarily increasing the price agreed upon in the contract by various amounts up to 18% every 9 to 12 months." *Perez* Complaint at ¶2.

96.     Specifically, Perez alleged that Stericycle routinely and automatically increased the rates of small quantity customers by 18% (*id*. ¶14) and would add "fuel and energy" surcharges to bills, without prior disclosure to customers. Perez alleged that these "fuel and energy" surcharges had no relationship to actual fuel and energy costs, as shown by the fact that Stericycle charged customers this amount even if the Company had not picked up any waste from them.  As a result, Perez alleged, Stericycle overcharged the government.  *Id.* ¶¶ 25-35.

97.     As the *Perez* Complaint also alleged, when customers called to complain about price increases, Stericycle "used various false statements" to justify the increases.  This included "[t]elling customers that Stericycle was experiencing annual increased costs for insurance, labor, energy, or regulatory requirements totaling as high as 30%, when their actual annual cost escalation was 3%" and "[t]elling customers that Stericycle passed on only a fraction of increases to customers because the company tried to absorb as much as possible . . . ." *Id.* ¶ 23.

98.     Perez alleged that her supervisors frequently admitted to her that they were aware that the Company's billing practices were improper as applied to the government accounts.

99.     Perez also alleged that she advised her superiors that Stericycle could not bill in advance of service, nor could it charge for un-bargained-for and/or unjustified increases and surcharges.  Stericycle, instead of heeding this advice, fired Perez.

100.     On January 2, 2013, as part of the proceedings the Government Case, Stericycle settled the claims against it that related to Stericycle's New York government customers, agreeing to pay $2.4 million to the State of New York, Perez, and New York State government customers (the "Partial Settlement Agreement").  As alleged by the *Perez* Complaint, Stericycle had unlawfully imposed rate increases on nearly 1,000 New York governmental entities, including hospitals, schools and jails.  Under the New York-specific settlement agreement, Stericycle

29

reimbursed the State of New York for costs stemming from the automated price increases and paid treble damages to the State.

101.    The Partial Settlement Agreement states that, "[d]uring the period January 1, 2003 through September 30, 2012, with respect to New York Government Customers, Stericycle presented invoices containing automatic price increases not authorized by contracts *viz* automatic periodic rate increases (automated price increases or 'APIs'), that resulted in overpayment for products and services."  In the Partial Settlement Agreement, Stericycle "denie[d]" those specific allegations and "assert[ed] that the APIs were authorized by its contracts."

102.    Stericycle only modified its fraudulent practices with respect to the New York government customers when the Government Case forced its hand, and only did so in a very limited manner.  As part of Stericycle's Partial Settlement with the New York Attorney General, Stericycle agreed that:

a.    Stericycle shall not, in the future, apply any APIs to New York Government Customers.  Any APIs applied to and paid by New York Government Customers after the period of the covered conduct shall be credited to customer accounts;

b.    Stericycle shall provide New York Government Customers sixty-days' written notice of and the reasons for any proposed future rate increases directed to any such customer, and should that customer who receives such notice object to the pending increase, that customer shall be permitted to opt-out, without penalty, of all remaining contractual obligations, upon thirty-days' written notice to Stericycle; and

c.    Nothing in this Agreement shall constitute a waiver of the rights of the State of New York to examine or re-examine the books and records of Stericycle to determine that no automated price increases have been applied to New York Government Customers.[1]

---

[1]  Stericycle's Partial Settlement Agreement with New York states that it is only for the benefit of the parties to the Government Case and does not release any claims against any other person or entity.  The Partial Settlement Agreement further stated that "[t]his stipulation is [not] an admission of liability by Stericycle."

103. The New York State Attorney General's press release announcing the settlement remarked upon how Stericycle had overcharged New York taxpayers through a "cynical scheme":

> "Stericycle improperly profited by overcharging New York taxpayers," said Attorney General Schneiderman. "In these times of harsh budget cuts to education, public health, and public safety, local governments and agencies need every available dollar and we will hold accountable corporations like Stericycle that use cynical schemes to rip off New York taxpayers."
>
> The Attorney General's investigation of the allegations in the complaint found that Stericycle had programmed its billing system to increase by 18%, an amount designed to go undetected by customers. The Attorney General's investigation found the sole reason for the APIs was to increase revenue and avoid detection by these customers. But when Stericycle customers would complain of rate increases, Stericycle employees were instructed to state that Stericycle had incurred actual increased costs due to, for example, new strict environmental regulations.

104. Stericycle also settled the remainder of the Government Case on October 8, 2015, with Stericycle paying 13 other state governments and state government customers involved $26.75 million and the relator $1.75 million (the "Settlement Agreement").[2]

105. As Judge William T. Hart's February 1, 2016 Opinion and Order granting Perez's motions for settlement and dismissal of the Government Case found, discovery in the Government Case initially revealed that there had been overcharges to the government customers at issue during the relevant time period of approximately $13.57 million. But, as that Opinion and Order further disclosed, in connection with the parties' determination of how the proceeds of the settlement would be allocated among the jurisdictions involved, "it was discovered that some private Stericycle customers had been miscoded as government customers." The effect of this revelation

---

[2] As with the Partial Settlement Agreement with New York State, the Settlement Agreement with the remaining states provides that Stericycle "denies all allegations of wrongdoing in connection with the Covered Conduct, and this Agreement shall not be construed as an admission of any wrongdoing or liability by Stericycle."

was "a $1.8 million decrease from $13.57 million to $11.76 million in the amount of government over-charges." In other words, the Opinion and Order found that some private Stericycle customers had erroneously been categorized as governmental entities and also overpaid Stericycle by $1.8 million in fees. This $1.8 million that resulted from an inadvertent mis-categorization is only a small percentage of the total overcharges that Stericycle's private customers overpaid the Company.

106. Judge Hart's February 1, 2016 Opinion and Order also noted that the submission by the U.S. government on the issue of the settlement and dismissal of the Government Case provided that the federal False Claims Act (pursuant to which the federal government would pursue its claims) "does not specifically require a consent decree [with Stericycle] and that the United States did not seek a consent decree because Stericycle ceased the price increases" with respect to the government. The U.S. government thus continued to understand, through the time of settlement, that Stericycle had imposed improper price increases on government customers, but was ceasing them as a result of the settlement.

107. Stericycle's settlements of the Government Case did not directly address any allegations concerning private, non-governmental SQ customers, and, unbeknownst to investors, Stericycle's fraud with respect to such customers existed and continued during the Class Period.

### 6. Stericycle Experienced Undisclosed Pricing Pressure as SQ Customers Cancelled or Re-Negotiated their Contracts

108. Once Stericycle's SQ customers became aware of the Company's abusive practices and excessive prices, in part, due to the light shed by the Government Case, many cancelled their contracts and left the Company and took their significant revenue streams with them, or asked Stericycle to lower their contract prices, which also had a materially negative impact on Stericycle's revenues and growth.

109.     Customers who noticed the fraudulent increases in their rates would first call Stericycle's Customer Service Department.  Once customers asked to cancel their contracts, Stericycle sent them to the Company's Retention Department, whose purpose was to coerce customers to stay with Stericycle.  The Retention Department did this by either decreasing the customers' prices or putting caps on their rate increases for a certain period of time.  According to a former Territory Sales Specialist who worked at Stericycle from December 2014 to November 2015, these caps did not apply to fees other than the automatic price increases, such as environmental fees, which would continue to increase.  Stericycle also strong-armed some customers into agreeing to new contracts that provided for a lower rate than Stericycle was currently charging them (but at a rate that was still higher than in their original contract).

110.     During the Class Period, Stericycle's Retention Department was one of the Company's most important departments because such a large number of customers called the Company to cancel their contracts.

111.     According to a former Stericycle Compliance Solutions Specialist who worked at the Company from November 2014 to February 2016, customers wanted to end their contracts because they were angry about the price increases and angry that Stericycle was pushing them to buy additional services that they did not need.  In addition, Stericycle sales people brought up their own concerns over the price increases because Stericycle was losing customers and the sales people were unable to upsell other services to them.

112.     According to a former employee who worked in Stericycle's SQ division in sales and, most recently, in the Retention Department from December 2008 to November 2014, customers made approximately 200-300 calls to the Retention Department per day and 90-95% of these calls were from customers who wanted to cancel their contracts because of the price

increases. The former employee described that the sales department was bringing in new accounts, but on the back end, the Company was losing accounts or having to re-negotiate contracts.

113. As a result of the flood of requested cancellations, Stericycle increased the size of the Retention Department and devoted significant resources to it:

      a.    According to a former Stericycle Regional Sales Manager for SQ customers, who worked for Stericycle from June 2008 through July 2015, the Retention Department increased from one manager and approximately eight representatives at the time he started working for the Company in 2008, to three managers and 25-30 representatives by the time he left Stericycle in July 2015;

      b.    A former Stericycle Customer Care Specialist, who worked for Stericycle from October 2013 through December of 2015, remembered that the Retention Department had approximately 36 employees at the time that the employee left Stericycle;

      c.    A former Stericycle Compliance Solution Specialist who worked with Stericycle from November 2014 to February 2016 remembered there being approximately 40 or 50 employees when the Compliance Solution Specialist left in early 2016; and

      d.    According to a former Territory Sales Specialist who worked at Stericycle from December 2014 to November 2015, the Retention Department became the largest team.

114. When customers indicated that they planned to leave Stericycle because of the price increases, the Retention Department also threatened them with large liquidated damages if they cancelled their contracts. The amounts of liquidated damages would be equal to half of the monthly average amount that the customers were due to pay Stericycle on their contracts for the duration of their contracts.

115. One former Stericycle Customer Care Specialist who worked at the Company from October 2013 to December 2015 remembered charging as much as $54,000 to a customer who was terminating its contract. Another former Stericycle employee, a Territory Sales Specialist

34

who worked for the Company from December 2014 to November 2015 remembered charging as much as $60,000 to a customer terminating its contract.

116.    Despite the threat of liquidated damages and the lure of a potentially lower, re-negotiated fee, Stericycle faced a material loss of customers during the Class Period as a result of its undisclosed misconduct:

> a.      According to the former Compliance Solution Specialist with the Company from November 2014 to February 2016, Stericycle focused on retention because they were "hemorrhaging" customers;

> b.      As a former Stericycle Small Quantity Division Territory Account Manager from April 2013 to August 2015 stated, customers were "leaving in droves";

> c.      A former Inside Sales Regional Account Manager who worked for Stericycle from May 2014 to October 2015 and a former Territory Sales Specialist who worked for Stericycle from December 2014 to November 2015 stated that the predominant reason customers wanted to leave was the price increases; and

> d.      The former Territory Sales Specialist who worked for Stericycle from December 2014 to November 2015 added that there was a large increase in the number of customers leaving Stericycle in around March 2015.

117.    The former Stericycle Territory Sales Specialist who worked at the Company from December 2014 to November 2015 further stated that, during that time, hospitals and other customers would join together and all be on one account and threaten to cancel their contracts with Stericycle.  Such customers were complaining to Stericycle that the Company could not raise their prices in the amounts that Stericycle had raised them without providing them with anything in writing, and they would also criticize Stericycle's automatic renewals of their contracts and the imposition of the environmental fees.

118.    According to a former Stericycle Regional Sales Manager who worked at the Company from June 2008 to July 2015, Stericycle carefully tracked the numbers from the

Retention Department showing how many customers cancelled their contracts with Stericycle, and the Company would create reports that showed customer and revenue loss.

119.     As a Small Quantity Division Territory Account Manager from April 2013 to August 2015 stated,  Stericycle's Vice President of Sales (for most of the Class Period, James Campanella) led monthly meetings (which some called "Town Hall" meetings) where employees were shown PowerPoint presentations that included the number of accounts lost.

120.     According to a former Stericycle Regional Sales Manager who worked at the Company from June 2008 to July 2015, there were also quarterly meetings run by Christopher Bosler, Stericycle's Senior Vice President of Sales, where retention numbers, including customer loss and percentages of revenue lost were discussed.  According to the former Regional Sales Manager, an executive guest was present at 75% of the quarterly meetings for at least some portion of the meeting.  Defendants Arnold, Ginnetti or ten Brink would usually attend the meetings and Defendant Alutto attended one or two meetings.

121.     According to a Compliance Solutions Specialist with Stericycle from November 2014 to February 2016, the earnings and guidance misses that Stericycle reported starting in October 2015 were tied to customers leaving and renegotiating their contracts.  In addition, a former Stericycle Territory Account Manager for the Small Quantity Division from April 2013 to August 2015 agreed that the Company's reported earnings misses were due to Stericycle customers leaving in droves.

122.     As Stericycle Vice President James Buckman testified in the Customer Case on December 10, 2015, the Company tracked its increases in loss and discounting growth (including at the request of Defendant Arnold) "on an ongoing basis" and "the impact of losses and discounting would grow 10 percent per year."

123.     Stericycle also analyzed "stick rates" – the amounts and percentages of customers retained in spite of the automatic price increases – in several reports, including API Impact Reports.  As discussed by Stericycle revenue and billing employee Tara Bender during her October 13, 2015 deposition under oath in the Customer Case, Defendant Kogler and Stericycle Vice Presidents monitored these reports.  As Bender testified, "Rich Kogler and [Stericycle] VPs" monitored the "monthly PI analysis reports," which were prepared by Stericycle's information technology department and which "examain[ed] how the price increase was going."  Bender further confirmed in her testimony that automatic price increases were something that was very important to Stericycle's executive team.

124.     As a result of the Officer Defendants extensively tracking Stericycle's revenue loss due to its discounting of customer contracts and customer attrition, the Officer Defendants knew or recklessly disregarded that the Company's automatic price increases were negatively impacting revenues and growth, while simultaneously falsely reassuring the market that Stericycle was experiencing growth based on honest reasons.

### 7.     The Automatic Price Increases and Baseless Additional Fees Were Material to Stericycle Revenues and Growth

125.     As discussed above, Stericycle engaged in its fraudulent scheme of automatic price increases because the revenue stream it generated was a critical percentage of Stericycle's business, it allowed Stericycle to meet Wall Street expectations, and the Company's executives were highly motivated to continue it.

126.     Indeed, James Buckman testified during his deposition in the Customer Case on December 10, 2015 that, as he wrote in a July 2011 email, ***most*** of Stericycle's SQ revenue growth was driven by pricing and environmental fee increases.  Buckman also admitted in his 2015 testimony that this continued to be true after the time he wrote his July 2011 email.  In Buckman's

words, "***those are significant components of growth***," and the discounts that Stericycle offered to

its customers who complained about them (in order to retain their business) "offset those." Indeed,

when asked if "fees and surcharges are one of the ways that Stericycle makes sure that any

decreases or changes in its revenue don't cause it to miss its targeted revenue goals," Buckman

testified, "I would say yes, that we have had fee increases in order to achieve revenue goals within

the sales and marketing organization."

127.     Since the fee increases were such significant components of revenue and growth,

Stericycle has not discontinued its fraudulent price increases except in a piecemeal fashion or

temporarily for only certain types of customers. For example, by 2006, Stericycle executives were

aware that federal government customers objected to Stericycle's API policy. As a result, in

September 2006, Stericycle Vice President Patrick Cott e-mailed his subordinates directing them

to stop charging APIs to federal government customers. While Stericycle understood that the

terms of its SQ customer contracts did not permit it to continue to charge APIs to the federal

government, Stericycle continued to impose APIs on its SQ private sector customers and did not,

in the end, cease entirely its overcharging of federal government customers.

128.     For example, in the Government Case, the U.S. government submitted a chart to

the Court in January 2016 setting forth its estimate that the total single damages suffered by the

U.S. government resulting from Stericycle's price increases of 18% were approximately $1.488

million. Mr. Cott's e-mail disclosed the reason that Stericycle continued its API policy with

respect to federal agencies despite recognizing that it was unlawful: it generated a substantial

revenue stream to Stericycle. As Mr. Cott wrote to two subordinates: "Todd/Jerry – please be

advised of the potential impact to the PI Impact Analysis reports that Courtenay sends to

Mark/Frank/Rich each month, as these accounts will no longer be in the mix for automated PIs and fuel charges, and thus you'll lose projected PI revenue with this change."

### 8. Stericycle's Fraudulent Prices Increases Were Unsustainable

129.    The Officer Defendants knew or recklessly disregarded that Stericycle's fraudulent business model based on automatic price increases and baseless additional fees was unsustainable. Based on material adverse information within the Company, Stericycle experienced significant undisclosed pricing pressure during the Class Period from SQ customers, and it was inevitable that Stericycle's fraud would collapse as its SQ customer base eroded. Stericycle could not simply continue over-charging its customers forever and reasonably expect them to continue paying the excessive, ever-increasing fees. Yet, that is exactly what the Officer Defendants did as they forged ahead with defrauding SQ customers.

130.    As early as 2009, former Stericycle Vice President Michael Kravets repeatedly expressed his concerns about the risks of automatic price increases to Stericycle and its customer base and urged the Officer Defendants to stop them because they were costing Stericycle customers and revenue. However, Kravets was repeatedly rebuffed. Specifically, Kravets testified at his January 26, 2016 deposition in the Customer Case that that as far back as 2009 or 2010, he voiced objections to Stericycle executives about the price increases. He testified that he "clearly demonstrated the *correlation between automated price increases and lost business*, and suggested that [Stericycle] not automatically increase customer's prices." Kravets further testified that, one reason among others for his objections to the automatic price increases was that they actually caused Stericycle to lose more revenue than it was gaining through the price increases. Kravets also testified that the automatic price increases were "causing a significant amount of administrative burden and cost to address these issues with the end result being a customer loss," and that they were also "hurting our customer loyalty results."

131.     Kravets testified that when he told Stericycle's executive committee (including Officer Defendants ten Brink, Arnold and Kogler) that he did not support the strategy of automatic price increases, they advised him that "it was not a subject really worth discussing in the future." Specifically, Kravets testified that they told him that his objections to APIs were not worth bringing up again.

132.     Indeed, Kravets specifically testified that ten Brink told him in 2009 that he should not raise the issue of whether Stericycle should be using automatic price increases as a pricing strategy after Kravets had presented to the executive team a "correlation between price increases, case volume, retention cases and lost business."  Kravets further testified that "Frank [ten Brink] and Rich [Kogler] both said we are not going to talk about that" and that "a lot of times" ten Brink and Kogler delivered a similar message to Kravets through Defendant Brent Arnold.  Kravets testified that the "general theme" was that ten Brink and Kogler did not want Kravets to proceed any further in analyzing automatic price increases.  Kravets described how "usually" when he raised a concern about the "downstream impact on customers" from the automatic price increases – i.e., "the negative effects on the business" (which included "losses" and "discounting," which was a "drag on revenue") – another executive, Bob Tangredi, would deliver a "message" to Kravets from senior executives (including Kogler, Alutto, and ten Brink) not to raise the issue.

133.     In sum, senior Stericycle management, including Defendants Alutto, Kogler, ten Brink and Arnold, not only knew that the price increases were a serious and actualized risk to the Company losing revenue and customers, but refused several times to listen to Kravets' concerns and went so far as to warn him not to bring the issue up again.

134. Kravets testified that despite repeatedly receiving such warnings to stop raising the issue, he continued to raise his concerns with automatic price increases with senior management because "I was right that *they were causing a negative downstream impact on the business*."

135. Kravets further testified that the executives did not change the Company's behavior in response to the analyses Kravets presented to them.

136. As Kravets indicated in his testimony, automatic price increases were "hurting [Stericycle's] customer loyalty results," and promoted a negative reputation for Stericycle, including among its own current and former customers, making it difficult for Stericycle to re-sign customers who had previously left Stericycle or cross-sell additional services to them.

137. According to a former Stericycle Inside Sales Representative, who worked at the Company from June 2014 to June 2015, Stericycle occasionally had an Acquisitions Team whose sole task was to obtain new Stericycle customers. Each month, each sales representative on the Acquisitions Team would receive the names of 300 businesses that had previously used Stericycle. Of these 300 businesses, sales representatives would, on average, only be able to sign a mere 10 businesses to a new Stericycle contract. These numbers were tracked and available in the reports tab on Stericycle's sales tracking system, Salesforce.

138. According to a former Small Quantity Division Territory Account Manager who worked at Stericycle from April 2013 to August 2015, Stericycle attempted to generate much of its revenue from cross-selling services to existing customers. However, in 2015, Stericycle started hitting a wall in terms of selling, the Company reduced the number of sales people on the sales floor (and moved many of them to the Retention Department) because leads were drying up and getting worse and worse, and the Company's earnings started declining, which occurred shortly after he left the Company in August 2015.

139.    The existence of excessive price increases on SQ customers during the Class
Period, and the fact that the magnitude of those increases was unsustainable, is corroborated by a
post-Class Period analyst report by Northcoast Research dated October 11, 2016.  In the report,
Northcoast discussed how, in the wake of the Company's corrective disclosures about the
existence of previously-undisclosed "pricing pressure" from its SQ customers, it had "contacted
50 medical waste disposal companies across the country and asked for price quotes for medical
waste disposal services" and also "called [Stericycle] and received similar quotes in 10 different
cities."  As a result of this study, Northcoast reported that:

> [Stericycle's] medical waste disposal services are 55-60% more
> expensive than local and regional competitors when a customer
> starts new service.  In addition to base service costs, [Stericycle]
> includes a 6% environmental surcharge and a fuel surcharge where
> most competitors do not.

140.    Northcoast further reported that Stericycle customers experienced price increases
that ranged from "6% to 20%" with "many contacts" quoting a "19%" increase.  As a result, in
Northcoast's words:

> The net result is the delta between [Stericycle] prices and competitor
> prices **expands exponentially** over time to levels that are
> **unsustainable**.

141.    Northcoast further wrote:

> If we assume a 19% escalation provision, a $120.73 monthly service
> price would escalate to $219.07 at the end of the first contract,
> $413.42 at the end of the second contract, $803.17 at the end of the
> third contract, and $1,584.73 at the end of a fourth term.  ***While these
> numbers may sound outrageous*** for a monthly service charge for a
> single box pick up of medical waste, ***it's consistent with some of the
> numbers we've heard from industry contacts***.  ***We've had many
> contacts tell us that [Stericycle's] monthly fees "exceed a thousand
> dollars per month for a single box."***

142.    In addition, Northcoast found that:

In order to stay competitive [Stericycle] is going to have to give its customers significant price concessions upon request. [Stericycle] is expecting 30% price concessions in its hospital-acquired SQ accounts and 10% to 15% price concessions in its independent SQ accounts. If these pricing dynamics played out as advertised we estimate it would be a $0.78 negative impact to [Stericycle]'s earnings over the life of these contracts. ***The reality is [Stericycle] prices may need to come down by as much as 50% to hold the customers, in which case the company could lose more than $2.00 in earnings per share over the life of the contracts***. …

### C.     The Truth Emerges

143.     Beginning on October 22, 2015, and through the end of the Class Period in September 2016, the true facts concerning the existence of the significant "pricing pressure" from SQ customers resulting from Defendants' fraud and the negative financial impact that Stericycle's unlawful and undisclosed rate increases (with their resulting, undisclosed increases in customer attrition and rate re-negotiations) were having on Stericycle's revenue were revealed to investors. The revelations included the materialization of the risk that Defendants had concealed from investors for years – a sharp decline in revenues and growth caused by Defendants' undisclosed and fraudulent automatic price increases on SQ customers and the fallout of that misconduct. Indeed, it was entirely foreseeable to Defendants that the pricing fraud they were perpetrating against their customers was unsustainable and would ultimately result in a sharp downturn in the Company's financial performance.

