**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| *In re Stericycle, Inc. Securities Litigation* | Civ. A. No. 1:16-cv-07145 |
|  | Hon. Andrea R. Wood |

**MEMORANDUM IN SUPPORT OF DEFENDANTS'
<u>MOTION TO DISMISS THE FOURTH AMENDED COMPLAINT</u>**

Sean M. Berkowitz
Michael J. Faris
Meghan M. Hansen
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone: (312) 876-7700
Facsimile: (312) 993-9767

*Counsel for Defendants Stericycle, Inc.,
Charles A. Alutto, Dan Ginnetti,
Brent Arnold, Frank ten Brink, Richard
Kogler, Mark C. Miller, Jack W. Schuler,
Lynn Dorsey Bleil, Thomas D. Brown,
Thomas F. Chen, Rodney F. Dammeyer,
William K. Hall, John Patience, and
Mike S. Zafirovski*

Robert Y. Sperling
Joseph L. Motto
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
Telephone: (312) 558-5600
Facsimile: (312) 558-5700

James P. Smith, III
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166
Telephone: (212) 294-4633
Facsimile: (212) 294-4700

*Counsel for Defendants Merrill Lynch,
Pierce, Fenner & Smith, Inc., Goldman
Sachs & Co. LLC, J.P. Morgan Securities
LLC, HSBC Securities (USA) Inc., MUFG
Securities Americas Inc. f/k/a Mitsubishi
UFJ Securities (USA) Inc., Santander
Investment Securities Inc., SMBC Nikko
Securities America, Inc., and U.S.
Bancorp Investments, Inc.*

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................1

BACKGROUND ................................................................................................5

ARGUMENT ......................................................................................................8

I.       LEGAL STANDARD ...............................................................................8

II.      THE FAC SHOULD BE DISMISSED AS IMPROPER PUZZLE PLEADING...............9

III.     PLAINTIFFS' EXCHANGE ACT SECTION 10(B) CLAIMS FAIL...........................11

         A.       Plaintiffs' Section 10(b) and Rule 10b-5 API Claims Are Time-Barred..............11

         B.       The FAC Does Not Allege Any Actionable False or Misleading
                  Statements or Omissions.................................................................14

                  1.       Plaintiffs Fail to Assert an Actionable API-Related Omission
                           Because Stericycle's Pricing Practices Were Public Knowledge.............15

                  2.       Plaintiffs Do Not Allege That Pricing Pressures Were Material
                           Before They Were Disclosed .............................................16

                  3.       Plaintiffs Do Not Allege Facts Demonstrating That Defendants
                           Made Any Misstatements or Omissions Regarding Stericycle's
                           Past Success With Integrating Acquisitions .............................21

                  4.       Plaintiffs' Remaining Allegations are Nonactionable .............................22

                           a.       Statements of Opinion....................................................23

                           b.       Forward-Looking Statements.........................................24

                           c.       Puffery............................................................................25

                           d.       Mischaracterized Statements .........................................26

         C.       Plaintiffs Fail to Plead Particularized Facts Giving Rise to a Strong
                  Inference of Scienter as Required by the PSLRA................................27

                  1.       Plaintiffs Fail to Plead Scienter for the API Claims ..................29

                  2.       Plaintiffs Fail to Plead Scienter for the ERP Claims ................33

                  3.       Plaintiffs' Attempt to Plead Scienter Through Motive Fails ..................33

i

D.    The FAC Does Not Establish Loss Causation for API or ERP Claims ................34

    1.    Plaintiffs Fail To Allege Corrective Disclosures .......................................34

    2.    Plaintiffs Cannot Establish that Pricing Pressure or ERP-Related Announcements Caused Their Losses .......................................................37

    3.    The Lack of Stock Drops After Announcements Directly Related to API Claims Undermines Any Attempt to Show Loss Causation on That Theory ...........................................................................................38

IV.    PLAINTIFFS' SECURITIES ACT SECTION 11 AND SECTION 12(A)(2) CLAIMS FAIL...................................................................................................39

    A.    Plaintiffs Fail to Plead any Material Misstatements or Omissions in the Offering Materials for the Depositary Shares .......................................40

    B.    The FAC Fails to Adequately Plead Section 12(a)(2) Standing ...........................43

V.    PLAINTIFFS' SECURITIES ACT SECTION 15 AND EXCHANGE ACT SECTION 20(A) CLAIMS FAIL FOR LACK OF A PREDICATE VIOLATION AND A FAILURE TO ALLEGE CONTROL LIABILITY................................................44

VI.    CONCLUSION...................................................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ....................................................................................... 8

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ....................................................................................... 8

*Boca Raton Firefighters' & Police Pension Fund v. DeVry Inc.,*
  2012 WL 1030474 (N.D. Ill. Mar. 27, 2012) .......................................... 36

*Borsellino v. Goldman Sachs Grp., Inc.,*
  477 F.3d 502 (7th Cir. 2007) ................................................................ 8, 40

*City of Brockton Ret. Sys. v. Avon Prods., Inc.,*
  2014 WL 4832321 (S.D.N.Y. Sept. 29, 2014) ........................................ 31

*City of Livonia Employees' Ret. Sys. & Local 295/Local 851 v. Boeing Co.,*
  711 F.3d 754 (7th Cir. 2013) .................................................................. 33

*City of New Orleans Employees' Ret. Sys. v. PrivateBankcorp, Inc.,*
  2011 WL 5374095 (N.D. Ill. Nov. 3, 2011) ...................................... 39, 41

*Conlee v. WMS Indus., Inc.,*
  2012 WL 3042498 (N.D. Ill. July 25, 2012) ............................................ 9

*Constr. Workers Pension Fund v. Navistar Int'l Corp.,*
  2014 WL 3610877 (N.D. Ill. July 22, 2014) ...................................... 9, 10

*Davis v. SPSS, Inc.,*
  431 F. Supp. 2d 823 (N.D. Ill. 2006) ...................................................... 23

*Desai v. Gen. Growth Props., Inc.,*
  654 F. Supp. 2d 836 (N.D. Ill. 2009) ...................................................... 45

*Donovan v. ABC–NACO, Inc.,*
  2002 WL 1553259 (N.D. Ill. July 15, 2002) .......................................... 45

*Dura Pharm., Inc. v. Broudo,*
  544 U.S. 336 (2005) ..................................................................................... 34

*Eckstein v. Balcor Film Investors,*
  58 F.3d 1162 (7th Cir. 1995) .................................................................. 41

*Eisenstadt v. Centel Corp.*,
 113 F.3d 738 (7th Cir. 1997) ................................................................. 25

*Elam v. Neidorff*,
 544 F.3d 921 (8th Cir. 2008) ................................................................. 23

*Fait v. Regions Fin. Corp.*,
 655 F.3d 105 (2d Cir. 2011) ................................................................. 40

*Fannon v. Guidant*,
 583 F.3d 995 (7th Cir. 2009) ................................................................. 45

*Garden City Employees' Ret. Sys. v. Anixter Int'l, Inc.*,
 2011 WL 1303387 (N.D. Ill. Mar. 31, 2011) ........................................ 17

*Glickenhaus & Co. v. Household Int'l, Inc.*,
 787 F.3d 408 (7th Cir. 2015) ................................................................. 37

*Greer v. Advanced Equities, Inc.*,
 683 F. Supp. 2d 761 (N.D. Ill. 2010) ............................................... 32, 40

*Higginbotham v. Baxter Int'l Inc.*,
 495 F.3d 753 (7th Cir. 2007) ........................................................ passim

*Howe v. Shchekin*,
 238 F. Supp. 3d 1046 (N.D. Ill. 2017) ................................................... 11

*In re Axis Capital Holdings Ltd. Sec. Litig.*,
 456 F. Supp. 2d 576 (S.D.N.Y. 2006) ................................................... 17

*In re Citigroup Inc. Bond Litig.*,
 723 F. Supp. 2d 568 (S.D.N.Y. 2010) ................................................... 43

*In re Citigroup, Inc. Sec. Litig.*,
 330 F. Supp. 2d 367 (S.D.N.Y. 2004) ................................................... 17

*In re Cosi, Inc. Sec. Litig.*,
 379 F. Supp. 2d 580 (S.D.N.Y. 2005) ................................................... 44

*In re Duane Reade Inc. Sec. Litig.*,
 2003 WL 22801416 (S.D.N.Y. Nov. 25, 2003) ..................................... 17

*In re Harley-Davidson Inc. Sec. Litig.*,
 660 F. Supp. 2d 969 (E.D. Wis. 2009) ............................... 15, 20, 29, 30

*In re JP Morgan Chase Sec. Litig.*,
 363 F. Supp. 2d 595 (S.D.N.Y. 2005) ................................................... 40

iv

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
   272 F. Supp. 2d 243 (S.D.N.Y. 2003) ............................................................... 15-16

*In re Metawave Commc'ns Corp. Sec. Litig.*,
   629 F. Supp. 2d 1207 (W.D. Wash. 2009) ............................................................. 20

*In re Midway Games, Inc. Sec. Litig.*,
   332 F. Supp. 2d 1152 (N.D. Ill. 2004) ............................................................ 25, 26

*In re Morgan Stanley Info. Fund Sec. Litig.*,
   592 F.3d 347 (2d Cir. 2010) ...................................................................... 40

*In re Newell Rubbermaid Inc. Sec. Litig.*,
   2000 WL 1705279 (N.D. Ill. Nov. 14, 2000) ....................................................... 43

*In re Stericycle, Inc., Steri-Safe Contract Litig.*,
   13-cv-5795 (N.D. Ill. Aug. 6, 2013) ............................................................... 6

*In re UBS AG Sec. Litig.*,
   2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012), *aff'd sub nom.*, 752 F.3d 173 (2d Cir. 2014) .. 15

*In re VMS Sec. Litig.*,
   752 F. Supp. 1373 (N.D. Ill. 1990) ................................................................ 23

*Johnson v. Tellabs, Inc.*,
   262 F. Supp. 2d 937 (N.D. Ill. 2003) ............................................................. 34

*Landsberger v. Martek Biosciences Corp.*,
   2010 WL 3038947 (D. Md. July 30, 2010) ........................................................... 13

*Lauria v. Biosante Pharm., Inc.*,
   968 F. Supp. 2d 951 (N.D. Ill. 2013) ............................................................. 10

*Longman v. Food Lion, Inc.*,
   197 F.3d 675 (4th Cir. 1999) ..................................................................... 16

*McCann v. Hy-Vee, Inc.*,
   663 F.3d 926 (7th Cir. 2011) ..................................................................... 11

*Merck & Co., Inc. v. Reynolds*,
   559 U.S. 633 (2010) ........................................................................... 11, 13

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
   540 F.3d 1049 (9th Cir. 2008) .................................................................... 35

*Mitchell v. Donchin*,
   286 F.3d 447 (7th Cir. 2002) ..................................................................... 14

*Norfolk Cnty. Ret. Sys. v. Ustian*,
2009 WL 2386156 (N.D. Ill. July 28, 2009) ............................................................ 34

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
135 S. Ct. 1318 (2015) .............................................................................................. 42

*Ong ex rel. Ong v. Sears, Roebuck & Co.*,
2005 WL 2284285 (N.D. Ill. Sept. 14, 2005) ........................................................... 24

*Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*,
673 F. Supp. 2d 718 (S.D. Ind. 2009) .......................................................... 17, 30, 42

*Premium Plus Partners, L.P. v. Goldman, Sachs & Co.*,
648 F.3d 533 (7th Cir. 2011) ............................................................................... 13, 14

*Pub. Employees' Ret. Sys. of Miss. v. Merrill Lynch & Co. Inc.*,
714 F. Supp. 2d 475 (S.D.N.Y. 2010) ...................................................................... 43, 44

*Pugh v. Tribune Co.*,
521 F.3d 686 (7th Cir. 2008) ........................................................................... passim

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004) ..................................................................................... 40

*Roth v. OfficeMax, Inc.*,
527 F. Supp. 2d 791 (N.D. Ill. 2007) .................................................................... 32-33

*Searls v. Glasser*,
64 F.3d 1061 (7th Cir. 1995) .................................................................................... 15

*St. Lucie Cnty. Fire Dist. Firefighters' Pension Tr. Fund v. Motorola, Inc.*,
2011 WL 814932 (N.D. Ill. Feb. 28, 2011) ......................................................... 24, 26

*Starr v. !Hey, Inc.*,
2003 WL 21212596 (N.D. Ill. May 23, 2003) ........................................................... 45

*Swanson v. Citibank, N.A.*,
614 F.3d 400 (7th Cir. 2010) .................................................................................... 36

*Tabankin v. Kemper Short-Term Global Income Fund*,
1994 WL 30541 (N.D. Ill. Feb. 1, 1994) .................................................................. 45

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) ............................................................................................. 8, 28

*Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP*,
475 F.3d 824 (7th Cir. 2007) .................................................................................... 34

*W. Pa. Elec. Employees Pension Tr. v. Plexus Corp.*,
2009 WL 604276 (E.D. Wis. Mar. 6, 2009) ............................................................ 28

*Whirlpool Fin. Corp. v. GN Holdings, Inc.*,
67 F.3d 605 (7th Cir. 1995) ............................................................................ 14

*Yates v. Mun. Mortg. & Equity, LLC*,
744 F.3d 874 (4th Cir. 2014) ............................................................................ 44

## STATUTES

15 U.S.C. § 77k(a) ............................................................................................ 40

15 U.S.C. § 77l (a)(2) ........................................................................................ 40

15 U.S.C. § 77o ................................................................................................ 44

15 U.S.C. § 77z-2(c) .......................................................................................... 43

15 U.S.C. § 78t(a) ............................................................................................. 44

15 U.S.C. § 78u-4(b)(1) .................................................................................. 8, 11

15 U.S.C. § 78u-4(b)(2)(A) ................................................................................. 9

15 U.S.C. § 78u-4(b)(3)(A) ................................................................................. 9

15 U.S.C. § 78u-5(c) ......................................................................................... 24

15 U.S.C. § 78u-5(c)(1)(A)(i) ............................................................................ 24

15 U.S.C. § 78u-5(i) .......................................................................................... 24

28 U.S.C. 1658(b) ............................................................................................. 11

## RULES

Fed. R. Civ. P. 9(b) ................................................................................... passim

Fed. R. Civ. P. 12(b)(6) ................................................................................ 8, 14

Defendants[1] respectfully submit this memorandum in support of their Motion to Dismiss (the "Motion") the Fourth Amended Complaint ("FAC"). Plaintiffs' FAC, filed after Defendants' Motion to Dismiss the Third Amended Complaint (the "Prior Motion") had been fully briefed, is their ***fifth attempt*** to state a cause of action in this case.[2] Once again, they have failed. It is time to dismiss this action with prejudice.