144.     As Stericycle disclosed, the Company's revenues and growth were declining versus expectations because the Company had been experiencing a previously-undisclosed "trend" of customers exerting "pricing pressure" on Stericycle by demanding lower prices. By the end of the Class Period, analysts viewed this trend as "the key investor concern" on Stericycle and "the most troubling development in recent quarters." As a result of this undisclosed trend in Stericycle's SQ business, as Defendants belatedly admitted, the Company "need[ed] to do

43

discounts to get new renewals" and Stericycle's organic growth rates declined due to its "inability to get the price that [Stericycle] assumed it was going to be able to get from these renewals." This result is precisely what Kravets warned Stericycle's senior management would happen as early as 2009 or 2010. However, the Officer Defendants knowingly or recklessly disregarded this significant risk, and the underlying misconduct, and failed to disclose it to investors throughout the Class Period.

### 1.  The October 22, 2015 Partial Disclosure

145. The Defendants' fraud began to be revealed on October 22, 2015, after the close of the financial markets, when the Company disclosed on its third quarter 2015 earnings call that its revenues were $718.6 million and internal growth was 6.3%. As reported by *Dow Jones Newswire*, Stericycle reported EPS of $0.47, sharply down from $0.96 in the third quarter of 2014. Stericycle also reported adjusted EPS of $1.08 for its third quarter, which was far below the analyst consensus of $1.18. Stericycle also revised its 2015 guidance downward from $4.64-$4.69 to $4.38-$4.41. On the earnings call with investors to discuss these results, CEO Alutto acknowledged that Stericycle executives were "disappointed with the results and the third quarter." Alutto further disclosed that "[w]e anticipate 2016 internal growth rates to be: SQ, 7% to 9%; LQ, 4% to 7%; international, 6% to 9%."

146. On the October 22, 2015 earnings call, an analyst asked Alutto to confirm if Stericycle had adjusted the growth ranges for "SQ, LQ, International." Alutto responded: "[Y]ou are correct on that. The growth engines performed well when we looked at it from an additional services perspective. But certainly we had headwinds related to fuel surcharges and those hazardous waste volumes. So we have adjusted the domestic LQ and SQ growth rates for 2015 and 2016, based on our assumption that the headwinds . . . will remain – will be in effect for 2015 and remain for 2016 as well."

44

147.    Defendant Alutto also stated on the earnings call that Stericycle expected lower hazardous waste volumes to continue in the short term, lowered the mid-point of Stericycle's mid-term domestic internal growth rates by 1%, and lowered Stericycle's 2015 adjusted and cash EPS guidance by 5.7% and 4.3%, respectively.

148.    By these disclosures, Defendants partially revealed to the market the negative financial impact that the Company was facing as a result of the large numbers of SQ customers who were leaving the Company or exerting pricing pressure on Stericycle to re-negotiate their contracts with Stericycle at lower prices.

149.    The October 22, 2015 partial disclosure of the truth caused a sharp decline in the price of Stericycle stock on October 23, 2015, with volume in the trading of Stericycle common stock of 8,070,202 shares, the third highest trading volume of the Class Period (aside from April 29 and July 29, 2016 – the trading days after two other partial disclosure dates discussed below). The price of Stericycle's common stock dropped precipitously from $149.04 per share on October 22, 2015, to a closing price of $120.31 on October 23, 2015, a statistically significant amount with a raw decline of over 19%.  This represented a market capitalization loss of over $2.4 billion.

150.    In addition, the trading price of Stericycle's depositary shares fell from $106.34 per share on October 22, 2015 to $92.56 on October 23, 2015, a decline of 13% and an aggregate loss of over $106 million.  Nonetheless, Defendants failed to disclose the full extent of the Company's poor performance and the full underlying reasons for it.  Instead, they continued to mislead the market into believing the Company's revenues were based on legitimate practices. Defendants' attribution of the shortfall in revenues and growth to "headwinds" that Stericycle was facing in SQ, LQ and international (and defining those headwinds to only include "fuel surcharges" and decreased "hazardous waste volumes") without fully disclosing Stericycle's contemporaneous loss

of customers and pricing pressures from SQ customers as a result of its fraudulent practices detailed herein was materially false and misleading and continued their fraud. Those material misrepresentations and omissions continued to artificially inflate the prices of Stericycle securities.

151.   Indeed, analysts on the October 22, 2015 call closely questioned Defendants' disclosures and the explanations for the declines in revenues. Michael Hoffman of Stifel Nicolaus commented: "Well, I guess I am *flummoxed*, which doesn't happen very often. The forecast seems about $100 million to $150 million light to me on the revenues." Another analyst, David Manthey of Robert W. Baird & Company, commented that, "on the GP [gross profit], *we've never really seen a drop like this*." Gary Bisbee of RBC Capital Markets was confused by Defendants' explanation that the decline was due to declines in industrial waste and project work, asking "The industrial waste and project work -- can you give us a little more color, exactly what that is?"

152.   Analyst reports reflect that, although there was market disappointment over the Company's revenue miss, investors were reassured by management's continued false statements that Stericycle's core business was still performing well. For example, Northcoast Research reported on October 23, 2015 that it reiterated its "Buy" rating for Stericycle and that "[d]espite the difficulties in the non-core industrial segment in its hazardous waste business, we believe the long-term growth outlook remains favorable and investors should take advantage of the discount in [Stericycle] shares." Analysts from Jeffries repeated this sentiment on October 26, 2015, reporting that, "Yes, *the 3Q miss was confusing and 2016 guidance lower than expected*, but fundamentals in the core medwaste remain intact and management's '16 targets are very conservative."

### 2.     The February 4, 2016 Partial Disclosure

153.   On February 4, 2016, after the close of the financial markets, Stericycle held a conference call to discuss its financial results for the fourth quarter and full year of 2015.

154.     On the call, Defendant Ginnetti reported that "growth rates were impacted by lower fuel surcharges and lower hazardous waste volumes from our industrial customers."  Defendant Alutto also discussed issues with "foreign-exchange headwinds and lower hazardous waste volume from our industrial customers."

155.     The February 4, 2016 disclosure of impacted growth rates caused the Company's stock price to fall from $115.94 per share on February 4, 2016 to $111.12 on February 5, 2016, a statistically significant amount with a raw decline of -4%.  This represented a total market capitalization loss of over $409 million.  Moreover, the trading price of Stericycle's depositary shares fell from $89.00 per share on February 4, 2016 to $86.72 on February 5, 2016, a decline of 2.5% and an aggregate loss of over $17 million.

### 3.     The April 28, 2016 Partial Disclosure

156.     On April 28, 2016, after the close of the financial markets, the Company released its financial results for the first quarter of 2016 in a press release and held a conference call to discuss those results.  During the call, Stericycle announced that its first quarter 2016 results fell below the Company's guidance and analyst expectations.  For example, Stericycle reported $1.11 in adjusted EPS, below the Company's guidance of $1.17 and the analyst consensus estimate of $1.14.  Moreover, Stericycle lowered its 2016 adjusted EPS guidance to $4.90-$5.05 from $5.26-$5.33.

157.     During the earnings call, Defendants admitted that Stericycle was having problems with "pricing pressure" in situations where hospitals (typically LQ customers) were acquiring individual doctors' offices (SQ customers).  In Defendant Alutto's words:

> Remember the decision-maker changes a little bit when the hospital
> acquires the doctor's practice.  Where we have normally dealt with
> an office administrator or office manager, we are now dealing with
> more personnel from the hospital.  So we believe we will see some

47

> pricing pressure on hospital-affiliated SQ accounts as these contracts come up for renewal.

This disclosure revealed that, when LQ customers learned of the excessive rates that Stericycle was forcing on its SQ customers, they had the ability to re-negotiate the SQ customers' contracts. The fact that LQ customers could exert pricing pressure on the SQ customers' contracts once they became aware of them reflected that the SQ customers' rates were not only excessive but that they lacked any legal basis in the SQ customers' contracts. Indeed, if the SQ customers' contracts with Stericycle had permitted Stericycle to charge the SQ customers the rates that it did, the LQ customers would have had no credible ability to re-negotiate them. As subsequent disclosures demonstrate, the LQ customers (and other SQ customers) recognized the excessive or fraudulent nature of the price increases and were re-negotiating them. Since the prices in the SQ contracts were purportedly "predetermined" and did not allow for Stericycle's imposition of automatic price increases or other improper fees on SQ customers, the customers could exert "pricing pressure" and it was a serious threat to Stericycle's revenues and growth.

158. The April 28, 2016 disclosure of "pricing pressure" from Stericycle customers caused the Company's stock price to fall from $121.74 per share on April 28, 2016 to $95.56 on April 29, 2016, a statistically significant amount with a raw decline of -21.5%. This represented a total market capitalization loss of over $2.2 billion. Moreover, the trading price of Stericycle's depositary shares fell from $91.76 per share on April 28, 2016 to $77.66 on April 29, 2016, a decline of 15.4% and an aggregate loss of over $108 million. Nonetheless, Stericycle and the Officer Defendants still failed to disclose the true extent of the Company's poor performance and the underlying fraudulent reasons for it. Instead, they continued to mislead the market into believing that the Company's revenues were based on legitimate billing practices. Those material

misrepresentations and omissions continued to affect, and artificially inflate, the price of Stericycle's common stock and depositary shares, and the fraud continued.

### 4. The July 28, 2016 Partial Disclosure

159. On July 28, 2016, after the close of the financial markets, the Company released its financial results for the second quarter of 2016 in a press release and held a conference call to discuss those results. During the call, Stericycle announced decelerated growth in its core business. The Company also sharply lowered its 2016 EPS guidance to $4.68-$4.75 per share from $4.90-$5.05 per share.

160. During the call, Defendant Alutto blamed the further disappointing reported financial results and the cut in guidance on "increased pricing pressure on our SQ customer base" as a result of "consolidation of physician practices by hospitals and the overall healthcare cost pressures resulting from managed-care." Alutto also admitted that these same issues would likely result in 2017 growth rates below Stericycle's historical average.

161. Analysts were shocked by this news. One analyst noted that, "consolidation has been happening in the space for a long time," and asked why the Company was purportedly only seeing this issue "all of a sudden now."

162. In response, Defendant Arnold admitted that consolidation "is not a new trend" and that the Company has "been tracking this for quite some time" and it was something Stericycle has been "following closely." Arnold added that:

> [N]ow that these doctors practices that have been acquired by hospitals are starting to get integrated into their networks, we are starting to see continued pressures as those contracts come up at the put those out for large RFP – we're starting to see increased pricing pressure associated with that, that's now having a material impact on our business. Secondly, we're seeing to a lesser extent we're also seeing the same trends now in our SQ business as we go to renew those contracts we're also seeing pricing pressure and the need to do discounts to get new renewals.

49

163.    Defendant Alutto also admitted on the July 28, 2016 call, in response to an analyst question, that the issues with organic growth rates were due, in part, to Stericycle's "inability to get the price that [Stericycle] assumed it was going to be able to get from these renewals."  As Defendant Alutto further admitted, "[c]ertainly we've seen some of this **SQ pricing** start to build now so there is a component of that in Q2."

164.    On the July 28, 2016 call, Alutto also claimed that the percentage of SQ customers that were involved in requests for discounts tied to contract renewals in connection with consolidation within the healthcare industry was "like 18% to 20%."

165.    Another analyst again stressed on the call that the SQ pricing pressure "would seem like the kind of issue that would develop over time and it seems like it's all kind of hitting home pretty quickly all in one shot."  Defendant Alutto stated in response:

> Yes, I think if you look at this ***certainly it has been something that we've looked at for many years.***  We actually, within the company, we call it blended account, hospital affiliated account.  ***Certainly, it's been a trend***.  We've seen over the years some pricing pressure not really material to the overall numbers.  We did see it increasing in Q1 and that's why we kind of spoke about it on the last call.  ***We saw that trend continue and more contracts get renegotiated in Q2*** . . . ."

166.    Also on the July 28, 2016 call, Defendant Arnold disclosed that Stericycle was experiencing an aspect of the pricing pressure in addition to the pressure related to hospitals acquiring physician practices from SQ customers that are not "affiliated" with larger customers. Arnold disclosed to investors that:

> The other [aspect] is just with the local and regional competition and just the ***unaffiliated SQ*** looking to save more money as their reimbursements going down.  We are noticing an increasing amount of discounting that we need to make to renew those agreements.  Again, it's not like the business is declining.  This is just cutting into our overall SQ growth.

167. The news regarding "pricing pressure" was critical to investors, who again expressed shock at the Company's announcements. As stated by analysts at RBC Capital Markets on July 29, 2016, the SQ segment is "really the company's crown jewel," and, as result of this news, many analysts changed their views or lowered their ratings of Stericycle. For example:

a. Great Lakes Review announced on July 29, 2016 that "[w]ith SQ pricing pressure expected to continue, our rating is now *HOLD* . . . .";

b. Imperial Capital wrote that, "[p]articularly concerning to us is the revelation that with 2Q16 earnings report, pressures appear to be more directly affecting the 'core' medical waste business, as reflected in the deceleration of domestic SQ and LQ growth, which were attributed in part to pricing pressure associated with customer consolidation within the health care industry, which appears to be a longer-term issue, in our view"; and

c. RBC wrote that "the problems at the company are deeply rooted and in many cases structural in nature, and attributing them largely to weaker industrial demand hurting hazardous waste and delayed Shred-it synergies underappreciates the number and depth of challenges the company faces." RBC added that "Compounding these challenges is the news that the company is seeing increasing pricing pressure from customers in its best business (US small customer medical waste and compliance)."

168. RBC also linked the Company's discussion of increased pricing pressures from SQ customers to the fraudulent rate increases that, up to that point, were simply allegations in the Government Case. For example, RBC wondered in its July 29, 2016 report "if a class action settlement a couple of years ago against the company by a number of its small customers over pricing increases has emboldened these customers to push back."

169. The July 28, 2016 disclosures caused the Company's stock price to plummet from $105.93 per share on July 28, 2016 to $90.27 on July 29, 2016, a statistically significant amount with a raw decline of -14.8%, which resulted in a total market capitalization loss of ***over $1.3 billion***. In addition, the trading price of Stericycle's depositary shares fell from $84.72 per share on July 28, 2016 to $74.59 on July 29, 2016, a decline of -12% and an aggregate loss of over $78 million.

### 5.    The September 2, 2016 Partial Disclosure

170.    Early in the day on September 2, 2016, William Blair issued a report discussing its recent meeting at Stericycle's headquarters with the Company's management, including Defendants Alutto, Ginnetti and Arnold.   William Blair stated that "Conversations primarily focused on the recent weakness in the company's small-quantity (SQ) generator pricing (which we believe has emerged as the key investor concern on the name) . . . ."  William Blair then reduced its 2017 cash EPS estimate for Stericycle from $4.98 to $4.80 to "reflect a more cautious margin stance until SQ pricing pressure abates."

171.    The report went on to state that William Blair "acknowledge[d] that the recent weakness in the core SQ healthcare business (related to emerging pricing pressure in the space due to industry consolidation among provider groups and hospitals) could present a near-term overhang on the stock – at least until this pressure abates (perhaps upon cycling through contract renewals or via the cross-selling of incremental solutions to offset this risk)."

172.    William Blair further reported the following:

> **SQ Pricing Outlook.** We believe the key investor focus on Stericycle has moved away from volatility in the company's hazardous waste business (which investors now accept as an end-market driven headwind, which is largely out of management's near-term control and—equally important—already incorporated into guidance) *to pricing weakness in the core SQ healthcare business.*
>
> In our view, part of the reason for this change in focus is the ***novelty of the disclosure***—with management first highlighting it as a risk during the first quarter 2016 earnings call and then reducing 2016 sales guidance by $10 million to $15 million (or $20 million to $30 million annualized) to account for pricing pressure.  However, we believe the more pressing concern is how this trend will affect growth and margins going forward and how long the pressure might persist.
>
> In our view, the main concern is that management highlighted that after years of hospitals acquiring smaller doctor groups, these

groups are now (upon contract renewal) being included in the hospital's contracts at much lower prices. It follows that this would thus take several years to cycle through, putting growth and margins at risk for a multiyear period. And management agreed that this will not only affect 2016 results but likely will at least carry into 2017 as well.

173. The September 2, 2016 report discussing William Blair's meeting with Stericycle executives and the executive's discussion of "pricing pressure" from Stericycle customers caused the Company's stock price to fall from a closing price of $85.36 per share on September 1, 2016 to $84.15 on September 2, 2016, a statistically significant amount with a raw decline of -1.42%. This represented a total market capitalization loss of over $102 million. Moreover, the trading price of Stericycle's depositary shares fell from $69.20 per share on September 1, 2016 to $68.82 on September 2, 2016, a decline of -.54%. This represented a total market capitalization loss of over $3 million.

### 6. The September 18 and 19, 2016 Partial Disclosures

174. Before the opening of the markets on September 19, 2016, Stericycle disclosed through analysts for the first time that, apart from the pricing pressure resulting from hospitals acquiring SQ customers, the 60-70% of U.S. SQ clients that are independent physician practices were also exerting pricing pressure on Stericycle, and achieving 10-15% price discounts on their Stericycle contracts at the time of contract renewal.

175. Several analysts issued reports discussing this development and reducing their estimates on Stericycle based on the news. For example, in a report dated Sunday, September 18, 2016, RBC reported that it was reducing its Stericycle estimates in order to "incorporate recent company commentary, which has emphasized several negatives from Q2." Specifically, RBC reported the following:

> **Pricing pressure in US SQ med waste is expanding**. Recent commentary from the company suggests that *US SQ med waste*

*pricing pressure is broader than previously believed*, which bodes poorly for margins and profit growth. The company has discussed the ~20% of its US SQ mix that is hospital-owned physician practices, where it has seen 10-30% pricing pressure upon renewals. However, *it has also recently acknowledged that the 60-70% of US SQ clients that are independent physician practices are also seeing 10-15% price discounts at renewal* due to rising local and regional competition. [Stericycle] guided for this to be a $0.10-$0.13 EPS headwind in H2/16, and it could be double that for 2017.

176.    RBC reiterated this point later in its September 18, 2016 report, writing that:

**US SQ pricing pressure is the latest negative development**. . . . *[A]rguably the most troubling development in recent quarters is the company's acknowledgement that it is seeing mounting pricing pressure in its key US small customer (SQ) medical waste and compliance business*. Approximately 20% of this customer base is made up of physician practices that have been acquired by hospitals, which it has seen begin to demand significant pricing concessions (10-30%) upon contract renewals, as those hospital owners press for terms closer to what the hospitals themselves pay Stericycle. In addition, the company has *recently* stated that rising competitive pressures from local and regional competitors has led to 10-15% price concessions at renewal with a portion of the base of independent physician practices (*60-70% of the US SQ customer base*). Given that contracts typically last several years, this pressure seems likely to continue in future years as the base of SQ business comes up for renewal. And, with US SQ medical waste having margins more than double the level of any of the company's other businesses, it would be a significant negative for margins and profit growth if this pricing pressure continued (or accelerated).

177.    As a result of this new information from the Company, RBC now expected "higher US SQ pricing pressure to offset Shred-it synergies and higher paper prices in 2017, and look for flattish earnings." RBC stated that it remained negative on Stericycle, and believed that investors should avoid the stock. RBC drastically lowered its price target from $89.00 to $77.00 and reiterated its Underperform rating.

178.    An Oppenheimer analyst report issued on Monday, September 19, 2016 also addressed the SQ customer pricing pressure and discussed Oppenheimer's recent meeting in Europe with Defendant Ginnetti. The report stated that "[d]iscussions were focused primarily on

[Stericycle's] objectives for performance over coming years/challenges that have materialized in recent quarters." Among other issues, Defendant Ginnetti addressed "small customer medical waste pricing challenges."

179. The Oppenheimer analyst report further stated that:

> In recent years, large medical waste generators/(hospitals) have aggregated small medical waste generators/(physicians). [Stericycle] indicated ~20% of its small customers are now affiliated with large customers, who are progressively pushing for ~30% pricing concession as contracts mature. ***Another 60% of (unaffiliated) small customers are seeking ~15% pricing concessions (enhanced competitive marketing).*** We interpret a multi-year tail to the pricing dynamic.

180. Oppenheimer additionally found that, during investors' meetings with management, "the most prominent discussion point was Stericycle's announcement in its 2Q16 conference call that it was enduring significant pricing pressure across its small medical waste customer base," and Oppenheimer reported that:

> [I]nvestors exhibited the greatest level of interest in newly announced (on the 2Q16 conference call) pricing challenges Stericycle is facing in its core medical waste business primarily relating to small quantity customers. Not only has pricing pressure stemmed from large quantity customers aggregating small quantity customers and pushed for concessions at renewal time, but ***an even larger portion of Stericycle's small quantity portfolio (unaffiliated with larger aggregators) have become more active in pursuing lower prices*** in what the company refers to as a now more competitively marketed environment. While we can envision light at the end of the tunnel for each of Stericycle's current challenges, ***the pricing challenges in its core medical waste business appears to have investors most unsettled since Stericycle acknowledges visibility is sub-optimal, and the pricing dynamic could persist as a headwind beyond 2017 as small customer medical waste contracts are typically 3-5 years in length.*** As it always has historically, Stericycle will provide out-year (2017 in this case) guidance on its 3Q16 conference call. Further understanding the adverse profitability magnitude and tail of the pricing challenges Stericycle is facing with its core small quantity medical waste customers, we're modifying our 2017 cash EPS estimate from $5.20 to $4.78 while maintaining our 2016 cash EPS estimate of $4.71. . .

181.    Further, a William Blair analyst report issued on September 19, 2016 stated that "Street Estimates Likely Remain Too High" and described the pricing pressure in the SQ customer segment as a "key hot button topic." William Blair also found that given the assumption "that SQ pricing headwinds experienced in the second half of 2016 will affect 2017 sales as well, and that further contract-renewal pressure will add more revenue headwind in the SQ segment through 2017," Stericycle would need to "produce roughly $135 to $224 million in other incremental sales to offset SQ pricing headwinds and produce low- to midsingle-digit organic sales growth." William Blair also wrote that "the recent weakness in the core small-quantity healthcare business (related to emerging pricing pressure in the space due to industry consolidation among provider groups and hospitals) could present a near-term overhang on the stock."

182.    As noted in a September 19, 2016 article by *Dow Jones Newswires*, the disclosures in the September 18 and 19, 2016 reports discussing the serious "pricing pressure" at Stericycle caused the Company's stock price to fall. As the *Dow Jones* article concluded:

> Behind today's decline is bear RBC cutting its price target for the 5th time this year, going this round to $77 from $89. The bank is also lowering forecasts through 2017 as "recent commentary from the company suggests that *US [small-customer] med-waste pricing pressure is broader than previously believed*, which bodes poorly for margins and profit growth." Renewals are occurring with double-digit price reductions, notes RBC. "We have little confidence that Stericycle has its arms around the issues and a game plan for quick improvement." [Stericycle] falls 4% to $77.99, putting the year's slump at 35%.

183.    Indeed, in response to the Company's disclosures reported by the analysts, Stericycle's stock price fell from a closing price of $81.24 per share on Friday, September 16, 2016 to a closing price of $78.00 on September 19, 2016, a statistically significant amount with a raw decline of -4%. This represented a total market capitalization loss of over $275 million. Moreover, the trading price of Stericycle's depositary shares fell from $66.11 per share on

September 16, 2016 to $64.20 on September 19, 2016, a decline of -2.88%. This represented a total market capitalization loss of over $14 million.

184. The following chart shows the price of Stericycle common stock during the Class Period and each of the corrective disclosures discussed above that led to the sharp declines:



185. In addition, as illustrated by the chart below comparing the performance of Stericycle's common stock price to the Dow Jones U.S. Waste & Disposal Services Index, Stericycle's negative financial performance that resulted from customers' pricing pressures (and the resulting stock price decline) were unique problems for Stericycle. Stericycle's competitors did not suffer from the same type of negative stock price impact or pricing pressures.