## INTRODUCTION

This is a case of business setbacks, not securities fraud. Stericycle met market expectations for earnings and revenue growth quarter after quarter for thirty-four straight quarters, and its stock price rose accordingly. On October 22, 2015, this string was finally broken. Although the Company's third-quarter revenues increased over the same prior-year quarter, the increase failed to meet analyst expectations and the Company revised its previous projection of earnings per share for the year downward. The next day, the stock price dropped. In several successive quarters, the Company announced additional disappointing results, and its stock price dropped further. Not surprisingly, Plaintiffs are attempting to take advantage of this business downturn by claiming fraud. This attempt should be rejected.

In search of a theory to take advantage of the stock price drops, Plaintiffs' initial complaint, filed July 11, 2016, alleged that investors who purchased Stericycle stock during the class period were misled into believing that relations between Stericycle and its Small Quantity ("SQ") customer base were better than they actually were. According to Plaintiffs, Stericycle highlighted its loyal SQ customer base at a time when it knew those customers were so unhappy

---

[1] Defendants include Stericycle, Inc. ("Stericycle" or the "Company"), Officer Defendants, Director Defendants, and Underwriter Defendants, each as defined in the Motion.

[2] *See* Complaint filed July 11, 2016 (Dkt. 1), Amended Complaint filed August 4, 2016 (Dkt. 5), Corrected Amended Complaint filed October 21, 2016 (Dkt. 41), Class Action Complaint filed February 1, 2017 (Dkt. 50), and Amended Class Action Complaint filed March 30, 2018 (Dkt. 84).

with the Company's practice of applying automatic price increases ("APIs"), they were leaving in droves. The departure of significant number of customers as a result of APIs, Plaintiffs say, caused Stericycle to miss Wall Street's earnings expectations beginning in the third quarter of 2015, resulting in injury to investors. This API theory of securities fraud formed the backbone of the Third Amended Complaint and was the subject of Defendant's Prior Motion. *See* Dkt. 55.

Presumably concerned about the survival of their API theory after the motion to dismiss briefing, Plaintiffs have added a newly-contrived theory: that Stericycle knowingly misled investors about the Company's success at integrating the operations of the hundreds of companies that it acquired over the years. Plaintiffs point to a February 21, 2018 announcement that the Company was investing between $175 and $200 million in an Enterprise Resource Planning ("ERP") system as proof that the Company's earlier integration claims were false. *See, e.g.*, ¶¶ 200, 396.[3] Plaintiffs apparently hope to avoid some of the flaws in their API theory of securities fraud by asserting this new ERP theory of securities fraud as well. Both theories fail.

**<u>Plaintiffs' API Theory of Securities Fraud Fails</u>**

Plaintiffs' API theory of liability remains doomed by the same fatal flaws Defendants demonstrated in the Prior Motion:

***First,*** Plaintiffs rely on citations to over one hundred different Stericycle public statements without any meaningful attempt to explain which parts of those statements are allegedly inaccurate and why. This kind of "puzzle pleading" has repeatedly been rejected, and for this reason alone Plaintiffs' action should be dismissed.

***Second,*** investors who purchased Stericycle stock during the class period could not have

---

[3] Unless otherwise noted, references to "¶ [_]" are references to the FAC. In all quotations, unless otherwise noted, internal quotations and citations are omitted and emphasis is supplied.

been misled as to Stericycle's pricing practices. To the contrary, the SQ customer concerns that Plaintiffs attempt to repackage as securities claims were already well known to the market even before the class period began.

*Third,* once the SQ pricing allegations became public, the applicable two-year statute of limitations on securities fraud claims began to run. Indeed, the limitations period had run—at the latest—by March 18, 2015. The current action, filed on July 11, 2016, is therefore untimely.

*Fourth,* Plaintiffs' speculation that Defendants knew or should have known that the Company's pricing strategies were "illegal," "fraudulent," or "unsustainable" is just that: speculation. Under the Private Securities Litigation Reform Act ("PSLRA"), such allegations must be supported by *facts* sufficient to establish a "strong inference" that each Defendant acted with the requisite scienter. Plaintiffs' allegations fall far short.

*Fifth,* Plaintiffs have failed to plead loss causation: that Stericycle's stock price fell after a "corrective disclosure" in which allegedly concealed information about API practices was disclosed. The reality in this case is the opposite: each time the market received news specifically addressing the API allegations, the stock price *rose or did not react*. The dates Plaintiffs look to for significant stock drops were dates on which no new information regarding API practices was disclosed.

*Sixth,* Plaintiffs' failure to plead a material misrepresentation dooms their claims under Sections 11 and 12(a)(2) of the Securities Act relating to Stericycle's September 2015 offering of depositary shares. Plaintiffs also lack standing to assert a Section 12(a)(2) claim by failing to allege facts describing a purchase in the offering, rather than in the aftermarket.

Each of these fundamental flaws was identified in the Prior Motion. Plaintiffs had the opportunity, if they could do so, to try to fix these issues in the FAC. They did not, instead

seeking to extend the class period and capture losses from additional stock drops in August 2017 and February 2018 while leaving their puzzle pleading and API theory fundamentally unaltered.

### **Plaintiffs' New ERP Theory of Securities Fraud Also Fails**

In the new allegations added in the FAC, Plaintiffs allege that Stericycle's statements relating to the successful integration of the ***operations*** of the companies it had acquired must have been false in light of its later announcement that it was investing in an ERP system to better integrate ***the business applications and financial systems*** employed locally by these acquired companies. *See, e.g.*, ¶¶ 200, 396. This ERP theory of securities fraud should be dismissed for a number of reasons:

***First,*** the FAC fails to demonstrate that Stericycle's statements regarding operational integration were anything other than immaterial puffery.

***Second,*** even if material, the FAC fails to demonstrate those statements to have been false. The only allegation of ***fact*** bearing on the question is that the Company has subsequently announced an investment in an ERP system. But ***operational integration*** and ***systems integration*** for streamlined financial reporting, technology, and human resources management, are two entirely different things. Stericycle's statements regarding them were always consistent and accurate.

***Third,*** the FAC is utterly lacking in factual allegations supporting a strong inference of scienter with respect to the ERP claims as required under the PSLRA.

***Fourth,*** loss causation is once again lacking. Indeed, the Company had announced the possible need for an ERP system to improve systems integration as early as May 4, 2017, nine months before Plaintiffs allege they were injured, and continued to provide more details about the system in each subsequent quarter.

Having once again failed to state a claim under the securities laws, Plaintiffs should not be given another chance; the FAC should be dismissed with prejudice.

## BACKGROUND[4]

Stericycle specializes in the collection, processing, and disposal of regulated waste and the collection and secure destruction of personal and confidential information. *See* Ex. 1 at 3.[5] Stericycle has over one million customers worldwide. *Id.* The Company serves both large-quantity generators ("LQ"), such as hospitals and pharmaceutical manufacturers, and SQ generators, such as medical or dental offices, clinics, and pharmacies. *Id.* at 4. Since as early as 2006, Stericycle has reported increased revenues every year. *See* ¶ 52; Ex. 1 at 31. In addition to organic growth, Stericycle has built its customer base and route density by acquiring other businesses in this highly fragmented industry. Ex. 1 at 6. Over its history, Stericycle has completed 496 acquisitions in the U.S. and abroad. *Id.*

As the FAC itself demonstrates, the billing practices that Plaintiffs now call a secret scheme go back a decade and have been public knowledge for years. Even before the class period began, on January 8, 2013, the New York Attorney General ("NY AG") publicly announced a $2.4 million settlement regarding these same pricing practices. Ex. 2. The press release accused Stericycle of improperly increasing prices for government customer contracts, and stated that "[s]ince 2003, Stericycle implemented a plan to charge automated price increases . . . without giving any notice to these customers and in violation of the contract terms." *Id.*

---

[4] This Motion is based on the well-pleaded facts set forth in the FAC, documents incorporated in the FAC by reference, and matters of which a court may take judicial notice as Defendants demonstrated in the Prior Motion and Plaintiffs have not contested. *See* Dkt. 55 at 3 n.3. The matters of which this Court may take judicial notice include: (1) Stericycle's filings with the United States Securities and Exchange Commission ("SEC"); (2) publicly-issued press releases; (3) newspaper articles; (4) analyst reports; (5) publicly-reported stock quotes; (6) earnings call transcripts; and (7) court filings.

[5] References in the form "Ex. [_]" refer to exhibits to the Declaration of Meghan Hansen in Support of the Defendants' Motion To Dismiss the Fourth Amended Complaint, filed herewith.

The NY AG asserted that Stericycle acted in bad faith and that the "sole reason for the APIs was to increase revenue and avoid detection by these customers." *Id.*

That same day, a whistleblower ("*qui tam*") complaint filed by former Stericycle employee Jennifer Perez was unsealed. *See* ¶ 92; *see also* Ex. 3. The *qui tam* complaint alleged that "Stericycle was routinely billing ***all small quantity customers*** . . . with annual 18% increases, adding surcharges, . . . [and] ***carried out the practices alleged . . . across the board with almost all of its small quantity customers*.*" Ex. 3 ¶ 16; *see also* ¶¶ 92-105. Multiple news reports (*see, e.g.*, Exs. 4-6) and a January 9, 2013, analyst report by Northcoast (Ex. 7) discussed the allegations and the settlement. Northcoast concluded the settlement was a "non-issue." *Id.* at 1. The market obviously agreed. Between the time the stock market opened on January 8, and the end of January 9, 2013, Stericycle's stock price ***increased*** from $95.34 to $95.40. Ex. 8.

Two months later, on March 8, 2013, Stericycle was sued by a non-government customer seeking to represent a class consisting of "all current and former Stericycle customers that were charged unlawful, automatic, excessive and/or unauthorized price increases, and/or other undisclosed fees or surcharges" (the "Customer Class Action") and asserting claims similar to those asserted by the NY AG and the *qui tam* relator on behalf of government customers. Ex. 9 ¶ 49. The Customer Class Action purported to include "hundreds of thousands" of customers. *Id.* ¶ 50. Ultimately, ***twenty-four additional, separate actions*** were filed around the country and consolidated by the Judicial Panel on Multidistrict Litigation. *See In re Stericycle, Inc., Steri-Safe Contract Litig.*, 13-cv-5795 (N.D. Ill. Aug. 6, 2013).

On March 18, 2013, Stericycle disclosed the Customer Class Action in a public Form 8-K filing with the SEC. Ex. 10. Stericycle told the market that "[t]he complaint alleges, among other things, that we imposed unauthorized or excessive price increases and other charges on our

customers." *Id.*; *see also* ¶ 318. In its public filings, Stericycle denied (and continues to deny) allegations that its pricing practices violated customer contracts. In the Answer Stericycle filed in the Customer Class Action in 2013, Stericycle denied wrongdoing, but acknowledged: (1) that "automatic price increases" existed; (2) that certain customers received price increases of 18%; and (3) that executives received reports reflecting API revenue. Ex. 11.

Analysts discussed the Customer Class Action in their reports, just as they had the NY AG settlement and the *qui tam* action. *See, e.g.*, Exs. 12-14. Once again, the stock barely reacted. The price of Stericycle stock, which had closed the previous trading day at $102.04, ended March 18, 2013, down by only 94 cents, and rebounded the next day to a high of $102.06. Ex. 15. Despite all of the discussion of the billing practices litigation, Stericycle's stock price continued to climb. Even when Stericycle announced that it had agreed to pay $26.75 million to settle the *qui tam* action on October 8, 2015, the stock price did not drop. *See* Exs. 16-17; *see also* ¶ 104. After closing the previous trading day at $144.70, the stock price continued to climb after news of the settlement, closing at $146.83 on October 8, 2015, and at what was then an all-time high of $149.62 four days later. Ex. 17.

The first allegedly relevant stock drop occurred following the release of third quarter 2015 earnings on October 22, 2015. Ex. 18. Although the Company's third-quarter revenues increased over the same quarter of 2014, the increase was less than analysts expected. Ex. 19. The Company revised its year-end earnings per share guidance downward. *Id.* at 6. Notably, the Company's discussion and analyst reporting focused on the earnings miss and downward revision to guidance, and not pricing issues related to the SQ business. *See generally* Ex. 19.

When the focus was on the SQ pricing allegations, as when Stericycle announced on August 2, 2017 that it had settled the Customer Class Action for $295 million, the stock price

7

*rose*. *See* ¶ 184; *see also* Exs. 20, 21. When the focus shifted back to overall Company results the next day, and the Company announced second quarter 2017 earnings, the stock fell slightly, but not enough to overcome gains from Customer Class Action news. *See* ¶¶ 185, 192; Ex. 21.