Indeed, on the Company's October 27, 2016 conference call with investors, Defendant Alutto acknowledged that Stericycle was facing "revenue headwinds from previously discussed [SQ] pricing pressure" and that "we are down about $40 million in pricing concessions . . . it's $40 million in price that goes right to the bottom line, about $100 million to $110 million in revenue . . . ." On the same call, Arnold added that "the SQ pricing pressure discussed previously continued in the quarter and will remain for the foreseeable future."

## V.   VIOLATIONS OF THE EXCHANGE ACT

### A.   Stericycle and the Officer Defendants' Material Misstatements and Omissions in Violation of the Exchange Act

186.   Stericycle and the Officer Defendants made materially false and misleading statements and omissions of material fact to investors during the Class Period in violation of

Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder. Among other things, these Defendants falsely and misleadingly represented to investors that: (i) SQ internal domestic revenues and growth were due to innocent explanations (rather than the fraudulent, undisclosed rate increases at issue here); (ii) Stericycle was able to extract greater margins from SQ customers compared to LQ customers because the SQ customers "appreciate the value of the services we provide" (rather than because of the undisclosed misconduct); (iii) Stericycle raised its SQ customers' rates, if at all, in line with the approximately 2% increase in the consumer price index (when, in reality, the increase was 18% every six months); (iv) the useful lives of its customer contracts were "10 [or 14] to 40 years" (when, in reality, Stericycle was facing significant numbers of SQ customers attempting to cancel their contracts, which would jeopardize the useful lives of the contracts); (v) described SQ customers as "loyal" and providing a "stable and profitable customer base" (while failing to disclose the pricing pressure that SQ customers were exerting on the Company to cancel or re-negotiate their contracts); (vi) described Stericycle's rates as "predetermined" (when they were in fact automatically increased); (vii) stated that revenue from customer contracts was recognized "evenly" over the lives of the contracts (when, due to the automatic price increased and compounded every six months and, in addition, Stericycle would not know ahead of time whether customers would accept the increased prices or renegotiated the terms of the contract); and (viii) Stericycle customers' allegations that Stericycle had engaged in unlawful price increases were purportedly "without merit" (when in fact they have merit and pose significant risk to the Company).

1. **Stericycle and the Officer Defendants' Material Misrepresentations About the Source of Stericycle's Pricing, Revenues and Growth**

   a) **Fourth Quarter 2012 and Year-End 2012**

187. The Class Period begins on February 7, 2013, the first trading day after Stericycle released its financial results for the fourth quarter and full year of 2012 in a press release and held a conference call to discuss those results. In the press release, the Company reported its full year 2012 results as follows:

> Revenues for the full year 2012 were $1.91 billion, up 14.1% from $1.68 billion in 2011. Acquisitions contributed approximately $140.3 million to the current year's growth in revenues. Revenues increased 15.4% compared to the prior year when adjusted for unfavorable foreign exchange impacts of $21.8 million. Gross profit was $857.3 million, up 12.7% from $760.7 million in 2011. Gross profit as a percent of revenue was 44.8% compared with 45.4% in 2011. Earnings per diluted share increased 14.6% to $3.08 in 2012 from $2.69 in 2011. Non-GAAP earnings per diluted share, when adjusted for various items, increased 15.4% to $3.30 from $2.86.

188. On the conference call, Defendant ten Brink reported Stericycle's fourth quarter 2012 results as follows:

> Revenues were $503.6 million, up 12.8% from $446.6 million in Q4 of '12. And internal growth, excluding returns and recall revenues, was up 8.4%. Domestic revenues were $355.6 million, of which $332.7 million was domestic regulated waste and compliance services, and $22.8 million was recalls and returns. ***Domestic internal growth, excluding recalls and returns revenue, was up 10%, consisting of SQ up 11% and LQ up 9%***. International revenues were $148.1 million, and internal growth, adjusted for unfavorable exchange impact of $2.3 million, was up 5%. Acquisitions contributed $31.1 million to the growth in the quarter.
>
> The gross profit was $227 million, or 45.1% of revenues. SG&A expense, including amortization, was $95.6 million, or 19% of revenues. Net interest expense was $13 million. Net income attributable to Stericycle was $70.1 million, or $0.80 per share on an as reported basis, and $0.88 adjusted for acquisitions and other non-recurring expenses.

189.     Defendant Kogler added that "[t]he strong internal growth rates we experienced in this quarter resulted from more and more customers adopting our multiple services." He continued to state "[w]e are excited about future growth, because our customers continue to adopt additional services such as StrongPak [*i.e.*, Stericycle's services for retailers for the proper disposition of Resource Conservation and Recovery Act (RCRA) and Drug Enforcement Administration (DEA) hazardous waste]. These additional services can more than double or triple existing customer revenues." Defendant Alutto added that, "the main growth drivers continue. SQ being SteriSafe. Clinical services on the international front. And the sharps management service on the LQ side of the business."

190.     Additionally, Frank ten Brink, in reaction to an analyst question about whether there is anything in particular that Stericycle believed would lead to a deceleration in growth, stated "[t]here is nothing really specific that would drive that in any direction."

191.     Analysts reacted positively to the Company's announcements:

  a.     Northcoast Research stated that "management indicated it continues to benefit from upselling customers to its value-added services";

  b.     Morgan Stanley stated in a February 7, 2013 analyst report that one of the "Key Value Drivers" of Stericycle was that its "[o]rganic growth in the mid to high single digits has remained solid through the economic cycle";

  c.     Wedbush gave Stericycle an "Outperform" rating with its reason being the Company's "mix benefiting margin, multi-year build out services including patient communication and Strongpak, and continued solid execution. . . ."; and

  d.     Barrington Research stated that it "continue[d] to appreciate Stericycle's ability to grow its core business, make strategic acquisitions, and add new services that will be key drivers of long term growth."

192.     On February 28, 2013, the Company filed its Form 10-K for the year ended December 31, 2012, as well as the accompanying Certifications pursuant to the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") (the "Sox Certifications").

61

a.   In the Form 10-K, Stericycle explained that it targets SQ customers as a growth area because "[w]e believe that when small-quantity regulated waste customers understand the potential risks of failing to comply with applicable regulations, they appreciate the value of the services that we provide." Stericycle then claimed that this factor was "***the basis*** for the higher gross margins that we have achieved with our small-quantity customers relative to our large-quantity customers." Stericycle also claimed that its "internal growth for domestic small account customers increased by $71.4 million, approximately 10%, driven by an increase of Steri-Safe revenues." Stericycle further stated that "customers for our Steri-Safe service pay a predetermined subscription fee in advance for regulated waste collection and processing services" and that "our Steri-Safe revenues are recognized evenly over the contractual service period." Stericycle also claimed that one of its competitive strengths was its "Diverse Customer Base and Revenue and Cost Stability" as the Company is "generally protected from the cost of regulatory changes or increases in fuel, insurance or other operating costs because our regulated waste contracts typically allow us to adjust our prices to reflect these cost changes." Moreover, Stericycle claimed that it has "been able to maintain high customer retention through excellent customer service" and "determined that our customer relationships have useful lives from 14 to 40 years based upon the type of customer, with a weighted average remaining useful life of 26.5 years."

b.   In the Sox Certifications (signed by Defendants Alutto and ten Brink), Defendants stated that:

1.   I have reviewed this annual report on Form 10-K of Stericycle, Inc.;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report.

4.   The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

c. In a separate SOX Certification (signed by Defendants Alutto and ten Brink), Defendants certified that:

(a) The report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (14 U.S.C. 78m or 78o(d)); and

(b) The information contained in the report fairly presents, in all material respects, the financial condition and results of operations of the registrant.

193. In reaction to these disclosures, on March 3, 2013, Wedbush analysts reiterated their "Outperform" rating for Stericycle in a report entitled "Reiterate OUTPERFORM As Margins and LQ/SQ Growth Rates Benefiting from New Service Offerings . . . ." And, on March 25, 2013, Oppenheimer wrote that "SRCL [Stericycle] continues to garner growth worldwide, driven by expanded service offerings and new account acquisitions. Roughly 20% of large quantity (LQ) customers and 30% of small quantity (SQ) customers utilize more than one SRCL service offering, which underlies potential for untapped growth across the majority of its client base."

194. Moreover, the statements set forth in ¶¶187-90 and 192 above were materially false and misleading because: (i) Stericycle was engaged in an undisclosed scheme to unilaterally and fraudulently increase the rates it charged its SQ customers (which it falsely stated were "predetermined") without relation to the Company's actual costs incurred and without prior notice to Stericycle's customers; (ii) the Company's reported financial results (including revenues and growth) were due to, at least in part, such undisclosed misconduct rather than (or solely) the reasons the Company gave investors (such as "more and more customers adopting our multiple services," that "SteriSafe" was "the main growth driver" for "SQ," or that "Steri-Safe revenues" were driving growth for "domestic small account customers"); (iii) Stericycle's fraudulent rate increases caused a large number of Stericycle customers to leave the Company, or to complain to

Stericycle in order to have their rates lowered below what Stericycle had understood at the time the customers would pay under the Company's automatic price increase regime (*i.e.*, customers were exerting undisclosed "pricing pressure" on Stericycle); (iv) Stericycle's customer service department was engaged in tactics to obtain, retain and up-sell additional services to customers that, in fact, led many customers to react negatively to further contacts from Stericycle; (v) Stericycle's misconduct jeopardized the useful lives of its customer relationships (which it misleadingly claimed to be "14 to 40 years"); (vi) Stericycle was facing shrinking margins and lowered revenues and growth; and (vii) revenue was not recognized "evenly" because, due to the automatic price increases, the rates increased and compounded every six months and, in addition, Stericycle would not know ahead of time whether customers would accept the increased prices or renegotiate the terms of the contracts.

195.    In addition:

a.    Ten Brink's claim that there was "nothing really specific" that could drive a deceleration in Stericycle's growth was materially false and misleading for the reasons set forth above and because Stericycle's fraudulent rate increases on SQ customers (and resulting loss of customers and need to re-negotiate retained customers' contracts at lower rates), was threatening to decelerate, and did decelerate, Stericycle's growth;

b.    Stericycle's attribution of the difference between the higher gross margins from SQ customers versus LQ customers solely to SQ customers "understand[ing] the potential risks of failing to comply with applicable regulations" was materially false and misleading because the difference in margins between SQ and LQ customers resulted from the Company's fraudulent rate increases on SQ customers while not imposing such massive increases on LQ customers; and

c.    Stericycle's claims that its competitive strengths included a "diverse customer base and revenue and cost stability" because of its contract terms that "generally protect[] from the cost of regulatory changes or increases in fuel, insurance or other operating costs" and "typically allow us to adjust our prices to reflect these cost changes," were materially false and misleading (i) for the reasons set forth above; (ii) because Stericycle's fraudulent rate increases had eroded, and were eroding, its SQ customer base; and (iii) because Stericycle was using the very contract terms it cited

to fraudulently impose costs on its SQ customers that had no relation to the Company's actual costs.

**b)    First Quarter 2013**

196.    On April 24, 2013, after the close of the financial markets, the Company released its financial results for the first quarter of 2013 in a press release and held a conference call to discuss those results.   On the conference call, Defendant ten Brink reported the Company's earnings as follows:

> Revenues were $513.8 million, up 11.7% from $460.1 million in Q1 of '12.  And internal growth, excluding returns and recall revenues, was up 8.1%.  Domestic revenues were at $363.6 million, of which $341.1 million was domestic regulated waste and compliance services, and $22.5 million was recalls and returns.  Domestic internal growth, excluding recalls and returns revenues, was up over 9%, consisting SQ up 10% and LQ up 8%.

197.    Defendant Kogler added again that "[t]he strong internal growth rates we experienced in this quarter resulted from more customers adopting our multiple services . . . ." and the Company was "excited about our future growth because when customers adopt multiple services, this can more than double or triple customer revenues."

198.    Analysts reported favorably on the Company's reported "strong internal growth rates":

> a.    William Blair said that the Company "had another solid quarter of organic growth, with domestic large-quantity sales up 8% and small-quantity sales up 10%";
>
> b.    Barclays reported on April 25, 2013 that, "Stericycle continues to execute its organic growth and M&A strategies, and we expect double digit growth to continue";
>
> c.    Morgan Stanley reported that "[o]rganic growth at the top end of guidance suggest new drivers are performing well, though disclosure and visibility remains limited," and that it believed "such strong organic growth results indicate the company's diversification strategy is working";

      d.      Great Lakes Review stated on April 25, 2013 that "**Stericycle believes it can double, or even triple, the value of each SQ and LQ account through its multiple service offerings, with only one of its multiple offerings being utilized by only 30% and 20% of its SQ and LQ customers, respectively**" (emphasis in original);

      e.      Northcoast Research reported on April 25, 2013 that "we believe it is clear that SRCL continues to post strong core business internal growth rates year-over-year due to its success in upselling customers to its value added services"; and

      f.      Oppenheimer stated that "1Q13 organic growth remained strong (9% core domestic organic growth) supported by SRCL's multiple growth initiatives including emerging StrongPak."

199.     On the April 24, 2013 conference call, Defendant ten Brink also commented on customer turn-over or "churn," falsely described it as a non-issue, and failed to disclose that customers were leaving Stericycle because of the fraudulent rate increases:

> Really, we don't see a major difference in churn. We have a very good revenue retention, about 95%. And the rest of 5% leaves us some customers don't pay their bills. Obviously we stop service. There's doctors, dentists, that close their shops and retire, some consolidate. That's a 2%, and then your normal revenue, maybe 1% or 2%, is obviously it's a competitive market, and we lose some to competition.

200.     On the same call, a Barclays Capital analyst also asked Alutto: "I guess the first question, the guidance for organic growth for the SQ and LQ units, and you continue to be trending at the high end of those, does that remain conservative or *is there anything we might look for that could lead to some slowing in those growth rates* as we move through the year?" Alutto responded that "[the Company is] always conservative in guidance. Obviously, there are a lot of changes going on in healthcare right now, so I think it's prudent to be conservative with our growth rates. Growth rates obviously vary quarter to quarter based on the days in the quarter, influx of large contracts and holidays. But I think we are consistent to where we have been in the past, which is conservative."

201.     On May 9, 2013, the Company filed its Form 10-Q for the quarter ended March 31, 2013 and accompanying SOX Certifications with the language set forth in ¶192 above (and signed by Defendants ten Brink and Alutto).  The Company claimed that its "[o]rganic revenue growth for domestic small account customers increased by $18.3 million, or approximately 10%, driven by an increase in Steri-Safe revenues and regulated waste management for retailers."  Moreover, in this Form10-Q, the Company again claimed that it had "determined that our customer relationships have useful lives from 14 to 40 years based upon the type of customer, with a weighted average remaining useful life of 26.2 years."

202.     The statements set forth in ¶¶196-197 and 199-201 above were materially false and/or misleading for the reasons set forth in ¶194 above.  In addition, ten Brink's discussion of the reasons for customer churn – including that customers leave Stericycle when they "don't pay their bills" – was materially false and misleading because it failed to disclose that customers were leaving Stericycle or refusing to pay their Stericycle bills as a result of discovering the Company's fraudulent price increases.

### c)     Second Quarter 2013

203.     On July 24, 2013, after the close of the financial markets, the Company released its financial results for the second quarter of 2013 in a press release and held a conference call to discuss those results.  On the conference call, Defendant ten Brink reported the Company's earnings as follows:

> Revenues were $526.5 million, up 12.3% from $468.9 million in the second quarter of 2012.  And internal growth, excluding returns and recall revenues, was up 7.5%.  Domestic revenues were $370.2 million, of which $346.5 million was domestic regulated waste and compliance services, and $23.7 million was recalls and returns.
>
> **Domestic internal growth excluding recalls and returns revenue was up 7%, consisting of SQ up 8% and LQ up 6%.**

International revenues were $156.3 million and internal growth adjusted for unfavorable exchange impact of $4.1 million was up approximately 9%.

Acquisitions contributed $34.1 million to the growth in the quarter.

The gross profit was $237.9 million or 45.2% of revenues and SG&A expense including amortization was $100.6 million or 19.1% of revenues.

Net interest expense was $12.9 million and net income attributable to Stericycle was $78 million or $0.89 per share on an as-reported basis and $0.93 adjusted for acquisition and other nonrecurring expenses.

204.    Defendant Kogler added that "[t]he strong domestic internal growth rates we experienced this quarter resulted from more customers implementing our multiple services . . ."

205.    Analysts reported favorably on Stericycle's disclosures:

    a.    William Blair reported on July 24, 2013 that "[t]he company also had another solid quarter of organic growth . . ." and reiterated its "outperform" rating;

    b.    A July 25, 2013 Morgan Stanley report stated "[s]olid organic growth and a notable acceleration in the international business continues to suggest new growth drivers are performing well, though disclosure and visibility remains limited";

    c.    Northcoast Research reported that "Following its 2Q13 results, we believe it is clear that SRCL continues to post strong internal growth rates year-over-year due to its success in upselling customers to its value added services"; and

    d.    Barrington Research reported on July 29, 2013 that "[w]e believe cross-selling and up-selling of the Steri-Safe OSHA Compliance program continues to be a key driver of growth."

206.    On August 8, 2013, the Company filed its Form 10-Q for the quarter ended June 30, 2013 and accompanying SOX Certifications with the language set forth in ¶192 above (and signed by Defendants ten Brink and Alutto). In this Form 10-Q, the Company again claimed that

it had "determined that our customer relationships have useful lives from 14 to 40 years based upon the type of customer, with a weighted average remaining useful life of 26.1 years."

207.    The statements set forth in ¶¶203-204 and 206 above were materially false and/or misleading for the reasons set forth in ¶194 above.

### d)    Third Quarter 2013

208.    On October 23, 2013, after the close of the financial markets, the Company released its financial results for the third quarter of 2013 in a press release and held a conference call to discuss those results.  On the conference call, Defendant ten Brink reported the Company's earnings as follows:

> Revenues were $534.6 million, up 11.3% from $480.5 million in Q3 of 2012, and internal growth, excluding returns and recalled revenues, was up 6.5%.  Domestic revenues were $378.1 million, of which $353 million was domestic regulated waste and compliance services and $25.1 million was recalls and returns.  ***Domestic internal growth, excluding recalls and returns revenues, was up 6.4%, consisting of SQ up 8% and LQ up 5%.***  International revenues were $156.5 million, and internal growth adjusted for unfavorable exchange impact of $5.3 million was up approximately 7%.  Acquisitions contributed $34.1 million to the growth in the quarter.

> Gross profit was $241.4 million or 45.2% of revenues.  SG&A expense, including amortization, was $102.3 million or 19.1% of revenues.  Net interest expense was $13.3 million, and net income attributable to Stericycle was $80.5 million or $0.92 per share on an as-reported basis and $0.96 adjusted for acquisition and other nonrecurring expenses.

209.    Defendant Kogler also addressed analyst questions about why SQ growth was at the high-end of targeted internal ranges, and he attributed the Company's growth to StrongPak, stating, "I think the thing to keep in mind, and we have said this, I think, in prior conference calls, growth rates vary quarter to quarter.  That's why we give you a range of growth rates for LQ, SQ and the like.  And I think that StrongPak did contribute in 2012, and it will continue to contribute, but the StrongPak customers do come in in large amounts."  He added later that StrongPak will "obviously, contribute to the growth rates in SQ and LQ. . . ."

210.     An analyst from Stifel Nicholas also asked Defendant Kogler:

"[D]id you guys sense that there was any change in the momentum of your business in the underlying basis at all, or does it just seem to me like exactly that, that there's an anomaly – I would even say an anomaly, but just sometimes it's higher, sometimes lower.  I guess the question is, should we think about the growth rates going forward being towards the lower end of the range because of tougher comps versus what we saw over the last year?"

Defendant Kogler responded:

"No.  I think, to answer your question directly, ***there's really no change in the underlying business***, and we see all eight cylinders still hitting.  And like we said, we are within our guidance."

211.     On the October 23, 2013 conference call, Defendant ten Brink was asked about the Company's 8% growth in its domestic SQ business and how it would break up that increase between an increase in SQ customers' prices and the volume of SQ business.  Defendant ten Brink falsely and misleadingly responded that the price increases on SQ customers were "a little bit over the CPI [consumer price index] on the price side and then volume in the industry is obviously a little better on the SQ than the LQ.  So that's a couple percentage points, and then the rest is the additional services."  An analyst then asked ten Brink, "so if I work the math, CPI is running around 2%.  So on SQ it splits pretty evenly between price and volume and ancillary services?"  Defendant ten Brink responded, "Yes, that's a good approximation" – *i.e.*, that Stericycle increased its revenues based on SQ price increases that were only approximately 2.67% (*i.e.*, one-third of the 8% increase in SQ domestic growth and "a little bit over the CPI").

212.     Following these claims, analysts reported that the amounts of Stericycle's price increases on its SQ customers were only slightly greater than the increases in the domestic consumer price index.  For example, on January 13, 2014, Wunderlich reported that, on the issue of price growth at Stericycle for SQ customers, "Think about price at CPI to CPI plus a modest spread."

213.    Analysts favorably noted Stericycle's reported SQ growth:

   a.    Northcoast Research wrote that "[i]nternal growth in SRCL's domestic SQ (+7.6%), domestic LQ (+4.6%) and International (+7.0%) medical waste businesses all remained stable in the quarter, despite more difficult year-over-year comparisons.  We note that management indicated it continues to benefit from upselling customers to the value-added services . . . .";

   b.    Oppenheimer wrote on October 24, 2013 that "domestic organic growth was solid" and reiterated its "outperform" rating based on "SRCL's dependable growth story"; and

   c.    Wedbush reported "[w]e continue to view SRCL as one of the few growth names in the Environmental Services sector and believe current shareholders should maintain their current positions and look for more visibility that in the current cycle, management can deliver internal growth rates at the mid-to-upper end of their targets."

214.    On November 7, 2013, the Company filed its Form 10-Q for the quarter ended September 30, 2013 and the accompanying SOX Certifications with the language set forth in ¶192 above (and signed by Defendants ten Brink and Alutto), which further discussed the Company's financial results for the third quarter of 2013.  In this Form 10-Q, the Company again claimed that it had "determined that our customer relationships have useful lives from 14 to 40 years based upon the type of customer, with a weighted average remaining useful life of 25.9 years."

215.    The statements set forth in ¶¶208-211 and 214 above were materially false and misleading for the reasons set forth in ¶194 above.

216.    In addition, the statements set forth in ¶ 211 above about how Stericycle's increases in SQ customers' rates were purportedly only slightly above the 2% growth in the CPI were materially false and misleading because Stericycle was systematically increasing the rates it charged to SQ customers by 18% every six months – *i.e.*, well in excess of the approximately 2% growth in the CPI.

### e) Fourth Quarter 2013 and Year-End 2013

217.     On February 5, 2014, after the close of the financial markets, Stericycle released its financial results for the fourth quarter and full year of 2013 in a press release and held a conference call to discuss those results.  In the press release, the Company reported its full year 2013 results as follows:

> Revenues for the full year 2013 were $2.14 billion, up 12.0% from $1.91 billion in 2012. Acquisitions contributed approximately $137.6 million to the current year's growth in revenues.  Revenues increased 13.0% compared to the prior year when adjusted for unfavorable foreign exchange impacts of $19.0 million.  Gross profit was $964.6 million, up 12.5% from $857.3 million in 2012.  Gross profit as a percent of revenues was 45.0% compared with 44.8% in 2012.  GAAP earnings per diluted share increased 15.7% to $3.56 from $3.08 in 2012.  Non-GAAP earnings per diluted share, when adjusted for various items identified in the second of the following tables, increased 12.4% to $3.75 from $3.34.