## ARGUMENT

## I. LEGAL STANDARD

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must not only provide the defendant with fair notice of a claim's basis, but must also be facially plausible. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The factual allegations in a complaint must "raise a right to relief above the speculative level" and offer "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" to support the allegations. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

Complaints alleging fraud must "state with particularity the circumstances" constituting an alleged fraud. Fed. R. Civ. P. 9(b). This ordinarily requires describing the "who, what, when, where, and how" of the fraud. *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007). Even if the complaint purports to assert a claim other than fraud, "[a] claim that 'sounds in fraud'—in other words, one that is premised upon a course of fraudulent conduct— can implicate Rule 9(b)'s heightened pleading requirements." *Id.*

The PSLRA, which Congress enacted as "a check against abusive litigation by private parties," imposes an even more demanding standard. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313-14 (2007). To properly allege that a defendant misrepresented or omitted material facts, the PSLRA requires a plaintiff to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information or belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B).

8

To plead scienter, a private securities complaint must, with respect to each allegedly false or misleading statement, "state with particularity facts giving rise to a ***strong inference***" that each named defendant had actual knowledge of the statement's falsity or a reckless disregard of a substantial risk that the statement was false. 15 U.S.C. § 78u-4(b)(2)(A); *Higginbotham v. Baxter Int'l Inc.*, 495 F.3d 753, 756 (7th Cir. 2007). Failure to plead particularized facts mandates dismissal. *See* 15 U.S.C. § 78u-4(b)(3)(A).

## II. THE FAC SHOULD BE DISMISSED AS IMPROPER PUZZLE PLEADING

As a threshold matter, Plaintiffs' 163-page, 462-paragraph complaint should be dismissed for failure to comply with Rule 9(b) and the PSLRA by failing to identify which particular facts allegedly render which statements false or misleading. *See, e.g.*, *Conlee v. WMS Indus., Inc.*, 2012 WL 3042498, at *4 (N.D. Ill. July 25, 2012) ("A complaint which relies on puzzle pleading does not meet Rule 9(b)'s particularity requirement."); *see also Constr. Workers Pension Fund v. Navistar Int'l Corp.*, 2014 WL 3610877, at *4-6 (N.D. Ill. July 22, 2014) (collecting cases).

In *WMS*, the court dismissed a complaint that left the reader "jumping from page to page in an attempt to link the alleged statements to the background that supposedly makes them false or misleading." 2012 WL 3042498, at *4. The FAC recites a similar "mash-up of block quotes, snippets, parentheticals and Lead Plaintiff's characterizations" (*id.*), including over one hundred statements from Stericycle's SEC filings, press releases, and earnings calls. *See, e.g.*, ¶¶ 207-362. Plaintiffs do not identify which parts of the statements they claim are false or misleading or why. For example, ¶ 264 states: "Defendant Arnold touted improvements that Stericycle had made to foster continued growth, claiming that: '[w]e increased our regulated waste, operational infrastructure, enabling the continued growth of our retail and SQ regulated waste business.'" Are Plaintiffs alleging that there was not an increase in regulated waste or infrastructure; or that this did not enable growth? Both? Neither? They simply do not say.

9

Many of the challenged statements are straightforward recitations of financial results. *See, e.g.*, ¶¶ 207-08, 216, 223, 228, 237, 246, 252, 257, 262, 269, 277, 285. There is, however, no allegation that any of these financial results were inaccurate when reported, and there is no further explanation for why these paragraphs are actionable. At times, the long block quotes are partially italicized or bolded, but it remains impossible to "ascertain which allegations are meant to match up with the italicized/bolded portions of the complaint" or what the meaning of the italics and bold is. *See Lauria v. Biosante Pharm., Inc.*, 968 F. Supp. 2d. 951, 957-59 (N.D. Ill. 2013) (dismissing such a complaint as deficient). For example, in some paragraphs the italicized and bolded parts are analyst statements or questions, (*see, e.g.*, ¶¶ 140-42, 151-52, 172, 175-76, 179-80, 182, 186, 195, 218, 220, 265, 316), which cannot be attributed to Defendants.

These deficiencies are compounded by Plaintiffs' repeated use of a few stock paragraphs purporting to list the "reasons" the statements in dozens of other paragraphs are allegedly false or misleading. *Compare, e.g.*, ¶¶ 214, 215(b)-(c) (stock paragraph of reasons) *with* ¶¶ 207-08, 216, 223, 228, 237, 246, 252, 257, 262, 263, 269, 277 (paragraphs citing quarterly revenue figures for each quarter, allegedly false for the "reasons" in ¶¶ 214 and 215(b)-(c)). It is impossible to tell which of the "reasons" match up to the various allegedly false statements. As another Court in this district summarized, "[c]ourts around the country have made clear that a complaint does not satisfy the PSLRA's pleading standards when it quotes the defendant at length and then uses ***a stock assertion*** that the statement is false or misleading for reasons stated in an earlier paragraph." *Navistar*, 2014 WL 3610877, at *4.

Puzzle pleading is not merely an issue of organization, but one of substance. Plaintiffs' recent amendment still fails to identify: (1) which portions of which statements are allegedly false or misleading; (2) what specific facts render each statement false or misleading; and (3)

*why*. *See* 15 U.S.C. § 78u-4(b)(1). The FAC thus violates Rule 9(b) and the PSLRA and should be dismissed.

## III. PLAINTIFFS' EXCHANGE ACT SECTION 10(B) CLAIMS FAIL[6]

To state a claim under Exchange Act Section 10(b) and Rule 10b-5, a plaintiff must allege that each defendant: (1) made a misrepresentation or omission; (2) of a material fact; (3) with scienter; (4) in connection with the purchase or sale of a security; (5) upon which the plaintiff justifiably relied; and (6) that reliance proximately caused the plaintiff's injury. *See Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008). The Exchange Act claims should be dismissed for four reasons: (1) they are barred by the statute of limitations; and the FAC does not adequately plead (2) actionable misstatements, (3) scienter, or (4) loss causation.

### A. Plaintiffs' Section 10(b) and Rule 10b-5 API Claims Are Time-Barred

A claim of securities fraud must be brought within two years after the discovery of the facts constituting the violation and in no event more than five years after the violation. *See* 28 U.S.C. § 1658(b). The Supreme Court has held that a claim accrues, and the two-year statute of limitations begins to run, when a plaintiff actually discovers or "a reasonably diligent plaintiff would have discovered the facts constituting the violation, including scienter." *Merck & Co. Inc. v. Reynolds*, 559 U.S. 633, 653 (2010). The "violation" triggering the two-year statute of limitations is "the date of a misrepresentation or omission made in connection with a sale that gives rise to a claim." *Howe v. Shchekin*, 238 F. Supp. 3d 1046, 1050 (N.D. Ill. 2017); *see also McCann v. Hy-Vee, Inc.*, 663 F.3d 926, 932 (7th Cir. 2011).[7] Here, a reasonably diligent plaintiff would have discovered the facts constituting the alleged violation related to the

---

[6] The Exchange Act claims are not alleged against the Underwriter Defendants.

[7] Under established Seventh Circuit law, loss causation and damages are not required for a claim to accrue. *McCann*, 663 F.3d at 931. The statute of limitations begins to run from the date of the purported fraud, not the date of the injury. *Id.*

purported API scheme on January 8, 2013, when the NY AG announced his settlement with Stericycle and the *qui tam* complaint was unsealed. If not by January 8, 2013, then the statute began to run on the API theory of liability at the latest by March 18, 2013, when a Stericycle Form 8-K announced the filing of the Customer Class Action. *See* ¶ 318; *see also* Ex. 10.

These events put the world on notice that Stericycle was accused of intentionally and fraudulently engaging in billing practices that violated its SQ customer contracts and of hiding this conduct from public scrutiny. For example, the *qui tam* complaint alleged that Stericycle "defrauded federal, state and local governments by ***knowingly or recklessly*** overcharging its governmental customers" through APIs and contained specific allegations about the state of mind of Stericycle executives.[8] Ex. 3 ¶ 5; *supra* p. 6.

The Customer Class Action alleged that the pricing practices applied to "***all of Stericycle's customers***" and that "over 95% of [Stericycle's] revenues are under [these] contracts." Ex. 9 ¶¶ 20, 23. Like the *qui tam* complaint, this lawsuit contained specific allegations related to Stericycle's purported bad intent.[9] Indeed, Plaintiffs ***affirmatively contend*** that all three of these prior lawsuits alleged knowing and intentional fraud.[10]

Plaintiffs cannot simultaneously claim that these cases are all evidence of the fraud (*see,*

---

[8] *See, e.g.*, Ex. 3 ¶ 21 ("Relator's supervisors routinely admitted to Relator that they were aware that Stericycle's price escalation practices were improper."); ¶ 22 ("[A] senior Stericycle executive admitted to Relator in 2006, that Stericycle was in fact subjecting federal customers to improper price increases.").

[9] *See, e.g.*, Ex. 9 ¶ 28 ("Stericycle . . . fails to disclose its intent to implement APIs."); ¶ 47 (discussing "Defendant's knowing and active concealment of its deceptive practices.").

[10] *See, e.g.*, ¶ 58 ("The contours of ***this fraud*** have now been well-established after years of litigation in multiple related lawsuits."); ¶ 95 ("The Perez Complaint alleged that Stericycle defrauded the government by 'knowingly or recklessly: (a) submitting false claims; (b) making false statements in order to get false or fraudulent claims paid or approved . . . (d) fraudulently inducing the Government to enter into a contract knowing . . . it had no intent of honoring the terms of the contract but instead intended on arbitrarily increasing the price agreed upon in the contract by various amounts up to 18% every 9 to 12 months.'"); ¶ 103 (alleging the NY AG charged Stericycle with engaging in a "cynical scheme"); ¶ 318 (noting that Stericycle's 8-K described the Customer Class Action as alleging violations of the Illinois Consumer Fraud and Deceptive Business Practices Act and implied duties of good faith and fair dealing).

*e.g.*, ¶¶ 7, 8, 58, 91, 365) and ask the Court to ignore that those allegations have all been in the public domain for years. The allegations of fraudulent intent, coupled with detailed and specific factual allegations, put Plaintiffs on notice of all the essential elements of the fraud claim they now seek to assert.[11] The result here should follow *Premium Plus Partners, L.P. v. Goldman, Sachs & Co*., in which the Seventh Circuit found the plaintiff's claims barred by the statute of limitations where an SEC investigation was public knowledge and a reasonably diligent investor would have uncovered the facts constituting scienter more than two years before the claim was filed. 648 F.3d 533, 537 (7th Cir. 2011); *see also Landsberger v. Martek Biosciences Corp.*, 2010 WL 3038947, at *4 (D. Md. July 30, 2010) (holding that the plaintiff's claims were time-barred where fraud allegations were previously made public in a class action suit).

That Stericycle has denied the allegations has no impact on the running of the statute of limitations. The Seventh Circuit instructs courts to "focus[] attention on what the plaintiff knows or could have found out, not on what the defendant admits or denies." *Premium Plus*, 648 F.3d at 537. In *Premium Plus*, defendants "consistently denied" elements of the insider trading claims and the Seventh Circuit held that the statute of limitations began to run ***despite such reassurances***, rejecting the "contention that a claim for securities . . . fraud does not accrue until the defendant has confessed," and making clear "[t]hat's not the law—nor can the same result be achieved by saying . . . that denial of liability equitably estops the defendant to plead the statute

---

[11] This fact distinguishes this case from *Merck*. *Merck* was a securities class action filed after the FDA and customers charged Merck & Co. with misrepresenting the safety of its painkiller Vioxx. *Merck* argued that the securities actions were untimely because the statute of limitations had been triggered by the filing of earlier product liability complaints and the issuance of a public FDA warning letter. The Court disagreed but grounded its opinion on the unique facts of that case. Specifically, the Court held that prior product liability complaints did not disclose anything regarding Merck's state of mind (and noted that Merck did not assert they did), and although the FDA letter stated that Merck had misrepresented negative clinical study results, it stopped short of stating that Merck did so with an intent to deceive. *Merck*, 559 U.S. at 653-54. To the contrary, Plaintiffs have pled explicitly that the NY AG action, the *qui tam* action, and the Customer Class Action all showed Stericycle to have acted with intent to deceive.

of limitations." *Id.* at 536. As the court had earlier put it in the context of a Section 1983 action, "if we permitted denials of liability to be recast as active steps preventing plaintiffs from suing in time, a statute of limitations would not begin to run until a defendant acknowledged liability, an entirely strange concept." *Mitchell v. Donchin*, 286 F.3d 447, 451 (7th Cir. 2002).

With respect to their API theory of liability, because Plaintiffs affirmatively "plead[] facts" about disclosures related to those prior litigations that show their suit is barred by a statute of limitations, they "plead [themselves] out of court under a Rule 12(b)(6) analysis." *See Whirlpool Fin. Corp. v. GN Holdings, Inc.*, 67 F.3d 605, 608 (7th Cir. 1995).

### B. The FAC Does Not Allege Any Actionable False or Misleading Statements or Omissions

Despite setting forth over one hundred allegedly misleading statements from over three years of Stericycle press releases, earnings and analyst calls, and SEC filings (*see* ¶¶ 207-362), the FAC fails to allege any actionable material misstatement or omission with respect to either the API or ERP-related theories.

Plaintiffs' tangled mass of API-related allegations appear to ultimately be based primarily on an omission theory: Defendants failed to disclose that Stericycle's revenues were propped up by an allegedly fraudulent pricing scheme that lead to customer attrition and all other statements about Stericycle's revenue growth, customer retention, and loyalty were misleading as a result. *First,* Plaintiffs cannot overcome the fact that the market was fully aware of the pricing practices they claim Defendants failed to disclose. *Second,* Plaintiffs do not allege sufficient facts to establish that purported customer complaints and attrition were material before they were disclosed or that their omission rendered Stericycle's public statements false or materially misleading.

*Third,* Plaintiffs' new ERP theory—that Stericycle made material misrepresentations

14

regarding the integration of its acquisitions—fails, both because the implementation of an ERP platform is in no way inconsistent with Stericycle's representations regarding successful integration of recent acquisitions, and because Stericycle disclosed its intent to implement a system integration months before the alleged February 2018 "revelation."