218.     On the conference call, Defendant ten Brink reported Stericycle's fourth quarter 2013 results as follows:

> Revenues were $567.9 million, up 12.8% from $503.6 million in the fourth quarter of 2012, and internal growth, excluding returns and recall revenues, was up 7.1%. Domestic revenues were $394.6 million, of which $368.2 million was domestic regulated waste and compliance services, and $26.4 million was recalls and returns. ***Domestic internal growth, excluding recalls and return revenues, was up 7.8%, consisting of SQ up 9% and LQ up 7%.***
>
> International revenues were $173.3 million, and internal growth adjusted for unfavorable exchange impact of $5.4 million, was up approximately 6%.
>
> Acquisitions contributed $32.4 million to the growth in the quarter.
>
> Gross profit was $253.3 million, or 44.6% of revenues. Adjusted for litigation settlements, gross profit was 45% of revenues.
>
> SG&A expense, including amortization, was $109.9 million, or 19.3% of revenues. Net interest expense was $15.3 million. Net income attributable to Stericycle was $78.2 million, or $0.90 per share, on an as-reported basis and $0.99 adjusted for acquisition and other nonrecurring expenses.

219.     Defendant Alutto added that "the general business improved by about 13 basis points" and touted the Company's domestic growth:

73

When you think about our latest quarter domestically, I would just characterize it that all of our growth engines performed really well in the quarter, especially StrongPak. And I think that's why you saw us come back on the higher end of the range for both the SQ and the LQ growth this quarter.

220.    ten Brink further commented on Stericycle's SQ growth and added:

Yes, so if you look at the small quantity generated 8% to 10% kind of guidance we give, roughly 40% to 50% of that growth comes from kind of price and volume in the market, and the remainder is really the additional services.  So, this is compliance, this is Steri-Safe, StrongPak, some ComSol, Communication Solutions feed.

221.    Similarly, when asked on the conference call how much of the SQ and LQ growth was due to ancillary services versus pricing, Defendant Alutto stated that "I don't think it's materially different than when Frank answered the other question though in breaking out what is coming from the ancillary services except that we had a stronger StrongPak this quarter as compared to last quarter."

222.    Defendant ten Brink was also asked on the call about pricing in 2013 and whether it would be better or worse than in 2014.  Defendant ten Brink responded "2013 and 2014, again, for us, very similar.  Our business is very stable.  And so what I just mentioned as to the contribution from price and volume, we have no different assumptions there."

223.    Analysts seized on the Company's false and misleading explanations for its growth:

    a.    A February 5, 2014 Jeffries report stated "[e]ncouragingly, organic growth rates in the domestic segment (SQ and LQ) accelerated both sequentially, and on a two-year basis . . . Management attributed much of the domestic strength to StrongPak";

    b.    Northcoast Research analysts stated on February 6, 2014 that "[g]iven SRCL's 4Q13 results, we believe the growth outlook remains positive . . . SRCL continues to benefit from up-selling customers to value-added services"; and

    c.    Oppenheimer reported on February 6, 2014 that Stericycle's "organic growth was again solid, particularly in the higher-margin core Small Quantity (SQ) segment which increased 9% y/y in 4Q13" which it attributed

to "the continued emergence of StrongPak, as well as SRCL's significant cross-selling opportunities via multi-service adoptions."

224.    On February 28, 2014, the Company filed its Form 10-K for the year ended December 31, 2013 and the accompanying SOX Certifications with the language set forth in ¶192 above (both signed by Defendants ten Brink and Alutto), which further described the Company's 2013 financial results for 2013.  In the Form 10-K, Stericycle explained that it targets SQ customers as a growth area because "[w]e believe that when small-quantity regulated waste customers understand the potential risks of failing to comply with applicable regulations, they appreciate the value of the services that we provide."  Stericycle then claimed that this factor was "***the basis*** for the higher gross margins that we have achieved with our small-quantity customers relative to our large-quantity customers" and "[w]e believe that the same potential exists in processing returns of hazardous and expired products for smaller customers."  Stericycle stated that "customers for our Steri-Safe service pay a predetermined subscription fee in advance for regulated waste collection and processing services."  Stericycle further claimed that "our Steri-Safe revenues are recognized evenly over the contractual service period."  Stericycle also claimed that one of its competitive strengths was its "Diverse Customer Base and Revenue and Cost Stability" because the Company is "generally protected from the cost of regulatory changes or increases in fuel, insurance or other operating costs because our regulated waste contracts typically allow us to adjust our prices to reflect these cost changes."  Moreover, Stericycle claimed that it had "been able to maintain high customer retention through excellent customer service" and "determined that our customer relationships have useful lives from 14 to 40 years based upon the type of customer, with a weighted average remaining useful life of 24.6 years."

225.    The statements set forth in ¶¶217-222 and 224 above were materially false and/or misleading for the reasons stated in ¶¶194 and 195(b)-(c) above.

### f) First Quarter 2014

226.     On April 24, 2014, after the close of the financial markets, the Company released its financial results for the first quarter of 2014 in a press release and held a conference call to discuss those results.   On the conference call, Defendant ten Brink reported the Company's earnings as follows:

> Revenues were $570 million, up 10.9% from $513.8 million in Q1 2013. And internal growth excluding returns and recall revenues was up 6.3%. Domestic revenues were $392.1 million, of which $369 million was domestic regulated waste and compliance services and $23.1 million was recalls and returns. ***Domestic internal growth excluding recalls and returns revenue was up 6.4%, consisting of SQ up 8% and LQ up 5%.*** International revenues were $177.9 million, and internal growth adjusted for unfavorable exchange impact of $8.1 million was up 6%. Acquisitions contributed $32.9 million to the growth in the quarter.

> Gross profit was $255.5 million or 44.8% of revenue. SG&A expense including amortization was $110.8 million or 19.4% of revenues. Net interest expense was $14.9 million and net income attributable to Stericycle was $79.1 million or $0.91 per share on an as reported basis and 104 adjusted for acquisitions and other nonrecurring expenses.

227.     On the call, Defendant Arnold added that "[i]n the quarter we experienced a solid growth in selling additional services to our existing customer base.  This growth came from retail hazardous waste, sharps management, pharmaceutical waste, and communication solutions.  For example, we are seeing increased adoption of our pharmaceutical waste service by physician practices. By utilizing our existing customer relationships along with our environmental solutions infrastructure, we are able to deliver a simple and cost-effective service that keeps our customers compliant and helps protect the environment."

228.     Moreover, Defendant Alutto broke down Stericycle's SQ internal growth and stated "SQ is about 8% to 10% internal organic growth.  About 40% to 50% of that is price and volumes. The additional comes from additional services[.]"

229.     Analysts reacted positively to Stericycle's announcements:

    a.    Northcoast Research reported that "it is clear that SRCL continues to benefit from up-selling existing customers to additional value-added services and it has begun to successfully duplicate this model internationally, which will help drive improvements in internal growth and margins going forward"; and

    b.    Wunderlich Securities reported on a Stericycle panel at an investor summit on April 28, 2014 where it was discussed with regard to growth that "[o]n the organic side, it's all about leveraging the customer relationships and upselling new and incremental products, like compliance services combined with its medical waste."

230.    On May 8, 2014, the Company filed its Form 10-Q for the quarter ended March 31, 2014 and the accompanying SOX Certifications with the language set forth in ¶192 above (and signed by Defendants ten Brink and Alutto), which further discussed the Company's financial results for the first quarter of 2014.  In this Form 10-Q, the Company stated that it had "determined that our customer relationships have useful lives from 10 to 40 years based upon the type of customer, with a weighted average remaining useful life of 25.3 years."  Further, the Company claimed that its "[o]rganic revenue growth for domestic small account customers increased by $15.8 million, or approximately 8%, driven by higher revenues from our Steri-Safe, StrongPak, and other regulated compliance services."

231.    The statements set forth in ¶¶226-228 and 230 above were materially false and misleading for the reasons set forth in ¶194 above.

### g)    Second Quarter 2014

232.    On July 24, 2014, after the close of the financial markets, the Company released its financial results for the second quarter of 2014 in a press release and held a conference call to discuss those results.  On the conference call, Defendant Ginnetti reported the Company's earnings as follows:

Revenues were $640.8 million, up 21.7% from $526.5 million in Q2 2013. And internal growth, excluding returns and recall revenues, was up 7.2%. Domestic revenues were $454.5 million, of which $429.8 million was domestic regulated

waste and compliance services, and $24.7 million was recalls and returns. ***Domestic internal growth, excluding recalls and returns revenues, was up 8.3%, consisting of SQ up 9% and LQ up 7%.*** International revenues were $186.3 million, and internal growth adjusted for unfavorable exchange impact of $4.4 million was up 5%. Acquisitions contributed $81.7 million to the growth in the quarter.

Gross profit was $275.3 million, or 43% of revenues. SG&A expense, including amortization, was $121.7 million, or 19% of revenues. Net interest expense was $16.4 million. Net income attributable to Stericycle was $81.9 million, or $0.95 per share on an as-reported basis, and $1.03 adjusted for acquisitions and other nonrecurring expenses.

*    *    *

Yes. Free cash flow, we came in as reported, 66.6 and 194.7 year to date.

233. Moreover, Defendant Alutto stated "I think you saw some good grace growth rates in the domestic business."

234. Analysts reported favorably on Defendants' reported growth:

a. Jeffries reiterated its buy rating, reporting that "[d]omestic organic growth rates (both SQ and LQ) improved sequentially";

b. William Blair & Company analysts reiterated their "Outperform" rating in an article entitled "*Another Solid Quarter; PSC Integration Off to a Good Start and Organic Growth Accelerates Nicely.*" (emphasis added);

c. Northcoast Research wrote that "SRCL's domestic SQG (+9.1% internal growth year-over-year) and domestic LQG (+7.4% internal growth year-over-year) both posted strong results" and stated that "[g]iven SRCL's 2Q14 results, we believe the growth outlook remains positive."; and

d. Credit Suisse also reported that "Organic domestic growth was 8.3%, driven by 9% in small quantity generators. We believe that clinical services and communication solutions contribute with a significant share of growth particularly in SQ clients."

235. On August 7, 2014, the Company filed its Form 10-Q for the quarter ended June 30, 2014 and the accompanying SOX Certifications with the language set forth in ¶192 above (and signed by Defendants Alutto and Ginnetti), which further described the Company's financial results for the second quarter of 2014. In this 10-Q, the Company claimed that it had "determined

that our customer relationships have useful lives from 10 to 40 years based upon the type of customer, with a weighted average remaining useful life of 24.2 years." Further, in this Form 10-Q, the Company stated that its "[o]rganic revenue growth for small domestic small account customers increased by $35.2 million, or approximately 8%, ***driven by an increase in Steri-Safe revenues and regulated waste services for retailers***."

236. The statements set forth in ¶¶ 232-233 and 235 above were materially false and/or misleading for the reasons set forth in ¶194 above.

### h) Third Quarter 2014

237. On October 23, 2014, after the close of the financial markets, the Company released its financial results for the third quarter of 2014 in a press release and held a conference call to discuss those results. On the conference call, Defendant Ginnetti reported the Company's earnings as follows:

> Revenues were $667.9 million, up 24.9% from $534.6 million in Q3 2013, and internal growth, excluding returns and recall revenues, was up 10.3%.

> Domestic revenues were $470.7 million, of which $454 million was domestic regulated waste and compliance services, and $16.6 million was recalls and returns. ***Domestic internal growth, excluding recalls and returns revenues, was up 8.6%, consisting of SQ up 9% and LQ up 8%.*** International revenues were $197.2 million and internal growth adjusted for unfavorable exchange impact of $4.1 million was up 14.3%. Acquisitions contributed $93.8 million to the growth in the quarter. Gross profit was $279.5 million, or 41.9% of revenues. SG&A expense, including amortization, was $125.3 million, or 18.8% of revenues. Net interest expense was $16.6 million. Net income attributable to Stericycle was $82.8 million, or $0.96 per share on an as reported basis, and $1.08 adjusted for acquisitions related expenses and other adjusted items.

238. Moreover, Ginnetti maintained that "[o]ur core business is on track and did improve by greater than 10 basis points."

239. Analysts reacted positively to the Company's disclosures:

a.  William Blair reiterated its "Outperform" rating and reported that the internal growth of the third quarter "marked a solid acceleration from the second quarter . . . .";

b.  Barrington Research reiterated its "Outperform" rating, and stated that "[t]he quarter was highlighted by organic growth . . . and solid performance in the domestic SQ and LQ businesses"; and

c.  Great Lakes Review wrote that, "3Q14 organic growth accelerated to in excess of 10%, the best figure in six years."

240.  On November 7, 2014, the Company filed its Form 10-Q for the quarter ended September 30, 2014 and the accompanying SOX Certifications with the language set forth in ¶192 above (and signed by Defendants Alutto and Ginnetti), which further described the Company's financial results for the third quarter of 2014.  The Company stated with regard to its SQ sector that "[o]rganic revenue growth for domestic small account customers increased by $19.2 million, or approximately 9%, driven by higher revenues from our Steri-Safe, regulated waste services for retailers, and other regulated compliance services."  Moreover, in this Form 10-Q, the Company further claimed that it had "determined that our customer relationships have useful lives from 10 to 40 years based upon the type of customer, with a weighted average remaining useful life of 23.7 years."

241.  The statements set forth in ¶¶237-238 and 240 above were materially false and/or misleading for the reasons set forth in ¶194 above.

### i)  Fourth Quarter 2014 and Year-End 2014

242.  On February 5, 2015, after the close of the financial markets, Stericycle released its financial results for the fourth quarter and full year of 2014 in a press release and held a conference call to discuss those results.  In the press release, the Company reported its full year 2014 results as follows:

Revenues for the full year 2014 were $2.56 billion, up 19.3% from $2.14 billion in 2013. Acquisitions contributed approximately $301.6 million to the current year's

growth in revenues. Revenues increased 20.8% compared with the prior period when adjusted for unfavorable foreign exchange impact of $33.6 million. GAAP gross profit was $1.09 billion, up 13.5% from $964.6 million in 2013. GAAP gross profit as a percent of revenues was 42.8% compared to 45.0% in 2013. Non-GAAP gross profit, when adjusted for various items identified in the second of the following tables, was $1.10 billion, up 13.5% from $967.2 million in 2013. Non-GAAP gross profit as a percent of revenues was 42.9% compared to 45.1% in 2013. GAAP earnings per diluted share increased 6.3% to $3.79 from $3.56 in 2013. Non-GAAP earnings per diluted share, when adjusted for various items identified in the third of the following tables, increased 13.8% to $4.27 from $3.75.

243.     On the conference call, Defendant Ginnetti reported Stericycle's 2014 fourth quarter results as follows:

Revenues were $676.9 million, up 19.2% from $567.9 million in Q4 2013. And internal growth, excluding returns and recall revenues, was up 8%.

Domestic revenues were $479.7 million of which $462.7 million was domestic regulated waste and compliance services and $17 million was recalls and returns. ***Domestic internal growth, excluding recalls and returns revenues was up 7.3% consisting of SQ up 8% and LQ up 7%.***

International revenues were $197.2 million. And internal growth, adjusted for unfavorable foreign-exchange impact of $17 million, was up 10%.

Acquisitions contributed $93.1 million to the growth in the quarter. Gross profit was $285.4 million or 42.2% of revenues.  SG&A expense, including amortization, was $124.2 million or 18.3% of revenues.  Net interest expense was $18.1 million, net income attributable to Stericycle was $82.5 million or $0.96 per share on an as reported basis and $1.12 adjusted for acquisition related expenses and other adjusted items.

*          *          *

So, versus the prior quarter, gross margins were up 30 basis points.

244.     Defendant Arnold touted improvements that Stericycle had made to foster continued growth, claiming that: "[w]e increased our regulated waste, operational infrastructure, enabling the continued growth of our retail and SQ regulated waste business."

245.     Analysts reported on the Company's disclosures and remarked on its long track record of meeting or exceeding consensus estimates:

a.    Macquarie reported on February 5, 2015 that "SRCL delivered ~8% growth, consistent with long-term trends and our estimates. Note that 4Q14 marks the 34th consecutive quarter that SRCL has met or exceeded consensus EPS";

b.    Morgan Stanley reported that, "[m]anagement lowered '15 guidance due to heavier FX impact but we see improving sentiment around organic growth and margin expansion";

c.    Northcoast Research noted that domestic SQ "posted solid results"; and

d.    Oppenheimer reported that, "With a solid secular growth profile as baby boomers age and receive increased medical treatment, core 4+ year contracts, *95% customer retention*, and highly recurring medical waste streams, Stericycle's revenue, earnings and cash flow are highly dependable. *With its higher-margin small-quantity (SQ) medical waste customer business organically growing faster than its large-quantity (LQ) medical waste customer business*, SRCL's core benefits from a favorable underlying margin mix shift."

246.    On March 2, 2015, the Company filed its Form 10-K for the year ended December 31, 2014 and the accompanying SOX Certifications with the language set forth in ¶192 above (and signed by Defendants Alutto and Ginnetti), which further described the Company's financial results for 2014. In the Form 10-K, Stericycle stated that "customers for our Steri-Safe service pay a predetermined subscription fee in advance for regulated waste collection and processing services." Stericycle further claimed that "our Steri-Safe revenues are recognized evenly over the contractual service period." Stericycle claimed that one of its competitive strengths was its "Strong Service Relationships with Customers" and touted its "Revenue and Cost Stability" as the Company is "generally protected from the cost of regulatory changes or increases in fuel, insurance or other operating costs because our regulated waste contracts typically allow us to adjust our prices to reflect these cost changes." In addition, Stericycle claimed in the Form 10-K that it targets SQ customers because "[w]e believe that when small-quantity regulated waste customers understand the potential risks of failing to comply with applicable regulations, they appreciate the value of the services that we provide." Stericycle further claimed that this was "***the basis*** for the

higher gross margins that we have achieved with our [SQ] customers relative to our [LQ] customers." Stericycle also claimed that it had "determined that our customer relationships have useful lives from 10 to 40 years based upon the type of customer, with a weighted average remaining useful life of 23.8 years" and that it had "been able to maintain high customer retention through the quality of our customer service."

247. Analysts were satisfied with the Company's statements. For example, Barrington Research reported on March 3, 2015 that it was maintaining its rating for Stericycle of "OUTPERFORM," and noted that the organic growth for SQ was "in line with targeted SQ organic growth of 8-10% for full-year 2014."

248. The statements set forth in ¶¶242-244 and 246 above were materially false and misleading for the reasons set forth in ¶¶194 and 195(b)-(c) above.

### j) First Quarter 2015

249. On April 23, 2015, after the close of the financial markets, the Company released its financial results for the first quarter of 2015 in a press release and held a conference call to discuss those results. On the conference call, Defendant Ginnetti reported the Company's earnings as follows:

> Revenues were $663.3 million, up 16.4% from $570 million in Q1 2014. Internal growth, excluding returns and recall revenues, was up 6.8%. Domestic revenues were $472.2 million, of which $452.3 million was domestic regulated waste and compliance services and $20 million was recalls and returns. ***Domestic internal growth, excluding recalls and returns revenues, was up 6.4%, consisting of SQ up 8% and LQ up 5%.*** International revenues were $191.1 million. And internal growth, adjusted for unfavorable foreign exchange impact of $23.1 million, was up 8%.

> Acquisitions contributed $86.3 million to the growth in the quarter. Gross profit was $281.3 million, or 42.4% of revenues. SG&A expense, including amortization, was $128.3 million, or 19.3% of revenues. Net interest expense was $18.6 million. Net income attributable to Stericycle was $75.5 million, or $0.87 per share on an as reported basis, and $1.08 adjusted for acquisition-related expenses and other adjusted items.

250.     In the quarter, the Company missed its revenue guidance by $13.8 million and Ginnetti dismissed the importance of the revenue miss by blaming it primarily on "the extreme weather impact that we had and its impact on seasonality, as well as the lower energy surcharges that we got in Q1."

251.     Defendant Alutto claimed that, despite the revenue miss, the Company was still experiencing positive internal growth:

> I think when you look at the growth drivers for our SQ customer base in the US, ***there are several growth drivers that drive our organic internal growth. SteriSafe is one of them, Communication Solutions, our hazardous waste, our Environmental Solutions business Brent [Arnold] talked about, the recently completed integration of the PSC [i.e., PSC Environmental Services, LLC, another provider of environmental and regulated waste management solutions], really they all contribute.*** We continue to improve the SteriSafe offering, which gives us an ability to increase value for our customers and an opportunity to also accelerate revenue growth and profitability.
>
> \*     \*     \*
>
> ***I think if you look at the growth engines on the SQ side of the business, SteriSafe still provides a majority of the growth on the SQ business, and then Com Sol, Communication Solutions and Environmental Solutions adds some additional growth there.***

252.     Analysts commented positively on Stericycle's announcement of its 1Q15 results. For example, Jeffries stated that, "the core business remain[s] healthy and margins and addressable opportunities continue to expand."  Oppenheimer again wrote on April 24, 2015 that Stericycle has a "solid secular growth profile."

253.     On May 7, 2015, the Company filed its Form 10-Q for the quarter ended March 31, 2015 and the accompanying SOX Certifications with the language set forth in ¶192 above (signed by Defendants Alutto and Ginnetti), which further described the Company's financial results for the first quarter of 2015.  In this Form 10-Q, the Company claimed that it had "determined that our

customer relationships have useful lives from 10 to 40 years based upon the type of customer, with a weighted average remaining useful life of 23.6 years."

254. On June 1, 2015, Stericycle representatives spoke at a Stifel Investor Summit (the "Stifel Summit"). At the Stifel Summit, Defendant ten Brink stated that ***Stericycle enjoyed 8% to 10% internal growth from SQ customers***, with the price component of such growth being slightly higher than Consumer Price Index. Specifically, ten Brink claimed that, "I think that we have said in the past on our small customers, we get a little bit better on CPI on price."

255. On July 16, 2015, the Company held a conference call to discuss its acquisition of Shred-it International, Inc. ("Shred-it") in which various Defendants also discussed Stericycle's operations. Defendant Alutto compared the Company's business to Shred-it's and said both "have a similar and exciting growth pattern" and "[r]ecurring revenue and multi-year contracts provide both businesses with a very predictable revenue and profit profile. ***SQ customers provide a stable and profitable customer base***." Moreover, Defendant Arnold described Stericycle's customers as "***our large loyal base of customers***."

256. The statements set forth in ¶¶249-251 and 253-255 above were materially false and misleading for the reasons stated in ¶194 above. In addition, the statements set forth in ¶¶254-255 above were materially false and misleading because Stericycle was systematically increasing the rates charged to SQ customers well in excess of the growth in CPI. Moreover, Defendant ten Brink knew or recklessly disregarded that the Company's fraudulent billing practices were undermining its relationships with its customers.

k) **Second Quarter 2015**

257. On July 23, 2015, after the close of the financial markets, the Company released its financial results for the second quarter of 2015 in a press release and held a conference call to

discuss those results. On the conference call, Defendant Ginnetti reported the Company's earnings and touted its gross margins:

> Revenues were $715.7 million, up 11.7% from $640.8 million in Q2 2014. Internal growth, excluding returns and recall revenues, was up 7.7%. Domestic revenues were $518.2 million, of which $489.9 million was domestic regulated waste and client services, and $28.3 million was recalls and returns. ***Domestic internal growth, excluding recalls and returns revenues, was up 6.6%, consisting of SQ up 8% and LQ up 5%.***

> International revenues were $197.5 million and internal growth adjusted for unfavorable foreign exchange impact of $27.3 million was up 10%. Acquisitions contributed $58.9 million to growth in the quarter. Gross profit was $305.3 million, or 42.7% of revenues. SG&A expense, including amortization, was $135.7 million, or 19% of revenues. Net interest expense was $16.4 million. Net income attributable to Stericycle was $60.5 million or $0.70 per share on an as-reported basis and $1.14 adjusted for acquisition-related expenses and other adjusted items.