The remaining allegations—thrown in as part of Plaintiffs' kitchen sink approach—are not actionable because they are opinions, puffery, or forward-looking statements protected by the PSLRA.[12]

### 1. Plaintiffs Fail to Assert an Actionable API-Related Omission Because Stericycle's Pricing Practices Were Public Knowledge

In their API theory of liability, Plaintiffs contend that Stericycle omitted to disclose that its revenues were derived in part from APIs that a significant number of its SQ customers challenged as illegal or fraudulent.  It is not at all clear however, what, precisely, Stericycle "omitted" when it disclosed the multiple lawsuits making the very same claims about its pricing practices.  Even if something were omitted—which Stericycle contests—to be actionable, that omission must be material, and an omission is material only if "there is a substantial likelihood that disclosure of the information would have been viewed by the reasonable investor to have significantly altered the total mix of information."  *See In re Harley-Davidson Inc. Sec. Litig.*, 660 F. Supp. 2d 969, 984 (E.D. Wis. 2009) (quoting *Searls v. Glasser*, 64 F.3d 1061, 1066 (7th Cir. 1995)).  An omission of public information cannot be material.  *See, e.g.*, *In re UBS AG Sec. Litig.*, 2012 WL 4471265, at *32-33 (S.D.N.Y. Sept. 28, 2012), *aff'd sub nom.*, 752 F.3d 173 (2d Cir. 2014) (dismissing claims where allegations that defendants were involved in a tax evasion scheme were "matters of general public knowledge"); *In re Merrill Lynch & Co., Inc. Research*

---

[12] For the Court's convenience, a chart listing all of the statements challenged in the FAC and the reasons that Plaintiffs fail to plead an actionable misrepresentation or omission, is included as Appendix A.

*Reports Sec. Litig.*, 272 F. Supp. 2d 243, 250 (S.D.N.Y. 2003)  (dismissing claims where the "Complaint demonstrate[d] that [allegedly withheld] information . . . was publicly available"). As the Seventh Circuit has recognized, "[t]he securities laws do not require [companies] to disclose information that is already in the public domain." *Higginbotham*, 495 F.3d at 759.

As demonstrated above, the public knew of the API-related allegations against Stericycle even before the class period began.  *See supra* pp. 5-7, Part III.A.  As Plaintiffs themselves acknowledge (¶ 103), the allegations underlying Plaintiffs' claim became public on January 8, 2013 when the NY AG issued a press release accusing Stericycle of imposing APIs, and a whistleblower complaint that made the same allegations with respect to "all small quantity customers" was unsealed.  These allegations were not only publicly disclosed, but specifically discussed by research analysts and news outlets.  *See supra* pp. 5-7; Exs. 4-7.

The result here should be the same as that in *Longman v. Food Lion, Inc.*, 197 F.3d 675 (4th Cir. 1999).  In that case, the plaintiff brought a 10b-5 claim, alleging that Food Lion failed to disclose that its reported earnings were artificially inflated by labor law violations.  *Id.* at 684. However, allegations regarding Food Lion's labor violations had already been made public after a food workers' union filed a complaint with the Department of Labor charging Food Lion with wage and hour violations.  *Id.*  Because the allegations "were in fact well known to the market," and the market had "a full opportunity to evaluate these claims and to reflect their risk in the market price," the omission was immaterial.  *Id.* at 684-85.  The district court dismissed the plaintiff's claim and the Fourth Circuit affirmed.  *Id.* at 686.

### 2.     Plaintiffs Do Not Allege That Pricing Pressures Were Material Before They Were Disclosed

Plaintiffs' API theory of liability also alleges that Defendants hid from investors the "fact" that SQ customers requested discounts or cancelled their contracts in response to

Stericycle's pricing practices and that this omission then rendered false all other statements regarding Stericycle's financial results.

As an initial matter, Plaintiffs do not allege that Stericycle's reported financial results were inaccurate, just that they were unsustainable due to alleged SQ pricing pressure.[13] Courts routinely reject the argument that accurately reported revenue and income are rendered materially misleading by a failure to disclose that such income was unsustainable. *See In re Axis Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 587 (S.D.N.Y. 2006); *see also In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 378 (S.D.N.Y. 2004) (dismissing 10(b) and 10b-5 claims "premised on the assertion that [defendant] breached a duty to disclose that its revenues were unsustainable"). The entire theory of Plaintiffs' case runs contrary to the well-established principle that the "disclosure of accurate historical data does not become misleading even if less favorable results might be predictable by the company in the future." *In re Duane Reade Inc. Sec. Litig.*, 2003 WL 22801416, at *6 (S.D.N.Y. Nov. 25, 2003).[14]

Second, to sustain their API theory of fraud, Plaintiffs must demonstrate that Stericycle's pricing practices resulted in such "significant negative consequences" that they rendered Defendants' statements materially misleading. *See Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*, 673 F. Supp. 2d 718, 735 (S.D. Ind. 2009); *see also Garden City Employees' Ret. Sys. v. Anixter Int'l, Inc.*, 2011 WL 1303387, at *25 (N.D. Ill. Mar. 31, 2011) (finding that a customer pricing dispute was not material and defendant had no duty to

---

[13] Likewise, Plaintiffs allege that Defendants' explanations for Stericycle's growth during the class period were materially misleading because revenues and growth were instead due to Stericycle's undisclosed misconduct. *See* ¶¶ 209, 212, 217, 221, 224, 229-30, 239, 241, 244, 247, 250, 253, 255, 260, 264, 266, 270, 271, 280, 282-83, 286, 287-88, 290, 293-95; App'x A at 11-17. However, Plaintiffs allege no **facts** calling into question Stericycle's statements regarding factors affecting growth.
[14] *See* ¶¶ 207-08, 216, 223, 228, 237-38, 246, 252, 257-58, 262-63, 269, 277, 285-86, 414; App'x A at 1-10.

17

disclose it). Here, however, Plaintiffs allege no facts supporting their speculation that the APIs caused material SQ pricing pressure and customer attrition throughout the class period that should have been disclosed.

The FAC provides no credible basis to quantify the impact of Stericycle's pricing practices on its future earnings. Plaintiffs rely entirely on allegations that: (1) unspecified, but "large" numbers of customers cancelled their contracts during the class period;[15] (2) Stericycle increased the size of its Retention Department between 2008 and 2016 (which is entirely consistent with the growth of the Company during that period);[16] (3) Stericycle tracked and reported retention rates and discussed retention during meetings;[17] and (4) two lower-level employees, who are not alleged to have had any insight into the Company's consolidated financial statements, revenues, or earnings, believed that Stericycle's October 2015 earnings miss was due to Stericycle "customers leaving and renegotiating their contracts."[18] The bulk of these allegations come from confidential witnesses. *See, e.g.*, ¶¶ 108-24. The Seventh Circuit has held that such allegations "must be discounted" and "[u]sually that discount will be steep."

---

[15] *See, e.g.*, ¶ 116 (confidential witness allegations that "Stericycle focused on retention because they were 'hemorrhaging' customers," "customers were 'leaving in droves,'" and that "there was a large increase in the number of customers leaving Stericycle in around March 2015").

[16] *See, e.g.*, ¶ 113 (confidential witness allegations estimating that the Retention Department approximately tripled its size in the seven years between 2008 and 2015, and that the Retention Department had somewhere between 36 and 50 employees in early 2016).

[17] *See, e.g.*, ¶¶ 118-20 (confidential witness allegations that Stericycle "create[d] reports that showed customer and revenue loss," held monthly meetings with PowerPoint presentations "that included the number of accounts lost," and also held quarterly meetings "where retention numbers, including customer loss and percentages of revenue lost were discussed"); ¶ 123 ("As [a Stericycle revenue and billing employee] testified, 'Rich Kogler and [Stericycle] VPs' monitored the 'monthly PI analysis reports,' which were prepared by Stericycle's information technology department and which 'examin[ed] how the price increase was going.'").

[18] *See, e.g.*, ¶ 121 (allegation by a former "Compliance Solutions Specialist" that "the earnings and guidance misses that Stericycle reported starting in October 2015 were tied to customers leaving and renegotiating their contracts," and by a former "Territory Account Manager for the Small Quantity Division" that the "reported earnings misses were due to Stericycle customers leaving in droves").

*Higginbotham*, 495 F.3d at 757. That is particularly true here where there is nothing to suggest that these confidential witnesses possess reliable information. The FAC includes no information about the witnesses other than their titles and dates of employment, which demonstrate only that Plaintiffs' sources were lower-level employees,[19] and does not allege that any of these employees communicated with Stericycle executives—much less with any of the Officer Defendants or Director Defendants (each an "Individual Defendant").

More importantly, Plaintiffs provide no statistics as to the number of customers who allegedly exerted pricing pressure due to the APIs, when this occurred, the amount of any resulting losses, or any explanation of the impact on Stericycle's financials.[20] For example, Plaintiffs claim that an April 2013 statement to investors that customer churn was a non-issue was misleading (¶ 219), but plead no facts to suggest that churn ***was*** an issue at the time. Plaintiffs also allege repeatedly that Defendants' statements regarding the useful lives of customer contracts were false and misleading,[21] but admit that those calculations were based on then-"currently-available data regarding the current length of relationships." *See* Pls.' Resp. (Dkt. 58) at 30. Plaintiffs also refer to the existence of reports and meetings at which retention was discussed, ¶¶ 118-20, but fail to plead ***any facts*** rendering those reports or meetings meaningful, such as what was contained in the reports, what was discussed at the meetings, when the reports were issued or the meetings occurred, or whether any of the information was

---

[19] Plaintiffs' confidential witnesses appear to comprise eight former Stericycle employees: a "Compliance Solution Specialist," "Customer Care Specialist," "Small Quantity Division Territory Account Manager," "Territory Sales Specialist," "Regional Sales Manager," "Inside Sales Regional Account Manager," "Inside Sales Representative," and a "former employee who worked in Stericycle's SQ Division in Sales and, most recently, in the Retention Department."

[20] In fact, the same earnings call transcripts that Plaintiffs cite in the FAC reveal that the number of accounts was increasing continuously from February 6, 2013, through at least July 23, 2015. *See, e.g.*, Ex. 22 at 3; Ex. 23 at 12-13.

[21] *See* App'x A at 24-26.

inconsistent with Defendants' public statements.

Courts regularly dismiss securities claims exhibiting these flaws.  In *Harley-Davidson*, for example, the court dismissed claims of alleged omissions regarding "excess dealer inventories" because the complaint "[did] not set forth statistics to place the allegations of 'excess dealer inventory' in context."  660 F. Supp. 2d at 986.  The court held that confidential witness allegations concerning production and inventory reports were insufficient where the allegations "[did] not actually mention any reports that contained statistics materially inconsistent with the defendants' public statements."  *Id.* at 987.

Confidential witnesses' conjectures that Stericycle's earnings misses were caused by customers leaving or renegotiating their contracts do not change the result.  Indeed, confidential witness ***opinions*** do not satisfy the PSLRA's heightened pleading standards where, as here, the confidential witness "has not established an adequate basis for stating his or her opinion."  *See In re Metawave Commc'ns Corp. Sec. Litig.*, 629 F. Supp. 2d 1207, 1216 (W.D. Wash. 2009). Here, the FAC offers no basis for the opinions expressed by these former employees.  Indeed, one of the witnesses was with the Company only sixteen months and the other left the Company ***prior*** to the announcement of Stericycle's first earnings and guidance miss in October 2015.  ¶ 121.

Ultimately, Plaintiffs themselves acknowledge that Stericycle reported pricing pressures beginning in October 2015 and continuing through February 2018.  ¶143.  Plaintiffs claim, however, that Defendants hid that the "true reason for Stericycle's pricing pressure was the API fraud and Stericycle customers leaving the Company or re-negotiating their contracts."  ¶ 301; *see also* ¶ 310.  Once again, Plaintiffs allege no facts to support the allegation that pricing pressure was due to customer backlash from APIs, and not competition or cancellations due to

20

consolidations, as the Company stated. [22]

### 3. Plaintiffs Do Not Allege Facts Demonstrating That Defendants Made Any Misstatements or Omissions Regarding Stericycle's Past Success With Integrating Acquisitions

In relation to their ERP claims, Plaintiffs fail to plead that Defendants made material misrepresentations or omissions regarding the integration of Stericycle's past acquisitions.[23] First, Plaintiffs fail to plead that any of Defendants' statements were false or misleading because Plaintiffs conflate Stericycle's statements regarding its success at integrating ***the operations*** of acquired businesses with the need for better integration of ***business applications and financial systems*** once a large number of entities had been acquired. *See* ¶¶ 200, 396. Defendants made this distinction clear throughout the class period when discussing the ERP system. For example, on the November 8, 2017 earnings call, Stericycle executives explained that the ERP was being developed because Stericycle "knew that we were operating far too many systems . . . [a]nd internally we struggled with the fact that we've done a good job of integrating acquisitions into a service line, . . . but not necessarily into the broader Stericycle." Ex. 24 at 13. Likewise, analysts understood that the ERP system concerned the integration of data systems not core businesses. The RBC report (cited at ¶ 202) noted: "the latest cloud-based SAP ERP system . . . will allow Stericycle to consolidate onto a single financial system (from ~65 today), standardize and simplify processes, and produce better data with which to run the company." Ex. 25 at 5. Stericycle's announcement of a plan to implement such a system for the purpose of integrating ***processes*** across hundreds of acquired entities does not render misleading its prior statements about successfully integrating companies.

---

[22] *See* ¶¶ 300, 302-05, 307-08, 313; *see also* App'x A at 29-30.
[23] *See* ¶¶ 329, 331, 333, 335, 337, 339, 341, 343-45, 347-49, 351, 353, 356, 358-61, 408; *see also* App'x A at 31-35.