> \*     \*     \*

> So we are very pleased with our third straight quarter-over-quarter increase in gross margin. Our increase over Q1 was 25 basis points. So, if you start with a Q1 gross margin of 42.4%, the returns on the recall business rebounded from the weather and seasonality, and that increased our margin by about 55 basis points.

258. Defendant Alutto claimed that "[a]ll of our lines of business continued to perform well" and discussed the Company's purported growth as follows:

> SQ growth, as we have stated in our guidance, is 8% to 10% growth. There really hasn't been a significant change to the contribution to those growth rates. ***Again, about 40% to 50% of that organic growth is related to price and volume, and then 50% to 60% of that, so the remainder of that growth, is in the additional services, whether that's Steri-Safe hazardous-waste disposal, Communications Solutions, they all contribute to the SQ growth.***

259. Analysts reported favorably on Stericycle's announcement of positive results. Jeffries analysts stated that "2Q was the best yet in terms of # of events, and highest revenue quarter of the last eleven" and Macquarie analysts reported that they "continue[d] to recommend SRCL as a core LT holding as organic growth remains solid . . . ."

260.     On August 9, 2015, the Company filed its Form 10-Q for the quarter ended June 30, 2015 and the accompanying SOX Certifications with the language set forth in ¶192 above (and signed by Defendants Alutto and Ginnetti), which further described the Company's financial results for the second quarter of 2015.   In this Form 10-Q, the Company stated that it had "determined that our customer relationships have useful lives from 10 to 40 years based upon the type of customer, with a weighted average remaining useful life of 23.3 years."   The 10-Q also stated that "[o]rganic revenue growth for domestic small account customers increased by $18.4 million, or approximately 8%, driven by higher revenues from our Steri-Safe and regulated waste services for retailers."

261.     The statements set forth in ¶¶257-258 and 260 above were materially false and/or misleading for the reasons set forth in ¶194 above.

### l)     Third Quarter 2015

262.     On October 22, 2015, after the close of the financial markets, the Company released its financial results for the third quarter of 2015 in a press release and held a conference call to discuss those results.   As discussed in greater detail below, during the call, Stericycle announced that its growth rates and revenues were unfavorably impacted in part by lower hazardous waste volumes from its industrial customers. On the conference call, however, Defendant Arnold attempted to reassure investors that, while the Company had not performed as expected, it was still experiencing positive growth:

> In the quarter we experienced a solid growth in selling additional services to our existing customer base. This growth came from retail hazardous waste, sharps management, pharmaceutical waste, and communication solutions. For example, we are seeing increased adoption of our pharmaceutical waste service by physician practices. By utilizing our existing customer relationships along with our environmental solutions infrastructure, we are able to deliver a simple and cost-effective service that keeps our customers compliant and helps protect the environment.

263.    On November 9, 2015, the Company filed its Form 10-Q for the quarter ended September 30, 2015 and the accompanying SOX Certifications with the language set forth in ¶192 above (and signed by Defendants Alutto and Ginnetti), which further described the Company's financial results for the third quarter of 2015.  In this Form 10-Q, the Company stated that it had "determined that our customer relationships have useful lives from 10 to 40 years based upon the type of customer, with a weighted average remaining useful life of 23.2 years."  The 10-Q also stated that "[o]rganic revenue growth for domestic small account customers increased by $18.3 million, or approximately 7%, *driven by higher revenues from our Steri-Safe and regulated waste services for retailers*."

264.    The statements set forth in ¶¶262-263 above were materially false and/or misleading for the reasons set forth in ¶194 above.

### m)    Fourth Quarter 2015 and Year-End 2015

265.    On February 4, 2016, after the close of the financial markets, Stericycle released its financial results for the fourth quarter and full year of 2015 in a press release and held a conference call to discuss those results.  In the press release, the Company reported its full year 2015 results as follows:

> Revenues for the full year 2015 were $2.99 billion, up $430.3 million or 16.8%, from $2.56 billion in the same period last year. Acquisitions contributed approximately $378.5 million in revenues to the current year's growth. Revenues increased 21.2% compared with the prior period when adjusted for unfavorable foreign exchange impact of $110.2 million.

> GAAP gross profit was $1.27 billion, up 15.7% from $1.09 billion in the same period last year. GAAP gross profit as a percent of revenues was 42.4% compared to 42.8% in the same period last year. Non-GAAP gross profit, when adjusted for various items identified in the second of the following tables, was $1.27 billion, up 15.5% from $1.10 billion in the same period as last year. Non-GAAP gross profit as a percent of revenues was 42.5% compared to 42.9% in the same period last year.

GAAP earnings per diluted share decreased 21.7% to $2.96 from $3.79 in 2014. Non-GAAP earnings per diluted share, when adjusted for various items identified in the third of the following tables, increased 3.0% to $4.40 from $4.27.

266.     On the conference call, Defendant Ginnetti reported Stericycle's fourth quarter 2013 results as follows:

Revenues were $888.3 million, up 31.2% from $676.9 million in Q4 2014, and internal growth, excluding returns and recall revenues, was up 5.2%. Domestic revenues were $651.1 million, of which $626.8 million was domestic regulated waste and compliance services and $24.3 million was recalls and returns.

**Fourth-quarter domestic internal growth, excluding returns and recalls revenues, was up 4%, consisting of SQ up 6% and LQ up 2%.** As anticipated, growth rates were impacted by lower fuel surcharges and lower hazardous waste volumes from our industrial customers.

International revenues were $237.2 million, and internal growth adjusted for unfavorable foreign exchange impact of $26.9 million was up 8.1%. This growth rate was also impacted by lower hazardous waste volume. Acquisitions contributed $200 million to growth in the quarter. Gross profit was $380.4 million, or 42.8% of revenues. SG&A expense, including amortization, was $203.6 million, or 22.9% of revenues. Net interest expense was $24.9 million. Net income attributable to Stericycle was $78.9 million, or $0.80 per share on an as reported basis, and $1.11 when adjusted for acquisition related expenses and other adjustments.

267.     Defendant Alutto emphasized that "[o]verall, our business performed very well in the quarter and remains on track despite foreign-exchange headwinds and lower hazardous waste volume from our industrial customers."

268.     Later in the call, Defendant Alutto stated that "if you think about where we are today with growth rates last quarter of [62%], had we normalized that for fuel surcharges and reduction in hazardous waste volume, we would have been at, SQ at about 8%, LQ at about 7%."

269.     Analysts, including those at Barrington Research, pointed to the fact that in their investment highlights, "organic growth rates in the domestic SQ and LQ businesses were in line with management's annual growth expectations."

270. On March 15, 2016, the Company filed its Form 10-K for the year ended December 31, 2015 and the accompanying SOX Certifications with the language set forth in ¶192 above (and signed by Defendants Alutto and Ginnetti), which further described the Company's financial results for 2015. In the Form 10-K, the Company claimed that, in response to an unmet need of small businesses, Stericycle developed a comprehensive service "at low, *flat* monthly fees" and that it had "developed a strong and loyal customer base, with a revenue retention rate exceeding 90%." Stericycle further claimed that "[o]ur compliance service revenues are recognized evenly over the contractual service period." Stericycle also claimed that one of its competitive strengths was its "Strong Service Relationships with Customers" and that it had "determined that our customer relationships have useful lives from 10 to 40 years based upon the type of customer, with a weighted average remaining useful life of 19.2 years." Stericycle also claimed that its "[o]rganic revenue growth for domestic small account customers increased by $69.4 million, or approximately 6.8%, driven by an increase in Steri-Safe revenues and regulated waste services for retailers."

271. The statements set forth in ¶¶265-268 and 270 above were materially false and/or misleading for the reasons set forth in ¶194 above.

**n)    First Quarter 2016**

272. On April 28, 2016, after the close of the financial markets, the Company released its financial results for the first quarter of 2016 in a press release and held a conference call to discuss those results. As discussed further below, during the call Stericycle announced that its first quarter 2016 results fell below the Company's guidance and analyst expectations. Even so, Stericycle still claimed that it was experiencing internal growth.

273. Even though Stericycle lowered its EPS guidance, Defendant Arnold still stated to investors that "[i]n our retail and healthcare hazardous waste compliance programs, we continue

90

to experience strong growth. The growth is fueled by increased enforcement of existing regulations and by Stericycle strong customer relationships in both retail and the healthcare industry." Defendant Alutto later reassured investors that although the Company "did see a lower hazardous-waste volume," with regard to healthcare hazardous waste, or the "SQ hazardous waste," "[w]e had really strong growth there."

274.    Defendant Ginnetti further claimed that "healthcare, hazardous, and retail continue to have great growth." And, Defendant Alutto added that, "we experienced strong revenue growth, strong cash flow, and solid sequential growth for the Shred-it acquisition." Defendant Arnold further stated that, "[i]n our retail and healthcare hazardous waste compliance programs, we continue to experience strong growth."

275.    On May 9, 2016, the Company filed its Form 10-Q for the quarter ended March 31, 2016 and the accompanying SOX Certifications with the language set forth in ¶192 above (and signed by Defendants Alutto and Ginnetti), which further described the Company's financial results for the first quarter of 2016. In this Form 10-Q, the Company stated that it had "determined that our customer relationships have useful lives from 10 to 40 years based upon the type of customer, with a weighted average remaining useful life of 19.1 years." The Company further added that "[o]rganic revenue growth for domestic small account customers increased by $17.0 million, or approximately 6%, *driven by an increase in Steri-Safe revenues and regulated waste services for retailers*."

276.    The statements set forth in ¶¶272-275 above were materially false and/or misleading for the reasons set forth in ¶194 above.

### 2. Stericycle and the Officer Defendants' Material Misrepresentations that Claims of Improper Rate Increases Were "Without Merit"

277.     Prior to and during the Class Period, the New York Attorney General and other Stericycle customers brought lawsuits against Stericycle claiming that the Company had imposed unwarranted price increases on their contracts with the Company.  However, in response to these allegations, Stericycle reassured investors by falsely claiming, in every quarter of the Class Period, that the lawsuits were "without merit."

### a)     Fourth Quarter 2012 and Year-End 2012

278.     On February 6, 2013, after the close of the financial markets, the Company released its financial results for the fourth quarter of 2012 and the year-end 2012 in a press release and held a conference call discussing those results.  During the earnings call, an analyst asked Defendant Kogler about Stericycle's settlement of the charges that the New York Attorney General Office had brought against Stericycle, alleging that the Company had overcharged New York government entities in their contracts with Stericycle.  Specifically, the analyst asked Kogler whether – outside of government contracts – Stericycle was exposed to issues of overcharging with respect to private SQ customers:

> You referenced the New York Attorney General overcharging settlement, or at least that's what the release we saw said.  Can you give us any color on this in terms of how much of the Company is  government, and *if there are contracts elsewhere [i.e., non-government contracts] where you don't specifically have pricing in the contract, and thus, could have some exposure to something like this*?

279.     Kogler falsely and misleadingly responded in the following way, dodging the analyst's question and failing to disclose Stericycle's fraudulent practices with respect to non-governmental customers:

> This was an investigation that targeted really a small number of our government customers in New York, about 650.  The New York attorney general, obviously, alleged that we didn't follow our contract terms.  We disagreed with him.  But we

made the business decision that to avoid legal expense, we would settle. And ***it is all now settled and behind us***. ***We don't really see anything else to it***.

280.     On March 18, 2013, the Company announced in a Form 8-K that it had been served with a class action complaint filed in the U.S. District Court for the Western District of Pennsylvania by an individual plaintiff for itself and on behalf of all other "similarly situated" customers of Stericycle. The complaint alleged, among other things, that the Company imposed unauthorized or excessive price increases and other charges on its customers in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act and Stericycle's implied contractual duties of good faith and fair dealing. In the Form 8-K, signed by Defendant ten Brink, Stericycle claimed that "[w]e believe that we have operated in accordance with the terms of our customer contracts and that the complaint is without merit."

281.     In response to this disclosure, analysts repeated the Company's statements in their analyst reports. For example, on March 18, 2013, Northcoast Research reported that it "believe[d] the class action lawsuit represents little threat to SRCL." And, in a March 18, 2013 Wedbush analyst report, Wedbush stated that "[w]e do not believe there are any material structural issues with contract pricing . . . ."

282.     The statements set forth in ¶¶278-280 above were materially false and misleading because Defendants knew or recklessly disregarded that they were violating their customer contracts, and lacked a reasonable basis to claim that the lawsuits lacked merit, because the alleged violations were not limited to government contracts, and the lawsuits had merit.

**b)     First Quarter 2013**

283.     On the April 24, 2013 earnings call, Defendant Kogler commented on the various lawsuits that alleged the Company was engaged in the systematic fraudulent billing practices

alleged herein and further claimed to investors that "we think the lawsuits are without merit; we will defend ourselves vigorously."

284.    In response to this statement, Wedbush again reported on April 25, 2013 that "[w]e do not believe that there are any material structural issues with contract pricing . . . ."

285.    The Company also claimed in its Form 10-Q filed with the SEC on May 9, 2013 (and signed by Defendants ten Brink and Alutto) that Stericycle "operated in accordance with the terms of our customer contracts" and class action complaints alleging otherwise "are without merit."

286.    The statements set forth in ¶¶283 and 285 above were materially false and misleading for the reasons set forth in ¶282 above.

### c)    Second Quarter 2013 through Second Quarter 2016

287.    In each of the Company's filings from its August 8, 2013 Form 10-Q (signed by Defendants ten Brink and Alutto) through to its May 9, 2016 Form 10-Q (signed by Defendants Alutto and Ginnetti), Stericycle claimed as follows: tat it "operated in accordance with the terms of our customer contracts" and class action complaints alleging otherwise "are without merit":

   a.   The Company's Form 10-Q filed on November 7, 2013 (signed by Defendants ten Brink and Alutto) claimed that Stericycle "operated in accordance with the terms of our customer contracts" and that class action complaints alleging otherwise "are without merit."

   b.   On February 28, 2014, the Company filed its Form 10-K (signed by Defendants ten Brink and Alutto), which claimed that Stericycle "operated in accordance with the terms of our customer contracts" and that complaints alleging otherwise "are without merit";

   c.   The Company also claimed in its May 8, 2014 Form 10-Q (signed by Defendants ten Brink and Alutto) that the Company "operated in accordance with the terms of our customer contracts" and class action complaints alleging otherwise "are without merit";

d. In its August 7, 2014 Form 10-Q (signed by Defendants Alutto and Ginnetti), the Company claimed that it "operated in accordance with the terms of our customer contracts" and class action complaints alleging otherwise "are without merit";

e. On November 7, 2014, the Company filed its Form 10-Q (signed by Defendants Alutto and Ginnetti), which stated that the Company "operated in accordance with the terms of our customer contracts" and class action complaints alleging otherwise "are without merit";

f. In its March 2, 2015 Form 10-K (signed by Defendants Alutto and Ginnetti), Stericycle claimed that it "operated in accordance with the terms of our customer contracts" and that class action complaints alleging otherwise "are without merit";

g. In its May 7, 2015 Form 10-Q (signed by Defendants Alutto and Ginnetti), the Company claimed that it "operated in accordance with the terms of our customer contracts" and class action complaints alleging otherwise "are without merit";

h. In its Form 10-Q for the second quarter of 2015 filed on August 9, 2015 (signed by Defendants Alutto and Ginnetti), the Company claimed that it "operated in accordance with the terms of our customer contracts" and complaints alleging otherwise "are without merit";

i. In its November 9, 2015 Form 10-Q (signed by Defendants Alutto and Ginnetti), the Company claimed that it "operated in accordance with the terms of our customer contracts" and class action complaints alleging otherwise "are without merit";

j. In its March 15, 2016 Form 10-K (signed by Defendants Alutto and Ginnetti), the Company stated it "operated in accordance with the terms of our customer contracts" and that class action complaints alleging otherwise "are without merit";

k. In its May 9, 2016 Form 10-Q (signed by Defendants Alutto and Ginnetti), the Company also claimed that it "operated in accordance with the terms of our customer contracts" and class action complaints alleging otherwise "are without merit";

l. In its August 9, 2016 Form 10-Q (signed by Defendants Alutto and Ginnetti), the Company stated that it "operated in accordance with the terms of our customer contracts" and that class action complaints alleging otherwise "are without merit";

288. The statements set forth in ¶287 above were materially false and misleading for the reasons set forth in ¶282 above.

### 3. Defendants' Omissions of Material Facts

289. The foregoing statements were also materially false and misleading for their failure to disclose other material, non-public facts whose non-disclosure rendered the Defendants'

95

statements materially misleading. During the Class Period, the Defendants failed to disclose the material adverse facts below that were in existence at the time each of the foregoing materially false and misleading statements was made, the disclosure of which would have led to declines in Stericycle's stock price at an earlier date:

      a.    Stericycle imposed fraudulent 18% automatic price increases on SQ customers every six months (¶¶57-72);

      b.    Stericycle had increased the frequency of automatic price increases from 12 months to nine months and then to six months in order to increase revenue (¶¶65, 67);

      c.    Stericycle imposed environmental and regulatory fees on its customers that had no relationship to actual environmental or regulatory costs (¶¶77-83);

      d.    Stericycle customers were upset over the automatic price increases on their contracts and terminated their Stericycle contracts or re-negotiated them for lower rates, and this undisclosed "pricing pressure" caused by Defendants' fraud negatively impacted Stericycle's revenues and growth (¶¶108-124);

      e.    The automatic price increases and baseless additional fees and surcharges created significant undisclosed administrative burdens and costs on Stericycle (including the significant growth in the size of Stericycle's Retention Department (¶¶113, 130)) and negatively impacted Stericycle's reputation among its own customers (¶¶116-118, 121-123, 129-142); and

      f.    At least one Stericycle executive warned the Officer Defendants that the automatic price increases correlated with a loss in customers and revenues, and that the increases were having negative downstream effects on Stericycle's business, but the Officer Defendants rebuffed those warnings and told the executive not to raise them again (¶¶130-138).

290. Defendants' statements with regard to Stericycle's revenue growth and, subsequently, its decelerated growth throughout the Class Period, as well as the merit of lawsuits concerning its unlawful price increases were not only materially false and misleading because they sought to affirmatively represent that Stericycle's growth stemmed from the sale of additional services to existing customers or other innocent explanations, but also because they omitted the above-referenced material facts necessary to make the statements not misleading when made.

These omissions were later revealed by Defendants' later admissions that Stericycle's revenue and growth were negatively impacted by pricing pressures from the Company's SQ customers that resulted from, among other things, larger customers and SQ customers demanding discounts on Stericycle contracts whose prices had been inflated by the Officer Defendants' fraud without support in the contracts themselves.

**B.    Additional Allegations of Stericycle and the Officer Defendants' Scienter**

291.    Numerous facts, considered collectively, support a strong inference that the Officer Defendants (and, by extension, Stericycle) knowingly or recklessly orchestrated a scheme to fraudulently increase SQ customers' rates and hid from investors the fact that Stericycle derived its revenues and growth from that fraud.  The Officer Defendants also knowingly or recklessly concealed from investors the pricing pressure that the SQ customers inflicted on the Company as they demanded that Stericycle cancel their contracts or lower their excessive rates that the Company had inflated through fraud.

292.    ***First***, deposition testimony under oath from senior Stericycle executives in the Customer Case, which only became public in 2016, and accounts of other former Stericycle employees demonstrate that the Officer Defendants were directly involved in developing and implementing the fraudulent automatic price increases on SQ customers.  *See* ¶¶65, 67, 73-76, 78, 120, 122-123, 127-128, 129-136.  As that testimony shows, for example:

a.    Defendant Kogler and other members of Stericycle upper management were responsible for the automatic price increases (¶73-76), and the "rules" concerning the increases were "driven" by Kogler and "upper-level management" (¶74);

b.    The executive team – comprised of the Officer Defendants (Alutto, ten Brink, Kogler, Ginnetti and Arnold) – made the determination to run the automatic price increases (¶75);

c.    Defendant Arnold tasked a Stericycle Vice President of Business Operations to develop a five-year plan for SQ customers that would implement the 18% price increase (¶70);

d.    Arnold asked that the five-year plan include the ability to add in additional baseless environmental and regulatory fees, and suggested that such fees increase by 2.5% in January, February and March of 2012 (¶78);

e.    Defendants Arnold and Kogler were involved in the decision to switch from imposing automatic price increases every nine months to imposing those increases every six months (¶65);

f.    Defendants Alutto, Ginnetti or ten Brink usually attended the quarterly Stericycle meetings in which retention numbers were discussed, including the customers and percentages of revenues lost (¶120);

g.    Not only did Stericycle have meetings about the price increases, but according to internal Stericycle emails, Defendants ten Brink and Kogler received separate "[Price Increase] Impact" analyses that tracked revenue from price increases (¶123, 128);

h.    Defendant Kogler monitored reports on "stick rates" – the amounts and percentages of customers retained in spite of the automatic price increases, including in so-called API Impact Reports (¶123); and

i.    After a former Stericycle Vice President demonstrated to Officer Defendants ten Brink, Arnold, Alutto and Kogler the correlation between automatic price increases and lost business, and suggested that Stericycle discontinue the practice, they told him to never bring it up again (¶¶129-136).

293.    ***Second***, the Officer Defendants were put on notice of allegations by Stericycle customers that the Company was over-charging them through automatic price increases. Unlike investors, the Officer Defendants had access to the internal Stericycle policies, documents and information that would have confirmed (rather than undermined) the customers' claims. Specifically, the automatic price increases are not only the subject of the $30.9 million dollar settlement with the government in the Government Case, but are also the subject of the currently ongoing Customer Case. In the Government Case, discovery revealed that the cumulative overcharges of governmental entities at issue were approximately $11.76 million, a material

amount. As part of the settlement of the Government Case, the Officer Defendants also agreed to cease Stericycle's automatic price increases for specific government customers. Yet, the Officer Defendants knowingly or recklessly continued the automatic price increases with respect to customers not covered by the settlements, including private SQ customers.

294. The Officer Defendants also knowingly or recklessly denied that the allegations in the Customer Case had merit. For example, when an analyst asked on February 6, 2013 if the Company had "exposure" to the type of issues that the New York State settlement identified beyond New York State, Defendant Kogler attempted to evade the question and misleadingly claimed that "***We don't really see anything else to it***."

295. In fact, throughout the Class Period, instead of disclosing the improper automatic price increases, the Defendants repeatedly made statements in their SEC filings (including in almost all Stericycle Form 10-Qs and 10-Ks filed during the Class Period) and on earnings calls that there were no problems related to rate increases and that any lawsuits claiming otherwise are "without merit." *See* ¶¶278-280, 283, 285, 287.

296. Officer Defendants also attempted to hide during the Customer Case that customers did not authorize the price increases. For example, Defendant Kogler was asked under oath during his deposition in the Customer Case what an "automated [Price Increase] was" and he incorrectly stated that "[i]t means that it's automated within the system, so it's been present according to the customer's contract." This answer is contradicted by testimony from James Buckman, a Stericycle Vice President, who stated that the automatic price increases were imposed on all SQ contracts that did not specifically include the terms of future pricing.

297. ***Third***, the Officer Defendants imposed the automatic price increases in order to achieve revenue goals set by the Company and Wall Street. Consistently meeting these goals

necessarily required coordination at Stericycle's highest levels regarding the Company's and Wall Street analysts' revenue and growth estimates, and the timing and amount of specific price increases set by Stericycle.

298.     **Fourth,** the sharp and rapid growth of the Retention Department – which was responsible for handling customers' requests to cancel or re-negotiate their Stericycle contracts – was a red flag to the Officer Defendants that customers were exerting pricing pressure on Stericycle.  In addition, Stericycle executives necessarily needed to authorize the resources required to staff and fund the Company's rapidly-expanding Retentions Department, which grew from approximately 9 employees in 2008 to approximately 40 or 50 employees in 2016 (¶113), which was a further red flag of which the Officer Defendants were aware or recklessly disregarded.