In addition, Plaintiffs fail to plead that Stericycle omitted any information regarding the ERP system or the related Business Transformation Plan, as the market had long since been aware of both (1) the potential costs associated with integrating Stericycle's acquisitions[24] and (2) Stericycle's plan to adopt an ERP platform to assist with systems integration. Indeed, Defendants discussed moving to a single ERP system on May 4, 2017, more than six months prior to the February 2018 disclosure that Plaintiffs call shocking. At that time, Stericycle told the market that it was considering adopting a single ERP system and that the Company would require some time to "adequately analyze what single system would fit Stericycle's environment." Ex. 27 at 8. Investors therefore had ample time to digest this news. Stericycle provided additional detail about the ERP system in each subsequent earnings call as it learned more about the scale and costs and on November 8, 2017, introduced a "comprehensive Business Transformation initiative" which included "the implementation of an . . . ERP technology platform to consolidate the Company's multiple systems." Ex. 24 at 3. The Company also included a discussion of the ERP plan in the 10-Q Risk Factors released the same day, noting in particular: "the ERP platform will require significant investment of human and financial resources." Ex. 28 at 47.

#### 4.   Plaintiffs' Remaining Allegations are Nonactionable

The remaining statements that Plaintiffs challenge under both ERP and API-related theories break into four categories of purported affirmative misstatements: (1) statements of opinion; (2) forward-looking statements; (3) puffery; and (4) mischaracterized statements. Not one is actionable.

---

[24] These risks were discussed in dozens of analyst reports throughout the class period. *See, e.g.*, Ex. 26 at 1 (a February 5, 2014 report by Jefferies LLC noting that Stericycle's "[r]isks include potential stumbles related to acquisition integrations").

a.    **Statements of Opinion**

The FAC challenges numerous statements of Defendants' belief or opinion, including statements: (1) expressing belief that Stericycle "operated in accordance with the terms of our customer contracts" and that allegations in the customer cases were "without merit" (*e.g.*, ¶ 318);[25] (2) expressing belief in the "potential" for growth or expansion (*e.g.*, ¶ 244);[26] and (3) expressing belief "that when small-quantity regulated waste customers understand the potential risks of failing to comply with applicable regulations, they appreciate the value of the services that we provide" (*e.g.*, ¶ 212).[27]  Such "expressions of opinion and promises or predictions of future fact ordinarily cannot ground fraud charges." *In re VMS Sec. Litig.*, 752 F. Supp. 1373, 1397 (N.D. Ill. 1990).  For such statements to be actionable, Plaintiffs must adequately allege that "the speaker does not believe the opinion and the opinion is not factually well-grounded." *Davis v. SPSS, Inc.*, 431 F. Supp. 2d 823, 829 (N.D. Ill. 2006).  Plaintiffs have not done so.

With respect to Defendants' statements concerning the customer cases being without merit, Plaintiffs attempt to plead knowledge through the conclusory allegation that "the Officer Defendants had access to the internal Stericycle policies, documents and information that would have confirmed (rather than undermined) the customers' claims." ¶ 365.  Plaintiffs have not pled what these ***hypothetical*** "policies, documents and information" are, what they say, that Defendants read them, or what they thought about them.  "[M]erely assert[ing] that [the] information must have existed and must have been known" falls far short of the heightened pleading standards under the PSLRA.  *Elam v. Neidorff*, 544 F.3d 921, 930 (8th Cir. 2008).

Plaintiffs also fail to plead specific facts about Defendants' knowledge or belief

---

[25] *See also* ¶¶ 316-17, 321, 323, 325; App'x A at 27-28.
[26] *See also* ¶ 271; App'x A at 13, 15.
[27] *See also* ¶¶ 244, 266; App'x A at 11, 13-14.

concerning growth opportunities. As discussed above, that Defendants monitored and discussed retention rates does not suffice to establish that their statements were false or misleading—much less that Defendants knew this to be the case. *See, e.g.*, *Ong ex rel. Ong v. Sears, Roebuck & Co.*, 2005 WL 2284285, at *23 (N.D. Ill. Sept. 14, 2005).

### b.     **Forward-Looking Statements**

The FAC also challenges Defendants' statements concerning projected growth and customer adoption of services.[28] For example, Plaintiffs point to predictions that Stericycle's hazardous waste disposal service, StrongPak, will "contribute to the growth rates in SQ and LQ," and statements that the Company was "excited about our future growth because when customers adopt multiple services, this can more than double or triple customer revenues." ¶¶ 209, 217, 229.[29] These statements fall within the PSLRA's safe harbor provision, which protects certain forward-looking statements, including statements "of future economic performance" or "containing a projection of revenues." *See* 15 U.S.C. § 78u-5(c),(i). Such forward-looking statements are non-actionable if they "[i] are accompanied by meaningful cautionary statements, [ii] are immaterial, or [iii] were not made with actual knowledge of the falsity or misleading nature of the statement." *St. Lucie Cnty. Fire Dist. Firefighters' Pension Tr. Fund v. Motorola, Inc.*, 2011 WL 814932, at *8 (N.D. Ill. Feb. 28, 2011).

Cautionary language is meaningful if it "identif[ies] important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(i). "[I]t is enough to point to the principal contingencies that could cause actual results to depart from the projection." *St. Lucie*, 2011 WL 814932, at *9. Stericycle's SEC

---

[28] *See* ¶¶ 209-10, 217, 220, 229-30, 242, 244, 257-58, 271; App'x A at 5, 12-13, 15, 19-20.
[29] *See also* ¶¶ 220, 230, 242, 257-58, 271; App'x A at 5, 12, 15, 19-20.

filings consistently warned that reducing prices could significantly affect revenue—the very phenomenon that Plaintiffs claim was "undisclosed."[30] Stericycle also warned that its forward-looking statements involved "known and unknown risks and should be viewed with caution," and that the company's actual results could "differ materially from expected results." *See, e.g.*, Ex. 22 at 3.

c.      **Puffery**

Other statements challenged by Plaintiffs are immaterial puffery, i.e., "general, optimistic statements that are not capable of being objectively verified." *In re Midway Games, Inc. Sec. Litig.*, 332 F. Supp. 2d 1152, 1164 (N.D. Ill. 2004). For example, Plaintiffs challenge statements that Stericycle had "developed a strong and loyal customer base" (¶ 290), that customers "appreciate the value of the services that we provide" (¶ 212), that Stericycle had "strong growth" (¶ 293), and that Stericycle "continue[s] to improve the SteriSafe offering, which gives us an ability to increase value for our customers and an opportunity to also accelerate revenue growth and profitability" (¶ 271).[31] Plaintiffs also challenge several statements that Stericycle was a "[p]roven integrator having successfully completed 425 acquisitions" (*see, e.g.*, ¶ 347) and had "demonstrated a consistent ability to integrate [its] acquisitions into [its] operations successfully" (*see, e.g.*, ¶ 349),[32] which are classic examples of puffery. *See, e.g.*, *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 745 (7th Cir. 1997) ("The heart of a reasonable investor does not

---

[30] Stericycle's public filings consistently said that: "Substantial price reductions could significantly reduce our earnings." *See, e.g.*, Ex. 29 at 12, Ex. 30 at 12. The market understood the risks of pricing pressure and consolidation. For example, in a February 7, 2013, report, Morgan Stanley's "Risks to the Downside" included: "Accelerating consolidation among hospital and physician customers could reduce pricing power." Ex. 31 at 2. A February 12, 2013, S&P Stock Report similarly warned of the "competitive pricing environment" and included analyst research notes from April 2012 that "competitive pricing should continue [to] limit growth." Ex. 32 at 25-26.

[31] *See also* ¶¶ 209, 217, 242, 244, 266, 275, 278, 294, 306, 414; *see generally* App'x A.

[32] *See also* ¶¶ 329, 331, 337, 361, 408; *see generally* App'x A.

begin to flutter when a firm announces that some project or process is proceeding smoothly.").

Courts regularly dismiss claims based on statements such as these. For example, another court in this district dismissed as inactionable puffery statements that a company was "well position[ed] to . . . capitalize on . . . industry growth" and that it "believ[ed] these products comprise the strongest home video game lineup in the Company's history." *Midway Games*, 332 F. Supp. 2d at 1163-65; *see also St. Lucie*, 2011 WL 814932, at *7 ("Statements regarding a company's 'strong balance sheet' or its 'proven record of growth' are immaterial puffery that no reasonable investor would rely on.").

### d. **Mischaracterized Statements**

Finally, Plaintiffs' claims fail as to the remaining statements for the simple reason that the statements do not say what Plaintiffs allege.

***First,*** Plaintiffs allege that statements estimating that SQ growth attributable to price increases represented "a little bit over the CPI" (2.67%) were false and misleading "because Stericycle was systematically increasing the rates it charged to SQ customers by 18% every six months—*i.e.*, well in excess of the approximately 2% growth in the CPI." ¶¶ 231, 236.[33] Calling this a "strained reading" would be generous. Defendant ten Brink was asked by an analyst to account for the 8% growth in domestic SQ business and responded that approximately one third of that growth (2.67%) was due to price increases. ¶ 231. He ***did not*** say that the Company was increasing particular customers' prices by 2.67%, but instead attributed one-third of the Company's overall SQ growth to price increases. *Id.*

***Second,*** Plaintiffs contend a disclosure in Stericycle's 10-K that "Steri-Safe revenues are recognized evenly over the contractual service period" was false and misleading because the

---

[33] *See also* ¶¶ 240, 248, 274, 278; *see also* App'x A at 17-18.

"rates increased and compounded every six months." ¶¶ 212, 214(vii).[34]  Plaintiffs' selective quotation omits the surrounding text, which makes clear that "revenues are recognized evenly" does not mean that individual customer revenue would not increase over time, but rather that, from an accounting perspective, the Company recognized its overall "Steri-Safe revenues . . . evenly over the contractual service period."  *See* Ex. 29 at 19.

*Third,* Plaintiffs claim that statements describing Stericycle's fees as "predetermined" or "flat" were false or misleading because Stericycle's prices increased.  ¶¶ 212, 244, 266, 290, 313; *see also* App'x A at 21-22.  Here again, the full disclosures make clear what the terms mean.  For example, in its 2013 10-K, Stericycle explained that "[c]ustomers for our Steri-Safe service pay a ***predetermined subscription fee in advance*** for regulated waste collection and processing services."  Ex. 30 at 5.  Likewise, in its 2015 10-K, the Company stated "we developed comprehensive, no-hassle compliance programs which feature ***scheduled service at low, flat monthly fees***."  Ex. 33 at 2.  As clearly indicated, customer rates were "predetermined" or "flat" insofar as they were set and paid prior to the provision of services, as opposed to being based on the customer's ***use*** of the services.  Stericycle never said those fees would not increase.[35]

### C.  Plaintiffs Fail to Plead Particularized Facts Giving Rise to a Strong Inference of Scienter as Required by the PSLRA

The FAC should also be dismissed for failure to allege with particularity facts that create a strong inference that any alleged misstatement or omission was made with scienter.  Scienter is

---

[34] *See also* ¶¶ 244, 266, 290; App'x A at 21.

[35] Indeed, Stericycle explicitly disclosed that it has the ability to increase prices.  *See, e.g.*, Ex. 29 at 3 ("We are also generally protected from the cost of regulatory changes or increases in fuel, insurance or other operating costs because our regulated waste contracts typically allow us to adjust our prices to reflect these cost changes.").  Further, contrary to Plaintiffs' contentions (¶ 48), this disclosure does not promise that changes in law or increases in costs are the ***only*** bases on which it can increase prices.

"an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Higginbotham*, 495 F.3d at 756; *supra* Part I; *see Pugh*, 521 F.3d at 693. To avoid dismissal, a plaintiff must plead facts as to ***each defendant*** "rendering an inference of scienter ***at least as likely*** as any plausible opposing inference." *Tellabs*, 551 U.S. at 328 (emphasis in original). Plaintiffs fail to do that here. With respect to both API and ERP claims, the more plausible inference is that Defendants believed their statements at the time they were made, even if actual results differed from their expectations. *See, e.g.*, *W. Pa. Elec. Employees Pension Tr. v. Plexus Corp.*, 2009 WL 604276, at *5 (E.D. Wis. Mar. 6, 2009) (finding the inference that defendants believed their statements, but "that their expectations were not realized," more compelling than the alternative).

    As an initial matter, the FAC fails to adequately plead scienter because it is riddled with impermissible "group pleading." Rather than analyze each Defendant's state of mind, Plaintiffs allege generally what "the Defendants knew" or "the Officer Defendants knew," usually by virtue of their positions and presumed access to non-public information, and often failing to distinguish between the Officer Defendants. *See, e.g.*, ¶ 120 ("[A]n executive guest was present."); ¶ 124 ("As a result of the Officer Defendants extensively tracking Stericycle's revenue loss due to its discounting of customer contracts and customer attrition, the Officer Defendants knew or recklessly disregarded that the Company's APIs were negatively impacting revenues and growth."); ¶ 365 ("[T]he Officer Defendants had access to the internal Stericycle policies, documents and information that would have confirmed (rather than undermined) the customers' claims."); *see also* ¶¶ 2, 27, 129, 320, 376, 429, 433. The Seventh Circuit rejects group pleading in assessing scienter, and requires that a complaint create a strong inference of scienter as to each Defendant. *Pugh*, 521 F.3d at 693-95. Generalized allegations, such as those in the FAC,

asserting that "Defendants knew or recklessly disregarded," or which "rel[y] on the defendants' positions in the company as a basis for inferring their states of mind" must be disregarded. *Harley-Davidson*, 660 F. Supp. 2d at 995-96. On this basis alone, the FAC should be dismissed.