299.     **Fifth**, Stericycle's Vice President of Sales, Christopher Bosler, held monthly meetings which addressed customer losses and these meetings were attended at times by Defendants Alutto and ten Brink.

300.     **Sixth**, Stericycle's automatic price increases and environmental and other surcharges and fees were significant components of Stericycle's revenues and growth and, as a result, they were issues of which the Officer Defendants were aware or recklessly disregarded. Indeed, the Company's SQ growth was also one of its most critical metrics, a subject of intense market scrutiny and concern, and a topic on which Defendants made numerous public statements during the Class Period.  Given the importance of this metric, analysts repeatedly asked about it during conference calls and commented on it in their analyst reports.  *See supra* ¶¶191, 193, 198, 205, 210-213, 221, 223, 229, 234, 238, 245, 247, 252, 259 and 269.  Often, in response, the Officer Defendants made repeated statements about the reason for the difference between gross margins between SQ and LQ customers.  Defendants were, at a minimum, reckless in making such

statements and failing to disclose the existence of automatic price increases that were truly responsible for that difference.

301.     **Seventh**, Stericycle set up its billing system in order to implement the automatic price increases, which required the necessary planning and investment in the infrastructure to carry out the fraudulent automatic price increases.

302.     **Eighth**, Stericycle created a system of incentives for its employees to retain customers and lock them into long-term contracts, no matter how fraudulent.  These business practices included but were not limited to providing little to no explanation of the contract to the customer, pressuring customers to sign the contract during the call, a so-called "one-call close" and rewarding employees with the most numbers of one-call closes.

303.     **Ninth**, as noted by both the SEC and analysts, Stericycle's financial statements lacked transparency and sufficient disclosure to identify how it was quantifying the worth of its customer relationships and how its revenue stream was analyzed.

304.     On March 25, 2015, the SEC asked Stericycle to "expand your discussion regarding the specific key assumptions and specific factors considered in the determination of customer relationship **useful lives**."  The SEC also asked that Stericycle "expand its disclosure to quantify how much of the increase or decrease in internal revenue from each of domestic small account customers, domestic large account customers and internal revenue for your international segment are due to volume of services provided, number of customer accounts, and/or average price."  The Officer Defendants knew or recklessly disregarded that an overwhelmingly large portion of Stericycle's revenue stemmed from its automatic rate increases, that Stericycle customers were leaving or re-negotiating their contracts, and that a lack of transparency in the Company's financial statements was, thus, beneficial to the Defendants' scheme.  Therefore, in a response to the SEC's

letter signed by Defendant Ginnetti, dated May 1, 2015, Stericycle stonewalled the SEC and refused to revise its financial statements in the future and responded that "[i]t is very difficult to isolate and quantify a particular factor as material to internal revenue growth." This representation to the SEC was directly contrary to the materially false and misleading claim that Defendant ten Brink made to investors on the Company's October 23, 2013 conference call that the Company's SQ customer price increases accounted for slightly more than 2% of Stericycle's growth.

305. Analysts also wrote during the Class Period that Stericycle's financial statements lacked transparency and that it was difficult for analysts or investors to understand from where particular growth or revenue stemmed. For example, in May 2016, after the April 28, 2016 partial corrective disclosure, RBC recommended that Stericycle "***dramatically increase disclosure*** to allow investors to understand what is going on and hold the company accountable."

306. ***Tenth***, the Officer Defendants held and/or received large numbers of Stericycle stock and stock options, which provided them with a strong motive and incentive to artificially inflate the price of Stericycle stock through materially false and misleading statements to investors. The following chart shows the amounts of shares of common stock owned by Defendants as of March 22, 2013, March 21, 2014, March 30, 2015 and March 28, 2016 based on publicly-available information:

| Defendant | March 22, 2013 | March 21, 2014 | March 30, 2015 | March 28, 2016 |
|---|---|---|---|---|
| Frank ten Brink | 242,309 | 178,242 | N/A | N/A |
| Richard Kogler | 142,079 | 106,581 | 93,252 | N/A |
| Charles Alutto | 91,106 | 133,323 | 182,995 | 278,768[3] |

---

[3] During the Class Period, Defendant Alutto received stock option grants of 145,500 shares in February 2013, 119,000 in 2014, 110,000 in 2015, and 105,406 in 2016. The Company also added compensation of Restricted Stock Units in 2016 and awarded 7,027 shares to Defendant Alutto.

| Defendant | March 22, 2013 | March 21, 2014 | March 30, 2015 | March 28, 2016 |
|---|---|---|---|---|
| Dan Ginnetti | N/A | N/A | 71,879 | 71,085 |
| Brent Arnold | N/A | N/A | N/A | 67,760 |

307. **Eleventh**, Defendants disclosed the fraud in a piecemeal fashion whereby they attempted to conceal the full extent and implications of their misconduct from investors as long as possible.

### C. Officer Defendants Took Advantage of Stericycle's Soaring Stock Price to Reap Millions in Insider Stock Sales and Launch a Secondary Offering

308. During the Class Period, the Officer Defendants made massive insider sales of their personally held Stericycle common stock, which were highly suspicious in timing and amount. Collectively, Alutto, Arnold, Ginnetti, ten Brink and Kogler sold Stericycle shares valued at $55.69 million, and resulting in total net profits of approximately $30.92 million. As a result, the Officer Defendants personally benefited from the artificial inflation of Stericycle's stock price caused by their materially false and misleading statements to investors. These facts further support a strong inference of scienter.

309. The Officer Defendants made all of their sales not pursuant to any Rule 10b5-1 trading plans and at times when the Company's financial results were artificially inflated through the dissemination of false and misleading statements to the market.

310. **Ten Brink.** During the Class Period, Defendant ten Brink's sales of 222,635 shares for a net profit of approximately $14.23 million were made *not* pursuant to any Rule 10b5-1 trading plan. Defendant ten Brink's sales of Stericycle securities were suspicious in amount compared to his total holdings of Stericycle common stock and exercisable Stericycle stock options:

a. According to Stericycle's Proxy Statement filed in April 2013, as of March 22, 2013, ten Brink held 242,309 shares of Stericycle common stock (including shares of common stock issuable upon the exercise of stock options as of or within 60 days after March 22, 2013). From March 2013 through March 2014, ten Brink sold 132,635 shares of Stericycle common stock, which represented approximately *54.8%* of the 242,209 shares he held as of March 2013.

b. In addition, according to Stericycle's Proxy Statement filed in April 2014, as of March 21, 2014, ten Brink held 177,242 shares of Stericycle common stock (including shares of common stock issuable upon the exercise of stock options as of or within 60 days after March 21, 2014) (which was an overall *27%* decline compared to the prior March). From April 2014 through July 2014 (when Stericycle's public sales records on ten Brink's stock sales end because he left as Stericycle's CFO in August 2014), ten Brink sold another 75,000 shares of Stericycle common stock, which represented approximately *42.3%* of the 177,242 shares he held as of March 2014.

c. Indeed, by April 2015, ten Brink reported ownership of only 91,899 shares of Stericycle common stock and exercisable stock options. This represented an overall decline in ten Brink's ownership of Stericycle stock and then-exercisable Stericycle options from April 2013 through April 2015 of *62%*.

311. ***Kogler***. During the Class Period, Defendant Kogler's sales of 174,253 shares for a net profit of approximately $9.89 million were made *not* pursuant to any Rule 10b5-1 trading plan. Kogler's sales of Stericycle securities were suspicious in amount compared to his total holdings of Stericycle common stock and exercisable Stericycle stock options:

a. According to Stericycle's Proxy Statement filed in April 2013, as of March 22, 2013, Kogler held 142,079 shares of Stericycle common stock (including shares of common stock issuable upon the exercise of stock options as of or within 60 days after March 22, 2013). From March 2013 through March 2014, Kogler sold 104,066 shares of Stericycle common stock, which represented approximately *73.2%* of the 142,079 shares he held as of March 2013.

b. In addition, according to Stericycle's Proxy Statement filed in April 2014, as of March 21, 2014, Kogler held 106,581 shares of Stericycle common stock (including shares of common stock issuable upon the exercise of stock options as of or within 60 days after March 21, 2014) (which was an overall *25%* decline compared to the prior March). From April 2014 through October 2014 (when Stericycle's public records on Kogler's stock sales end because he left his role as Stericycle's COO in January 2015), Kogler sold

another 50,187 shares of Stericycle common stock, which represented approximately *47%* of the 106,581 shares he held as of March 2014.

c.    Indeed, by April 2015, Kogler reported ownership of only 93,252 shares of Stericycle common stock and exercisable stock options. This represented an overall decline in Kogler's ownership of Stericycle stock and then-exercisable Stericycle options from April 2013 through April 2015 of *34.4%*.

312.    *Alutto*. During the Class Period, Defendant Alutto's sales of 39,500 shares for a net profit of approximately $2.93 million were made *not* pursuant to any Rule 10b5-1 trading plan. Alutto's sales of Stericycle securities were suspicious in amount compared to his total holdings of Stericycle common stock and exercisable Stericycle stock options:

a.    According to Stericycle's Proxy Statement filed in April 2013, as of March 22, 2013, Alutto held 91,106 shares of Stericycle common stock (including shares of common stock issuable upon the exercise of stock options as of or within 60 days after March 22, 2013). From March 2013 through March 2014, Alutto sold 14,000 shares of Stericycle common stock, which represented approximately *15.3%* of the 91,106 shares he held as of March 2013.

b.    In addition, according to Stericycle's Proxy Statement filed in April 2014, as of March 21, 2014, Alutto held 133,323 shares of Stericycle common stock (including shares of common stock issuable upon the exercise of stock options as of or within 60 days after March 21, 2014). From April 2014 through March 2015, Alutto sold another 25,500 shares of Stericycle common stock, which represented approximately *19.1%* of the 133,323 shares he held as of March 2014.

313.    *Ginnetti*. During the Class Period, Defendant Ginnetti's sales of 32,184 shares for a net profit of approximately $2.37 million were made *not* pursuant to any Rule 10b5-1 trading plan. According to Stericycle's Proxy Statement filed in April 2015, as of March 30, 2015, Ginnetti held 71,879 shares of Stericycle common stock (including shares of common stock issuable upon the exercise of stock options as of or within 60 days after March 30, 2015). From April 2015 through March 2016, Ginnetti sold 22,184 shares of Stericycle common stock, which represented approximately *31%* of the 71,879 shares he held as of March 2015.

314.    *Arnold*.  During the Class Period, Defendant Arnold's shares of 13,750 shares for a net profit of approximately $1.14 million were made *not* pursuant to any Rule 10b5-1 trading plan.  As of April 2016, Stericycle reported that Arnold held a *de minimis* amount of Stericycle common stock and 45,882 total exercisable Stericycle stock options as of March 2016.  The 4,750 shares of Stericycle common stock that Arnold sold in 2014, and the 9,000 shares of Stericycle stock that Arnold sold in 2015 represent a significant percentage of the common stock and exercisable options that Arnold held as of that time.

315.    Specifically, Kogler, ten Brink, Alutto, Ginnetti and Arnold made the following sales of Stericycle stock on the following dates during the Class Period, and reaped the following proceeds and net profits from these sales:

| Defendant | Transaction Dates | Shares Sold | Prices per Share | Total Value | Profits per Sale |
|---|---|---|---|---|---|
| TEN BRINK | 2/13/2013 | 11,022 | $96.51 | $1,063,733.22 | $  638,669.79 |
| TEN BRINK | 2/14/2013 | 3,978 | $96.55 | $  384,075.90 | $  230,664.33 |
| TEN BRINK | 4/26/2013 | 18,408 | $108.21 | $1,991,929.68 | $1,282,025.16 |
| TEN BRINK | 4/26/2013 | 8,141 | $108.21 | $  880,937.61 | $  499,694.58 |
| TEN BRINK | 4/26/2013 | 3,451 | $108.21 | $  373,432.71 | $  211,822.38 |
| TEN BRINK | 8/1/2013 | 38,259 | $116.34 | $4,451,052.06 | $2,659,383.09 |
| TEN BRINK | 8/1/2013 | 7,500 | $116.40 | $  873,000.00 | $  583,762.50 |
| TEN BRINK | 8/1/2013 | 100 | $116.34 | $    11,634.00 | $      6,319.00 |
| TEN BRINK | 10/28/2013 | 139 | $117.02 | $    16,265.78 | $      9,100.33 |
| TEN BRINK | 11/1/2013 | 4,579 | $116.89 | $  535,239.31 | $  299,191.86 |
| TEN BRINK | 11/1/2013 | 1,100 | $116.89 | $  128,579.00 | $    70,114.00 |
| TEN BRINK | 11/4/2013 | 12,595 | $116.58 | $1,468,325.10 | $  798,900.85 |
| TEN BRINK | 11/5/2013 | 11,587 | $116.48 | $1,349,653.76 | $  733,804.71 |
| TEN BRINK | 2/11/2014 | 3,027 | $116.08 | $  351,374.16 | $  209,619.75 |
| TEN BRINK | 2/12/2014 | 6,438 | $116.02 | $  746,936.76 | $  445,445.22 |
| TEN BRINK | 2/12/2014 | 737 | $116.02 | $    85,506.74 | $    46,335.19 |
| TEN BRINK | 2/13/2014 | 5,574 | $116.19 | $  647,643.06 | $  351,384.96 |
| TEN BRINK | 2/13/2014 | 4,220 | $116.19 | $  490,321.80 | $  266,028.80 |
| TEN BRINK | 2/14/2014 | 6,780 | $116.17 | $  787,632.60 | $  427,275.60 |
| TEN BRINK | 4/29/2014 | 23,766 | $116.08 | $2,758,757.28 | $1,533,619.98 |
| TEN BRINK | 4/30/2014 | 6,234 | $116.14 | $  724,016.76 | $  402,654.06 |
| TEN BRINK | 7/29/2014 | 30,000 | $118.8384 | $3,565,152.00 | $2,018,652.00 |

| Defendant | Transaction Dates | Shares Sold | Prices per Share | Total Value | Profits per Sale |
|---|---|---|---|---|---|
| TEN BRINK | 7/29/2014 | 15,000 | $118.8384 | $1,782,576.00 | $ 507,576.00 |
| **TEN BRINK Totals** | | **222,635** | | **$25,467,775.29** | **$14,232,044.14** |

| Defendant | Transaction Dates | Shares Sold | Prices per Share | Total Value | Profits per Sale |
|---|---|---|---|---|---|
| KOGLER | 2/13/2013 | 11,600 | $96.52 | $ 1,119,632.00 | $ 576,404.00 |
| KOGLER | 2/14/2013 | 8,400 | $96.55 | $ 811,020.00 | $ 378,000.00 |
| KOGLER | 4/26/2013 | 30,000 | $108.21 | $ 3,246,300.00 | $1,651,800.00 |
| KOGLER | 7/29/2013 | 22,560 | $116.04 | $ 2,617,862.40 | $1,454,894.40 |
| KOGLER | 7/30/2013 | 4,718 | $115.86 | $ 546,627.48 | $ 303,414.58 |
| KOGLER | 7/30/2013 | 2,241 | $115.86 | $ 259,642.26 | $ 144,118.71 |
| KOGLER | 7/30/2013 | 481 | $115.86 | $ 55,728.66 | $ 30,163.51 |
| KOGLER | 8/1/2013 | 5,000 | $116.57 | $ 582,850.00 | $ 460,918.83 |
| KOGLER | 10/28/2013 | 68 | $117.02 | $ 7,957.36 | $ 4,343.16 |
| KOGLER | 11/1/2013 | 2,798 | $116.81 | $ 326,834.38 | $ 178,120.68 |
| KOGLER | 11/4/2013 | 3,772 | $116.58 | $ 439,739.76 | $ 239,257.96 |
| KOGLER | 11/4/2013 | 2,432 | $116.58 | $ 283,522.56 | $ 154,261.76 |
| KOGLER | 11/5/2013 | 5,430 | $116.48 | $ 632,486.40 | $ 343,881.90 |
| KOGLER | 2/11/2014 | 2,851 | $116.08 | $ 330,944.08 | $ 197,431.75 |
| KOGLER | 2/12/2014 | 6,614 | $116.02 | $ 767,356.28 | $ 457,622.66 |
| KOGLER | 2/12/2014 | 143 | $116.02 | $ 16,590.86 | $ 9,219.21 |
| KOGLER | 2/13/2014 | 9,223 | $116.19 | $ 1,071,620.37 | $ 596,174.72 |
| KOGLER | 2/14/2014 | 5,634 | $116.17 | $ 654,501.78 | $ 364,069.08 |
| KOGLER | 2/14/2014 | 101 | $116.17 | $ 11,733.17 | $ 6,365.02 |
| KOGLER | 4/30/2014 | 8,750 | $116.12 | $ 1,016,050.00 | $ 761,718.59 |
| KOGLER | 7/29/2014 | 15,000 | $119.3471 | $ 1,790,206.50 | $ 515,206.50 |
| KOGLER | 10/27/2014 | 6,010 | $123.09 | $ 739,770.90 | $ 228,920.90 |
| KOGLER | 10/27/2014 | 4,090 | $123.09 | $ 503,438.10 | $ 155,788.10 |
| KOGLER | 10/27/2014 | 2,400 | $123.09 | $ 295,416.00 | $ 91,416.00 |
| KOGLER | 10/28/2014 | 12,500 | $123.91 | $ 1,548,875.00 | $ 486,375.00 |
| KOGLER | 10/28/2014 | 1,437 | $123.80 | $ 177,900.60 | $ 101,524.05 |
| **KOGLER Totals** | | **174,253** | | **$19,854,606.90** | **$9,891,411.07** |

| Defendant | Transaction Dates | Shares Sold | Prices per Share | Total Value | Profits per Sale |
|---|---|---|---|---|---|
| ALUTTO | 4/26/2013 | 13,500 | $107.95 | $1,457,325.00 | $936,697.50 |
| ALUTTO | 4/26/2013 | 500 | $107.95 | $ 53,975.00 | $ 39,205.00 |

| Defendant | Transaction Dates | Shares Sold | Prices per Share | Total Value | Profits per Sale |
|---|---|---|---|---|---|
| ALUTTO | 8/18/2014 | 8,162 | $119.29 | $  973,644.98 | $658,877.45 |
| ALUTTO | 8/19/2014 | 6,000 | $119.38 | $  716,280.00 | $397,380.00 |
| ALUTTO | 8/19/2014 | 2,338 | $119.38 | $  279,110.44 | $188,945.47 |
| ALUTTO | 2/12/2015 | 9,000 | $132.02 | $1,188,180.00 | $709,830.00 |
| **ALUTTO Totals** | | **39,500** | | **$4,668,515.42** | **$2,930,935.42** |

| Defendant | Transaction Dates | Shares Sold | Prices per Share | Total Value | Profits per Sale |
|---|---|---|---|---|---|
| GINNETTI | 10/31/2014 | 5,000 | $  125.05 | $625,250.00 | $432,425.00 |
| GINNETTI | 2/17/2015 | 5,000 | $  132.86 | $664,300.00 | $471,475.00 |
| GINNETTI | 7/29/2015 | 5,000 | $  139.81 | $699,050.00 | $433,300.00 |
| GINNETTI | 2/19/2016 | 6,924 | $110.3562 | $764,106.33 | $396,095.73 |
| GINNETTI | 2/19/2016 | 1,076 | $110.8795 | $119,306.34 | $  62,116.94 |
| GINNETTI | 2/19/2016 | 5,684 | $110.8795 | $630,239.08 | $364,057.36 |
| GINNETTI | 2/19/2016 | 3,500 | $110.8795 | $388,078.25 | $210,208.25 |
| **GINNETTI Totals** | | **32,184** | | **$3,890,330.00** | **$2,369,678.28** |

| Defendant | Transaction Dates | Shares Sold | Prices per Share | Total Value | Profits per Sale |
|---|---|---|---|---|---|
| ARNOLD | 10/27/2014 | 3,000 | $123.06 | $369,183.90 | $209,730.00 |
| ARNOLD | 10/30/2014 | 1,750 | $123.61 | $216,312.25 | $123,305.00 |
| ARNOLD | 2/17/2015 | 4,000 | $132.91 | $531,622.80 | $344,320.00 |
| ARNOLD | 7/30/2015 | 5,000 | $139.30 | $696,522.50 | $462,350.00 |
| **ARNOLD Totals** | | **13,750** | | **$1,813,641.45** | **$1,139,705.00** |

316.  Defendants, therefore, had motive to tout Stericycle's internal SQ growth rate while misleadingly failing to disclose that such growth was due to unlawful price increases and that it was having a concomitant negative financial impact on the Company through the loss of SQ customers and the need to re-negotiate SQ customers' rates once they learned of the improper rate increases.

317.  The Officer Defendants' Class Period stock sales were suspicious in timing because they made these sales while in possession of the material, non-public adverse information that

Stericycle's growth was due to unlawful rate increases and that due to these rate increases customers were leaving Stericycle in large numbers.  As Defendant Alutto admitted on July 28, 2016, in response to an analyst question about pricing pressure:  "I think if you look at this certainly it has been something that we've looked at for many years."  Because of this awareness, under the securities laws, the Officer Defendants were required to either disclose the adverse non-public information or abstain from trading in Stericycle stock.  They did neither.

318.     The Officer Defendants' sales are also suspicious in amount compared to their base salaries.  Defendant ten Brink received a combined salary of $573,846 for 2013 and 2014 (which is over-inclusive due to the fact that the Class Period starts in February 2013) compared with *24.74 times* that amount in insider trading profits of *$14.2 million*; Defendant Kogler received a combined salary of $638,269 for 2013 and 2014 compared with *15.5 times* that amount in insider trading profits of *$9.89 million*; in 2013, 2014 and 2015 Defendant Alutto received a combined base salary of $1,215,961 compared with nearly double that amount in insider trading profits of $2.93 million; Defendant Ginnetti received a combined salary of $622,308 for 2014 and 2015 compared with *3.81 times* that amount in insider trading profits of $2.369 million; and Defendant Arnold received a salary of $683,077 in 2015, compared with *1.67 times* that amount in insider trading profits of $1.139 million.

319.  During the Class Period, the Officer Defendants made no purchases of Stericycle shares on the open market – all shares were part of a compensation package – which supports a strong inference that Defendants did not view Stericycle stock on the open market to be under-valued.

320.     While trading decreased for Defendants Arnold, Kogler, ten Brink and Ginnetti during the Class Period compared with the prior period of similar length -- from August 18, 2009

to February 5, 2013 (the "Control Period") – this is of no moment. First, only the executive officers of Stericycle publicly filed information regarding their stock trading. Defendant Arnold became an executive officer only in 2014 and Ginnetti became the Chief Financial Officer only on August 1, 2014. And, Defendants ten Brink and Kogler left their executive officer positions at Stericycle to take on other roles as of late 2014 and early 2015, respectively. Second, as disclosed by Stericycle during the Class Period, it had a policy that required its executive officers with less than five years of service as an executive officer to hold a stock position equal to three times his or her base salary, and an executive officer with five or more years of service to have a position equal to five times his or her base salary. These executives' Stericycle Class Period stock sales were thus constrained by this publicly-disclosed policy and by the expectation that they should not even approach these limits in the volume of their sales. Third, any Control Period sales were made during a time when Stericycle faced scrutiny over its alleged unlawful price increases charged to government customers.

321.     In addition, as set forth below in the section of this Complaint concerning Plaintiffs' claims brought pursuant to the Securities Act, Stericycle also embarked on a secondary offering of Stericycle depositary shares in September 2015 in order to fund the Company's acquisition of document destruction company Shred-it. Defendants unlawfully did so while in possession of material adverse information concerning Stericycle's fraudulent automatic price increases, and in order to diversify the Company away from Stericycle's weakening SQ customer business.