### 1. Plaintiffs Fail to Plead Scienter for the API Claims

In addition, to support their API theory, Plaintiffs impermissibly leap from asserting that Defendants knew about APIs, customer losses, and certain lawsuits to a conclusion that Defendants knew their statements about revenues and growth were false or misleading. But Defendants' knowledge of those *topics* does not establish that they knew their statements about the Company's performance were misleading. Plaintiffs plead no facts—direct or circumstantial—regarding any Defendant's state of mind with respect to any particular statement. They do not claim any Defendant ever acknowledged a misstatement or omission. They do not identify any evidence that Defendants possessed information that contradicted their public statements. Rather, Plaintiffs' attempts to establish an inference of scienter related to the API claims break into six main categories, none of which is sufficient.

*First,* as discussed previously, Plaintiffs rely heavily on statements from confidential witnesses that the Seventh Circuit has said must be discounted. *See supra* Part III.B.2; *see also, e.g.*, ¶¶ 8, 65, 85, 87, 109, 111, 137. Confidential witness allegations are inherently suspect, particularly when relied upon to establish the requisite strong inference of scienter: "It is hard to see how information from anonymous sources could be deemed 'compelling' or how we could take account of plausible opposing inferences. Perhaps these confidential sources have axes to grind. Perhaps they are lying. Perhaps they don't even exist." *Higginbotham*, 495 F.3d at 757.

*Second,* Plaintiffs point to some deposition testimony from the Customer Class Action that purportedly shows that "the Officer Defendants were directly involved in developing and implementing" the APIs (¶ 364), including, for example, testimony that allegedly demonstrates

that "upper management were responsible for the [APIs]" and that Brent Arnold and Rich Kogler "were involved in the decision . . . to impos[e] [the APIs] every six months" (¶ 364(a), (e)).  *See also* ¶ 364 (b)-(d).  That Defendants knew about APIs does not establish knowledge that these strategies violated customer contracts, were fraudulent, or were unsustainable.  Still less would it support an inference that Defendants actually knew their statements about growth and revenue were not true.  While "[o]fficers of a company can be assumed to know of facts critical to a business's core operations . . . respective positions within the company prove nothing about fraud or knowledge thereof."  *Zimmer*, 673 F. Supp. 2d at 746-47.  Where the complaint does not "include any allegation that any Individual Defendant had been actually aware of any material information, Plaintiff cannot rely on Defendants' implied knowledge to establish a strong inference of scienter."  *Id.* at 747.

**Third,** Plaintiffs allege that Defendants were aware of a trend of customer losses and pricing pressure because certain Individual Defendants "received" or "monitored" reports that tracked revenue and retention rates against price increases (¶ 364(g)-(h)), had "looked at" pricing pressure (¶ 389), and/or attended meetings "in which retention numbers were discussed" or "which addressed customer losses" (¶¶ 364(f), 371).[36]  This is insufficient.  As the court in *Harley-Davidson* held, general allegations that certain Defendants received reports or attended meetings in which a certain topic was discussed are insufficient absent "fact-based connections between a speaker, a statement, and specific, contradictory information presumably known to that speaker at the time the statement was made."  660 F. Supp. 2d at 1000.

**Fourth,** Plaintiffs claim that Defendants "were put on notice of allegations by Stericycle customers that the Company was over-charging them" through the allegations in the lawsuits.  ¶

---

[36] *See also, e.g.*, ¶¶ 120, 123-24.

365.  As discussed *supra* Part III.A, there is no doubt that the pleadings in certain lawsuits contained allegations directly related to Defendants' alleged fraudulent intent in propounding the API practices.  That, however, does not imply that Defendants' subsequent statements about the Company's revenues and growth were made with intent to deceive.  Plaintiffs try to distract from the flaw in their argument—this mismatch in time and subject matter—by pointing to hypothetical access Defendants had to hypothetical information that "would have" substantiated customers' claims.  *See, e.g.*, ¶ 365 ("Unlike investors, the Officer Defendants had access to the internal Stericycle policies, documents and information that would have confirmed (rather than undermined) the customers' claims").  As discussed *supra* Part III.B.4.a, it is black-letter law that this sort of allegation does not meet the PSLRA's heightened pleading standards.

*Fifth,* Plaintiffs rely heavily on the story of one employee, a former "Vice President," Michael Kravets, apparently derived from excerpts of deposition transcripts.  ¶¶ 130-36.  The FAC is vague as to the dates, participants, and contents of all of these alleged conversations, but claims that Kravets expressed concern about APIs and their impact on the business to some of the Defendants, and was allegedly told (or, seemingly more often, received "a message" from one executive through another) not to raise the issue.  *Id.*  Plaintiffs give no information about the basis, if any, for Mr. Kravets' concern about APIs.  Vague allegations that one employee expressed concerns about a business practice or its impact on the business do not establish that the strategy itself was fraudulent, let alone that Defendants were in possession of facts contradicting their public statements or acted with an intent to defraud.  *See, e.g.*, *City of Brockton Ret. Sys. v. Avon Prods., Inc.*, 2014 WL 4832321, at *24 (S.D.N.Y. Sept. 29, 2014) (dismissing scienter allegations predicated on "[t]he mere fact that [defendant] received [a] whistleblower letter").  Further, the only information provided by Plaintiffs about the dates of

any alleged conversations between Kravets and Stericycle leadership is that they occurred "as far back as 2009 or 2010." ¶ 130. This is important for two reasons. If Kravets' concern was that APIs "actually caused Stericycle to lose more revenue than it was gaining through the price increases" (*id.*), he was **wrong**. Stericycle experienced "astronomical" growth from the time of Kravets' alleged warning in 2009 or 2010 until the end of 2015. ¶ 52. This undercuts any inference that Defendants were reckless if, in fact, they did not take his alleged warnings seriously. Moreover, it is inconceivable that concerns raised by one employee **three to four years before** the class period began gave Defendants knowledge **at the time** that their class-period statements were false or misleading.

**Sixth,** Plaintiffs' conclusory statements that, in effect, Defendants had knowledge because these were significant issues are "**must have known**"-type allegations, which are insufficient as a matter of law. For example, Plaintiffs allege that the "Officer Defendants imposed the automatic price increases in order to achieve revenue goals," "meeting these goals **necessarily required coordination at Stericycle's highest levels**" and "Stericycle **executives necessarily needed to authorize the resources** required to staff and fund the Company's rapidly-expanding Retentions Department." ¶¶ 369-70; *see also* ¶¶ 129, 376,[37] 379. Courts in this district have consistently found such unsupported assumptions insufficient to establish scienter. In *Greer v. Advanced Equities, Inc.*, the court rejected plaintiffs' argument that because the alleged misrepresentations and omissions "were highly material and went to the core of [the company's] technology, management, and financial health, the defendants must have had the requisite intent." 683 F. Supp. 2d 761, 775-76 (N.D. Ill. 2010). Similarly, in *Roth v. OfficeMax,*

---

[37] Plaintiffs' attempt to characterize the allegations in ¶ 376 regarding Stericycle's letter to the SEC as evidence of scienter rely on innuendo (e.g., alleging that "a lack of transparency in the Company's financial statements was, thus, beneficial to the Defendants' scheme") without factual support and is therefore insufficient like the other conclusory allegations.

*Inc.*, the court rejected allegations that because of a company's "top-down management style," executives "must have known" about "red flags" that would have put defendants on notice of a purported fraud. 527 F. Supp. 2d 791, 798-99 (N.D. Ill. 2007). None of these allegations support a cogent inference of scienter and Plaintiffs ignore that the opposing inference—that Defendants believed their public statements concerning revenue, growth, and the lawsuits were true—is much more plausible.

### 2. Plaintiffs Fail to Plead Scienter for the ERP Claims

With respect to Stericycle's statements that the Company successfully integrated its acquisitions, Plaintiffs ***fail to put forth a single specific allegation of scienter***. Even if the general catch-all allegation that Defendants "knew or recklessly disregarded" the alleged falsity of their statements were taken as an attempt to plead scienter (¶ 429), this conclusory language falls far short of the PSLRA's heightened pleading standard. Because Plaintiffs point to no evidence ***whatsoever*** to suggest that Defendants intentionally misrepresented Stericycle's ability to integrate its acquisitions, Plaintiffs' ERP claims necessarily fail.

### 3. Plaintiffs' Attempt to Plead Scienter Through Motive Fails

As the Seventh Circuit recently recognized, "[w]ithout a motive to commit securities fraud, businessmen are unlikely to commit it." *City of Livonia Employees' Ret. Sys. & Local 295/Local 851 v. Boeing Co.*, 711 F.3d 754, 758 (7th Cir. 2013). Plaintiffs attempt to establish motive through Defendants' possession and sale of stock but do not plead that Defendants' trading patterns were out of line with trades prior to the class period. ¶¶ 378, 387-92. As the Seventh Circuit made clear in *Pugh*, "because executives sell stock all the time, stock sales must generally be unusual or suspicious to constitute circumstantial evidence of scienter." 521 F.3d at 695. To qualify as "'unusual' or 'suspicious,' the [alleged] insider trading must be 'dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from

undisclosed inside information.'" *Johnson v. Tellabs, Inc.*, 262 F. Supp. 2d 937, 956 (N.D. Ill. 2003). The FAC contains no allegations to that effect (connected to either the ERP or API theories of fraud) and Plaintiffs have previously acknowledged that such an "'apples to apples' comparison [is] unworkable" in this case. *See* Pls.' Resp. (Dkt. 58) at 35 n.32. In fact, Plaintiffs concede that "trading *decreased* for Defendants Arnold, Kogler, ten Brink and Ginnetti during the Class Period compared with the prior period of similar length." ¶ 392. Plaintiffs also fail to plead facts establishing a connection between Defendants' sales and the allegedly misleading statements—i.e., that the trades were made specifically "at times calculated to maximize the personal benefit from undisclosed inside information." *Johnson*, 262 F. Supp. 2d at 956.

### D. The FAC Does Not Establish Loss Causation for API or ERP Claims

The 10(b) and 10b-5 claims should be dismissed for the separate and independent reason that the FAC fails to adequately allege—under either the API or ERP theory—that the purported misrepresentations and omissions proximately caused Plaintiffs' alleged economic loss. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345-46 (2005). Loss causation is typically shown through a "corrective disclosure," "where the truth about previously misrepresented information is revealed and is followed by a decline in share price." *Norfolk Cnty. Ret. Sys. v. Ustian*, 2009 WL 2386156, at *5 (N.D. Ill. July 28, 2009). To establish loss causation plaintiffs need to establish that it was the revelation of "the *very facts* about which the defendant lied which caused [their] injuries." *Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 842 (7th Cir. 2007). Here, Plaintiffs cannot establish either that the supposed "corrective disclosures" revealed the alleged fraud or caused Stericycle's stock to drop.

### 1. Plaintiffs Fail To Allege Corrective Disclosures

To establish loss causation on the API claims, Plaintiffs need to show not only an injury, but an injury caused by the disclosure of the *specific risk* here alleged to have been undisclosed:

that Stericycle's pricing practices caused customers to cancel or renegotiate their contracts which hurt Stericycle's revenues. The FAC fails to make that connection.

For example, Plaintiffs assert that on October 22, 2015, the truth about the purported API fraud began to emerge when Stericycle reported lower than expected earnings per share. ¶¶ 145-47. Plaintiffs argue that this disclosure "partially revealed to the market the negative financial impact that the Company was facing *as a result of* the large numbers of SQ customers who were leaving the Company or exerting pricing pressure on Stericycle to re-negotiate their contracts with Stericycle at lower prices." ¶ 148. This, however, is akin to reading "coded messages" into Stericycle's disappointing financial results, which the Company attributed to unrelated issues like unfavorable foreign exchange rates, lower fuel surcharges and a decrease in industrial (not SQ) waste volumes. Ex. 19 at 3 (cited in part ¶¶ 146-47, 151). Plaintiffs' tactic has been criticized by courts: "[s]o long as there is a drop in a stock's price, a plaintiff will always be able to contend that the market 'understood' a defendant's statement precipitating a loss as a coded message revealing the fraud. . . . Loss causation requires more." *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1064 (9th Cir. 2008). [38]

Similarly, on April 28, 2016, Stericycle again announced results below expectations, lowered 2016 guidance, and discussed anticipated pricing pressure stemming from historically low-margin LQ customers' acquisitions of historically high-margin SQ customers. Stericycle stated, "*we believe we will see some pricing pressure* on hospital-affiliated SQ accounts *as these contracts come up for renewal*." ¶ 157. In Plaintiffs' world, the LQ customers' ability to renegotiate contracts for acquired entities revealed "that the SQ customers' rates were not only

---

[38] The same is true for the alleged revelations on February 4, July 28, and September 2, 18 and 19. *See* Defs.' Reply Mem. in Supp. of Defs.' Mot. to Dismiss the Third Amend. Compl. (Dkt. 65) at 15 n. 32-33.

excessive but . . . lacked any legal basis in the SQ customers' contracts." *Id.* This goes beyond finding "coded messages" to making up an alternate world out of whole cloth. Of course, when smaller customers are acquired by larger customers and renegotiate their contracts, they have more leverage to negotiate prices. Plaintiffs' suggestion that this is evidence that the rates "lacked any legal basis" (*id.*) is simply false.

*Boca Raton Firefighters' & Police Pension Fund v. DeVry Inc*., is instructive as to API claims. 2012 WL 1030474 (N.D. Ill. Mar. 27, 2012). There, as here, the plaintiff argued that the defendant's stock price declined as the truth about an allegedly predatory business model (that for-profit schools allegedly engaged in abusive and fraudulent recruiting and financial aid lending practices) leaked out into the market in a series of partial disclosures. *Id.* at *1, *14. There, as here, the "partial disclosures" were simply negative news, and not disclosures of any fraud. The court looked behind the plaintiff's bare assertions—that the stock price declined because the truth about the predatory business model leaked out through various reports and articles and statements by the company—and "scrutinize[d] the content of the alleged disclosure[s]" to determine whether they actually disclosed the information defendants allegedly concealed. *Id.* at *13-19. Ultimately, the court found that "the [plaintiff]'s theory—that the market learned about [defendant]'s fraud even though no fraud was ever disclosed—does not hold together." *Id.* at *18 (citing *Swanson v. Citibank, N.A*., 614 F.3d 400, 404 (7th Cir. 2010)). Similarly here, Plaintiffs leap from disclosures about disappointing financial results to concluding that the results must have been due to customers learning of the APIs and cancelling their contracts. There is simply no basis for this speculation.