### D.     Additional Loss Causation Allegations

322.     The market price of Stericycle's publicly traded common stock and depository shares was artificially inflated by the material misstatements and omissions alleged herein, including misstatements and omissions about the merit of legal challenges to the fraudulent price increases, and the reasons for SQ growth.

323. The artificial inflation in Stericycle's stock price was removed when Defendants revealed the truth behind these material misrepresentations and omissions to the public on October 22, 2015, February 4, 2016, April 28, 2016, July 28, 2016, September 2, 2016, and September 18 and September 19, 2016. Statements made on these days revealed on a piecemeal basis the true nature and extent of Defendants' scheme to conceal how SQ growth was due, in large part, to the unlawful price increases. These disclosures, more particularly described above (¶¶145-185), reduced the amount of inflation in the price of Stericycle's publicly traded common stock and depository shares, causing economic injury to Lead Plaintiffs and other members of the Class.

324. As illustrated by the chart below, each of these loss-causing disclosures occurred against a backdrop of little to no movements in the wider stock market:

| Date of Corrective Disclosure | Corrective Disclosure | Common Stock and Depositary Share Price Changes | S&P 500 Price Change |
|---|---|---|---|
| October 22, 2015 | Announcement of decelerated SQ growth. | SRCL: $149.04 per share on day of disclosure. Closed next day at $120.31.<br><br>**Percentage change: -19%**<br><br>SRCLP: $106.34 per depository share on day of disclosure. Closed next day at $92.56.<br><br>**Percentage change: -13%** | $2,052.51 on day of disclosure. Closed next day at $2,075.14.<br><br>**Percentage change: 1.10%** |
| February 4, 2016 | Announcement of decelerated SQ growth. | SRCL: $115.94 per share on day of disclosure. Closed next day at $111.12.<br><br>**Percentage change: -4%**<br><br>SRCLP: $89.00 per depository share on day of disclosure. Closed next day at $86.72.<br><br>**Percentage change: -2.5%** | $1,915.45 on day of disclosure. Closed next day at $1,880.05.<br><br>**Percentage change: -1.8%** |

| Date of Corrective Disclosure | Corrective Disclosure | Common Stock and Depositary Share Price Changes | S&P 500 Price Change |
|---|---|---|---|
| April 28, 2016 | Announcement of decelerated SQ growth in connection with hospital-based SQ customer "pricing pressure." | SRCL: $121.74 on day of disclosure.  Closed next day at $95.56.<br><br>**Percentage change: -21.5%**<br><br>SRCLP: $91.76 on day of disclosure.  Closed next day at $77.66 per share.<br><br>**Percentage change: -15.4%** | $2,075.81 on day of disclosure.  Closed next day at $2,065.31.<br><br>**Percentage change: -.50%** |
| July 28, 2016 | Announcement of decelerated SQ growth in connection with SQ pricing pressure generally. | SRCL: $105.93 on day of disclosure.  Closed next day at $90.27.<br><br>**Percentage change: -14.8%**<br><br>SRCLP: $84.72 on day of disclosure.  Closed next day at $74.59.<br>**Percentage change: -12%** | $2,180.06 on day of disclosure.  Closed next day at $2,173.60.<br><br>**Percentage change: -.29%** |
| September 2, 2016 | Analysts report on recent weakness in Stericycle's core SQ healthcare business. | SRCL: $85.36 on day before disclosure.  Closed day of disclosure   at $84.15.<br><br>**Percentage change: -1.41%**<br><br>SRCLP: $69.20 on day before disclosure.  Closed on day of disclosure at $68.82.<br><br>**Percentage change: -.54%** | $2,170.86 on day of disclosure.  Closed next trading day at $2,179.98.<br><br>**Percentage change: .41%** |
| September 18 and 19, 2016 | Analysts report Defendants' statements that 60-70% of SQ customers were requesting price changes. | SRCL: $81.248.00 on trading day before disclosure.  Closed on day of disclosure at $78.00.<br><br>**Percentage change: -4%**<br><br>SRCLP: $66.11 on trading day before disclosure.  Closed on day of disclosure at $64.20.<br>**Percentage change: -2.88%** | $2,139.16 on day before disclosure.  Closed day of disclosure at $2,139.12.<br><br>**Percentage change: -.001%** |

112

13.    None of these disclosures was sufficient on its own to fully remove the inflation from Stericycle's stock price because each of them only partially revealed the conditions, risks and trends that had been concealed from investors.  The corrective impact of the disclosures alleged herein was tempered by Defendants' continued misstatements and omissions about Stericycle's revenue growth and pricing pressure.  These misrepresentations and omissions inflated and maintained the prices of Stericycle's publicly traded stock and depository shares at levels that were artificially inflated, inducing members of the Class to continue purchasing Stericycle's common stock even after the truth began to partially enter the market.

## E.    Presumption of Reliance

325.    At all relevant times, the markets for Stericycle's common stock and depositary shares were efficient markets for the following reasons, among others:

a.    Stericycle's common stock and depositary shares met the requirements for listing, and were listed and actively traded on the NASDAQ Global Select Market, a highly efficient and automated market;

b.    As a regulated issuer, Stericycle filed periodic public reports with the SEC and the NASDAQ Global Select Market;

c.    Stericycle regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d.    Stericycle was followed by multiple securities analysts employed by major brokerage firm(s) who wrote reports, which were distributed to the sales force and certain customers of their respective brokerage firm(s).  Each of these reports was publicly available and

113

entered the public marketplace. Indeed, 343 analyst reports on Stericycle were published during the Class Period.

326. As a result of the foregoing, the market for Stericycle's stock promptly digested current information regarding Stericycle from all publicly available sources and reflected such information in the price of Stericycle's stock. Under these circumstances, all purchasers of Stericycle's stock during the Class Period suffered similar injury through their purchase of Stericycle's stock at artificially inflated prices and the presumption of reliance applies.

327. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material false and misleading statements and omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's practice of systematically and routinely raising their customers' rates without notice and in contravention of their contracts and the subsequent material adverse negative impact on Stericycle's customer retention and revenues—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of Stericycle's SQ clients to the Company's revenues, gross margins, and growth, that requirement is satisfied here.

## VI.    VIOLATIONS OF THE SECURITIES ACT

328. Lead Plaintiff ATRS's claims under the Securities Act do not sound in fraud and ATRS expressly disavows and disclaims any allegations of fraud, scheme or intentional conduct as part of its claims under the Securities Act. Any allegations of fraud, fraudulent conduct, or motive are specifically disclaimed from the following allegations for the purposes of Lead

Plaintiff's claims under the Securities Act, which do not have scienter, fraudulent intent or motive as required elements. To the extent that these allegations incorporate factual allegations elsewhere in this Complaint, those allegations are incorporated only to the extent that such allegations do not allege fraud, scienter, or intent of the Defendants to defraud ATRS or members of the Class.

329. As alleged below, Stericycle and other Defendants made a series of materially untrue statements and omissions of material facts in Stericycle's registration statement, preliminary prospectus and prospectus in connection with the Company's September 15, 2015 Offering of 7.7 million depositary shares, and in the Company's public filings incorporated by reference into and therefore deemed part of the registration statement, preliminary prospectus and prospectus for the Offering.

330. On September 15, 2015, Stericycle offered to investors 7.7 million depositary shares, each of which represented a 1/10th interest in a share of Stericycle's 5.25% Series A Mandatory Convertible Preferred Stock, $0.01 par value. The purpose of the Offering was to raise capital to fund Stericycle's acquisition of the document destruction company Shred-it. Ultimately, Stericycle sold the 7.7 million of depositary shares in the Offering for net proceeds of approximately $746.9 million.

331. On September 8, 2015, Stericycle filed a registration statement on Form S-3 (the "Registration Statement") with the SEC in connection with the Offering. The Registration Statement was signed by Defendants Ginnetti (then Stericycle's Executive President and CFO) and Stericycle Directors Alutto, Miller, Schuler, Bleil, Brown, Chen, Dammeyer, Hall, Patience and Zafirovski, and the Offering was underwritten by the Underwriter Defendants.

332. Stericycle supplemented the Registration Statement with a preliminary prospectus supplement filed with the SEC on September 9, 2015 (the "Preliminary Prospectus"), a pricing

term sheet filed with the SEC on September 10, 2015 (the "Pricing Term Sheet"), and a prospectus supplement filed with the SEC on September 11, 2015 (the "Prospectus" and together with the Registration Statement, the Preliminary Prospectus, and the Pricing Term Sheet, the "Offering Materials").

333.    The Registration Statement, Preliminary Prospectus and  incorporated by reference, among other documents:

      a.     Stericycle's Form 10-K for the year ended December 31, 2014, filed on March 2, 2015; and

      b.     Stericycle's Form 10-Qs for the quarters ended March 31, 2015 (filed on May 7, 2015) and June 30, 2015 (filed on August 9, 2015), including the false and/or misleading statements contained in those filings.

334.    Specifically, in Stericycle's Form 10-K filed with the SEC on March 2, 2015, the Company claimed that "customers for our Steri-Safe service pay a predetermined subscription fee in advance for regulated waste collection and processing services."  Stericycle further claimed that "our Steri-Safe revenues are recognized evenly over the contractual service period."  Additionally, Stericycle claimed that one of its competitive strengths was its "Strong Service Relationships with Customers" and touted its "Revenue and Cost Stability" as the Company is "generally protected from the cost of regulatory changes or increases in fuel, insurance or other operating costs because our regulated waste contracts typically allow us to adjust our prices to reflect these cost changes." In addition, Stericycle claimed in the Form 10-K that it targets SQ customers because "[w]e believe that when small-quantity regulated waste customers understand the potential risks of failing to comply with applicable regulations, they appreciate the value of the services that we provide." Stericycle further claimed that this was "***the basis*** for the higher gross margins that we have achieved with our [SQ] customers relative to our [LQ] customers."  Stericycle also claimed that it had "determined that our customer relationships have useful lives from 10 to 40 years based upon

the type of customer, with a weighted average remaining useful life of 23.8 years" and that it had "been able to maintain high customer retention through the quality of our customer service."

335.  These statements were materially misstated and omitted material facts sufficient to render them not misstated because: (i) Stericycle was engaged in an undisclosed scheme to unilaterally increase the rates it charged its SQ customers (which it falsely stated were "predetermined") without relation to the Company's actual costs incurred and without prior notice to Stericycle's customers; (ii) the Company's reported financial results (including revenues, growth and margins) were due to, at least in part, such undisclosed misconduct rather than (or solely) the reasons the Company gave investors (such as SQ customers' appreciation of the "value of the services that we provide"); (iii) Stericycle's automatic price increases caused a large number of Stericycle customers to leave the Company, or to complain to Stericycle in order to have their rates lowered below what Stericycle had understood at the time the customers would pay under the Company's automatic price increase regime (*i.e.*, customers were exerting undisclosed "pricing pressure" on Stericycle); (iv) Stericycle's customer service department was engaged in tactics to obtain, retain and up-sell additional services to customers that, in fact, led many customers to react negatively to further contacts from Stericycle; (v) Stericycle's misconduct jeopardized the useful lives of its customer relationships (which it misleadingly claimed to be "10 to 40 years"); and (vi) Stericycle was facing shrinking margins and lowered revenues and growth; and (vii) revenue was not recognized "evenly" because, due to the automatic price increases, the rates increased and compounded every six months and, in addition, Stericycle would not know whether customers would accept the increased price or renegotiate.

336.  In addition:

   a.  Stericycle's attribution of the difference between the higher gross margins from SQ customers versus LQ customers solely to SQ customers

117

"understand[ing] the potential risks of failing to comply with applicable regulations" was materially false and misleading because the difference in margins between SQ and LQ customers resulted from the Company's automatic price increases on SQ customers while not imposing such massive increases on LQ customers; and

b. Stericycle's claims that it had "Strong Service Relationships with Customers" and "Revenue and Cost Stability" because of its contract terms that "generally protect[] from the cost of regulatory changes or increases in fuel, insurance or other operating costs" because "our regulated waste contracts typically allow us to adjust our prices to reflect these cost changes," were materially false and misleading (i) for the reasons set forth above; (ii) because Stericycle's automatic price increases had eroded, and were eroding, its SQ customer base; and (iii) because Stericycle was using the very contract terms it cited to improperly impose costs on its SQ customers that had no relation to the Company's actual costs.

337.    In addition, the Company's Form 10-Q for the quarter ended March 31, 2015, filed on May 7, 2015, claimed that it had "determined that our customer relationships have useful lives from 10 to 40 years based upon the type of customer, with a weighted average remaining useful life of 23.6 years." These statements were materially misstated and omitted material facts sufficient to render them not misstated for the reasons set forth in ¶335 above.

338.    The Company's Form 10-Q for the quarter ended June 30, 2015, filed on August 9, 2015, also claimed that "[o]rganic revenue growth for domestic small account customers increased by $18.4 million, or approximately 8%, driven by higher revenues from our Steri-Safe and regulated waste services for retailers." The Company also claimed that it had "determined that our customer relationships have useful lives from 10 to 40 years based upon the type of customer, with a weighted average remaining useful life of 23.3 years." These statements were materially misstated and omitted material facts sufficient to render them not misstated for the reasons set forth in ¶335 above.

339.    In addition, in the Company's Form 10-K for the year ending December 31, 2014, filed on March 2, 2015; and in Stericycle's Form 10-Qs for the quarters ended March 31, 2015

(filed on May 9, 2013) and June 30, 2015 (filed on August 9, 2015), Stericycle claimed that it "operated in accordance with the terms of our customer contracts" and that class action complaints alleging otherwise "are without merit." These statements were materially misstated and omitted material facts sufficient to render them not misstated because Stericycle's automatic price increases were not in accordance with the terms of the Company's contracts, and the allegations in complaints concerning Stericycle's practice of imposing automatic price increases were not "without merit."

340. Furthermore, in the Prospectus, Stericycle claimed that one of its competitive strengths was its "Strong Service Relationships with Customers," and the Company touted its "Revenue and Cost Stability" as the Company is "generally protected from the cost of regulatory changes or increases in fuel, insurance or other operating costs because our regulated waste contracts typically allow us to adjust our prices to reflect these cost changes." The Prospectus also contained a summary of the Company's financial results for the six months ended June 30, 2015, including revenues of nearly $1.4 billion and undiluted EPS of $1.60, and for the full year ended December 31, 2014. These statements were materially misstated and omitted material facts sufficient to render them not misstated for the reasons set forth in ¶335, 336(b) above.

341. The foregoing alleged misstatements in this section of the Complaint were also materially misstated for their failure to disclose other material, non-public facts whose non-disclosure rendered the Defendants' statements materially misstated. During the Class Period, the Defendants failed to disclose the material adverse facts below that were in existence at the time each of the foregoing material misstatements was made, the disclosure of which would have led to declines in Stericycle's stock price at an earlier date:

a. Stericycle imposed automatic 18% price increases on SQ customers every six months (¶¶57-72);

119

b.  Stericycle had increased the frequency of automatic price increases from 12 months to nine months and then to six months in order to increase revenue (¶¶65, 67);

c.  Stericycle imposed environmental and regulatory fees on its customers that had no relationship to actual environmental or regulatory costs (¶¶77-83);

d.  Stericycle customers were upset over the automatic price increases on their contracts and terminated their Stericycle contracts or re-negotiated them for lower rates, and this undisclosed "pricing pressure" caused by Defendants' misconduct negatively impacted Stericycle's revenues and growth (¶¶108-124);

e.  The automatic price increases and baseless additional fees and surcharges created significant undisclosed administrative burdens and costs on Stericycle (including the significant growth in the size of Stericycle's Retention Department (¶¶113, 130)) and negatively impacted Stericycle's reputation among its own customers (¶¶116-118, 121-123, 129-142); and

f.  At least one Stericycle executive warned the Officer Defendants that the automatic price increases correlated with a loss in customers and revenues, and that the increases were having negative downstream effects on Stericycle's business, but the Officer Defendants rebuffed those warnings and told the executive not to raise them again (¶¶130-138).

342.  Defendants' statements with regard to Stericycle's revenues and growth, as well as the merit of lawsuits concerning its automatic price increases were not only materially misstated because they sought to affirmatively represent that Stericycle's growth stemmed from innocent explanations, but also because they omitted the above-referenced material facts necessary to make the statements not misleading when made.  These omissions were later revealed by Defendants' later admissions that Stericycle's revenue and growth were negatively impacted by pricing pressures from the Company's SQ customers that resulted from, among other things, larger customers and SQ customers demanding discounts on Stericycle contracts whose prices had been inflated by the Officer Defendants' automatic price increases without support in the contracts themselves.

## VII.    INAPPLICABILITY OF STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

343.    Stericycle's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

344.    Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time, each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of Stericycle who know the statement was false.  None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## VIII.    CLASS ALLEGATIONS

345.    Lead Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons or entities who purchased or otherwise acquired: (i) Stericycle's publically traded common stock or depositary shares during the Class Period; and (ii) depositary shares in or traceable to the Offering (the "Class").  Excluded from the Class are Defendants and their families, directors, and officers of Stericycle, and their families.

346.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of July 29, 2016, Stericycle had 85,041,964 shares of common stock outstanding, owned by hundreds, if not thousands, of investors worldwide.  As of March 31, 2016, Stericycle had 7,700,000 depositary shares outstanding, each representing a $1/10^{th}$ interest in a

share of Stericycle's 5.25% Series A Mandatory Convertible Preferred Stock, owned by hundreds, if not thousands, of investors worldwide.

347. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class, which predominate over questions which may affect individual Class members, include:

a. Whether Defendants violated the Securities Act and/or the Exchange Act;

b. Whether Defendants omitted and/or misrepresented material facts;

c. Whether Defendants made false and/or misleading statements;

d. Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

e. Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and/or misleading;

f. Whether the Officer Defendants or Director Defendants are personally liable for the alleged misrepresentations and omissions described herein;

g. Whether the prices of Stericycle stock and depositary shares were artificially inflated;

h. Whether Defendants' misconduct caused the members of the Class to sustain damages; and

i. The extent of damage sustained by Class members and the appropriate measure of damages.

348. Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class sustained damages from Defendants' wrongful conduct.

349.     Plaintiffs will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiffs have no interests that conflict with those of the Class.

350.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## IX.     CLAIMS FOR RELIEF

### COUNT I
### For Violation of Section 10(b) of the Exchange Act
### and Rule 10b-5 Against Stericycle and the Officer Defendants

351.     Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

352.     During the Class Period, Stericycle and the Officer Defendants carried out a plan, scheme, and course of conduct, which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Stericycle's common stock and/or depositary shares at artificially inflated prices.

353.     Stericycle and the Officer Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock and depositary shares in an effort to maintain artificially high market prices for Stericycle's stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

354.     Stericycle and the Officer Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material

information about the Company's financial well-being, operations, prospects, compliance with customer contracts, and improper billing practices.

355. During the Class Period, Stericycle and the Officer Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

356. Defendant Stericycle is liable for all materially false and misleading statements made during the Class Period, as alleged above, including the false and misleading statements in:

    i.    Stericycle's Form 8-K, filed with the SEC on February 6, 2013 (¶278);

    ii.    Stericycle's Form 10-K, filed with the SEC on February 28, 2013 (¶192);

    iii.    Stericycle's Form 8-K, filed with the SEC on March 18, 2013 (¶280);

    iv.    Stericycle's Form 8-K, filed with the SEC on April 24, 2013 (¶196);

    v.    Stericycle's Form 10-Q, filed with the SEC on May 9, 2013 (¶201);

    vi.    Stericycle's Form 8-K, filed with the SEC on July 24, 2013 (¶203);

    vii.    Stericycle's Form 10-Q, filed with the SEC on August 8, 2013 (¶206);

    viii.    Stericycle's Form 8-K, filed with the SEC on October 23, 2013 (¶208);

    ix.    Stericycle's Form 10-Q, filed with the SEC on November 7, 2013 (¶214);

    x.    Stericycle's Form 8-K, filed with the SEC on February 5, 2014 (¶217);

    xi.    Stericycle's Form 10-K, filed with the SEC on February 28, 2014 (¶224);

    xii.    Stericycle's Form 8-K, filed with the SEC on April 24, 2014 (¶226);

    xiii.    Stericycle's Form 10-Q, filed with the SEC on May 8, 2014 (¶230);

    xiv.    Stericycle's Form 8-K, filed with the SEC on July 24, 2014 (¶232);

    xv.    Stericycle's Form 10-Q, filed with the SEC on August 7, 2014 (¶235);

    xvi.    Stericycle's Form 8-K, filed with the SEC on October 23, 2014 (¶237);

    xvii.    Stericycle's Form 10-Q, filed with the SEC on November 7, 2014 (¶240);

    xviii.    Stericycle's Form 8-K, filed with the SEC on February 5, 2015 (¶242);

    xix.    Stericycle's Form 10-K, filed with the SEC on March 2, 2015 (¶246);

    xx.    Stericycle's Form 8-K, filed with the SEC on April 23, 2015 (¶249);

xxi.    Stericycle's Form 10-Q, filed with the SEC on May 7, 2015 (¶253);

xxii.    Stericycle's Form 8-K, filed with the SEC on July 23, 2015 (¶257);

xxiii.    Stericycle's Form 10-Q, filed with the SEC on August 9, 2015 (¶260);

xxiv.    Stericycle's Form 8-K, filed with the SEC on October 22, 2015 (¶262);

xxv.    Stericycle's Form 10-Q, filed with the SEC on November 9, 2015 (¶263);

xxvi.    Stericycle's Form 8-K, filed with the SEC on February 4, 2016 (¶265);

xxvii.    Stericycle's Form 10-K, filed with the SEC on March 15, 2016 (¶270);

xxviii.    Stericycle's Form 8-K, filed with the SEC on April 28, 2016 (¶272);

xxix.    Stericycle's Form 10-Q, filed with the SEC on May 9, 2016 (¶275); and

xxx.    Stericycle's Form 10-Q, filed with the SEC on August 9, 2016 (¶287).

357.    Defendant Stericycle is further liable for the false and misleading statements made by Stericycle officers during conference calls and at conferences with investors and analysts, as alleged above, as the maker of such statements under the principle of respondeat superior. These statements are set forth in ¶¶ 187-190, 196-199, 203-204, 208-211, 217-222, 226-228, 232-233, 237-238, 242-244, 249-251, 254, 255, 257-258, 262, 265-268, 272-274, 278-280, 283.

358.    Additionally, Defendants Alutto, ten Brink, Kogler, Ginnetti and Arnold, as top executive officers of the Company during their respective tenures, are liable as direct participants in the wrongs complained of herein. Defendants Alutto, ten Brink, Kogler, Ginnetti and Arnold are also liable for the false and misleading statements they personally made and/or signed, including as follows:

Defendant Alutto

i.    Defendant Alutto signed Stericycle's Forms 10-K (and their accompanying SOX Certifications) for the years ended December 31, 2012 (¶192); December 31, 2013 (¶¶224, 287); December 31, 2014 (¶¶246, 287); December 31, 2015 (¶¶270, 287); the Company's Forms 10-Q (and their accompanying SOX certifications) dated May 9, 2013 (¶¶201, 287), August 8, 2013 (¶¶206, 287), November 7, 2013 (¶¶214, 287), May 8, 2014 (¶¶230, 287), August 7, 2014 (¶¶235, 287), November 7, 2014 (¶¶240, 287), May 7, 2015 (¶¶253, 287), August 9, 2015 (¶¶260, 287), November 9, 2015 (¶¶263, 287), May 9, 2016 (¶¶275, 287), and August 9, 2016 (¶287);

    ii.    Defendant Alutto made additional false statements during earnings calls with investors on February 6, 2013 (¶189), April 24, 2013 (¶200), February 5, 2014 (¶219, 221), April 24, 2014 (¶228), July 24, 2014 (¶233), April 23, 2015 (¶251), July 23, 2015 (¶258), February 4, 2016 (¶267, 268), and April 28, 2016 (¶¶ 273, 274); and

    iii.    Defendant Alutto made false statements during the Company's July 16, 2015 conference call discussing its acquisition of Shred-it (¶255).