Likewise, Stericycle's announcement regarding the ERP is also not a corrective disclosure. As discussed *supra* Part III.B.3, the announcement that Stericycle intended to

implement a plan to integrate "*systems from [its] acquisitions*" did not reveal that Stericycle's statements about successfully integrating those *companies* were false or misleading. Furthermore, Stericycle discussed its plan to implement an ERP system across its acquisitions well before February 21, 2018.

### 2. Plaintiffs Cannot Establish that Pricing Pressure or ERP-Related Announcements Caused Their Losses

In addition to failing to allege a corrective disclosure under any theory, Plaintiffs also cannot "isolate the extent to which a decline in stock price is due to fraud-related corrective disclosures and not other factors." *Glickenhaus & Co. v. Household Int'l, Inc*., 787 F.3d 408, 421 (7th Cir. 2015). In other words, Plaintiffs cannot establish that their losses occurred *because of* the alleged pricing or ERP-related statements and not the other negative information disclosed on those days.

Here, Defendants' disclosures included numerous pieces of information about the Company's performance and financial health—no single piece of which can be said to have proximately caused Plaintiffs' losses. Plaintiffs' allegations regarding the February 21, 2018 stock drop highlight this fundamental flaw in Plaintiffs' case. The FAC alleges that Stericycle's stock dropped on February 21 because of revelations about the so-called API scheme. *See* ¶¶ 193-203. On that same day, however, the Company also announced a plan to invest $275 to $300 million in a Business Transformation Plan. ¶ 200. Unable to disaggregate the effect of these announcements, Plaintiffs claim that the February 21 decline was also due to the revelation of a second "scheme to conceal . . . Stericycle's integration failures." ¶ 395; *see also* ¶ 200, 396. Which is it? Plaintiffs' inability to answer that question underscores the disconnect between Plaintiffs' losses and the supposed revelation of the alleged API fraud.

Not only can Plaintiffs not decide which theory of liability caused the stock to drop on

February 21, 2018, but where Plaintiffs previously claimed that the "truth" about the alleged API fraud had emerged by September 2016, they now maintain that shareholders did not learn the truth until *a year and a half after Plaintiffs filed their complaint*.[39]  It is inconceivable that any investor could be unaware of the Company's pricing practices after Plaintiffs' complaint based on the API theory of securities fraud was filed.  Plaintiffs' attempt to assert otherwise only highlights that the shareholders' injuries could not have been caused by the revelation of a previously unknown fraud.  Ultimately, Plaintiffs' assessment of when the "truth" emerged appears to be informed by current stock price (i.e., Plaintiffs' damages) and not the content of the Company's disclosures.

### 3. The Lack of Stock Drops After Announcements Directly Related to API Claims Undermines Any Attempt to Show Loss Causation on That Theory

Perhaps the best evidence that Plaintiffs' speculations about loss causation under their API theory are unfounded is the market's reaction (or lack thereof) to events during the class period that are most directly related to the API disputes: (1) the January 8, 2013 unsealing of the *qui tam* complaint; (2) the March 8, 2013 filing of the Customer Class Action; (3) Stericycle's March 18, 2013 8-K announcing the Customer Class Action; (4) Stericycle's announcement on October 8, 2015, that it would pay $26.75 million to settle the *qui tam* case; and (5) Stericycle's announcement on August 2, 2017, that it would pay $295 million to settle the Customer Class Action.  *See* ¶¶ 58, 104, 318; *see also* Exs. 3, 9, 10, 16, 20.  If revelations about the "API fraud" caused Stericycle's stock to drop—as Plaintiffs allege—the stock would have dropped with these announcements.  It did not.  Specifically, the stock did not drop on January 8, 2013 when the *qui*

---

[39] In fact, Plaintiffs deleted part of ¶185 of their prior complaint, alleging that Defendants discussed SQ pricing pressure in October 2016, seemingly to now claim that the "truth" wasn't revealed until more than a year later.

*tam* complaint was unsealed[40] or on March 8, 2013 when the Customer Class Action was filed.[41] On March 18, 2013 when Stericycle filed an 8-K disclosing the Customer Class Action, the stock declined 94 cents, and rebounded the next day to a high of $102.06.[42]  Additionally, Plaintiffs have not alleged any stock drop related to the settlement of these cases, because none occurred.[43] In fact, Plaintiffs admit that the stock *rose* following the August 2 announcement of the Customer Class Action settlement.  *See* ¶¶ 184, 192.[44]  The market's non-reaction or positive reaction to these announcements, which *related directly* to the allegedly fraudulent pricing practices, undermines any suggestion that the stock drops that Plaintiffs point to were due to "revelations" about this supposed fraud.

## IV.  PLAINTIFFS' SECURITIES ACT SECTION 11 AND SECTION 12(A)(2) CLAIMS FAIL

The FAC asserts violations of Securities Act Sections 11 and 12(a)(2) in relation to Stericycle's September 2015 public offering of depositary shares, which was accompanied by a Registration Statement, Prospectus, and other materials, and which incorporated by reference Stericycle's Form 10-K for 2014 (filed on March 2, 2015) and Form 10-Qs for the first two quarters of 2015 (collectively, the "Offering Materials").  ¶¶ 401-06.  "Sections 11 and 12(a)(2) of the Securities Act are provisions with parallel elements."  *City of New Orleans Employees' Ret. Sys. v. PrivateBankcorp, Inc.*, 2011 WL 5374095, at *9 (N.D. Ill. Nov. 3, 2011).  Section 11

---

[40] *See* Ex. 8 (**Jan. 8, 2013**: open: $95.34, close: $95.01, vol.: 314,500; **Jan. 9, 2013**: open: $95.80, close: $95.40, vol.: 581,300).

[41] *See* Ex. 34 (**Mar. 7, 2013**: open: $97.69, close: $97.36, vol.: 271,500; **Mar. 8, 2013**: open: $97.76, close: $98.49, vol.: 247,400; **Mar. 11, 2013**: open: $98.61, close: $99.13, vol.: 390,300).

[42] *See* Ex. 15 (**Mar. 15, 2013**: open: $101.38, close: $102.04, vol.: 911,200; **Mar. 18, 2013**: open: $101.42, close: $101.10, vol.: 441,000; **Mar. 19, 2013**: open: $101.00, close: $101.54, vol.: 377,600).

[43] *See* Ex. 17 (**Oct. 7, 2015**: open: $144.11, close: $144.70, vol.: 764,500; **Oct. 8, 2015**: open: $144.67, close: $146.83, vol.: 748,000; **Oct. 9, 2015**: open: $147.15, close: $148.63, vol.: 407,200).

[44] *See* Ex. 21 (**Aug. 2, 2017**: open: $77.07, close: $76.02, vol.: 577,100; **Aug. 3, 2017**: open $79.69, close: $82.76, vol.: 2,753,200; **Aug. 4, 2017**: open $80.50, close: $78.45, vol.: 2,662,100).

imposes liability for material misrepresentation or omission in a Registration Statement; Section 12 imposes liability for misrepresentations or omissions in a Prospectus. 15 U.S.C. § 77k(a); 15 U.S.C. § 77l (a)(2). Neither imposes liability here.

### A. Plaintiffs Fail to Plead any Material Misstatements or Omissions in the Offering Materials for the Depositary Shares

To state claims for violations of Section 11 and Section 12(a)(2), "a plaintiff must show that the relevant communication either misstated or omitted a material fact," *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 109 (2d Cir. 2011), the same as in the case of an Exchange Act Section 10(b) and Rule 10b-5 claim. *See In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010). Securities Act claims ordinarily do not need to be pled with particularity, unless they "sound in fraud." *Rombach v. Chang*, 355 F.3d 164, 171-72 (2d Cir. 2004). Here, Plaintiffs' Section 11 and 12(a)(2) claims do, in fact, "sound in fraud" and therefore must be pled with particularity. Plaintiffs state unequivocally that "[t]his is a case about a company that artificially inflated its publicly-reported financial results by perpetrating a massive pricing fraud against its own customers," (¶ 1) and repeatedly charge Defendants with intentionally misleading the market and deliberately concealing supposedly unfavorable information. *See, e.g.*, ¶¶ 2, 56, 143, 145. These fraud allegations are at the heart of the FAC and necessarily trigger the heightened fraud pleading standard for all of Plaintiffs' claims. Rule 9(b) applies where, like here, the complaint "is riddled with references to fraud, showing that this theory pervades [plaintiffs'] entire case." *See Borsellino*, 477 F.3d at 507. Plaintiffs' attempt to avoid Rule 9(b)'s heightened requirements by disclaiming allegations of fraud in their Section 11 and 12(a)(2) claims fails. "Rule 9(b) applies to all allegations of fraud, not just claims of fraud." *Greer*, 683 F. Supp. 2d at 767 (applying particularity requirement to Securities Act claim); *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 635 (S.D.N.Y. 2005) ("Plaintiffs cannot

evade the Rule 9(b) strictures by summarily disclaiming any reliance on a theory of fraud or recklessness.").

As discussed *supra* Part II, Plaintiffs do not meet the Rule 9(b) pleading standard because they fail to plead with particularity that Stericycle's public statements, including the Offering Materials, contained any material misstatements or omissions. To begin with, none of the supposed misstatements cited in the FAC from prior to the filing of Stericycle's Form 10-K on March 2, 2015 (such as the various referenced filings, press releases, and conference calls from 2013 and 2014) support Plaintiffs' Section 11 or Section 12(a)(2) claims, because they were not incorporated into the Offering Materials. Also irrelevant are, naturally, any alleged misstatements from after the September 2015 offering, including all of the various cited statements from Stericycle's public disclosures between October 2015 and May 2017. As Plaintiffs acknowledge, that leaves only the Prospectus for the offering and the three SEC filings they cite as to their Securities Act claims, namely, the Form 10-K for 2014 and Form 10-Qs for the first two quarters of 2015. ¶¶ 406-16. Plaintiffs do not adequately plead any material misrepresentations in any of those documents.

Instead, amidst this narrower range of disclosures, Plaintiffs point to certain statements about revenues and growth, customer loyalty, and optimism for the future and summarily conclude they necessarily constitute material misrepresentations because they are all premised on an undisclosed pricing fraud on Stericycle's customers. *Id.* To be actionable however, "a statement must be false or misleading at the time it was made." *City of New Orleans Employees' Ret. Sys.*, 2011 WL 5374095, at *9. "How things turn out *ex post* do[es] not matter to liability." *Id.* (citing *Eckstein v. Balcor Film Investors*, 58 F.3d 1162, 1169 (7th Cir. 1995)).

Nowhere in Plaintiffs' circular and conclusory pleading do they allege facts establishing

41

that Stericycle's then-present assessments of its performance or revenue were false or misleading. To the contrary, as described above, Plaintiffs misleadingly strip statements of context so as to create an appearance of inaccuracy where there was none. *See, e.g.*, ¶ 407 (quoting the Company's statement that "Steri-Safe revenues are recognized evenly over the contractual service period"). Plaintiffs also latch onto statements that their own pleading concedes were true. For example, they allege as false the statement that Stericycle's contracts "typically allow us to adjust our prices to reflect . . . cost changes," (*see id.*; *see also* ¶ 416) yet the FAC expressly cites language from a Steri-Safe Service agreement saying exactly that. ¶ 47.

Plaintiffs additionally cite statements reflecting typical, immaterial puffery, *see, e.g.*, ¶ 407 (quoting the Company's statement of belief that SQ customers "appreciate the value of the services that [it] provide[s]"), and statements of opinion, *see, e.g.*, *id.* (quoting the Company's statement that "[w]e believe that" SQ customers "understand the potential risks of failing to comply with applicable regulations"), which are not actionable absent pleading that the speaker did not sincerely believe the statement. *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1326 (2015). Plaintiffs' reliance on the bare assertion that Defendants "knew" the purported "scheme" concerning SQ customer contract price increases "was unsustainable," based seemingly on concerns voiced by one employee that price increases could lead to lost business, ¶¶ 2, 129-36, is not remotely sufficient to meet that standard.

Even assuming that customers were cancelling contracts as a result of APIs as Plaintiffs allege, Plaintiffs bear the burden of alleging with particularity that this "resulted in significant negative consequences which were known to Defendants." *See Zimmer*, 673 F. Supp. 2d at 735. As discussed *supra* Part III.C.1, Plaintiffs have failed to meet this burden.

Additionally, as noted *supra* Part III.B.4.b., the forward-looking statements contained in

Stericycle's filings contained meaningful cautionary language, which shields those statements from liability for alleged Securities Act violations. 15 U.S.C. § 77z-2(c); *In re Newell Rubbermaid Inc. Sec. Litig.*, 2000 WL 1705279, at *10 (N.D. Ill. Nov. 14, 2000).