## Defendant ten Brink

    i.    Defendant ten Brink signed Stericycle's Forms 10-K (and their accompanying SOX Certifications) for the years ended December 31, 2012 (¶192) and December 31, 2013 (¶¶224, 287); the Company's Forms 10-Q (and their accompanying SOX Certifications) dated May 9, 2013 (¶201), August 8, 2013 (¶¶206,287), November 7, 2013 (¶¶214, 287), May 8, 2014 (¶¶230, 287); the Company's Forms 8-K dated February 6, 2013 (¶278), March 18, 2013 (¶280), April 24, 2013 (¶196), July 24, 2013 (¶203), October 23, 2013 (¶208), February 5, 2014 (¶217), April 24, 2014 (¶226), and July 24, 2014 (¶232);

    ii.    Defendant ten Brink made additional false statements during earnings calls with investors on February 6, 2013 (¶¶188, 190), April 24, 2013 (¶¶196,199), July 24, 2013 (¶203), October 23, 2013 (¶¶208, 211), February 5, 2014 (¶¶218, 220, 222), and April 24, 2014 (¶226); and

    iii.    Defendant ten Brink made false statements during a Stifel Investor Summit on June 1, 2015 (¶254).

## Defendant Ginnetti

    i.    Defendant Ginnetti signed Stericycle's Forms 10-K (and their accompanying SOX Certifications) for the years ended December 31, 2014 (¶¶246, 287); December 31, 2015 (¶¶270, 287); Stericycle's Forms 10-Q (and their accompanying SOX Certifications) dated August 7, 2014 (¶¶235, 287), November 7, 2014 (¶¶240, 287), May 7, 2015 (¶¶253, 287), August 9, 2015 (¶¶260, 287), November 9, 2015 (¶¶263, 287), May 9, 2016 (¶¶275, 287), August 9, 2016 (¶287); Stericycle's Forms 8-K dated October 23, 2014 (¶237), February 5, 2014 (¶242), April 23, 2015 (¶249), July 23, 2015 (¶257), October 22, 2015 (¶262), February 4, 2016 (¶265), and April 28, 2016 (¶272); and

    ii.    Defendant Ginnetti made additional false statements during earnings calls with investors on July 24, 2014 (¶232), October 23, 2014 (¶¶237-238), February 5, 2015 (¶¶243), April 23, 2015 (¶¶249-250), July 23, 2015 (¶257), February 4, 2016 (¶266), and April 28, 2016 (¶274).

Defendant Kogler

i.    Defendant Kogler made false statements during earnings calls on February 6, 2013 (¶¶278-279), April 24, 2013 (¶¶197, 283), July 24, 2013 (¶204), and October 23, 2013 (¶209).

Defendant Arnold

i.    Defendant Arnold made false statements during earnings calls with investors on April 24, 2014 (¶227), February 5, 2015 (¶244), October 22, 2015 (¶262), and April 28, 2016 (¶¶273, 274); and

ii.    Defendant Arnold made additional false statements during the Company's July 16, 2015 conference call discussing its acquisition of Shred-it (¶255).

359.    Stericycle and the Officer Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Stericycle and the Officer Defendants engaged in this misconduct to conceal Stericycle's true condition from the investing public and to support the artificially inflated prices of the Company's common stock and depositary shares.

360.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Stericycle's common stock and/or depositary shares. Plaintiffs and the Class would not have purchased these securities at the prices they paid, or at all, had they been aware that the market prices had been artificially inflated by Stericycle's and the Officer Defendants' fraudulent course of conduct.

361.    As a direct and proximate result of Stericycle's and the Officer Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered economic loss and damages in connection with their respective purchases of the Company's common stock and/or depositary shares during the Class Period, as the prior artificial inflation in the price of these securities was removed over time.

362.    By virtue of the foregoing, Stericycle and the Officer Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**COUNT II**
**For Violation of Section 20(a) of the Exchange Act**
**Against the Officer Defendants**

363.    Lead Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

364.    The Officer Defendants acted as controlling persons of Stericycle within the meaning of Section 20(a) of the Exchange Act.   By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about Stericycle, the Officer Defendants had the power and ability to control the actions of Stericycle and its employees, and to cause the Company to engage in the wrongful conduct complained of herein.   Each of these Defendants was able to and did control, directly and indirectly, the content of the following public statements made by Stericycle during their tenures at Stericycle during the Class Period, which include Stericycle's false and misleading statements contained therein, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein:

Defendant Alutto (executive officer from February 2011 through the present)

   i.    2013: Stericycle's Form 8-K, filed with the SEC on February 7, 2013 (¶278); Stericycle's Form 10-K, filed with the SEC on February 28, 2013 (¶192); Stericycle's Form 8-K, filed with the SEC on March 18, 2013 (¶280); Stericycle's Form 8-K, filed with the SEC on April 24, 2013 (¶196); Stericycle's Form 10-Q, filed with the SEC on May 9, 2013 (¶201); Stericycle's Form 8-K, filed with the SEC on July 24, 2013 (¶203); Stericycle's Form 10-Q, filed with the SEC on August 8, 2013 (¶206); Stericycle's Form 8-K, filed with the SEC on October 23, 2013 (208); Stericycle's Form 10-Q, filed with the SEC on November 7, 2013 (¶214); Stericycle's earnings call with investors held on February 6, 2013 (¶¶188-190, 278-279), April 24, 2013 (¶¶196-199), July 24, 2013 (¶¶203-204), October 23, 2013 (¶¶208-211);

   ii.    2014: Stericycle's Form 8-K, filed with the SEC on February 5, 2014 (¶217); Stericycle's Form 10-K, filed with the SEC on February 28, 2014 (¶224; Stericycle's Form 8-K, filed with the SEC on April 24, 2014 (¶226); Stericycle's Form 10-Q,

filed with the SEC on May 8, 2014 (¶230); Stericycle's Form 8-K, filed with the SEC on July 24, 2014 (¶232); Stericycle's Form 10-Q, filed with the SEC on August 7, 2014 (¶235); Stericycle's Form 8-K, filed with the SEC on October 23, 2014 (¶237); Stericycle's Form 10-Q, filed with the SEC on November 7, 2014 (¶240); Stericycle's earnings calls with investors held on February 5, 2014 (¶¶218-222), April 24, 2014 (¶¶226-228), July 24, 2014 (¶¶232-233), and October 23, 2014 (¶¶237-238);

iii.  2015: Stericycle's Form 8-K, filed with the SEC on February 5, 2015 (¶242); Stericycle's Form 10-K, filed with the SEC on March 2, 2015 (¶246); Stericycle's Form 8-K, filed with the SEC on April 23, 2015 (¶249); Stericycle's Form 10-Q, filed with the SEC on May 7, 2015 (¶253); Stericycle's Form 8-K, filed with the SEC on July 23, 2015 (¶257); Stericycle's Form 10-Q, filed with the SEC on August 9, 2015 (¶260); Stericycle's Form 8-K, filed with the SEC on October 22, 2015 (¶262); Stericycle's Form 10-Q, filed with the SEC on November 9, 2015 (¶263); Stericycle's earnings calls with investors held on February 5, 2015 (¶¶243-244), April 23, 2015 (¶¶249-251), July 23, 2015 (¶¶257-258), and October 22, 2015 (¶262); statements made during Stericycle's July 16, 2015 conference call discussing the Shred-it acquisition (¶255); statements made during the June 1, 2015 Stifel Investor Summit (¶254); and

iv.  2016: Stericycle's Form 8-K, filed with the SEC on February 4, 2016 (¶265); Stericycle's Form 10-K, filed with the SEC on March 15, 2016 (¶270); Stericycle's Form 8-K, filed with the SEC on April 28, 2016 (¶272); Stericycle's Form 10-Q, filed with the SEC on May 9, 2016 (¶275); and Stericycle's Form 10-Q, filed with the SEC on August 9, 2016 (¶287); Stericycle's earnings calls with investors on February 4, 2016 (¶266-268), and April 28, 2016 (¶¶273-274).

Defendant ten Brink (executive officer from 1997 to August 1, 2014)

i.  2013: Stericycle's Form 8-K, filed with the SEC on February 7, 2013 (¶278); Stericycle's Form 10-K, filed with the SEC on February 28, 2013 (¶192); Stericycle's Form 8-K, filed with the SEC on March 18, 2013 (¶280); Stericycle's Form 8-K, filed with the SEC on April 24, 2013 (¶196); Stericycle's Form 10-Q, filed with the SEC on May 9, 2013 (¶201); Stericycle's Form 8-K, filed with the SEC on July 24, 2013 (¶203); Stericycle's Form 10-Q, filed with the SEC on August 8, 2013 (¶206); Stericycle's Form 8-K, filed with the SEC on October 23, 2013 (208); Stericycle's Form 10-Q, filed with the SEC on November 7, 2013 (¶214); Stericycle's earnings call with investors held on February 6, 2013 (¶¶188-190, 278-279), April 24, 2013 (¶¶196-199), July 24, 2013 (¶¶203-204), October 23, 2013 (¶¶208-211); and

ii.  2014: Stericycle's Form 8-K, filed with the SEC on February 5, 2014 (¶217); Stericycle's Form 10-K, filed with the SEC on February 28, 2014 (¶224; Stericycle's Form 8-K, filed with the SEC on April 24, 2014 (¶226); Stericycle's Form 10-Q, filed with the SEC on May 8, 2014 (¶230); Stericycle's Form 8-K, filed with the SEC on July 24, 2014 (¶232); Stericycle's earnings calls with investors held on February 5, 2014 (¶¶218-222), April 24, 2014 (¶¶226-228), and July 24, 2014 (¶¶232-233).

**Defendant Ginnetti (executive officer from August 1, 2014 through the present)**

i.  2014: Stericycle's Form 10-Q, filed with the SEC on August 7, 2014 (¶235); Stericycle's Form 8-K, filed with the SEC on October 23, 2014 (¶237); Stericycle's Form 10-Q, filed with the SEC on November 7, 2014 (¶240); Stericycle's earnings call with investors held October 23, 2014 (¶¶237-238);

ii.  2015: Stericycle's Form 8-K, filed with the SEC on February 5, 2015 (¶242); Stericycle's Form 10-K, filed with the SEC on March 2, 2015 (¶246); Stericycle's Form 8-K, filed with the SEC on April 23, 2015 (¶249); Stericycle's Form 10-Q, filed with the SEC on May 7, 2015 (¶253); Stericycle's Form 8-K, filed with the SEC on July 23, 2015 (¶257); Stericycle's Form 10-Q, filed with the SEC on August 9, 2015 (¶260); Stericycle's Form 8-K, filed with the SEC on October 22, 2015 (¶262); Stericycle's Form 10-Q, filed with the SEC on November 9, 2015 (¶263); Stericycle's earnings calls with investors held on February 5, 2015 (¶¶243-244), April 23, 2015 (¶¶249-251), July 23, 2015 (¶¶257-258), and October 22, 2015 (¶262); statements made during Stericycle's July 16, 2015 conference call discussing the Shred-it acquisition (¶255); statements made during the June 1, 2015 Stifel Investor Summit (¶254); and

iii.  2016: Stericycle's Form 8-K, filed with the SEC on February 4, 2016 (¶265); Stericycle's Form 10-K, filed with the SEC on March 15, 2016 (¶270); Stericycle's Form 8-K, filed with the SEC on April 28, 2016 (¶272); Stericycle's Form 10-Q, filed with the SEC on May 9, 2016 (¶275); and Stericycle's Form 10-Q, filed with the SEC on August 9, 2016 (¶287); Stericycle's earnings calls with investors on February 4, 2016 (¶266-268), and April 28, 2016 (¶¶273-274).

**Defendant Kogler (executive officer from 1999 to January 1, 2015)**

i.  2013: Stericycle's Form 8-K, filed with the SEC on February 7, 2013 (¶278); Stericycle's Form 10-K, filed with the SEC on February 28, 2013 (¶192); Stericycle's Form 8-K, filed with the SEC on March 18, 2013 (¶280); Stericycle's Form 8-K, filed with the SEC on April 24, 2013 (¶196); Stericycle's Form 10-Q, filed with the SEC on May 9, 2013 (¶201); Stericycle's Form 8-K, filed with the SEC on July 24, 2013 (¶203); Stericycle's Form 10-Q, filed with the SEC on August 8, 2013 (¶206); Stericycle's Form 8-K, filed with the SEC on October 23, 2013 (208); Stericycle's Form 10-Q, filed with the SEC on November 7, 2013 (¶214); Stericycle's earnings call with investors held on February 6, 2013 (¶¶188-190, 278-279), April 24, 2013 (¶¶196-199), July 24, 2013 (¶¶203-204), October 23, 2013 (¶¶208-211); and

ii.  2014: Stericycle's Form 8-K, filed with the SEC on February 5, 2014 (¶217); Stericycle's Form 10-K, filed with the SEC on February 28, 2014 (¶224; Stericycle's Form 8-K, filed with the SEC on April 24, 2014 (¶226); Stericycle's Form 10-Q, filed with the SEC on May 8, 2014 (¶230); Stericycle's Form 8-K, filed with the SEC on July 24, 2014 (¶232); Stericycle's Form 10-Q, filed with the SEC on August 7, 2014 (¶235); Stericycle's Form 8-K, filed with the SEC on October 23, 2014 (¶237); Stericycle's Form 10-Q, filed with the SEC on November 7, 2014 (¶240);

Stericycle's earnings calls with investors held on February 5, 2014 (¶¶218-222), April 24, 2014 (¶¶226-228), July 24, 2014 (¶¶232-233), and October 23, 2014 (¶¶237-238).

Defendant Arnold (executive officer from January 1, 2015 through the present)

    i.   <u>2015:</u> Stericycle's Form 8-K, filed with the SEC on February 5, 2015 (¶242); Stericycle's Form 10-K, filed with the SEC on March 2, 2015 (¶246); Stericycle's Form 8-K, filed with the SEC on April 23, 2015 (¶249); Stericycle's Form 10-Q, filed with the SEC on May 7, 2015 (¶253); Stericycle's Form 8-K, filed with the SEC on July 23, 2015 (¶257); Stericycle's Form 10-Q, filed with the SEC on August 9, 2015 (¶260); Stericycle's Form 8-K, filed with the SEC on October 22, 2015 (¶262); Stericycle's Form 10-Q, filed with the SEC on November 9, 2015 (¶263); Stericycle's earnings calls with investors held on February 5, 2015 (¶¶243-244), April 23, 2015 (¶¶249-251), July 23, 2015 (¶¶257-258), and October 22, 2015 (¶262); statements made during Stericycle's July 16, 2015 conference call discussing the Shred-it acquisition (¶255); statements made during the June 1, 2015 Stifel Investor Summit (¶254); and

    ii.   <u>2016:</u> Stericycle's Form 8-K, filed with the SEC on February 4, 2016 (¶265); Stericycle's Form 10-K, filed with the SEC on March 15, 2016 (¶270); Stericycle's Form 8-K, filed with the SEC on April 28, 2016 (¶272); Stericycle's Form 10-Q, filed with the SEC on May 9, 2016 (¶275); and Stericycle's Form 10-Q, filed with the SEC on August 9, 2016 (¶287); Stericycle's earnings calls with investors on February 4, 2016 (¶266-268), and April 28, 2016 (¶¶273-274).

365.    In their capacities as senior corporate officers of the Company, and as more fully described above, the Officer Defendants had direct involvement in the day-to-day operations of the Company. The Officer Defendants signed materially false and misleading SEC filings during the Class Period, and were directly involved in certifying and/or approving the false statements disseminated by Stericycle during the Class Period. As a result of the foregoing, the Officer Defendants, as a group and individually, were controlling persons of Stericycle within the meaning of Section 20(a) of the Exchange Act.

366.    As set forth above, Stericycle violated 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons of Stericycle and as a result of their own aforementioned conduct, the Officer Defendants are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent

as, the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiff and other members of the Class who purchased or otherwise acquired Stericycle common stock or depository shares. Moreover, as detailed above, during the respective times these Defendants served as officers and/or directors of Stericycle, each of these Defendants was culpable for the material misstatements and omissions made by Stericycle, as set forth above.

367. As a direct and proximate result of the Officer Defendants' conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases or acquisitions of Stericycle common stock or depository shares.

## COUNT III
### For Violation of Section 11 of the Securities Act
### Against Stericycle, the Director Defendants, the Underwriter
### Defendants, Alutto and Ginnetti

368. Lead Plaintiff ATRS repeats and realleges the allegations in ¶¶328-342 as if alleged fully in this Count.

369. This Count is brought by Lead Plaintiff ATRS pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all members of the Class who purchased or otherwise acquired securities sold pursuant or traceable to the Offering, and who were damaged thereby.

370. This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act. For purposes of asserting this Count, Lead Plaintiff ATRS does not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a Section 11 claim.

371. Liability under this Count is predicated on Stericycle's filing the Offering Materials, the Director Defendants', Alutto's, and Ginnetti's signing of the Registration Statement for the Offering, and Stericycle's, the Director Defendants', the Underwriter Defendants', and

Ginnetti's respective participation in the Offering, which was conducted pursuant to the Offering Materials. The Offering Materials were false and misleading, contained untrue statements of material facts, omitted to state facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

372. Less than one year elapsed between the time that ATRS discovered, or could reasonably have discovered, the facts upon which this Complaint is based and the initial complaint in this action. Less than three years has elapsed since the time that the securities at issue in this Complaint were bona fide offered to the public.

373. By reason of the foregoing, the Defendants named in this Count are each jointly and severally liable for violations of Section 11 of the Securities Act to Lead Plaintiffs and the other members of the Class pursuant to Section 11(e).

## COUNT IV
### For Violation of Section 12(a)(2) of the Securities Act
### Against the Underwriter Defendants

374. Lead Plaintiff ATRS repeats and realleges the allegations contained in ¶¶328-342 above as if fully set forth herein.

375. This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l, on behalf of all members of the Class who purchased or otherwise acquired Stericycle securities in and/or traceable to the Offering and who were damaged thereby.

376. This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act. For purposes of asserting this Count, Lead Plaintiff ATRS does not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a Section 12(a)(2) claim.

377.    The Underwriter Defendants were statutory sellers of Stericycle securities that were registered in the Offering pursuant to the Registration Statement and sold by means of the Offering Materials.  By means of the Offering Materials, the Underwriter Defendants sold approximately 7,700,000 depository shares in the Offering to members of the Class.  The Underwriter Defendants were at all relevant times motivated by their own financial interests.  In sum, the Underwriter Defendants were sellers, offerors, and/or solicitors of sales of the securities that were sold in the Offering by means of the materially false and misleading Offering Materials.

378.    The Offering Materials contained untrue statements of material fact and omitted other facts necessary to make the statements not misleading, and failed to disclose material facts, as set forth herein.

379.    Less than one year elapsed between the time that ATRS discovered, or could reasonably have discovered, the facts upon which this Complaint is based and the initial complaint in this action.  Less than three years has elapsed since the time that the securities at issue in this Complaint were bona fide offered to the public.

380.    By reason of the foregoing, the Underwriter Defendants are liable for violations of Section 12(a)(2) of the Securities Act to Plaintiffs ATRS and St. Lucie and the other members of the Class who purchased securities in or traceable to the Offerings, and who were damaged thereby.

### COUNT V
#### For Violation of Section 15 of the Securities Act
#### Against the Director Defendants, Alutto, Ginnetti, and Arnold

381.    Plaintiffs ATRS and St. Lucie repeat and reallege the allegations contained in ¶328-342 above as if fully set forth herein.

382.    This Count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, against the Director Defendants, Alutto, Ginnetti, and Arnold.

134

383.     At all relevant times, the Director Defendants, Alutto, Ginnetti, and Arnold were controlling persons of Stericycle within the meaning of Section 15 of the Securities Act.  As set forth herein, because of their positions at Stericycle and/or because of their positions on Stericycle Board, the Director Defendants, Alutto, Ginnetti, and Arnold had the requisite power to directly or indirectly control or influence the decision-making of the Company and the conduct of Stericycle's business, including the wrongful conduct complained of herein.

384.     In their capacities as senior corporate officers of the Company, and as more fully described above, Defendants Alutto, Ginnetti, and Arnold had direct involvement in the day-to-day operations of the Company, and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities law violations as alleged herein. They were also directly involved in providing false information and certifying and/or approving the false and/or misleading statements disseminated by Stericycle during the Class Period.  As a result of the foregoing, Defendants Alutto, Ginnetti, and Arnold, as a group and individually, were controlling persons of Stericycle within the meaning Section 15 of the Exchange Act.

385.     Defendants Alutto and Ginnetti also each signed the Registration Statement in connection with the Offering, the Offering Materials were disseminated to the investing public, and the Registration Statement became effective.  Thus, these Defendants controlled the contents and dissemination of the Offering Materials.

386.     Similarly, the Director Defendants served as Directors on Stericycle's board of directors at the time the Offering was conducted and at the time that the Registration Statement was signed.  As directors of a publicly owned company, these Defendants had a duty to disseminate accurate and truthful information with respect to Stericycle's financial condition and results of operations.  These Director Defendants each signed the Registration Statement in connection with

the Offering, the Offering Materials were disseminated to the investing public, and the Registration Statement became effective. Thus, these Defendants controlled the contents and dissemination of the Offering Materials.

387.    This claim does not sound in fraud. For purposes of asserting this claim under the Securities Act, ATRS does not allege that any Defendant acted with scienter or fraudulent intent, which are not elements of a Section 15 claim.

388.    By reason of the aforementioned conduct, each of the Defendants named in this Count is liable under Section 15 of the Securities Act to ATRS and the other members of the Class with claims pursuant to Sections 11 or 12(a)(2) of the Securities Act, as set forth above. As a direct and proximate result of the conduct of these Defendants, Lead Plaintiff ATRS and members of the Class suffered damages in connection with their purchase or acquisition of securities pursuant and/or traceable to the Offering.

## X.    **PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiffs pray for judgment as follows:

a.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

b.    Awarding compensatory damages in favor of Lead Plaintiffs and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c.    Awarding Lead Plaintiffs and the Class their reasonable attorneys' fees and expert fees;

d.    As to the claims set forth under the Securities Act, awarding rescission or a recessionary measure of damages; and

       e.      Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## XI.   <u>JURY DEMAND</u>

Lead Plaintiffs demand a trial by jury.

DATED: February 1, 2017               Respectfully submitted,

                                        */s/ Adam H. Wierzbowski*

**BERNSTEIN LITOWITZ BERGER**
  **& GROSSMANN LLP**
John C. Browne (admitted *pro hac vice*)
Adam H. Wierzbowski (admitted *pro hac vice*)
Julia K. Tebor (*pro hac vice* motion pending)
1251 Avenue of the Americas
New York, NY  10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
Email:  JohnB@blbglaw.com
Email:  Adam@blbglaw.com
Email:  Julia.Tebor@blbglaw.com

**BERNSTEIN LITOWITZ BERGER**
  **& GROSSMANN LLP**
Avi Josefson
875 North Michigan Avenue, Suite 3100
Chicago, IL 60611
Telephone:  (312) 373-3880
Facsimile:  (312) 794-7801
Email:  Avi@blbglaw.com

*Lead Counsel for Lead Plaintiffs the Public Employees' Retirement System of Mississippi and the Arkansas Teacher Retirement System*