### B. The FAC Fails to Adequately Plead Section 12(a)(2) Standing

In addition to the pleading defects noted above, the FAC confirms Plaintiffs' inability to plead standing to assert their Section 12(a)(2) claim against the Underwriter Defendants. Of the two named Plaintiffs, only Arkansas Teacher Retirement System ("ATRS") claims to have purchased any of the depositary shares upon which Plaintiffs' Section 12(a)(2) claim relies. *See* ¶¶ 19-20. In Plaintiffs' prior complaint, ATRS asserted that its purchases were "traceable" to the initial offering of the depositary shares (*see* Dkt. 50, ¶ 20) and did not allege any purchases directly in that offering. Defendants' Prior Motion observed, however, that "unlike a Section 11 claim which may be brought by any purchaser of the relevant security who can trace their shares to an allegedly misleading registration statement . . . a plaintiff seeking redress pursuant to Section 12(a)(2) must establish that it purchased the security directly from defendants through the public offering at issue." *In re CitiGroup Inc. Bond Litig.*, 723 F. Supp. 2d 568, 585 (S.D.N.Y. 2010) (noting that "[p]urchasers in . . . secondary market offerings do not have standing to bring actions under Section 12(a)(2)"); *see also Pub. Employees' Ret. Sys. of Miss. v. Merrill Lynch & Co. Inc.*, 714 F. Supp. 2d 475, 484 (S.D.N.Y. 2010) (dismissing Section 12(a)(2) claim for failure to "expressly allege" standing by "directly purchas[ing] the securities from the underwriting defendants in the subject public offering(s), and not in the secondary market").

Plaintiffs contested this pleading defect by attaching to their opposition brief an account statement listing ATRS's purchases of depository shares over time. *See* Pls.' Resp. (Dkt. 58) at 44, and Ex. 1 (Dkt 60-1). Some of the listed purchases were shown to have been made on the

same day as the initial offering, but the account statement included no information as to whether those purchases were made in the initial offering, or in the immediate aftermarket, and thus did not remedy Plaintiffs' failure to plead a direct purchase. *Cf. Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 901 (4th Cir. 2014) (dismissing Section 12(a)(2) claim for lack of standing where plaintiff pled purchases "pursuant and/or traceable to" the offering, despite that plaintiff attached trade confirmation of purchase that referenced initial offering materials).

Notwithstanding this history, the FAC, like the prior complaint, alleges only that ATRS purchased depositary shares "traceable to the Offering." *See* ¶ 20. Thus, the FAC confirms that Plaintiffs' prior allegation of mere traceability was no accident, and that the Court should not interpret Plaintiffs' ambiguous account statement to plausibly plead that ATRS purchased depositary shares directly in the initial offering. Accordingly, because Plaintiffs allege only that they purchased shares "traceable" to the offering, which is not sufficient to plead standing to assert a claim under Section 12(a)(2), their Section 12(a)(2) claim should be dismissed. *Pub. Employees' Ret. Sys. of Miss.*, 714 F. Supp. 2d at 484; *see also In re Cosi, Inc. Sec. Litig.*, 379 F. Supp. 2d 580, 589 (S.D.N.Y. 2005) (dismissing Section 12(a)(2) claim for lack of standing where named plaintiffs alleged they purchased securities "pursuant to or traceable to" the prospectus, rather than directly in the offering).

## V. PLAINTIFFS' SECURITIES ACT SECTION 15 AND EXCHANGE ACT SECTION 20(A) CLAIMS FAIL FOR LACK OF A PREDICATE VIOLATION AND A FAILURE TO ALLEGE CONTROL LIABILITY

Securities Act Section 15 and Exchange Act Section 20(a) render control persons jointly and severally liable for primary securities laws violations committed by persons under their control. 15 U.S.C. §§ 77o, 78t(a). For the reasons set forth above, the FAC does not state predicate violations under Securities Act Sections 11 and 12, Exchange Act Section 10(b), or Rule 10b-5. Without any underlying violation of the federal securities laws, Plaintiffs' Section

15 and 20(a) claims should be dismissed. *See, e.g.*, *Tabankin v. Kemper Short-Term Global Income Fund*, 1994 WL 30541, at *6 (N.D. Ill. Feb. 1, 1994).

Plaintiffs' Section 15 claim further fails because Plaintiffs fail to sufficiently allege control person liability with respect to any of the Director Defendants (*see* ¶¶ 29-30) or Defendant Arnold. To state a claim for control person liability, Plaintiffs must allege that Defendants "actually exercised control over the general operations of the primary violator; and . . . that the control person had the power or ability (even if not exercised) to control the specific transaction that is alleged to give rise to liability." *Starr v. !Hey, Inc.*, 2003 WL 21212596, at *4 (N.D. Ill. May 23, 2003). Plaintiffs must allege "facts from which these Defendants could fairly be deduced as subject to 'controlling person' liability." *See Donovan v. ABC–NACO, Inc.*, 2002 WL 1553259, at *6 (N.D. Ill. July 15, 2002). Simply alleging the Director Defendants' positions as directors, and that they signed the Registration Statement, as Plaintiffs do here, is not enough to meet that burden. *See id.*; *see also Desai v. Gen. Growth Props., Inc.*, 654 F. Supp. 2d 836, 862-63 (N.D. Ill. 2009). Plaintiffs' Section 15 claim also fails with respect to Defendant Arnold who is simply "presumed to have the power to control" by virtue of his position as COO, and is not alleged to have exercised actual control over or signed the Registration Statement at issue.

## VI. CONCLUSION

For the foregoing reasons the FAC should be dismissed with prejudice. *See Fannon v. Guidant*, 583 F.3d 995, 1002 (7th Cir. 2009) (affirming dismissal of plaintiffs' first consolidated complaint with prejudice). Furthermore, this is the fifth complaint that has been filed in this action. *See* Dkt. 1, 5, 41, 50, 84. As the Seventh Circuit has noted, a plaintiff should "not get leisurely repeated bites at the apple, forcing a district judge to decide whether each successive complaint was adequate under the PSLRA." *Pugh*, 521 F.3d at 698; *see also Fannon* 583 F.3d at 1002. Defendants respectfully request that dismissal be with prejudice.

45

Dated: May 25, 2018

COUNSEL FOR DEFENDANTS

/s/ Michael J. Faris

Sean M. Berkowitz
Michael J. Faris
Meghan M. Hansen
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone: (312) 876-7700
Facsimile: (312) 993-9767

*Counsel for Defendants Stericycle, Inc.,
Charles A. Alutto, Dan Ginnetti,
Brent Arnold, Frank ten Brink, Richard
Kogler, Mark C. Miller, Jack W. Schuler,
Lynn Dorsey Bleil, Thomas D. Brown,
Thomas F. Chen, Rodney F. Dammeyer,
William K. Hall, John Patience, and
Mike S. Zafirovski*

/s/ Robert Y. Sperling (w/ consent)

Robert Y. Sperling
Joseph L. Motto
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
Telephone: (312) 558-5600
Facsimile: (312) 558-5700

James P. Smith, III
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166
Telephone: (212) 294-4633
Facsimile: (212) 294-4700

*Counsel for Defendants Merrill Lynch,
Pierce, Fenner & Smith, Inc., Goldman
Sachs & Co. LLC, J.P. Morgan Securities
LLC, HSBC Securities (USA) Inc., MUFG
Securities Americas Inc. f/k/a Mitsubishi
UFJ Securities (USA) Inc., Santander
Investment Securities Inc., SMBC Nikko
Securities America, Inc., and U.S.
Bancorp Investments, Inc.*

## INDEX OF EXHIBITS

| Exhibit | Description |
|---|---|
| 1. | Stericycle's Form 10-K for the period ending December 31, 2017, filed with the SEC on February 26, 2018. |
| 2. | Press Release, Attorney General Eric T. Schneiderman, *A.G. Schneiderman Announces $2.4 Million Settlement with Stericycle For Overcharging NY State And Local Entities* (Jan. 8, 2013). |
| 3. | First Amended Qui Tam Complaint under Federal and State False Claims Acts, *United States ex rel. Perez v. Stericycle, Inc.*, No. 08-CV-2390 (N.D. Ill. June 28, 2010), ECF No. 5 (unsealed on Jan. 8, 2013, per Dkt. 21). |
| 4. | Keith Goldberg, *Medical Waste Co. Pays $2M to Settle NY's Overcharge Claims*, Law 360, Jan. 8, 2013, *available at* https://www.law360.com/articles/ 405585/print?section=employment https://www.law360.com/articles/405585/print?section=employment. |
| 5. | Bryan Cohen, *N.Y. AG announces $2.4 million settlement with Stericycle*, Legal NewsLine, Jan. 8, 2013, *available at* http://legalnewsline.com/stories/510514457-n-y-ag-announces-2-4-million-settlement-with-stericycle. |
| 6. | Allan Gerlat, *Stericycle Agrees to Settlement for Overcharging New York Customers*, Waste 360, Jan. 9, 2013, *available at* http://www.waste360.com/print/10807. |
| 7. | Ed Snyder & Erik Shoger, *SRCL: Settlement Charge A Non-Issue, Look For Continued Strong Internal Growth*, Northcoast Research, (Jan. 9, 2013). |
| 8. | Stericycle's stock prices between January 8, 2013, and January 9, 2013, as reported by Yahoo! Finance, *available at* https://finance.yahoo.com/quote/SRCL/history?period1=1357624800&period2=13577 11200&interval=1d&filter=history&frequency=1d. |
| 9. | Plaintiff's Class Action Complaint, *Cochranton Veterinary Hosp. v. Stericycle, Inc.*, No. 13-cv-00071 (W.D. Pa. Mar. 8, 2013) (Dkt. 1). |
| 10. | Stericycle's Form 8-K, filed with the SEC on March 18, 2013. |
| 11. | Defendant's Answer and Affirmative Defenses to First Amended Consolidated Complaint [Redacted Version], *In re Stericycle, Inc., Steri-Safe Contract Litig.*, No. 13-cv-05795 (N.D. Ill. Dec. 10, 2013) (Dkt. 74). |
| 12. | Ed Snyder & Erik Shoger, *SRCL: Class Action Lawsuit. Reiterate BUY Rating.*, Northcoast Research (Mar. 18, 2013). |

| 13. | Al Kaschalk & Scott Buck, *Reiterate OUTPERFORM; Adjusting Estimates FY13-FY15; Raising PT to $110 from $102*, Wedbush Securities (Mar. 18, 2013). |
|---|---|
| 14. | Elliott Schlang, Gregory Halter & Jason Rodgers, *Stericycle, Inc.*, Great Lakes Review (Mar. 18, 2013). |
| 15. | Stericycle's stock prices between Stericycle's stock prices between March 15, 2013, and March 19, 2013, as reported by Yahoo! Finance, *available at* https://finance.yahoo.com/quote/SRCL/history?period1=1363323600&period2=1363669200&interval=1d&filter=history&frequency=1d. |
| 16. | Press Release, Stericycle, Inc., *Stericycle Announces Settlement to End 7-Year Qui Tam Suit* (Oct. 8, 2015). |
| 17. | Stericycle's stock prices between October 7, 2015, and October 12, 2015, as reported by Yahoo! Finance, *available at* https://finance.yahoo.com/quote/SRCL/history?period1=1444194000&period2=1444626000&interval=1d&filter=history&frequency=1d. |
| 18. | Stericycle's Form 8-K, filed with the SEC on October 22, 2015. |
| 19. | Stericycle, Inc., Q3 2015 Results – Earnings Call Transcript (Oct. 22, 2015) *available at* https://www.capitaliq.com/CIQDotNet/Transcripts/Detail.aspx?keyDevId=313820332&companyId=34780. |
| 20. | Stericycle's Form 8-K, filed with the SEC on August 2, 2017. |
| 21. | Stericycle's stock prices between August 2, 2017, and August 4, 2017, as reported by Yahoo! Finance, *available at* https://finance.yahoo.com/quote/SRCL/history?period1=1501650000&period2=1501822800&interval=1d&filter=history&frequency=1d. |
| 22. | Stericycle, Inc., Q4 2012 Results – Earnings Call Transcript (Feb. 6, 2013) *available at* https://www.capitaliq.com/CIQDotNet/Transcripts/Detail.aspx?keyDevId=225774896&companyId=34780. |
| 23. | Stericycle, Inc., Q2 2015 Results – Earnings Call Transcript (July 23, 2015) *available at* https://www.capitaliq.com/CIQDotNet/Transcripts/Detail.aspx?keyDevId=304886583&companyId=34780. |
| 24. | Stericycle, Inc., Q3 2017 Results – Earnings Call Transcript (Nov. 8, 2017) *available at* https://www.capitaliq.com/CIQDotNet/Transcripts/Detail.aspx?keyDevId=539050336&companyId=34780. |

| 25. | Gary Bisbee, *Stericycle, Inc. Cut estimates & PT on weak 2018 guide; UP*, RBC Capital Markets (Feb. 22, 2018). |
|---|---|
| 26. | Sean Dodge, *Stericycle Inc. Accelerating Organic Growth Drives 4Q. Upside; Reiterate Buy*, Jeffries LLC (Feb. 5, 2014). |
| 27. | Stericycle, Inc., Q1 2017 Results – Earnings Call Transcript (May 4, 2017) *available at* https://www.capitaliq.com/CIQDotNet/Transcripts/Detail.aspx?keyDevId=424495618&companyId=34780. |
| 28. | Stericycle's Form 10-Q for the quarter ending September 30, 2017, filed with the SEC on November 8, 2017. |
| 29. | Stericycle's Form 10-K for the fiscal year ending December 31, 2012, filed with the SEC on February 28, 2013. |
| 30. | Stericycle's Form 10-K for the fiscal year ending December 31, 2013, filed with the SEC on February 28, 2014. |
| 31. | David R. Lewis, *Stericycle Inc. Solid Quarter; Signs of New Business Momentum*, Morgan Stanley (Feb, 7, 2013). |
| 32. | Standard & Poor's, *Stericycle Inc. Stock Report* (Feb. 12, 2013). |
| 33. | Stericycle's Form 10-K for the fiscal year ending December 31, 2015, filed with the SEC on March 15, 2016. |
| 34. | Stericycle's stock prices between March 7, 2013 and March 11, 2013, as reported by Yahoo! Finance, *available at* https://finance.yahoo.com/quote/SRCL/history?period1=1362636000&period2=13629 78000&interval=1d&filter=history&frequency=1d. |